# No. 14-1610-cv(L)

**14-1616-cv(con)**

## United States Court of Appeals
## For the Second Circuit

ROBERT ROSS, on behalf of himself and all others similarly situated, ANDREA KUNE, WOODROW CLARK, S. BYRON BALBACH, JR., MATTHEW GRABELL, PAUL IMPELLEZZERI, on behalf of themselves and all others similarly situated, RICHARD MANDELL, RANDAL WACHSMUTH,

*Plaintiffs-Appellants*,

HERVE SENEQUIER,

*Plaintiff,*

v.

CITIGROUP, INC., CITIBANK (SOUTH DAKOTA), N.A., CITICORP DINERS CLUB, CITIBANK USA, N.A., UNIVERSAL BANK, N.A.,

*(for continuation of caption see inside cover)*

Appeal from the United States District Court
for the Southern District of New York
Case Nos. 05-CV-7116(WHP) & 04-CV-5723(WHP)

---

### APPELLANTS' BRIEF AND SPECIAL APPENDIX

---

BERGER & MONTAGUE, P.C.
MERRILL G. DAVIDOFF
DAVID A. LANGER
1622 Locust Street
Philadelphia, PA  19103
Telephone:  (215) 875-3000
*Counsel for Plaintiffs-Appellants*
(additional counsel listed on signature block)

**ORAL ARGUMENT REQUESTED**

*(continued from cover page)*

UNIVERSAL FINANCIAL CORPORATION, DISCOVER FINANCIAL
SERVICES, INC., DISCOVER BANK, AMERICAN EXPRESS CO.,
AMERICAN EXPRESS TRAVEL RELATED SERVICES CO., INC., DB
SERVICING CORPORATION,

*Defendants-Appellees,*

BANK OF AMERICA N.A. (USA), CAPITAL ONE, J.P. MORGAN CHASE &
CO., CHASE BANK USA, N.A., HSBC FINANCE CORPORATION,
PROVIDIAN FINANCIAL CORPORATION, PROVIDIAN NATIONAL BANK,
INCORPORATED, HSBC BANK, NEVADA, N.A., CHASE BANK USA, N.A.,
CAPITAL ONE BANK (USA), N.A., FKA CAPITAL ONE BANK, CAPITAL
ONE, N.A., FKA CAPITAL ONE, F.S.B., BANK OF AMERICA, N.A.,
NATIONAL ARBITRATION FORUM, NATIONAL ARBITRATION FORUM,
CAPITAL ONE F S B, NOVUS CREDIT SERVICES, INC., MBNA AMERICA
BANK, N.A., MBNA AMERICA (DELAWARE), N.A., DFS SERVICES, LLC,

*Defendants.*

# **TABLE OF CONTENTS**

OPENING STATEMENT .........................................................................1

JURISDICTIONAL STATEMENT ........................................................4

ISSUES PRESENTED............................................................................5

STATEMENT OF THE CASE................................................................6

I.     Plaintiffs' Antitrust Claims in Two Related Matters Were Consolidated for a Five-Week Bench Trial................................................................6

II.    The Banks' Conspiracy to Adopt and Maintain CBA Clauses ....................10

    A.    The Frequency and Number of Meetings On Arbitration Among Banks Who Described Themselves as "Fierce" and "Vicious" Rivals Was Highly Unusual ........................................................................12

    B.    The Banks Create an "Arbitration Coalition" and Other Groups to Facilitate Their Inter-Firm Communications on Collectively Adopting and Maintaining CBA Clauses ........................................................13

        1.    The May 25, 1999 Meeting Among "Senior In-House Credit Card Counsel" ........................................................................13

        2.    Amex and First USA Initiate the "Arbitration Coalition" .................15

        3.    An Attempt to Expand the Arbitration Coalition to Other Industries Fails ........................................................................23

        4.    The Banks Create a Bank-Only Group Called the "In-House Counsel Group"........................................................................25

        5.    A Timeline of the Meetings, Calls and CBA Clause Adoptions ........27

        6.    The Arbitration Coalition Facilitated Other "External" Direct Communications Among the Banks Outside of Meetings.................31

    C.    All the Banks Adopt and Maintain CBA Clauses During the Course of These Private Meetings and Calls ........................................................32

        1.    The Banks Adopt CBA Clauses During Periods Where Meeting Frequency Peaked........................................................................32

        2.    The Banks Cease Meeting After They All Add CBA Clauses ..........36

        3.    The Banks Adopted CBA Clauses on the Recommendation of Their Senior In-House Counsel Who Participated in the Arbitration Coalition ........................................................................37

i

    D.    The Banks Eschewed the Competitive Advantages of CBA Clauses In Favor of Concerted Conduct ................................................................40

    E.    The Banks' Motivation for Adopting and Maintaining CBA Clauses.....43

SUMMARY OF ARGUMENT ................................................................49

STANDARD OF REVIEW ................................................................52

ARGUMENT ................................................................53

I.    Plaintiffs Proved That the Banks Combined and/or Conspired to Adopt and Maintain CBA Clauses ................................................................53

    A.    The District Court Erred By Requiring Evidence of Explicit Agreement to Collusively Impose CBA Clauses ........................................................56

    B.    The District Court Erred by Applying An Improper and Overly Restrictive Standard for Finding Conspiracy ............................................58

    C.    The District Court Erred By Separately Examining Evidence of Conspiracy ................................................................61

    D.    The Evidence Reviewed as a Whole Demonstrates That Plaintiffs Proved the Banks Conspired to Adopt and Maintain CBA Clauses ....................65

    E.    Evidence Suggestive of Independent Conduct Is Insufficient To Undercut the Preponderance of Evidence Proving Conspiracy ..............................74

        1.    Whether the Banks May, or May Not, Have Engaged in Some Permissible Conduct Does Not Negate Reasonable Inferences of Conspiracy ................................................................75

        2.    The Record Demonstrates the Banks Did Not Independently Adopt and Maintain CBA Clauses ................................................78

        3.    The Arbitration Coalition and In-House Counsel Group Were Not Wilmer Initiated Client Development Functions ...............................80

        4.    The Banks' Denial That They Conspired to Adopt and Maintain CBA Clauses Carries Little or No Weight ..................................................83

II.    The District Court Improperly Conflated Antitrust Injury And Antitrust Standing ................................................................87

CONCLUSION ................................................................90

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Alexander v. Nat'l Farmers Org.*,
  687 F.2d 1173 (8th Cir. 1982) ...........................................................78

*Alexander v. Phoenix Bond & Indem. Co.*,
  149 F. Supp. 2d 989 (N.D. Ill. 2001) ................................................83

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
  486 U.S. 492 (1988)...........................................................................77

*AlliedSignal, Inc. v. B.F. Goodrich Co.*,
  183 F.3d 568 (7th Cir. 1999) .............................................................87

*Alvord-Polk, Inc. v. F. Schumacher & Co.*,
  37 F.3d 996 (3d Cir. 1994) ................................................................51

*Am. Soc. of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*,
  456 U.S. 556 (1982)...........................................................................77

*Am. Tobacco Co. v. United States*,
  328 U.S. 781 (1946).........................................................49, 55,74, 76

*Ambook Enterprises. v. Time Inc.*,
  612 F.2d 604 (2d Cir. 1979) .............................................49, 50, 57

*American Express Co. v. Italian Colors Rest.*,
  133 S. Ct. 2304 (2013).................................................................11, 71

*In re American Express Merchants' Litig.*,
  634 F.3d 187 (2d Cir. 2011) .......................................................11, 48

*In re American Express Merchants' Litig.*,
  667 F.3d 204 (2d Cir. 2012) ..............................................................11

*Anderson News, L.L.C. v. Am. Media, Inc.*,
  680 F.3d 162 (2d Cir. 2012) .......................................50, 55, 56, 74

*Apex Oil v. DiMauro*,
  822 F.2d 246 (2d Cir. 1987) .....................................................*passim*

*In re Artha Mgmt., Inc.*,
  91 F.3d 326 (2d Cir. 1996) .................................................................82

*AT&T Mobility v. Concepcion*,
  131 S. Ct. 1740 (2011) ......................................................................71

*In re Auto. Refinishing Paint Antitrust Litig.*,
  229 F.R.D. 482 (E.D. Pa. 2005).........................................................77

*In re Brand Name Prescription Drugs Antitrust Litig.*,
  1995 WL 509666 (N.D. Ill. Aug. 18, 1995) ......................................78

*Brown v. Pro Football, Inc.*,
  518 U.S. 231 (1996)....................................................................1, 3, 57

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
  429 U.S. 477 (1977)............................................................................87

*Catalano v. Target Sales, Inc.*,
  446 U.S. 643 (1980) .............................................................................4

*Cipollone v. Liggett Group, Inc.*,
  668 F. Supp. 408 (D.N.J. 1987) .........................................................78

*Cont'l Airlines, Inc. v. Am. Airlines, Inc.*,
  824 F. Supp. 689 (S.D. Tex. 1993) ....................................................78

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
  370 U.S. 690 (1962)........................................................51, 61, 64, 76

*In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust
  Litig.*,
  906 F.2d 432 (9th Cir. 1990) .............................................................66

*In re Currency Conversion Fee Antitrust Litig.*,
  265 F. Supp. 2d 385 (S.D.N.Y. 2003) .................................................2

*Daniel v. Am. Bd. of Emergency Med.*,
  428 F.3d 408 (2d Cir. 2005) ..............................................................88

*Disenos Artisticos E Industriales S.A. v. Work*,
  676 F. Supp. 1254 (E.D.N.Y. 1987) ..................................................89

*In re Elec. Books Antitrust Litig.*,
859 F. Supp. 2d 671 (S.D.N.Y. 2012) ...............................................70

*F.T.C. v. Actavis, Inc.*,
133 S. Ct. 2223 (2013)...................................................................51

*F.T.C. v. Ind. Fed'n of Dentists*,
476 U.S. 447 (1986)............................................................1, 4, 77

*F.T.C. v. Superior Court Trial Lawyers Ass'n*,
493 U.S. 411 (1990)........................................................................77

*Fears v. Wilhelmina Model Agency, Inc.*,
2004 WL 594396 (S.D.N.Y. Mar. 23, 2004)....................................61

*In re Fresh & Process Potatoes Antitrust Litig.*,
2012 WL 3067580 (D. Idaho July 27, 2012)....................................70

*United States v. Gen. Motors Corp.*,
384 U.S. 127 (1966)..........................................................52, 72, 73

*Geneva Pharms. Tech Corp. v. Barr Labs. Inc.*,
386 F.3d 485 (2d Cir. 2004) ..............................................................53

*Greater Rockford Energy & Tech. Co. v. Shell Oil Co.*,
998 F.2d 391 (7th Cir. 1993) .......................................................88, 89

*Haff v. Jewelmont Corp.*,
594 F. Supp. 1468 (N.D. Cal. 1984).............................................88, 89

*Hamilton v. Accu-Tek*,
935 F. Supp. 1307 (E.D.N.Y. 1996) .................................................78

*In re High Fructose Corn Syrup Antitrust Litig.*,
295 F.3d 651 (7th Cir. 2002) ...............................................51, 62, 63

*Interstate Circuit v. United States*,
306 U.S. 208 (1939)........................................................................56, 70

*Kartell v. Blue Shield of Mass., Inc.*,
749 F.2d 922 (1st Cir. 1984).................................................................1

*Klickads, Inc. v. Real Estate Bd. of N.Y., Inc.*,
  2007 WL 2254721 (S.D.N.Y. Aug. 6, 2007)......................................................77

*Krist v. Kolombos Rest. Inc.*,
  688 F.3d 89 (2d Cir. 2012) ...................................................................................52

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986)..................................................................................50, 58, 59

*MCI v. AT&T*,
  708 F.2d 1081 (7th Cir. 1983) .............................................................................78

*In re Med. X-Ray Film Antitrust Litig.*,
  946 F. Supp. 209 (E.D.N.Y. 1996) ......................................................................62

*Minpeco, S.A. v. Conticommodity Servs., Inc.*,
  673 F. Supp. 684 (S.D.N.Y. 1987) .................................................................56, 83

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
  465 U.S. 752 (1984)...................................................................................*passim*

*Nat'l Soc. of Prof'l Eng'rs v. United States*,
  435 U.S. 679 (1978)..............................................................................................77

*NCAA v. Bd. of Regents of the Univ. of Okla.*,
  468 U.S. 85 (1984).................................................................................................1

*Paramount Famous Lasky Corp. v. United States*,
  282 U.S. 30 (1930).....................................................................................1, 53, 70

*Peconic Baykeeper, Inc. v. Suffolk County*,
  600 F.3d 180 (2d Cir. 2010) ................................................................................52

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*,
  998 F.2d 1224 (3d Cir. 1993) ..............................................................................49

*Pittsburgh Plate Glass Co. v. United States*,
  260 F.2d 397 (4th Cir. 1958) ...............................................................................67

*In re Processed Egg Products Antitrust Litig.*,
  821 F. Supp. 2d 709 (E.D. Pa. 2011)...................................................................70

*Products Liab. Ins. Agency, Inc. v. Crum & Forster Ins. Companies*,
    682 F.2d 660 (7th Cir. 1982) ..............................................................83

*In re Publ'n Paper Antitrust Litig.*,
    690 F.3d 51 (2d Cir. 2012) .........................................................*passim*

*Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.*,
    364 U.S. 656 (1961).............................................................................77

*Ross v. American Express Co.*,
    2005 WL 2364969 (S.D.N.Y. Sept. 27, 2005) .................................7, 8

*Ross v. American Express Co.*,
    547 F.3d 137 (2d Cir. 2008) ................................................................8

*Ross v. American Express Co.*,
    773 F. Supp. 2d 351 (S.D.N.Y. 2011) ..........................................52, 87

*Ross v. Bank of America, N.A. (USA)*,
    2006 WL 2685082 (S.D.N.Y. Sept. 20, 2006) ....................................8

*Ross v. Bank of America, N.A. (USA)*,
    524 F.3d 217 (2008)...........................................................2, 4, 8, 90

*Ross v. Bank of America, N.A. (USA)*,
    2009 WL 151168 (S.D.N.Y. Jan. 21, 2009) .........................52, 87, 89

*Shahinian v. Tankian*,
    242 F.R.D. 255 (S.D.N.Y. 2007) ......................................................82

*Standard Iron Works v. ArcelorMittal*,
    639 F. Supp. 2d 877 (N.D. Ill. 2009)................................................76

*Starr v. Sony BMG Entm't*,
    592 F.3d 314 (2d Cir. 2010) ..............................................................56

*Stolt-Nielsen, S.A. v. AnimalFeeds Int'l Corp.*,
    559 U.S. 662 (2010)............................................................................71

*In re Tamoxifen Citrate Antitrust Litig.*,
    466 F.3d 187 (2d Cir. 2006) ..............................................................51

*Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co.*,
  305 F.3d 1124 (10th Cir. 2002) ........................................................78

*Triple M Roofing Corp. v. Tremco, Inc.*,
  753 F.2d 242 (2d Cir. 1985) ............................................................87

*United Mine Workers v. Pennington*,
  381 U.S. 657 (1965).....................................................................77, 78

*United States v. Apple, Inc.*,
  952 F. Supp. 2d 638 (S.D.N.Y. 2013) ...........................54, 66,71, 74

*United States v. Associated Press*,
  52 F. Supp. 362 (S.D.N.Y. 1943), *aff'd*, 326 U.S. 1 (1945)..............76

*United States. v. Beaver*,
  515 F.3d 730 (7th Cir. 2008) ...........................................................49

*United States v. Consol. Packaging Corp.*,
  575 F.2d 117 (7th Cir. 1978) ...........................................................57

*United States v. Cont'l Group*,
  603 F.2d 444 (3d Cir. 1979) ............................................................70

*United States v. Green*,
  523 F.2d 229 (2d Cir. 1975) ............................................................70

*United States v. N.Y. Great Atl. & Pac. Tea Co.*,
  173 F.2d 79 (7th Cir. 1949) .............................................................76

*United States v. Paramount Pictures*,
  334 U.S. 131 (1948).............................................................50, 57, 66

*United States v. Young Bros., Inc.*,
  728 F.2d 682 (5th Cir. 1984) ...........................................................67

*Venture Tech., Inc. v. Nat'l Fuel Gas Co.*,
  685 F.2d 41 (2d Cir. 1982) ..............................................................55

*Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*,
  857 F.2d 55 (2d Cir. 1988) ..............................................................77

*In re Welding Fume Products Liab. Litig*,
2010 WL 7699456 (N.D. Ohio June 4, 2010) ....................................................78

## STATUTES

9 U.S.C § 1 ............................................................................................................1

9 U.S.C § 4 ............................................................................................................8

15 U.S.C. § 1 ..................................................................................................*passim*

15 U.S.C. § 26 ...................................................................................................1, 4

28 U.S.C. § 1291 ...................................................................................................4

28 U.S.C. § 1331 ...................................................................................................4

28 U.S.C. § 1337 ...................................................................................................4

## OPENING STATEMENT

This class action case alleges an antitrust conspiracy and/or combination among the nation's largest card issuing banks to adopt and maintain class-barring arbitration clauses ("CBA Clauses") and sought injunctive relief under 15 U.S.C. § 26. Collusion by competitors on arbitration clauses is nothing new. Since before World War II, and shortly after the passage of the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* (1925), the Supreme Court has found competitors *per se* liable for violating the Sherman Act when they agree to impose arbitration clauses. *See Paramount Famous Lasky Corp. v. United States*, 282 U.S. 30, 43-44 (1930).[1]

    As then Judge Breyer (later Justice Breyer) explained:

> Competitors cannot *agree*, for example, to insist that their contracts with sellers contain arbitration clauses, even though each individual competitor can make up his own mind to insist upon such a term in any, or all, of his contracts. [citing *United States v. First Nat'l Pictures, Inc.*, 282 U.S. 44, 51 (1930); *Paramount Famous Lasky*, 282 U.S. at 51] The unlawfulness of the agreement does not necessarily depend upon the undesirability of the contractual term as to which competitors agree not to compete.

*Kartell v. Blue Shield of Mass., Inc.*, 749 F.2d 922, 930 (1st Cir. 1984).

    The terms and conditions of consumers' transactions with Defendants, including Plaintiffs here, must be determined by competitive market forces and not

---

[1] Indeed, the Supreme Court has repeatedly cited collusion on arbitration clauses as an example of conduct that violates the Sherman Act. *See Brown v. Pro Football, Inc.*, 518 U.S. 231, 241 (1996); *F.T.C. v. Ind. Fed'n of Dentists*, 476 U.S. 447, 458 (1986); *NCAA v. Bd. of Regents of the Univ. of Okla.*, 468 U.S. 85, 110 n.40 (1984).

collusion, such as Defendants' CBA Clause combination here. Although the term on which Defendants colluded is nominally a non-price term, its effect has been to increase the full price of credit card services to Plaintiffs and other cardholders, diminishing the cards' value and reducing consumer choice. *See In re Currency Conversion Fee Antitrust Litig.*, 265 F. Supp. 2d 385, 410 (S.D.N.Y. 2003) (acknowledging CBA Clauses are part of the "price[] of doing business"); *Ross v. Bank of America, N.A. (USA)*, 524 F.3d 217, 223-24 (2008).

In *Bank of America*, this Court ruled the district court erred when it dismissed plaintiffs' CBA Clause antitrust claims for lack of Article III standing. 524 F.3d at 223. In reaching that decision, the Court accepted plaintiffs' well-pled allegations of defendants' collusion to impose CBA Clauses. Specifically, that: in early 1999 (if not sooner) the conspiring Banks (*see* n.2 *infra*) began communicating amongst themselves concerning CBA Clauses; they formed a group called the "Arbitration Coalition" to encourage each other to implement such clauses; the Banks discussed and shared plans on arbitration; they spun-off additional groups to aid them; and all the Banks ultimately adopted and maintained CBA Clauses. *See Bank of America*, 524 F.3d at 220-21, 225.

At trial, Plaintiffs proved these core facts and more. The record establishes the meetings among the Banks were highly unusual given their fierce rivalry in all other aspects of their credit card business. The Arbitration Coalition was

organized by the first two Banks to implement CBA Clauses. The other Banks adopted their CBA Clauses during peak periods of inter-firm communications, well in excess of anything remotely resembling a CLE, lobbying effort or potential client development pitch (as incorrectly suggested by the trial defendants). Over the course of at least 28 meetings of competitors, all the Banks implemented CBA Clauses. Once all the Banks imposed the CBA Clauses, the meetings ceased and the groups disbanded, despite the fact that CBA Clauses remained subject to serious legal challenges for at least eight more years. In collectively adopting CBA Clauses, the Banks eschewed any potential competitive advantage (as recognized by them) associated with the clauses.

Analyzing the record as a whole and applying the correct weighing standards—as the district court should have done—unquestionably demonstrates a reasonable inference that it was more likely than not the Banks conspired to adopt and maintain CBA Clauses. This suffices to prove the Banks agreed to a CBA Clause combination or conspiracy, illegal under the Sherman Act, *i.e.*, that they had a conscious commitment to a common scheme. *See Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984); *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 61-63 (2d Cir. 2012).

The Sherman Act condemns such collusion. *See, e.g., Pro Football*, 518 U.S. at 241 ("antitrust law forbids all agreements among competitors ... that

3

unreasonably lessen competition among or between them in virtually any respect whatsoever"); *Ind. Fed'n of Dentists*, 476 U.S. at 459 ("A refusal to compete with respect to the package of services offered to customers, no less than a refusal to compete with respect to the price term of an agreement, impairs the ability of the market to advance social welfare …."); *Catalano v. Target Sales, Inc.*, 446 U.S. 643, 648 (1980) (condemning restraints on interest-free grace periods); *Bank of America*, 524 F.3d at 223 ("one form of antitrust injury is '[c]oercive activity that prevents its victims from making free choices between market alternatives'") (quoting *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 528 (1983)).

The district court, therefore, erred when it failed to find the Banks combined and/or conspired in violation of the antitrust laws in connection with their CBA Clauses.

## JURISDICTIONAL STATEMENT

Plaintiffs in two related matters, which were consolidated for trial, appeal from final judgments entered in favor of Defendants following a five-week bench trial. The district court had jurisdiction over each matter pursuant to 15 U.S.C. § 26 and 28 U.S.C. §§ 1331, 1337. This Court has jurisdiction pursuant to 28 U.S.C. § 1291. The judgments in each matter were docketed on April 23, 2014 (SPA-93; SPA-95). Plaintiffs timely filed and served their Notices of Appeal in each matter

4

on May 9, 2014 (A1405).

## ISSUES PRESENTED

1.      Did the district court apply an incorrect legal standard in determining what constitutes unlawful "agreement" under Section 1 of the Sherman Act (15 U.S.C. § 1), and did it err in the manner in which it weighed the evidence, including:

a.      Whether the district court erred when it effectively required evidence of an explicit agreement by the Banks to adopt and maintain CBA Clauses, when antitrust law permits proof of conspiracy based on conduct and even a tacit agreement?

b.      Whether the district court erred by requiring evidence that "tends to exclude" the conspirators acted independently, when antitrust law requires only that the existence of a conspiracy must be a reasonable inference and need not be the only possible inference?

c.      Whether the district court erred when it separately assessed elements of the Banks' collusion to adopt and maintain CBA Clauses when antitrust law requires evidence of a conspiracy or combination to be assessed as a whole?

2.      Whether the district court erred in ruling that Plaintiffs lacked antitrust standing?

## STATEMENT OF THE CASE

### I.    Plaintiffs' Antitrust Claims in Two Related Matters Were Consolidated for a Five-Week Bench Trial

Appellants are plaintiffs ("Plaintiffs") in two related matters that were consolidated for a five-week bench trial: (i) *Ross v. American Express*, No. 04-cv-5723 (WHP) (S.D.N.Y.); (ii) and *Ross v. Bank of America*, No. 05-cv-7116 (WHP) (S.D.N.Y.).   Plaintiffs bring this action on behalf of the classes and subclass certified by the district court in *American Express* and *Bank of America* (*see* A366).   The *American Express* defendants are: American Express Company, American Express Travel Related Services and American Express Centurion Bank (collectively, "Amex").   The *Bank of America* trial defendants are: Citigroup, Inc., Citibank (South Dakota), N.A., Citibank USA, N.A., Universal Bank, N.A., Universal Financial Corp. and Citicorp Diners Club, Inc. ("Citi"); and DFS Services, LLC (now DB Servicing Corp.), Discover Financial Services and Discover Bank ("Discover").   The remaining *Bank of America* defendants settled prior to trial: Bank of America, N.A. (USA) and Bank of America, N.A. (which includes MBNA portfolios) ("Bank of America"); Capital One Bank (USA), N.A. and Capital One, N.A. ("Capital One"); J.P. Morgan Chase & Co. and Chase Bank USA, N.A. (which includes Bank One, First USA and Providian portfolios) ("Chase"); HSBC Finance Corp. and HSBC Bank Nevada, N.A. ("Household");

6

and the National Arbitration Forum ("NAF").[2]

In both matters, Plaintiffs allege the Banks violated Section 1 of the Sherman Act, 15 U.S.C. § 1, by forming an unlawful combination and/or conspiracy to implement and maintain arbitration clauses that prohibit participation in class actions ("CBA Clauses") as a term or condition for their general purpose cards. (A145; A280). Plaintiffs seek injunctive relief on behalf of themselves and other holders of "general purpose" cards (*i.e.*, credit or charge cards; hereinafter "credit cards" or "cards")[3] for Defendants' unlawful anti-competitive conduct.[4]

Before reaching trial, each matter was subject to an appeal. In *American Express*, the district court applied the doctrine of equitable estoppel to grant Amex's request to invoke its competitors' CBA Clauses. *Ross v. American*

---

[2] The bank defendants in both matters will be collectively referred to as the "Banks" or the "Issuing Banks". The trial defendants—Amex, Citi and Discover—will be referred to as "Defendants". Because some Banks (*e.g.*, Bank One, First USA, MBNA and Providian) operated independently during the conspiracy (before being acquired (*see* A4332), they will be referenced individually where appropriate.

[3] The Class does not include Amex cardholders, rather the antitrust claims here are for Amex's conduct as a co-conspirator with the nation's largest card issuing banks to adopt and maintain CBA Clauses.

[4] The *Bank of America* settlements contained similar terms, including: (1) immediately ceasing enforcement of CBA Clauses; (2) removing CBA Clauses for at least 3-1/2 years; (3) agreeing that these provision applied to both successors and after-acquired card portfolios, and (4) agreeing to not "contract, combine or conspire" as to CBA Clauses. Some 175 million cardholder accounts—likely some 100 million consumers and small businesses, after allowing for duplicates—were freed to vindicate their rights and their fellow cardholders' rights.

*Express Co.*, 2005 WL 2364969 (S.D.N.Y. Sept. 27, 2005). The court did not immediately compel arbitration because it also ruled that plaintiffs' antitrust claim concerning the validity of the CBA Clauses required a jury trial, pursuant to Federal Arbitration Act § 4, 9 U.S.C § 4. *Id.* at *10. Amex appealed the latter ruling and plaintiffs cross-appealed the former. On October 21, 2008, this Court held that Amex could not avail itself of its competitors' CBA Clauses and reversed the district court's equitable estoppel ruling, *Ross v. American Express Co.*, 547 F.3d 137 (2d Cir. 2008). As a result, plaintiffs' cross-appeal was moot.

In *Bank of America*, the district court dismissed plaintiffs' claims on the grounds of lack of Article III standing. *Ross v. Bank of America, N.A. (USA)*, 2006 WL 2685082 (S.D.N.Y. Sept. 20, 2006). On April 25, 2008, resolving plaintiffs' appeal, this Court held that the complaint alleged injury in fact sufficient to confer Article III standing and vacated and remanded. *See Ross v. Bank of America, N.A. (USA)*, 524 F.3d 217, 223 (2d Cir. 2008) ("The harms claimed by the cardholders ... are injuries to the market from the banks' alleged collusion to impose a mandatory term in cardholder agreements ... [and] the reduction in choice and diminished quality of credit service ... are present anti-competitive effects[.]"). This Court concluded the district court erred by "overlook[ing] the cardholders' antitrust arguments, instead viewing their claims, at the banks' urging, merely as challenges to the arbitration provisions in their credit agreements." *Id.*

8

On March 6, 2012, the district court consolidated Plaintiffs' injunctive relief claims from *American Express* and *Bank of America* for trial. The district court held a consolidated bench trial from January 7, 2013 to February 7, 2013. On May 6, 2013, the district court heard closing arguments and took the matter under consideration. On April 10, 2014, the district court entered its Opinion and Order granting judgment to Amex, Citi and Discover and dismissing Plaintiffs' antitrust claims for injunctive relief (SPA-1).

On April 23, 2014, the district court entered judgment in favor of Amex, Citi and Discover (SPA-93; SPA-95). The court found that Plaintiffs had Article III injury-in-fact standing to pursue their antitrust claims (a defense raised by Amex at trial) (SPA-44-48). Despite finding the credit card market is an oligopolistic market in which Amex, Citi, Discover and their co-conspirators collectively have overwhelming market power, and that they agreed to collectively pursue industry efforts to establish CBA Clauses as the "industry norm" (SPA-82), the court declined to find the Banks had agreed to collusively adopt and maintain CBA Clauses (SPA-81-84). The district court also declined to find that Plaintiffs have antitrust standing because the court determined that Plaintiffs did not prove a conspiracy by the Banks (SPA-48-49). The district court reached this conclusion notwithstanding its finding that Plaintiffs' injuries-in-fact are present market effects stemming from the adoption of CBA Clauses, the elimination of which

would redress the identified injuries to the market (SPA-47-48).

Additionally, the district court addressed whether the Banks' conduct would be an unreasonable restraint had the court found a collusive agreement in violation of the antitrust laws (SPA-87-89). Applying a "quick look" analysis, the court stated the collusive adoption of CBA Clauses would have constituted an unreasonable restraint on trade in violation of Section 1 of the Sherman Act.[5] *Id.*

This appeal challenges the district court's errors in applying an improper standard for determining collusion and for errors in weighing the evidence.

## II.    The Banks' Conspiracy to Adopt and Maintain CBA Clauses

The nation's largest credit card issuers conspired to impose and maintain CBA Clauses. The conspiracy was carried out by senior in-house counsel through at least 28 known private, invitation-only meetings and conference calls, and through other inter-firm communications. The Banks set aside their deep animus and fierce rivalry to achieve a common goal of using arbitration for collective immunity from class actions. After the objective of their conspiracy was achieved, the conspirators ceased meeting and communicating even though the enforceability

---

[5] Plaintiffs called an expert, Dr. Oren Bar-Gill, who testified about consumer harm from the collective imposition of CBA clauses—the touchstone for unreasonable restraint of trade (*see* SPA-88-89; Part II.E *infra*; A2104; A2109). Citi did not contest that such collusion would be an unreasonable restraint of trade (A886). American Express and Discover designated an expert, Dr. Orley Ashenfelter, who would be called to testify that CBA Clauses—even collusive ones—are not unreasonable restraints of trade, but Dr. Ashenfelter was never called to testify at trial.

10

of CBA Clauses continued to be a disputed issue for years to come.

The Banks' CBA Clauses benefit only them for the obvious reason that Banks do not bring class actions against their customers.  Rather, consumers bring class actions against the Banks for alleged unlawful conduct that typically injures many consumers (often millions) at a time.  These are claims the Banks understand are unlikely to be redressed absent class actions because "economically rational" consumers will not bring small individual claims.  *In re American Express Merchants' Litig.*, 634 F.3d 187, 194 (2d Cir. 2011) ("the class action device is the only economically rational alternative when a large group of individuals or entities has suffered an alleged wrong, but the damages due to any single individual or entity are too small to justify bringing an individual action").[6]

That the Banks entered into an unlawful agreement is evidenced by their conduct, which demonstrates a conscious commitment to a common scheme to adopt, refine and/or maintain their respective CBA Clauses.

---

[6] This case was amended on rehearing, s*ee In re American Express Merchants' Litig.*, 667 F.3d 204 (2d Cir. 2012), and reversed on other grounds by the Supreme Court.  *See American Express Co. v. Italian Colors Rest.*, 133 S. Ct. 2304 (2013).

11

A.     **The Frequency and Number of Meetings On Arbitration Among Banks Who Described Themselves as "Fierce" and "Vicious" Rivals Was Highly Unusual**

The many meetings and communications among the Banks related to CBA Clauses were orchestrated by and for a group of horizontal competitors who―normally―viewed each other with intense enmity (A372-375).

According to senior Amex in-house counsel, Timothy Heine (A373),[7] a meeting that included Amex and member banks of Visa and MasterCard, was highly unusual―it just "did not happen" (A374; A1542; A1546).   That was because, as Heine admitted, these banks were Amex's fierce rivals: "We're fierce competitors, we don't talk to these [non-Amex] people."  (A374; A1542; A2261).

The Visa and MasterCard member banks regarded Amex with similar hostility.  For example, Duncan MacDonald, a former General Counsel for Citi's card group who was retained as a consultant by First USA (A373), characterized Amex as "Darth Vader," stating that "in the Bank Card Industry … you just don't talk to American Express people.  The animosity was very, very strong."  (A373; A1695).

Joseph Yob, Discover's E.V.P. for Cardmember Services (A474), further confirmed the card industry was "not a friendly environment" explaining that "we were competitors and we were vicious competitors."  (A373; A2386).  When asked

---

[7] A "Cast of Characters" identifying the important players and their affiliations is at A559-566.

12

if Visa and MasterCard "tried to kill the baby at birth", *i.e.*, eliminate Discover at its inception, Yob's response was unequivocal: "Absolutely" (A373; A2392).

### B. The Banks Create an "Arbitration Coalition" and Other Groups to Facilitate Their Inter-Firm Communications on Collectively Adopting and Maintaining CBA Clauses

Central to the Banks' conspiracy was a private group called the "Arbitration Coalition" (or "Coalition") that was instigated by two Banks, Amex and First USA, who had already implemented CBA Clauses, for the purpose of moving their "fierce competitors" to adopt and maintain such clauses.

The group was organized in the wake of a meeting among senior in-house credit card counsel, held on May 25, 1999. After that meeting, the Arbitration Coalition "officially" came into existence. As discussed below, the Coalition held regular meetings concerning CBA Clauses and also spawned the "Consumer Class Action Working Group", and the Bank-only "In-House Counsel Working Group".[8]

### 1. The May 25, 1999 Meeting Among "Senior In-House Credit Card Counsel"

Prior to the first Arbitration Coalition meeting held on July 28, 1999 (A387; A392), a meeting among "senior in-house credit card counsel" was held on May 25, 1999 at the law offices of Wilmer Cutler & Pickering (now Wilmer Hale, hereinafter "Wilmer") (A383-384). The meeting co-sponsors were Amex, Citi,

---

[8] A timeline of known meetings and conference calls among the Banks, and the dates for noticing and implementing their respective CBA Clauses, is provided at Part II.B.5 *infra*. The full detailed version of this list is at A567-580.

13

First USA and Sears (A384).

Invitations were sent by Wilmer attorneys, on May 3, 1999, informing recipients that the "purpose of the meeting will be *to share views and experiences*[9] relating to the legal issues of common concern" to the participants (A384).  The invitation noted that after "initial discussions" among the co-sponsors a "consensus quickly emerged that there was a need for a broader exchange of views and experiences among [card] industry counsel *than has been possible through other forums* …." (A384-385; A1533-1534; A2581).  Another invitation was sent on May 14, 1999, which included an agenda listing, among other topics, the "use of arbitration clauses in card agreements" (A385; A2721; A2816).  One participant (Chase's in-house counsel) testified that arbitration was discussed during the meeting (A386-387).

Eight of the thirteen attendees were Banks who participated in the subsequent Coalition meetings and other arbitration-related communications discussed below (A387).

---

[9] Unless otherwise indicated, all emphasis is supplied.

### 2.  Amex and First USA Initiate the "Arbitration Coalition"

Following the May 25, 1999 meeting, two Banks (Amex and First USA) officially launched the Arbitration Coalition to further private industry meetings among senior in-house counsel.  First USA had implemented its CBA Clause in 1998 (A387-388).  Amex had recently noticed (*i.e.*, notified its cardholders of) the CBA Clause in April 1999, effective no later than June 1999 (A388).  The concept of a "coalition" arose with the Banks, and the group was created entirely for the Banks' benefit (and not, as Defendants contend, as a so-called "client development" meeting that might benefit outside counsel, like Wilmer).

The Arbitration Coalition was created to safeguard the Banks' use of CBA Clauses and was characterized as "the ***only organization uniquely devoted to protecting industry use*** of arbitration of consumer disputes" (A410; A2897).  It was created so the Banks could immunize themselves from class actions, which were viewed as "old fashioned protection rackets" (A2882) or a form of "legalized extortion to pay ransom" (A378; A2957).  The Banks saw themselves as subject to the "self-evident" greed of class action lawyers (A1691), who were "barbarians" seeking to undermine the card industry (A1731; A2903; A3131).  As MacDonald later put it, that the Banks "surrender to [class actions] as often as we do through ransoms or rule book defenses is mind boggling.  There's got to be a better way!" (A377; A2882; *see also* A2782; A2838).  That "better way" was the Arbitration

15

Coalition, through which the Banks collectively could get the class action "monkey off [their] back[s]" (A1683; A1701).

Beginning no later than June 1999 (and likely earlier), Amex, through Heine, and First USA, through MacDonald who was specifically retained as a consultant to create this Coalition (A389), identified competitor issuers to participate in a "coalition" focusing on arbitration (A389). When they began forming the Coalition, Heine and MacDonald barely knew each other (A389). They set aside their competitive animus as rival credit card issuers to create the Coalition and foster collective action regarding CBA Clauses.

By June 23, 1999, MacDonald informed Heine he had enlisted Alan Kaplinsky (an attorney with Ballard Spahr Andrews & Ingersoll ("Ballard")) to assist them (A389; A3098). Kaplinsky (Ballard) was a natural choice as he was regularly retained by credit card issuers, including Amex, Capital One, Citi and Discover, to provide advice on crafting CBA Clauses (A442; A1893-1894; A1954; A2272; A2303; A2401-2402). From Kaplinsky, they learned that competitors Bank of America, Discover and Household (among others) would support an arbitration meeting, and that MBNA was exploring imposing a CBA Clause (A389; A3098).

MacDonald also invited a number of Banks, including Bank of America and MBNA, to join the Coalition (A389-390; A1689; A2935), and he received

16

assistance from co-conspirator the National Arbitration Forum ("NAF"), an arbitration provider, to identify competitor counsel to invite to the Coalition (A390-391; A2848; A2853; A2920).

To encourage competitor Banks to participate, invitations were issued that clearly demonstrated that the Arbitration Coalition was a credit card bank-driven entity. A July 13, 1999 invitation identified the "co-chairs" as Heine (Amex) and MacDonald (First USA) (A390; A3099; A3101; A3336). The July 14, 1999 invitations identified Heine and MacDonald as the primary contact persons (A391; A2920). And while Wilmer made its New York office available for the first meeting, no Wilmer attorneys sent invitations (unlike the May 25, 1999 meeting), and none were copied on MacDonald's June 23, 1999 organizational email (A389; A3098).

Invitees were alerted to the collaborative purpose of the proposed coalition. The July 13, 1999 invitation letter emphasized: "It is important that consumer lenders *be equally as well networked if we are to ultimately prevail in establishing arbitration* as the acceptable forum for resolving consumer disputes." (A388; A3336). The letter elaborated "that *there is a need to do a better job in communicating with other lenders* that have adopted arbitration programs." (A390; A3336) Another invitation, sent on or about July 14, 1999, stated the purpose of the meeting was "[t]o explore efforts to protect arbitration," and it

17

identified the invitees as "[l]eading companies that have adopted or are *considering* adopting arbitration to resolve disputes with their consumer customers ...." (A390-391; A2920).

The agenda for the July 28, 1999 meeting emphasized collective action. Under the topic "Why we are here" it stated "Consumer service providers with [sic] ***common issue***" (A391; A3338). The agenda flagged that the Banks were subject to "[i]ncreased media scrutiny, even hostility & distortion" and they were the "[t]arget of class action lawyers" (A391; A3338).

The agenda also described how the Banks would tackle these issues. The purpose of the meeting was to "***Work[] together*** to turn the tide," which included first "***sharing*** best practices" and then "***[d]rafting*** fair, enforceable arbitration provisions," followed by other topics (A391-392; A3338).

At the July 28, 1999 meeting, the following five Banks joined Amex and First USA, among others, to begin "working together": Citi, Discover, Bank of America, Chase and Household (A392). No minutes or memoranda exist concerning this meeting (A392).

Planning for the next meeting started immediately. On August 4, 1999, MacDonald sent an email to his First USA colleague (senior in-house counsel David Carpenter) and Wilmer attorney Eric Mogilnicki suggesting topics for a September 29, 1999 meeting (A393; A2863). Again, the focus was on how

competitor Banks could work together with agenda topics such as "sharing best practices," "how to set up [sic] arbitration program," "arbitration price statistics" and "plain language vs fine print & overkill" (A393; A2863).

An email invitation for this meeting was sent on September 7, 1999, reminding Coalition participants that: "[w]e agreed to take a number of steps going forward, including ***sharing our thoughts and materials*** (including FAQ responses, customer information materials, and legal briefs) on the issues regarding arbitration that come up most frequently and pose the greatest difficulty" (A393; A3345). The Banks were also asked that "if you have not already done so, please send me the arbitration clause used by your company, any change-in-terms notices that were involved in the adoption for the clause, and any answers to FAQs or other explanations of the clause." (A393; A3345)  The agenda for this meeting focused on adopting CBA Clauses as it identified several challenges to consumer arbitration clauses, including "the challenges … to ***adoption*** of arbitration clauses" and "the challenges … to the ***absence*** of class actions." (A393-394; A2808).

The September 29, 1999 Arbitration Coalition meeting is unique because three internal Bank memoranda concerning the meeting were produced, one each from Chase, Amex and Discover, whereas the Banks, with few exceptions, failed to produce contemporaneous documents chronicling the discussions at the subsequent 26 meetings (*see* A394).  These memoranda demonstrate the Banks'

19

willingness to communicate on internal plans regarding CBA Clauses and to pursue collective efforts supporting CBA Clauses.

Chase's in-house counsel, Gail Siegel, prepared a memorandum about the September 29, 1999 meeting that documented no less than five communications from other card issuers (A397; A2687).  Under a section titled "Competitor's [sic] Feelings About Arbitration," Siegel noted: (i) Sears had expressed their "[n]eed to control class actions outweighs any other concern at this time;" (ii) GE was "concerned that their provision will be the subject of litigation if used since they just rely on NAF as an administrator;" (iii) Citi had "adopted a wait and see attitude" because Citi wanted "to see the results of all the litigation involving First USA;" (iv) Wells Fargo had adopted a "take it or leave it" attitude toward arbitration (which information was communicated by the Bank of America attendee); and (v) Household was similarly "watching what is happening" (A397; A2688).

Siegel's memorandum also reflected that the participants debated the viability of arbitration as a class-barring instrument.  She noted they discussed whether First USA's use of its CBA Clause for collections, specifically via co-conspirator NAF, "*may have contaminated the tool*," *i.e.*, CBA Clauses, and that "using arbitration in a mass production mode … *may have had the unintended*

*effect of diminishing its use to control class actions*" (A397; A2689-2690).[10]  She recorded that MacDonald lamented "on a philosophical note that after 2 years business personnel *may well decide that arbitration does not stop class actions*, and it is not worth the litigation and costs engendered—identify it as a lawyer's tool and decide that the lawyers abandon the effort" (A397-398; A2689).

Heine also prepared a memorandum, which he circulated to his in-house colleague Julia MacDermott, among other Amex personnel (A394; A2930).  He noted the participants discussed their concern that public debate on arbitration would focus on its use to eliminate class actions and that the "plaintiffs [sic] bar" was becoming "more sophisticated in their arguments" against CBA Clauses (*see* A394; A2930-2931).  The group would remain "alert to cases that presented opportunities to participate in an amicus manner," but they would do so secretly

---

[10] Defendants' determination to use arbitration *primarily* as a class-barring tool is embodied in their current CBA Clauses.  Discover's cardholder document expressly states that "if the Class Action Waiver in the 'Arbitration of Disputes' section is invalidated in any proceeding … then the 'Arbitration of Disputes' section will be void" (A5135).  Discover further requires that "[o]nly a court, and not an arbitrator, shall determine the validity and effect of the Class Action Waiver" (*Id.*).  Amex's class-barring language is contained in a section of its arbitration clause styled as "Limitations on Arbitration" (A4871-4872; A4879-4880).  Amex's clause states that "if any portion of these *Limitations on Arbitration* is deemed invalid or unenforceable, then the entire Arbitration provision (other than this sentence) will not apply" (A4871; A4879).  Citi's cardholder document provides that "[i]f any portion of this arbitration provision is deemed invalid or unenforceable, the entire arbitration provision shall not remain in force" (A4007).

21

"without attribution to any of the members" (A395; A2931).  He also agreed to join a sub-group that would develop "'response' points to counter various arguments being made to challenge arbitration clauses" and that these points "would be shared with and refined by the group" (A396; A2931-2932).

Heine revealed the Banks' determination to guard against the possible loss of their "tool," stating the Arbitration Coalition would act to protect against "the possibility of [a] ***rogue or unsophisticated player (not necessarily in our industry)*** who attempts to be heavy handed or unfair in the adoption or exercise of a clause such that it causes all businesses using consumer arbitration to be judged in an unfavorable light" (A395; A2931).

The third memorandum was prepared by Steven Daily, Discover in-house counsel (A398; A3881).  He informed his superiors, General Counsel Kelly McNamara-Corley and senior in-house counsel Jim Swift and Hugh Hayden, among others, that he had been asked "to take the lead" in preparing an internal "talking points" memorandum (or FAQs) "on the subject of arbitration" (A 398; A3881).  He disclosed he had "circulated a draft among other members of the arbitration group for comments" (A398; A3882).  Absent an instruction to the contrary, Daily planned to attend the next meeting, held on November 17, 1999 (A398; A3882), which he did attend (A399).  Daily later circulated revised FAQs reflecting comments he had received from the Coalition and "comments I've

22

received internally" (A455; A3393). He encouraged the group to "tailor these documents as you see fit" and described how Discover used the FAQs to point out "where the Discover arbitration clause provides special protections" (A455; A3393; *see generally* A454-456).

Daily also invited certain Arbitration Coalition members to a conference call to discuss arbitration "self-regulation" issues on December 3, 1999 (A455; A3392). On December 7, 1999, Daily emailed the subgroup again in preparation for another conference call, asking the group how the competitor banks would "reconcile differences between their own clauses and a new ***industry standard***" (A455-456; A3416). Evidencing concern about the propriety of such discussions, Daily suggested the group "***resolve any antitrust concerns to the extent we can, offline and prior to our next call***" (A456; A3416).

The Banks continued to participate in Arbitration Coalition meetings. Altogether, from July 28, 1999 through October 16, 2003, the Coalition held at least nineteen known meetings and/or conference calls (A388; *see also* A567-580 summary table), as listed in the summary timeline at Part II.B.5 *infra*.

### 3. An Attempt to Expand the Arbitration Coalition to Other Industries Fails

The small, bank-centric nature of the Arbitration Coalition made it a successful mechanism for Bank inter-firm communications on CBA Clauses. In contrast, when there was an effort to expand the reach of the Coalition beyond the

23

Banks to other industries, that effort failed, and instead (as discussed in the next section), the effort triggered the creation of an even more clandestine, senior in-house Bank counsel-only group.

Before the October 3, 2000 Arbitration Coalition meeting, MacDonald circulated a September 13, 2000 email suggesting the Coalition "support *a separate meeting* that would be devoted to new ways to deal with class actions" (A405; A2882). He hoped this new meeting would reach "companies and lawyers that are ***not in our coalition***, for example, those who do the bidding for the big auto, manufacturing, pharmaceutical, brokerage, healthcare, retail, and other industries" (A406; A2882). MacDonald dubbed this group the "Consumer Class Action Working Group" (or "Class Action Group") (A406), which he envisioned would function in a manner similar to the Coalition, *i.e.*, that attendees would "work[] together" "via frequent brainstorming sessions – and share them across industry" (A408; A1719; A2890-2891).

Importantly, he explained this second endeavor did "not reflect a decision to abandon our [the Coalition's] arbitration efforts" (A407; A2553).

The Class Action Group was mostly ineffective, holding only two meetings: on February 14, 2001 and May 30, 2001 (A408-409; A412-413). There was a large increase in the number of attendees and participants for this group, which included other outside counsel and a law professor (A409; A412-413; A2782;

24

A2838; A3257; A3579).

Expanding the Arbitration Coalition to reach other industries, however, was contrary to the Banks' interests. With such a large group, the focus was no longer on the Banks' concerns, and they acted immediately to correct that.

### 4.   The Banks Create a Bank-Only Group Called the "In-House Counsel Group"

While the Class Action Group did not gain traction among the Banks (or anyone else for that matter), the Banks used the group's two meetings to begin organizing another, much smaller, private "Bank-only" group.

During the May 30, 2001 Class Action Group meeting, Michael Barry (Capital One in-house counsel), James Condren (Chase in-house counsel) and Julia MacDermott (Amex in-house counsel), among other senior Bank in-house counsel, discussed forming a private group comprised solely of select Bank in-house counsel (A413; A3180 (referring to assembling "a list of the in-house attendees yesterday so we can start to put together *our little group*")); A3181; A3611). They wanted this new group to "focus on a narrow range of players" to "ensure some commonality of issues" (A414; A3611). The group was dubbed the "In-House Counsel Working Group" (or "In-House Counsel Group") (A414; A3181; A3611). It was comprised solely of in-house counsel from all the Banks, other than Discover (A414). No outside lawyers—even from Wilmer—were invited or aware of this group (*see, e.g.*, A2152-2153).

25

When Barry issued a June 29, 2001 email invitation for the In-House Counsel Group's first conference call, held on July 9, 2001 (A415) (the group held calls rather than in-person meetings), he noted that while the larger group "has value, it also has a few ***major shortcomings***" (A414; A4428). He listed three: "for in-house counsel in financial services companies, issues relating to non-financial issues are not as relevant"; "outside counsel, for all their worth, do not see the same internal issues that in-house counsel face"; and "the [larger] group's focus can be more academic and theoretical, and less practical" (A414-415; A4428).

The In-House Counsel Group was intended as "a sounding board to share issues that impact [the card] industry" (A415; A3611). The group planned to share information and strategies, and to create "an informal 'information please' email network" of in-house counsel for the largest card issuer competitors in the United States (A415; A3186; A3610). Members were encouraged to "ask questions of the others so that ***we may be able to get some answers to the burning issues our business people keep raising!***" (A415; A3616).

Arbitration was a "burning issue": the dial-in code for the July 9, 2001 call was the word "ARBITRATION" (A415; A3189); arbitration was an agenda item for the March 19, 2002 call (A423; A3624); and the group's participants discussed how to address attempts by cardholders to "unilaterally amend" cardholder documents to provide for a different arbitration administrator than that chosen by

26

the Bank (A424; A2602-2603).

The In-House Counsel Group held six conference calls during a nine-month period from July 9, 2001 to March 19, 2002 (A415-424).  When Chase (the last bank to adopt a CBA Clause) sent notice of its CBA Clause to cardholders in March 2002, the calls abated (A423).

This group was even more secretive then the Arbitration Coalition as it was limited to just Bank in-house counsel.  Outside counsel, including Lipsett, had no knowledge of the group (*see, e.g.*, A2152-2153).  In fact, Lipsett testified it was "news to me" when informed that the In-House Counsel Group held six calls (A2153).

### 5.    A Timeline of the Meetings, Calls and CBA Clause Adoptions

Altogether, the Banks participated in at least twenty-eight known meetings and/or conference calls beginning with the May 25, 1999 meeting followed by additional meetings or calls through October 16, 2003, organized via the Arbitration Coalition, Class Action Group and the In-House Counsel Group.  A shorthand timeline of these events, including the dates the Banks noticed and implemented their CBA Clauses, is set forth below.  The full timeline (with record citations and additional detail) is in the Appendix at A567-580.

| Date | Event |
|------|-------|
| November, 1997 | ***First USA notices its CBA Clause*** |
| January, 1998 | ***First USA implements its CBA Clause*** |
| April, 1999 | ***American Express notices its CBA Clause*** |
| May 25, 1999 | Credit Card Counsel Meeting |
| May/June, 1999 | ***American Express implements its CBA Clause*** |
| July, 1999 | ***Discover notices its CBA Clause*** |
| July 28, 1999 | Arbitration Coalition Meeting |
| September, 1999 | ***Discover implements CBA Clause*** |
| September 29, 1999 | Arbitration Coalition Meeting |
| November 17, 1999 | Arbitration Coalition Meeting |
| December, 1999 | ***MBNA notices its CBA Clause*** |
| January 12, 2000 | Arbitration Coalition Meeting |
| February, 2000 | ***MBNA implements its CBA Clause*** |
| February, 2000 | ***Bank of America notices its CBA Clause*** |
| February, 2000 | ***Household notices its CBA Clause*** |
| March 2, 2000 | Arbitration Coalition Meeting |
| April, 2000 | ***Bank of America implements its CBA Clause*** |
| April, 2000 | ***Household implements its CBA Clause*** |
| April 18, 2000 | Arbitration Coalition Meeting |
| June 14, 2000 | Arbitration Coalition Meeting |

| Date | Event |
|------|-------|
| October 3, 2000 | Arbitration Coalition Meeting |
| January 16, 2001 | Arbitration Coalition Meeting |
| February 14, 2001 | Class Action Group Meeting |
| March, 2001 | ***Providian notices its CBA Clause*** |
| April, 2001 | ***Providian implements its CBA Clause*** |
| April 5, 2001 | Arbitration Coalition Meeting |
| May 30, 2001 | Arbitration Coalition Meeting |
| May 30, 2001 | Class Action Group Meeting |
| April-June, 2001 | ***Citi  notices its CBA Clause (initial wave)*** |
| July, 2001 | ***Citi implements its CBA Clause (initial wave)*** |
| July 9, 2001 | In-House Counsel Group Call |
| August 7, 2001 | In-House Counsel Group Call |
| September, 2001 | ***Citi notices its CBA Clause (second wave)*** |
| September 4, 2001 | In-House Counsel Group Call |
| October, 2001 | ***Capital One notices its CBA Clause*** |
| October 24, 2001 | Arbitration Coalition Meeting |
| November, 2001 | ***Citi implements its CBA Clause (second wave)*** |
| November, 2001 | ***Citi notices Diners cardholders concerning its CBA Clause*** |
| November 6, 2001 | In-House Counsel Group Call |
| November 28, 2001 | Arbitration Coalition Meeting |

| Date | Event |
|------|-------|
| December, 2001 | *Citi implements its CBA Clause for Diners cardholders* |
| December 4, 2001 | In-House Counsel Group Call |
| January, 2002 | *Capital One implements its CBA Clause* |
| January 13, 2002 | Arbitration Coalition Meeting[11] |
| January 31, 2002 | Arbitration Coalition Meeting |
| March, 2002 | *Chase notices its CBA Clause* |
| March 19, 2002 | In-House Counsel Group Call |
| May, 2002 | *Chase implements its CBA Clause* |
| June 13, 2002 | Arbitration Coalition Meeting |
| January, 2003 | *Discover notices its CBA Clause "opt-out" provision* |
| April, 2003 | *Discover implements its CBA Clause "opt-out" provision* |
| April 22, 2003 | Arbitration Coalition Meeting |
| June 25, 2003 | Arbitration Coalition Call |
| October 16, 2003 | Arbitration Coalition Call |
| April 2005 | *Citi, Discover and Chase drop JAMS as an arbitral forum.* |

---

[11] Although the date of this meeting is contested, the evidence indicates that the listed individuals participated in a meeting on some date, if not the identified date. *See* n.13 *infra*.

6. **The Arbitration Coalition Facilitated Other "External" Direct Communications Among the Banks Outside of Meetings**

The Banks also engaged in "external" direct inter-firm communications. These communications among "fierce" competitors further evidence the Banks' collusion regarding CBA Clauses and related litigation practices:

- As a result of meeting GE Capital in-house counsel, Wendy Hufford, at the July 28, 1999 Coalition meeting, Joan Warrington, at that time General Counsel for Citi Cards, encouraged her senior in-house litigation counsel, Julie Nelson, to communicate directly and "compare notes" with Citi's competitor on "shar[ing] best practices regarding litigation management" (A433-434; A3497-3498).

- MBNA's in-house counsel, Regina Mullen, spoke with First USA in-house counsel, Larry Drexler, about the latter's experience using arbitration "both offensively (for collection actions) and defensively (for consumer complaints)" (A434; A3213). The reference to using arbitration "defensively" meant using a CBA Clause. This communication likely occurred in or before October 1999, prior to MBNA's December 1999 notice of its adopting a CBA Clause (*see* A399; A434-435).

- In early November 1999, Julie Lepri, in-house counsel for Bank One/First USA, emailed MacDonald that she was planning to meet with Mullen to "commiserate over mutual litigation woes" (A435; A3631). MacDonald responded that Mullen would be attending Arbitration Coalition meetings and that MBNA was "going to switch to arbitration soon, so I am told" (A435; A3631).

- On January 9, 2001, John Culhane, a Ballard attorney, emailed Julie Nelson (Citi in-house counsel) to follow-up on his prior voicemail message to her seeking information on Citi's plans concerning adoption of a CBA Clause (A436; A3562). Culhane conveyed that Ballard had "a client considering using arbitration clauses in credit card agreements" and he wanted Nelson to confirm whether "the use of arbitration clauses" was still "under consideration" by Citi, including "what the major concerns are" (A436; A3562).

31

- On July 31, 2001, Barry (Capital One) wrote Leonard Gail, in-house counsel for Bank One/First USA, asking whether Bank One permitted "cardholders to opt-out of the arbitration change-in-terms" and "[i]f yes, was there a penalty (i.e., they had to close their accounts)? And, what percentage of people opted out?" (A437; A3656). Gail forwarded the email to Lepri explaining "[Barry] is one of these guys with whom I have a monthly call" and urging her to respond to Barry's questions (A437; A3656). This communication by Barry seeking information on his competitor's practices and experiences with CBA Clauses occurred prior to Capital One's October 2001 notice concerning its CBA Clause (*see* A418; A437).

Given the numerous meetings and conference calls, it strains credulity that these record instances of inter-firm communications concerning CBA Clauses are the *only* instances of such communications.

### C. All the Banks Adopt and Maintain CBA Clauses During the Course of These Private Meetings and Calls

Through the Arbitration Coalition the Banks met repeatedly towards "working together" in order "to ultimately prevail in establishing arbitration" (A388; A3336) as the "industry norm" (SPA-82). They succeeded in their objective. Over the course of the numerous meetings and conference calls, all the Banks adopted and/or maintained (and refined) their CBA Clauses.

### 1. The Banks Adopt CBA Clauses During Periods Where Meeting Frequency Peaked

From July 1999 through April 2000, the Arbitration Coalition organized six meetings in a ten-month period, following the earlier May 25, 1999 meeting at Wilmer (*see* A387; A393; A398-401; A403). During that time, four Banks joined First USA and Amex by noticing their intent to implement CBA Clauses:

32

Discover, MBNA,[12] Bank of America and Household (A393; A399-401).

This is an extraordinarily high level of inter-firm communication on arbitration—more than one meeting every two months—far in excess of what is normally considered useful for legal education.  In fact, the meetings were unnecessary for that purpose because knowledgeable Ballard and Wilmer counsel provided the Banks with arbitration-related legal services.  Kaplinsky (Ballard) was retained by Amex, Capital One, Citi and Discover to provide legal advice as to their CBA Clauses (A442; A1893-1894; A1954; A2272; A2303; A2401-2402).

Wilmer attorney Christopher Lipsett, who helped organize the May 25, 1999 meeting (*see* A383-387) and participated in Coalition events (*see generally* A387-427), represented Bank of America, Bank One/First USA, Capital One, Citi, Household and Providian prior to 2003 (A441; A2146-2147).  He represented MBNA in MDL 1409 (regarding foreign transaction fee claims), and, at a minimum, he assisted Capital One and Citi with their CBA Clauses (A441; A2141; A2146).

---

[12] MBNA also had a number of "external" communications with the Banks and co-conspirator NAF during this period: an October 8, 1999 meeting with Brown (NAF), Mullen (MBNA) and other MBNA personnel (A434); an October 1999 call between Mullen (MBNA) and Drexler (First USA) (A434-435); the early November 1999 email exchange between MacDonald and Lepri concerning a meeting scheduled between Mullen and Lepri (A435); and a January 17, 2000 email from Brown (NAF) to Mullen, encouraging Mullen to speak to David Carpenter (First USA) concerning the latter's experience with using arbitration for collections (A435-436).

With respect to Citi, in February 2000, Lipsett provided Wendy Kleinbaum, Citi's cards General Counsel, with information regarding the March 2, 2000 Coalition meeting (held at Amex's headquarters), encouraging her to attend, and noting the attendees included in-house counsel from Amex, Bank of America, Chase, Discover, First USA, Household and MBNA (A466; A3284-3285). He also promised her materials on how to adopt an arbitration program (A466; A3285). Given Lipsett's input, Kleinbaum admitted it was unnecessary for Citi in-house counsel to attend meetings with competitors if Citi simply desired arbitration updates or educational materials (A466; A2348-2349).

The Arbitration Coalition was launched to convince competitors to *adopt and maintain* CBA Clauses—not merely educate them—and with these early successes in hand, the Banks continued to hold meetings. From May 2000 through March 2001, after the first tranche of CBA Clause adopters, the Coalition held three (known) meetings (A404-407). The first Class Action Group meeting also convened (A408), where the Banks began discussions on forming the In-House Counsel Group. The "later adopters"—Capital One, Citi, Chase and Providian—attended and/or were invited to at least one, or more, of these meetings (*see* A404-405; A408-409).

The frequency of meetings and conference calls increased sharply when the "later adopters" moved to add CBA Clauses. From March 2001 through March

34

2002, there were at least five Arbitration Coalition meetings, six In-House Counsel Group calls, and one Class Action Group meeting. Twelve[13] (known) scheduled events during a thirteen-month period—almost one event every month—belies any claim the Banks met merely for educational purposes. During this period of pervasive inter-firm communications the remaining Banks noticed their CBA Clauses: Providian (in March 2001, A409-410), Citi (in two waves: a smaller one in April-June 2001 (A411), with the remainder in September 2001 (A417-418), Capital One (in October 2001, A418), and Chase (in March 2002, A423).

The Banks' adoption and maintenance of CBA Clauses is remarkable in that it occurred at a time when normal competitive market forces had *not* made CBA Clauses a prevalent practice in other consumer related industries. Defendants' expert, Dr. Elzinga, relying on data from a 2001 study of 161 businesses, asserted that arbitration use had become prevalent with consumer products and services, stating that 35.4% of consumer contracts contained arbitration provisions (A2466). But when asked about ***CBA Clauses*** specifically, he admitted the survey he relied

---

[13]A2904 is a handwritten attendance list for a Coalition meeting that is dated January 13, 2002. Because that was a Sunday, the district court found the date was likely an error but that the document evidenced an additional Coalition meeting on an unknown date (*see* SPA-33 n.23). The meeting likely occurred on January 13, 2003 (a Monday), a time of the year where dates are often mis-recorded as the prior year. If the January 13, 2002 meeting is counted in the March 2001-March 2002 time frame, then there were at least thirteen meetings or conference calls in a thirteen-month period.

upon showed that less than 10% of such companies had adopted a CBA Clause (*see* A2466).  And, of course, only two Banks had propounded CBA Clauses when the meetings began.  By contrast to the 9.8% Dr. Elzinga found in his study, in this case all the major credit card banks adopted CBA Clauses (*see* A2494-2495).  The district court—erroneously—adopted Dr. Elzinga's conclusion that CBA Clauses "proliferated" in the face of the empirical evidence to the contrary (SPA-5; SPA-74-75).

### 2.    The Banks Cease Meeting After They All Add CBA Clauses

After the last Bank (Chase) noticed its CBA Clause in March 2002 (A423), the meetings dwindled and then ended (A445-457).  That the meetings stopped even though CBA Clauses remained subject to serious legal challenges for another decade refutes any contention the meetings were for purely educational and advocacy purposes.

In May 2002, Mogilnicki (a Wilmer attorney who aided the Banks in organizing Coalition meetings) commented that "relatively few members of the arbitration group were committed to attending our last meeting"[14] despite the fact "there's a lot going on relating to arbitration, ***most of it bad***" (A445-446; A3130).

---

[14] Mogilnicki also noted that dropping attendance had "been a trend in that direction over the past year" (A445-446; A3130).  What Mogilnicki did not know was that during that time the Banks had been scheduling regular conference calls via the In-House Counsel Group (*see* A415-424; A2152-2153 (Wilmer attorney Lipsett stating he was unaware of the In-House Counsel Group's existence)).

36

He hoped to "canvass a core group of arbitration members"—which he identified as in-house counsel from Amex (Heine and MacDermott), Capital One (Barry), Chase (Gail Siegel), MBNA (Mullen) and First USA (MacDonald), along with in-house counsel from GE (Wendy Hufford), Lipsett (Wilmer) and Kaplinsky (Ballard)—to reignite interest in the meetings (A446; A3130).

Mogilnicki's effort was unavailing. The last known In-House Counsel Group call was held on March 19, 2002, when Chase noticed its clause (A423). After that, there were only four known[15] Arbitration Coalition events: two meetings (June 13, 2002 and April 23, 2003) and two conference calls (June 25, 2003 and October 16, 2003) (A424-427). With their objective met—all Banks were now maintaining CBA Clauses—there was no need for ongoing meetings.

### 3. The Banks Adopted CBA Clauses on the Recommendation of Their Senior In-House Counsel Who Participated in the Arbitration Coalition

The Banks adopted CBA Clauses as recommended by their senior in-house counsel who attended the meetings and conference calls. Defendants illustrate this point.

Amex's CBA Clause originated with Heine, who played "the leading role" in the decision to adopt the clause (A457; A1557; A2229-2230), and who was the "primary draftsperson" of the clause (A458; A1552-1553; A1560-1561; A2230).

---

[15] Possibly five if the January 13, 2002 meeting actually occurred on January 13, 2003 (*see* n.13 *supra*).

He also worked with in-house counsel, Julia MacDermott (A458-459), and both of them participated in the meetings and calls (A459). Heine needed sign-off from Al Kelly, President of Amex's U.S. cards (A460; A2061; A2232), to implement the clause. He obtained this approval following an oral presentation to Kelly, for which no written record exists (A461; A1557-1558; A2061). Kelly, however, was entirely dependent on Heine on whether or not to adopt the CBA Clause, testifying that he "looked to [Heine] as being the person to advise on that [whether or not to adopt an arbitration clause]" (A460-461; A2064-2065).

Citi's CBA Clause was also initiated by its card in-house counsel. Kleinbaum, cards General Counsel, worked on the arbitration project with Julie Nelson, Karla Bergeson and Petra "Tedde" Tasheff, among others (A464-467, A471-472).[16] Nelson, Bergeson and Tasheff all attended one or more meetings or conference calls, with Kleinbaum's knowledge (*see* A466-467; A471; *see also generally* A567-580). To implement the CBA Clause, Kleinbaum's team needed approval from Steve Freiberg, the CEO of Citi Cards (A469-471; A2441; A2352).[17] Around September-October 2000, Kleinbaum obtained Freiberg's

---

[16] Nelson first began exploring arbitration in late 1998, which concept she raised with then-cards G.C. Joan Warrington (A462-463). Warrington attended both the May 25, 1999 Wilmer meeting and the July 28, 1999 inaugural Arbitration Coalition meeting (A464). She was later replaced by Kleinbaum as cards general counsel (*Id.*).

[17] There was some additional activity within Citi's various in-house counsel groups that, in part, spurred Kleinbaum and company to set a time table for adding the

authorization in a short meeting (less than twenty minutes) for which no written record exists (A469-471; A2441; A2352). Freiberg had no "specific dialogue" with Kleinbaum about arbitration prior to this meeting, and he did not conduct or request any investigation of arbitration (A470; A2019-2021). Freiberg relied on Kleinbaum, and her team, on whether or not to adopt the CBA Clause (A470; A1842; A2019; A2039; A2044).

Similarly, Discover's CBA Clause was initiated by Daily, who made a proposal to James Swift, V.P. and Head of Litigation, and Hugh Hayden,[18] V.P. and Associate General Counsel (A473-474; A1594-1595). Sometime in May 1999, as the May 25, 1999 meeting was being organized, the three in-house counsel sought authorization for the clause from Yob, head of Discover's card operations, in a meeting for which no records exist (A474-476; A2009; A2388). Yob had no recollection of the meeting; he was not involved in any aspect of

---

CBA Clause. In June 2000, a corporate Citi junior in-house counsel, Michael Heyrich, drafted a memorandum identifying the class-barring benefits of arbitration, relying substantially on an article from Kaplinsky, a Coalition participant who had also been discussing CBA Clauses with Nelson (A463; A467-468). Further, Heyrich's memorandum expressly recommended that Citi's general counsels should "discuss their experience with arbitration" with competitors (A467; A3298), which Citi's card in-house counsel were already doing. The memorandum led to a request from a senior Citi in-house counsel, Michael Ross, for a request on the "pros and cons" of a CBA Clause, to which Nelson responded with a proposed timeline for adoption, leading up to Kleinbaum's meeting with Freiberg (A468-469).

[18] Hayden attended the May 25, 1999 meeting as Discover's in-house counsel representative (A387).

implementing the clause; he was not aware of any analysis or research concerning arbitration; he had not reviewed an arbitration clause nor did he have any experience with arbitration; and he did not know whether any competitors had arbitration clauses (A475; A2006-2010; A2390-2392). Like his counterparts at Amex and Citi, Yob relied entirely on his senior in-house counsel with respect to the CBA Clause, including the same counsel who participated in the meetings.

### D. The Banks Eschewed the Competitive Advantages of CBA Clauses In Favor of Concerted Conduct

Although repressive and one-sided from consumers' perspective, a CBA Clause ostensibly offered a potential cost savings device from the Banks' perspective. Defendants' senior in-house counsel all understood this potential. Amex identified the "avoidance of very expensive class action suits in the medium to longer term" (A442-443; A2061) as a key benefit of arbitration and that eliminating class actions was "[a]bsolutely" a reason for Amex's adoption of a CBA Clause (A443; A2063-2064). Citi's in-house counsel primarily responsible for its adopting a CBA Clause, Kleinbaum and Nelson, each agreed that eliminating class actions was a major reason for using arbitration (A443; A2317; A2352). Discover's senior in-house counsel, Swift, also viewed arbitration as an "opportunity" to reduce litigation costs attributed to class actions (A443; A2399).[19]

---

[19] The other Banks similarly viewed arbitration as a mechanism to eliminate class actions and their associated costs (*see generally* A444-445).

40

A Bank that developed a viable, enforceable CBA Clause, therefore, possessed a cost savings advantage over its competitors. There would be no legitimate reason to divulge internal policies or practices regarding CBA Clauses, nor would a Bank wish to see a competitor seize the same advantage. But, by participating in the Arbitration Coalition and other groups, the early adopting Banks shared their advantage with competitors.

Discover is illustrative. Swift explained that "[t]o the extent that [Discover] had provisions in our arbitration clause that would be enforceable in many jurisdictions where challenges had been raised and that we had addressed those challenges, I felt that that would be an advantage to us" (A479-480; A2410-2411). Daily, a Coalition participant, also viewed Discover's clause as a "business advantage" and testified it would not have been beneficial for other Banks to adopt a CBA Clause (A480; A1608). Yob stated the CBA Clause separated Discover from its competitors because it was in "line with Discover's strategic goals in customer service" (A480; A2009-2010; A2391).

Despite this perceived competitive advantage, Daily—who helped research and make the case in favor of adopting a CBA Clause (*see* A473-476)—attended or was invited to (where no attendance list was produced for one meeting) five of the first six Arbitration Coalition meetings, held from July 28, 1999 through April 18, 2000 (A392; A398-400; A404). During that time, Daily prepared and

41

circulated to Discover's competitors a set of FAQs, based on internal Discover materials he had vetted with Discover personnel (A379; A398; A454-455; A3216; A3367; A3392; A3393); encouraged the group to fund research supporting CBA Clauses, which led to a discussion on how best to control the outcome of such a study while shielding it from potential discovery in litigation (A453; A2941; A3105; A3108); secured authorization from Discover's General Counsel to help share with the other Banks the costs for any research initiated by the Coalition (A453; A2941; A3105); and organized and participated in conference calls with Coalition members to discuss a "self-regulation project" or purported "fairness principles" for CBA Clauses (A455-456; A3392; A3393; A3416).

Daily provided Discover's competitors with this helpful information just as Discover noticed (in July 1999) and implemented its CBA Clause (in September 1999)—coincident with the first two meetings in July and September 1999—effectively ceding Discover's "competitive advantage" as soon as the bank had acquired it (*see* A383; A387; A392; A393).

This behavior is remarkable because the Banks *otherwise* competed vigorously on aspects of dispute resolution services other than CBA Clauses.[20]

---

[20] *See, e.g.*, A2009 (Discover sought to differentiate itself from its competitors on the basis of customer service; noting Discover was the first to offer toll free call centers and emphasized training for service representatives); A2014 (same); A2036-2037 (Citi has a "very strong process" for dealing with customer complaints); A2061-2062 (Amex closely monitored customer complaints,

Participating in the Arbitration Coalition and other meetings and conference calls was the antithesis of "fierce competition" by the Banks. Any competitive advantage gained both from adopting a viable CBA Clause and developing customer-oriented strategies to maximize the benefit of such a clause was lost by sharing this information with competitors. Rather than compete, the Banks relinquished a business advantage in favor of collective action against their consumers (and the perceived specter of a "plaintiffs' bar") to insulate themselves from consumer awareness, and possible backlash, of CBA Clauses.

### E.   The Banks' Motivation for Adopting and Maintaining CBA Clauses

In pursuing industry-wide adoption of CBA Clauses, the Banks were driven by their intense hatred of class actions, which they characterized as strictly nuisances (A379; A3393) and meritless (A379-380; A1896; A1991-1992; A2021; A2399), or as "a gaming business" (A2890), "shakedown racket" (A1718; A2890) or "blackmail" (A1429; A3393). They viewed their own cardholders (acting as representative plaintiffs) as their class action "adversaries [who we]re determined to bring industry to its knees" (A378; A1723; A2897).

---

including using call centers and holding service representative "roundtable" meetings); A2251-2252 (Amex's top concern was preserving customer relationship); A2386-2387 (Discover was going "to build the best customer service organization in the industry," *e.g.*, large call centers, empowered account representatives, etc.); A2426; A2431.

43

In setting aside their competitive rivalry, the Banks worked together to impose CBA Clauses, which they well understood effectively immunized them from classwide liability for unlawful conduct that injured their cardholders. The Banks' collusion allowed them to abuse cardholders without direct reprisal by the victims. Both Discover and Amex were later subject to investigations by the Consumer Finance Protection Bureau ("CFPB") and the Federal Deposit Insurance Corporation ("FDIC"), resulting in fines and consent orders (*see* A503-507).

These agencies found that from 2007 through 2011 Discover engaged in deceptive marketing practices (including failure to disclose material terms and conditions) and unsafe or unsound banking practices (A504; A4603-4607). Discover was ordered to pay a $14 million civil penalty and to pay $200 million in restitution to consumers (A505; A4623-4630).

The agencies found that from at least 2003 through the spring of 2012 Amex engaged in deceptive debt collection practices, deceptive solicitations, failure to report customer disputes, employing discriminatory credit score modeling, and failing to implement effective employee training to ensure compliance with consumer protection laws (A505-506; A4460-4461; A4472-4473; A4495). Amex was ordered to pay a $27.5 million civil penalty and to provide $85 million in restitution to approximately 250,000 customers (A507; A4460; A4495).

These are the types of improper practices that Plaintiffs' expert, Dr. Oren

44

Bar-Gill,[21] predicted the Banks would engage in following their adoption of CBA Clauses (A507).

The Banks recognized that CBA Clauses would be perceived as anti-consumer. Collective action permitted them to form a unified front to address potential backlash from the public, consumers or regulatory agencies. If they all adopted CBA Clauses, it would be less likely that one or two of them would be singled-out for regulatory investigation or lawsuits for adopting an anti-consumer provision.

During the period of the meetings, the Banks shared concerns that CBA Clauses would generate negative press (*see* A451-457; A2272 (Amex); A2346-2347 (Citi); A2400 (Discover); A1875 (First USA)). In a July 31, 1998 internal memo, Amex flagged the potential PR risk associated with a CBA clause, noting "can we turn this into a positive?" and assigning that issue to Heine (A452; A4853). Siegel (Chase in-house counsel) memorialized that during the September 1999 Coalition meeting "[t]here was discussion [] about the fact that using

---

[21] Professor Oren Bar-Gill is a leading expert on the law and economics of contracts and contracting, including behavioral economics (*see generally* A4418 (curriculum vitae)). He was the Evelyn and Harold Meltzer Professor of Law and Economics at New York University School of Law and also served as co-director of NYU's Center for Law, Economics and Organization, before joining Harvard Law School. Professor Bar-Gill has written extensively about the economics of consumer credit, including co-authoring "Making Credit Safer," which appeared in the University of Pennsylvania Law Review (2008), and authoring "Seduction by Contract: Law, Economics and Psychology in Consumer Markets," published by Oxford University Press in 2012.

45

arbitration for credit cards could be perceived as anti-consumer which could spawn more bills in Congress in the future" (A452; A2687).

The Banks, however, did not act as an "advocacy" group trying to promote consumer awareness or appreciation of the benefits of CBA Clauses. The Arbitration Coalition was a private, invitation-only group. It never became a formal organization (*see, e.g.*, A1703). Nor did the group provide funding akin to a political organization. At most, the Coalition contributed to scattered amicus briefs, which they did anonymously and "without attribution to any of the members" (A395; A461; A2931).

Defendants themselves acknowledge that as an advocacy venture, the Coalition was an abject failure: (i) at least "85 or 90 percent" of their advocacy projects never got off the ground (A683); (ii) they never selected an "institution or researcher" to conduct research on arbitration (A684);[22] (iii) they never drafted or agreed upon "voluntary fairness standards" (A685); and (iv) they never engaged a public relations firm—in fact, the PR firm Burson Marstellar, which attended a number of meetings (A392. A402-403), made a presentation to the Coalition that "flopped" (A687).

---

[22] When the Coalition did discuss possible arbitration research, they were more concerned with secretly controlling how the research would be conducted in order that they may abort the project if the results were unfavorable (*see* A453; A2941; A3105; A3108).

46

To the contrary, a genuine advocacy effort by the Banks would likely have increased consumer awareness of CBA Clauses in the marketplace, requiring the Banks to act competitively. Plaintiffs' expert, Dr. Bar-Gill, analyzed this issue in terms of "salience" (A447-451). Salience describes the prominence to consumers of various aspects of a multidimensional product. Those product aspects that are visible to consumers, and which have a stronger influence on consumer choice among products, are "salient" (A447; A2074; A2090-2091).

Dr. Bar-Gill explained that collusion can inhibit or delay the rise to salience of product features that would become salient under competitive conditions (A450; A2096). If there are

> sellers in a market colluding to adopt a particular term and to make that term pro-issuer, for example, a class-barring arbitration clause, this collusion can also prevent one issuer from saying you know what, I am actually going to offer a pro-consumer provision on this thing mentioned and market it. So the collusion keeps all of these terms in one kind of pro-issuer place. Then it might prevent the otherwise forces of competition that can make the term salient.

(A450; A2096).

Dr. Bar-Gill found that consumers would be harmed by cartel conduct involving CBA Clauses. He determined that collusion would lead to "reduction in choice" and "diminished quality" of cards (A2109). Collective action by the Banks also "led to an adoption of the CBA clauses earlier" then they otherwise

47

would have been adopted, as well as preventing cardholders from becoming more aware of CBA Clauses (A2104).

A CBA Clause is a highly specialized provision that benefits only the Banks because the clauses block consumers' ability to challenge improper or illegal practices. Dr. Bar-Gill found that by eliminating class proceedings cardholders are effectively barred from bringing suit because "the benefits for bringing an individual suit exceed the cost for bringing such a suit" (A2081; A2083). *See also American Express Merchants' Litig.*, 634 F.3d at 194. A cardholder who is subject to a CBA Clause has no ability to vindicate his or her rights without the class option (A2083). As reflected by the enforcement actions discussed above, the CBA Clauses affected the Defendants' incentives and made it more likely that they would engage in practices that are harmful to cardholders (A2085).

While the Banks did compete on other aspects of dispute resolution services (*see, e.g.*, n.20), they chose not to compete on CBA Clauses, instead agreeing to become "well networked" in order "to do a better job in communicating" with other Banks in "[w]orking together to turn the tide" and "sharing best practices" to "protect[] industry use of arbitration" (*see* A388; A390-392; A410).

48

## SUMMARY OF ARGUMENT

It is well-established that antitrust law requires examining both the conduct and the results of that conduct to ascertain whether an antitrust violation has occurred. The "essential combination or conspiracy in violation of the Sherman Act may be found in a course of dealings or other circumstances as well as in an exchange of words." *Am. Tobacco Co. v. United States*, 328 U.S. 781, 809-10 (1946); *Apex Oil v. DiMauro*, 822 F.2d 246, 252 (2d Cir. 1987); *Ambook Enterprises. v. Time Inc.*, 612 F.2d 604, 614 (2d Cir. 1979); *United States. v. Beaver*, 515 F.3d 730, 738 (7th Cir. 2008); *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, 998 F.2d 1224, 1242 (3d Cir. 1993) ("an antitrust plaintiff can establish concerted action through the defendants' behavior standing alone"). No formal agreement is required. "It is not the form of the combination or the particular means used but the result to be achieved that the statute condemns." *Am. Tobacco*, 328 U.S. at 809.

The district court's analysis did not comport with these bedrock antitrust principles resulting in at least three serious legal errors.

First, despite finding both that the Banks agreed to establish industry use of CBA Clauses and that they all adopted such clauses, the district court declined to find an "agreement" to combine or conspire. In practical effect, the court did not look to the Defendants' conduct, instead essentially requiring evidence of

49

conspiracy akin to an express statement of agreement or assent among the Banks, *i.e.*, the Banks informing each other that they will adopt a CBA Clause if the others also do so.  Antitrust law does not impose such a strict requirement to prove collusion as "conspiracies are rarely evidenced by explicit agreements." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 183 (2d Cir. 2012).  "It is not necessary to find an express agreement in order to find a conspiracy.  It is enough that a concert of action is contemplated and that the defendants conformed to this arrangement."  *Ambook*, 612 F.2d at 614 (quoting *United States v. Paramount Pictures*, 334 U.S. 131, 142 (1948)).  The record and the district court's findings unquestionably demonstrate the Banks contemplated they would all use CBA Clauses and that they conformed to that arrangement.

Second, the district court used an incorrect standard for weighing the evidence, requiring that "Plaintiffs must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently" (SPA-51; SPA-81 (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986))).  However, this Court has instructed that antitrust plaintiffs are not required to "dispel" the possibility of independent action to prove an antitrust violation. *See Publ'n Paper*, 690 F.3d at 61-63.

Third, the district court improperly analyzed the evidence in separate parts without the benefit of examining all of Plaintiffs' conspiracy evidence as a whole,

contrary to the longstanding antitrust maxim that "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each,'" *Cont'l Ore Co. v. Union Carbide & Carbon Corp*., 370 U.S. 690, 699 (1962); *In re Tamoxifen Citrate Antitrust Litig.*, 466 F.3d 187, 201 (2d Cir. 2006), *abrogated on other grounds by F.T.C. v. Actavis, Inc.*, 133 S. Ct. 2223 (2013); *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 655-56, 661 (7th Cir. 2002); *Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1007 (3d Cir. 1994).  Nowhere in its analysis does the court draw together Plaintiffs' evidence of the Banks' combination or conspiracy as a whole.

Had the court examined the conspiracy here in its entirety, it would have found the record "reasonably tends to prove" the Banks combined and/or conspired to adopt and maintain CBA Clauses. *Monsanto*, 465 U.S. at 764.  It is a result that logically follows the district court's finding the Banks agreed to make CBA Clauses the "industry norm" (SPA-82).

Despite these serious errors, even the district court conceded that Plaintiffs' asserted failure of proof was only by a "slender reed" (SPA-90).  Accordingly, the district court's ruling that Plaintiffs failed to prove combination or conspiracy by a preponderance of the evidence was error and should be reversed.

Additionally, the district court erred by improperly conflating the principles

51

of antitrust standing and antitrust injury when it ruled that Plaintiffs do not have antitrust standing. Standing is an issue that arises prior to trial, and which the court previously found satisfied. *See Ross v. American Express Co.*, 773 F. Supp. 2d 351, 372-73 (S.D.N.Y. 2011); *Ross v. Bank of America*, 2009 WL 151168, at *3-*4 (S.D.N.Y. Jan. 21, 2009). The requirement of antitrust injury is addressed after trial and it is satisfied here because Plaintiffs have proven that Defendants participated in a combination or conspiracy to adopt and maintain CBA Clauses.

## STANDARD OF REVIEW

A district court's conclusions of law and "application of law to the facts is reviewed *de novo*." *See Peconic Baykeeper, Inc. v. Suffolk County*, 600 F.3d 180, 185 (2d Cir. 2010) (following bench trial). The court's findings of fact are reviewed under a "clearly erroneous" standard. *See Krist v. Kolombos Rest. Inc.*, 688 F.3d 89, 95 (2d Cir. 2012).

On the issue of antitrust conspiracy (or agreement), "the ultimate conclusion by the trial judge, that the defendants' conduct did not constitute a combination or conspiracy in violation of the Sherman Act, is not to be shielded by the 'clearly erroneous' test" and is a matter of law reviewed *de novo*. *United States v. Gen. Motors Corp.*, 384 U.S. 127, 141 n.16 (1966).

52

## ARGUMENT

### I.    Plaintiffs Proved That the Banks Combined and/or Conspired to Adopt and Maintain CBA Clauses

The extensive record here undeniably established that the Banks, all ostensibly "fierce" and "vicious competitors" (SPA-63), agreed to participate in numerous meetings for the purpose of establishing CBA Clauses as the industry norm (SPA-82).  This is the conclusion the district court reached: "***It is clear that the Issuing Banks had an agreement*** [i] to explore advocacy efforts aimed at expanding the enforceability of arbitration clauses and [ii] ***to establish class-action-barring arbitration as an industry norm***."  (SPA-82).

An agreement among horizontal competitors to each adopt the same term or condition of sale—here, CBA Clauses—***alone*** satisfies the requirement that an antitrust plaintiff show "a combination or some form of concerted action between at least two legally distinct economic entities," *Geneva Pharms. Tech Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 506 (2d Cir. 2004), in order to prove a violation of Section 1 of the Sherman Act.[23]

---

[23]  An antitrust plaintiff must also show the combination or concerted action unreasonably restrained trade.  *Geneva*, 386 F.3d at 506.  The district court explained it would have applied a "quick look" analysis to this issue and would have found that collusively imposed CBA Clauses "constituted an unreasonable restraint on trade in violation of [S]ection 1 of the Sherman Act" (SPA-89).  While the court used a "quick look," Plaintiffs do not concede that Defendants' collusive conduct is not a *per se* violation, *see, e.g.*, *Paramount Famous Lasky*, 282 U.S. at 43-44, and further note that Defendants failed to provide any evidence of any

But the record here shows much more. As the district court found, over the course of the numerous meetings, conference calls and other communications, all of the Banks adopted and maintained CBA Clauses (*see* SPA-53). Once all the Banks adopted CBA Clauses, the regular pattern of meetings dropped off and then stopped (*see* SPA-54). The groups formed to facilitate inter-firm communications among horizontal competitors then disbanded (*see id.*). As recognized by the district court, the record also shows the Banks were motivated to work together (SPA-62) and they had an extraordinary volume of inter-firm communications over an extensive period of time concerning CBA Clauses (SPA-53; SPA-63 ("unusually high amount of inter-firm communications"); SPA-65 ("number of meetings … exceeds a level normally associated with client development pitches or CLEs")).

Together, these ***undisputed*** facts prove a CBA Clause conspiracy among the Banks. Antitrust law has set forth a variety of formulations on what qualifies as a "conspiracy." A plaintiff must "present direct or circumstantial evidence ***that reasonably tends to prove*** that the [defendant(s)] and others had ***a conscious commitment to a common scheme designed*** to achieve an unlawful objective." *Monsanto*, 465 U.S. at 764; *see also United States v. Apple, Inc.*, 952 F. Supp. 2d 638, 689 (S.D.N.Y. 2013) (*appeals filed* October 3 & 4, 2013). Alternatively, it is

---

purported competitive benefits arising from the joint imposition of CBA Clauses by horizontal competitors (*see* SPA-89).

sufficient where, as here, the record shows "the conspirators had *a unity of purpose* or *a common design and understanding*, or *a meeting of minds* in an unlawful arrangement, the conclusion that a conspiracy is established is justified." *Am. Tobacco*, 328 U.S. at 810; *Anderson News*, 680 F.3d at 183; *Apex Oil*, 822 F.2d at 252; *Venture Tech., Inc. v. Nat'l Fuel Gas Co*., 685 F.2d 41, 45 (2d Cir. 1982). The Banks joint pursuit of industry-wide use of CBA Clauses qualifies as a "conspiracy" under any of the above constructions.

The district court should have ruled that Plaintiffs had proved collusion to adopt and maintain CBA Clauses, and moved on to address whether this collusive conduct constituted an unreasonable restraint on trade (which conclusion the court said it would have reached (*see* n.23 *supra*)). Despite having found an agreement by the Banks to cause CBA Clauses to become the "industry norm" where the Banks, who dominate the credit card market,[24] ultimately did adopt and maintain such clauses, the district court declined to conclude that Plaintiffs proved collusion.

In failing to find conspiracy, the district court committed the several legal errors summarized *supra* at pp. 49-51. Each of these errors is further discussed below and this discussion is followed by an examination of the record as whole,

---

[24] The Court found the Banks possessed immense market power in the card market: "'[N]o elaborate industry analysis is required to demonstrate the anticompetitive character' of any agreement to adopt and maintain arbitration clauses among Issuing Banks that together hold an 80% share of the market" (SPA-88-89) (citation omitted). *See also* SPA-90 (Issuing Banks were responsible "for approximately 87% of all credit card transactions in the United States").

which demonstrates that Defendants combined and/or conspired to adopt and maintain CBA Clauses.

### A.    The District Court Erred By Requiring Evidence of Explicit Agreement to Collusively Impose CBA Clauses

Section 1 of the Sherman Act prohibits "[e]very contract, combination ... or conspiracy" in restraint of trade.  15 U.S.C. § 1.  "The crucial question in a Section 1 case is therefore whether the challenged conduct 'stem[s] from independent decision or from an agreement, tacit or express.'"  *Starr v. Sony BMG Entm't*, 592 F.3d 314, 321 (2d Cir. 2010) (quoting *Theatre Enterprises, Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540 (1954)); *see also Monsanto*, 465 U.S. at 764; *Anderson News*, 680 F.3d at 183-84.  "As a practical matter," the "best proof available most often will only tend to show the existence of an informal, perhaps even tacit, rather than explicit, agreement."  *Apex Oil*, 822 F.2d at 253; *Minpeco, S.A. v. Conticommodity Servs., Inc.*, 673 F. Supp. 684, 689 (S.D.N.Y. 1987).  The ultimate existence of an informal or tacit agreement under antitrust law is a legal conclusion.  *See Starr*, 592 F.3d at 319 n.2.

As a result, a court will look to the defendants' actions to draw a reasonable inference of conspiracy.  *See Monsanto*, 465 U.S. at 768; *Interstate Circuit v. United States*, 306 U.S. 208, 221 (1939) (direct testimony of agreement is often absent which "compel[s plaintiffs] to rely on inferences drawn from the course of conduct of the alleged conspirators").  Unlawful conduct may be inferred from

"uniform behavior among competitors, preceded by conversations implying that later uniformity might prove desirable or accompanied by other conduct that in context suggests that each competitor failed to make an independent decision." *Brown v. Pro Football, Inc*., 518 U.S. at 241 (internal citations omitted); *see also United States v. Consol. Packaging Corp*., 575 F.2d 117, 126 (7th Cir. 1978) (recognizing cartels often "devise some subtle, unique form of conspiracy tailored to best serve their own purposes" that "cannot be easily accommodated in the familiar mold of a simple and limited conspiracy").

"It is ***not necessary to find an express agreement*** in order to find a conspiracy. It is enough that a concert of action is contemplated and that the defendants conformed to this arrangement." *Ambook*, 612 F.2d at 614 (quoting *Paramount Pictures*, 334 U.S. at 142); *Consol. Packaging*, 575 F.2d at 126.

The district court found that the Banks contemplated—and agreed—they would work together to cause their industry to adopt and use CBA Clauses as an industry norm (SPA-82), and they all conformed to this agreement by adopting and maintaining such clauses (SPA-53-54). This suffices to prove conspiracy under the Sherman Act. All Plaintiffs must do is provide "direct or circumstantial evidence that reasonably tends to prove, " *Monsanto*, 465 U.S. at 764, the Banks combined and/or conspired to impose CBA Clauses, which standard Plaintiffs met. The district court erred to the extent it required evidence of explicit illegal

agreement because lawyers participated in the cartel conduct and, at times, activities also included events similar to a trade association or lobbying group (*see* SPA-82).

### B. The District Court Erred by Applying An Improper and Overly Restrictive Standard for Finding Conspiracy

A reason why the district court failed to find an "illegal agreement," despite the abundance of evidence demonstrating collusive conduct among the Banks, is the court applied an incorrect standard for weighing the evidence. The court improperly limited the inferences to be drawn from the trial evidence by requiring that "Plaintiffs must present evidence 'that tends to exclude the possibility that the alleged conspirators acted independently.'" SPA-51 (quoting *Matsushita*, 475 U.S. at 588). That is not the applicable standard.

This Court has cautioned against an over-reading of the *Matsushita* "tends to exclude" language. *See Publ'n Paper*, 690 F.3d at 61-63 (vacating summary judgment of Section 1 antitrust claim granted in favor of manufacturer). The Court explained that "[r]equiring a plaintiff to 'exclude' or 'dispel' the possibility of independent action ***places too heavy a burden*** on the plaintiff." *Id.* at 63. Where "a plaintiff relies on ambiguous evidence to prove its claim, ***the existence of a conspiracy must be a reasonable inference*** that the [factfinder] could draw from that evidence; it need not be the ***sole*** inference." *Id.* (emphasis on "sole" in original). In other words:

58

> It is important not to be misled by *Matsushita's* statement ... that the plaintiff's evidence, if it is to prevail, must 'tend ... to exclude the possibility that the alleged conspirators acted independently.' The Court surely did not mean that the plaintiff must disprove all nonconspiratorial explanations for the defendants' conduct. Not only did the court use the word 'tend,' but the context made clear that ***the Court was simply requiring sufficient evidence to allow a reasonable fact finder to infer that the conspiratorial explanation is more likely than not***."

*Id.* (quoting Phillip E. Areeda and Herbert Hovenkamp, *Fundamentals of Antitrust Law*, § 14.03(b), at 14-25 (4th ed. 2011) (footnotes omitted)).

Whether the evidence is sufficient to allow a reasonable factfinder to infer a collusive agreement is strongly influenced by the plausibility of the alleged conspiracy. *See Publ'n Paper*, 690 F.3d at 63.[25] Plaintiffs certainly alleged a plausible conspiracy. The district court recognized this plausibility when it determined that, under a "quick look" analysis, "the collusive adoption of mandatory class-action-barring arbitration clauses, if proven, would have constituted an unreasonable restraint on trade in violation of section 1 of the Sherman Act." (SPA-89). That plausibility is further buttressed by many of the court's other findings, including, for example: the Banks possessed market power in the card market (SPA-88-89); they had a motive to conspire (SPA-62); they engaged in a sustained and unusually high amount of inter-firm communications

---

[25] In *Matsushita*, the Supreme Court found the alleged conspiracy—a 20-year scheme to impose below cost pricing—implausible and therefore required the plaintiffs there to provide "more persuasive" evidence. 475 U.S. 587; *see also Publ'n Paper*, 690 F.3d at 62-63.

(SPA-63, SPA-65); they agreed to make CBA Clauses the "industry norm" (SPA-82); and by March 2002, all the Banks had adopted CBA Clauses (SPA-90).

It was error, therefore, for the district court to require Plaintiffs to dispel the possibility the Banks may have acted independently when the plausibility of the alleged conspiracy here warranted that reasonable inferences of collusion should be drawn from the entirety of the record. *See Publ'n Paper*, 690 F.3d at 63 (broader inferences are permitted, and the "tends to exclude" standard more easily satisfied, when the conspiracy is plausible) (citing *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 358 (3d Cir. 2004)).

Two examples help illustrate how the district court's improper "tends to exclude" standard deprived Plaintiffs of the full weight of their evidence. The court found the Banks "need to parry consumer backlash and temper any 'rogue' players establish[ed] a motive to conspire in the adoption of arbitration clauses" (SPA-62), but also observed that the Banks would be motivated to cooperate to sway public opinion on arbitration and to defend the legality of their clauses (SPA-63). The court also found the Banks "engaged in an unusually high amount of inter-firm communications regarding arbitration" (SPA-63) and the "number of meetings over a sustained period devoted to the topic of arbitration far exceeds a level normally associated with client development pitches or CLEs" (SPA-65), but also observed the Coalition meetings were akin to a fledgling special interest group

60

(SPA-67).

These evidentiary findings support reasonable inferences of collusion. Each assessed on their own may not "dispel" the corresponding observations of permissible or independent conduct. But, as this Court has instructed, they are not required to do so. *See Publ'n Paper*, 690 F.3d at 62-63. It is likely that **both** unlawful and lawful conduct occurred. Rarely does human conduct fall into "all bad" or "all good" characterizations. By requiring Plaintiffs to dispel inferences of putatively non-collusive conduct (that may or may not have also occurred during the various meetings), the district court essentially neutralized each item of evidence supporting an inference of collusion, and, as discussed in the next part, it did so without looking at all the inferences of collusion as a whole.

In sum, the district court erred because it applied an improper weighing standard. The court should not have looked to see whether one inference "tends to exclude" another. *See id.* at 63.

## C. The District Court Erred By Separately Examining Evidence of Conspiracy

Antitrust "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each.'" *Cont'l Ore*, 370 U.S. at 699; *see also Fears v. Wilhelmina Model Agency, Inc.*, 2004 WL 594396, at *4 (S.D.N.Y. Mar. 23, 2004) (recognizing that while "factors considered independently … may be insufficient

61

to establish an inference of conspiracy" a reasonable inference of conspiracy can arise when those same factors are considered as a whole) (internal citations omitted); *In re Med. X-Ray Film Antitrust Litig.*, 946 F. Supp. 209, 218 (E.D.N.Y. 1996) ("in combination [various factors] taken together and 'on the ground' may support a reasonable inference that an agreement or conspiracy existed."). As Judge Posner explained, the "trap to be avoided ... is to suppose that if no single item of evidence ... points unequivocally to conspiracy, the evidence as a whole cannot" support an antitrust claim. *High Fructose*, 295 F.3d at 655.

While the district court acknowledged this maxim (*see* SPA-53), a review of its evidentiary analysis reflects that it ran afoul of the "trap" described by Judge Posner, *i.e.*, the court separately determined the weight of certain evidence. There are numerous examples illustrating this compartmentalized approach:

- The district court found the Banks had a motive to collude to cause CBA Clauses to be the industry norm, but that they may also have collaborated to sway public opinion or to defend the legality of their clauses. (SPA-61-63) Because the court deemed the two motives equally plausible, it reasoned "there can be no fair inference of collusion" from the record on motive (SPA-63).[26]

- The court found the Banks engaged in "an unusually high amount of inter-firm communications regarding arbitration" (SPA-63), but reasoned that mere opportunity to conspire is not proof of conspiracy (SPA-64).

---

[26] In addition, in the earlier meetings, there was no motive to collaborate to defend CBA Clauses which most of the Banks had not yet adopted.

- The court found the May 25, 1999 Wilmer meeting provided an opportunity to conspire, but observed there was no evidence of a "meeting of the minds" at that meeting (SPA-65).

- The court found that the numerous Arbitration Coalition meetings involving a high level of cooperation and information sharing among fierce competitors raised an inference of illegality (SPA-67), but observed that some meeting activity was akin to a fledgling special interest group (*Id.*).

- The court found that the Class Action Group meetings on their own did not support an inference of collusion (SPA-68), while omitting that it was during these meetings the Banks discussed and formed the In-House Counsel Group (*see* A413-415).

- The court found that while the In-House Counsel Group calls raised antitrust concerns it "fizzled" and "faded away" (SPA-68-69), but omitted that the group discussed arbitration issues (A413; A423-424), the group's calls coincided with the later-adopting Banks' decisions to implement CBA Clauses, the calls ended the same month the last Bank adopted a CBA Clause, (A423), and the conference call password was "ARBITRATION." (A415).

These examples show the district court analyzed the various aspects of Plaintiffs' conspiracy evidence separately. For each discrete aspect, the court stacked-up inferences of collusion alongside inferences of permissible activity, or in some instances, determined the evidence on its own did not raise an inference of illegality. This compartmentalized approach led to the district court's conclusion of no conspiracy because no single piece of evidence "point[s] unequivocally to conspiracy." *High Fructose*, 295 F.3d at 655.

The district court's analysis did not examine Plaintiffs' conspiracy evidence in its entirety. A motivation to make CBA Clauses the "industry norm" on its own

63

may not establish a conspiracy, just as a single price increase standing alone may not prove a price-fixing conspiracy.  But where the evidence also shows that proof of the Banks' motivation arises from the early communications and invitations leading to the first (known) Arbitration Coalition meeting (*see* A388, A390-391; A2920; A3335), that a total of 28 meetings and calls were held (*see* Part II.B.5), during the course of which all of the Banks adopted and/or maintained CBA Clauses (*see id.*), and the meetings ended shortly after the last Bank implemented its CBA Clause (*see* A423-427), then together the evidence presents a strong, reasonable inference the Banks conspired to adopt and maintain CBA Clauses. And in this case, there was explicit evidence and a district court finding that the Banks formed the Arbitration Coalition for the "ultimate goal" of making CBA Clauses the "accepted industry standard" (SPA-55).  This was far beyond mere parallel motives or conduct.

Because the district court did not examine the evidence as a whole to determine whether the record ***in its entirety*** "reasonably tends to prove" the Banks conspired to adopt and maintain CBA Clauses, as required by *Cont'l Ore*, 370 U.S. at 699, *Monsanto*, 465 U.S. at 764, and other applicable law, it erred in finding Plaintiffs did not prove conspiracy.

64

**D.    The Evidence Reviewed as a Whole Demonstrates That Plaintiffs Proved the Banks Conspired to Adopt and Maintain CBA Clauses**

Applying the appropriate standards for evaluating the record as a whole, a factfinder would necessarily find the evidence reasonably tends to prove that Defendants and their co-conspirators had a conscious commitment to a common scheme to adopt and maintain CBA Clauses. *Monsanto*, 465 U.S. at 764. This is all Plaintiffs are required to prove under the "conspiracy" element of Section 1.

In *Publ'n Paper*, this Court explained that "the existence of a conspiracy must be a ***reasonable inference*** … [but] need not be the sole inference." 690 F.3d at 63. The detailed record, described in the Statement of the Case (at Part II) unquestionably establishes at least (and in fact much more than) a "reasonable inference" the Banks agreed to adopt and maintain CBA Clauses.

The pursuit of enforceable CBA Clauses by the Banks was not the product of competitive forces. The Banks set aside their self-described "fierce" and "vicious" competition (A373; A1542; A2261; A2386) in order to become "well networked" (A388; A3335) for the express purpose of resolving "challenges … to the adoption of arbitration clauses" (A393-394; A2807), and to establish CBA Clauses as the industry norm (SPA-82).

The notion the Banks "need[ed] to do a better job in communicating" in order "to ultimately prevail in establishing arbitration" (A388; A3335) originated with Amex and First USA, who were the first two Banks to adopt CBA Clauses

(A387-391, A449). They created the Arbitration Coalition as a group "uniquely devoted" to protecting the Banks' use of CBA Clauses (A410; A2897), and they invited their competitors, identified as "[l]eading companies that have adopted or are considering adopting arbitration" (A390-391; A2920), to join them.

The decisions by Amex and First USA to invite their major competitors to be "well networked" on arbitration issues only makes sense as an effort to convince the other Banks to adopt CBA Clauses. That these entities drew on assistance from others to launch the Coalition (such as the NAF or Ballard attorney, Alan Kaplinsky) in no way diminishes their role as initiators of the CBA Clause conspiracy. *See Apple*, 952 F. Supp. 2d at 701 (quoting *United States v. Andreas*, 216 F.3d 645, 679-80 (7th Cir. 2000)) ("[A] co-conspirator who used his power to guide or direct other conspirators qualifies as an organizer even though his control was not absolute. The need to negotiate some details of the conspiracy with the cartel members also does not strip a defendant of the organizer role."). It is also well-established that both leaders and followers are liable in an antitrust conspiracy. *See Paramount Pictures*, 334 U.S. at 161 ("acquiescence in an illegal scheme is as much a violation of the Sherman Act as the creation and promotion of" the illegal scheme).[27]

---

[27] *See also In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litig.*, 906 F.2d 432, 447 (9th Cir. 1990) ("when a price leader wished to initiate a restoration, it could effectively solicit tacit agreement") (citation and footnote

The Banks focused on "working together", "sharing best practices" and "drafting fair, enforceable arbitration provisions" (A382-392; A3335). They "agreed to take a number of steps going forward, including sharing [their] thoughts and materials … regarding arbitration" (A393; A3345). The language used by the Arbitration Coalition is one of action by the Banks, not legal "education" or social get-togethers.

The record shows the Banks did in fact communicate regarding their respective CBA Clause plans. Gail Siegel's (Chase) memorandum of the September 29, 1999 Arbitration Coalition meeting records information on five issuers' arbitration plans (A397; A2687). She also memorialized worries that using a CBA Clause for collections would "diminish[] its use to control class actions," in turn causing "the lawyers to abandon the effort" (A397-398; A2687). Heine's memorandum flagged that the Banks would guard against "the possibility of [a] rogue or unsophisticated player (not necessarily in our industry)" whose actions might negate the Banks' use of CBA Clauses (A395; A2931). Daily's memorandum highlighted his efforts to share and refine talking points (or "FAQs") regarding arbitration with Discover's competitors (A398; A3881). In

omitted); *United States v. Young Bros., Inc.*, 728 F.2d 682, 685 (5th Cir. 1984) (defendant convicted for "persuading potential bidders not to submit a bid or to submit a complimentary bid"); *Pittsburgh Plate Glass Co. v. United States*, 260 F.2d 397, 400 (4th Cir. 1958) (chairman of trade association announced an intention to raise prices during a meeting and others followed).

disseminating this information, Daily described how Discover used the FAQs to flag aspects of Discover's clause reflecting "special protections" (A455; A3393). The notable absence of memoranda describing the content of the 26 subsequent meetings does not negate an inference of conspiracy, it buttresses it.

The Banks' desire for direct inter-firm communication is also shown by their creation of the In-House Counsel Group. Discussions about this Bank in-house counsel-only group began no later than the two Class Action Group meetings (A408-409; A412-413; A2782; A2838; A3180; A3181; A3257; A3579; A3611; A3778; A3796; A4428). The group was a "sounding board" or "informal 'information please' email network" for the Banks' benefit to "answer[ ] the burning issues [their] business people keep raising!" (A415; A3186; A3188; A3615). The password used was "ARBITRATION" (A415; A3186; A3188). It was also a secret from friendly outside counsel, such as Wilmer and Ballard, who did not know the group existed (*see, e.g.*, A2152-2153). The Banks used this group's calls and "email network" to discuss CBA Clauses (A415; A423-424; A2602; A3186; A3188; A3624). These facts do not square with the district court's conclusion that the meetings resulted from outside counsel's marketing enthusiasm (*see, e.g.*, SPA-65; SPA-90).

And, there were instances of direct inter-firm communications among the Banks outside the context of the scheduled meetings and calls. These included

68

communications about sharing information on litigation issues (A433-435; A3497; A3631) and on arbitration, including how best to employ CBA Clauses (A434; A3212), information about plans to adopt CBA Clauses (A435-436; A3562; A3631), and whether one Bank offered customers a chance to opt out of the CBA Clause (A437; A3656).

In all there were at least 28 known meetings and conference calls, as well as additional inter-firm communications outside of the group activities (*see* A382-427; A433-440; pp. 28-30 *supra*).  Throughout this period, all of the Banks joined Amex and First USA in adopting and maintaining CBA Clauses, which clauses were promoted by the senior in-house counsel attending the meetings and calls (*see, e.g.*, A457-460; A464-467; A469-476).  The first tranche (Discover, MBNA, Bank of America and Household) did so during a peak period of meetings immediately following the initial Arbitration Coalition meeting: six in ten months—more than one meeting every two months (A387; A393; A398-400; A401; A403).  The next tranche (Providian, Citi, Capital One and Chase) added their CBA Clauses during another period of extensive meetings and calls: twelve in thirteen months—almost one event every month (*see* A382-427; pp. 28-30 *supra*; A409-411; A417-418; A423).  The district court recognized the timing of the CBA

69

Clause adoptions was consistent with collusion (*see* SPA-55-59).[28]   Indeed, a

conspirator can join a conspiracy at any time.[29]

Having achieved their objective to impose and maintain CBA Clauses, the

_____

[28] The district court correctly held that 28 meetings over a four-year period is indicative of parallel conduct and collusion (*see* SPA-53; SPA-59 (concluding "there was conscious parallel action in the adoption and maintenance of [CBA] clauses among the Issuing Banks," and that the "temporal connection between the meetings and adoption of the clauses suggests parallel conduct")).  The district court properly rejected Defendants' argument that a conspiracy cannot be carried out over a three or four year period noting that "not all conspiracies require swift, simultaneous parallelism." *Id.* at *25 (citing *In re Nw. Airlines Cop. Antitrust Litig.*, 208 F.R.D. 174, 198 (E.D. Mich. 2002)).

The district court's finding on parallel conduct is in line with long-standing precedent that conspiracies may last for many years and that conspirators may join and drop out over time. *See Paramount Famous Lasky*, 282 U.S. at 42 (affirming trial court's finding of a combination and conspiracy to adopt arbitration clauses that spanned a six-year period); *United States v. Green*, 523 F.2d 229, 233 (2d Cir. 1975) (eight-year conspiracy where members joined and dropped out over time); *United States v. Cont'l Group*, 603 F.2d 444, 449, 453 (3d Cir. 1979) (twenty six-year conspiracy where members joined and dropped out over time).  The fact that Defendants implemented their CBA Clauses at different times is similarly unremarkable. *See Interstate Circuit*, 306 U.S. at 227 ("It is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators.").  Further, the staggered adoption is easily explained by both the Defendants' legal sophistication (and desire to make it appear no collusion was occurring) and logistical difficulties in implementing Defendants' CBA Clauses (*see, e.g.*, A472-473 (describing Citi's operational difficulties with implementing a CBA Clause).

[29] *Interstate Circuit*, 306 U.S. at 227; *Green*, 523 F.2d 229 at 233 ("The fact that new members joined the conspiracy as time went on and old members may have dropped out does not preclude a finding that a single, ongoing conspiracy existed."); *see also In re Fresh & Process Potatoes Antitrust Litig.*, 2012 WL 3067580, at *11 (D. Idaho July 27, 2012) (citing *Green*); *In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671, 689 (S.D.N.Y. 2012); *In re Processed Egg Products Antitrust Litig.*, 821 F. Supp. 2d 709, 741 (E.D. Pa. 2011).

70

Banks' in-house counsel had no need to attend further meetings. *See Apple*, 952 F. Supp. 2d at 689 ("Just as a conspiracy's 'failure to achieve its ends' after an intended period may be 'strong evidence' that the conspiracy did not in fact exist, the success of the conspiracy in achieving its goals may confirm the very existence of the conspiracy.'") (citations omitted).

In March 2002, Chase was the last Bank to notice (or disclose) its CBA Clause (A423).  Over the next nineteen months there were only four scheduled Coalition events (A424-427; *see also* n.15 *supra*), and none by the In-House Counsel Group, whose last call was scheduled for March 19, 2002, contemporaneous with Chase's action (A423; A3280; A3624).  The Banks were no longer interested in participating in the Arbitration Coalition even though "there [was] a lot going on relating to arbitration, most of it bad" (A445-446; A3130).  In fact, many of the major challenges to CBA Clauses had yet to be reached by the Supreme Court.  *See, e.g.*, *American Express Co. v. Italian Colors Rest.*, 133 S. Ct. 2304 (2013); *AT&T Mobility v. Concepcion*, 131 S. Ct. 1740 (2011); *Stolt-Nielsen, S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662 (2010).

The Banks elected to "work[] together" (A391-392; A3335) despite viewing CBA Clauses as providing a competitive advantage (*see* A442-443; A2061; A2063-2064; A2317; A2352; A2399).  The district court, however reasoned this fact made an inference of collusion less likely because, the court believed, the

Banks could more easily obtain the cost-savings benefits of CBA Clauses by "educating one's competitors" (SPA-83).

This makes no competitive sense. If early adopters of CBA Clauses, like Amex, First USA and Discover, genuinely viewed the clauses as a competitive advantage (*see, e.g.*, A445; A479-480), they would not have participated in private meetings with their competitors where this competitive advantage would be dissipated. They would not engage in meetings or other communications where their competitors could learn about effective drafting of CBA Clauses (A391-392; A400; A423; A2837 (at n.204)); issues concerning opt outs and how to manage them (A437); whether to use CBA Clauses for collections as well as a defense to cardholder litigation (A397; A434-435); how to address inquiries from customers or the public (A393; A3980399; A454-455; A480); or any other facet of their respective CBA Clause business practices that would aid a competitor.

Even if a Bank believed it would derive some benefit from educating its competitors on CBA Clauses, that belief would not immunize the Bank for antitrust liability arising from participating in collusive conduct among competitors. "It is of no consequence, for purposes of determining whether there has been a combination or conspiracy under [Section] 1 of the Sherman Act, that each party acted in its own lawful interest. Nor is it of consequence for this purpose whether the [conduct at issue is] lawful or economically desirable." *Gen.*

*Motors*, 384 U.S. at 142-43 (citations omitted).

The Banks' collective conduct was successful in large part because they "worked together" rather than competed. The Banks characterized class actions as nuisances and meritless (A379-380; A1896; A1991-1992; A2399; A3393), and they saw their customers (represented by class action lawyers who they deemed to be "barbarians" (A2903; A1731)) as their "adversaries [who we]re determined to bring industry to its knees" (A378; A2897). Collective action provided the Banks with the opportunity, as MacDonald colorfully stated, to use CBA Clauses to get the class action "monkey off your back" (A1683; A1701).

A fair reading of the evidence as a whole, therefore, is that the inference of joint conduct among the Banks to adopt and maintain CBA Clauses is inescapable. They disregarded their typical competitive rivalry in favor of collaborative conduct. The documents evidencing the organization of the Arbitration Coalition overwhelmingly reflect the Banks' desire to communicate on implementing CBA Clauses. Throughout the period of the meetings and communications, the Banks engaged in numerous communications concerning arbitration. During the course of the meetings and communications, all the Banks adopted and maintained CBA Clauses, thereby giving up the competitive advantage associated with the clauses. At the time the last Bank implemented its CBA Clause, interest in continued meetings fell off and the meetings stopped. Although the validity of CBA Clauses

remained subject to serious challenges, the Banks, who dominate the credit card market, no longer attended meetings after CBA Clauses became the industry norm and the goal of the conspiracy was achieved.

There is an abundance of evidence, discussed above and at length in Part II of the Statement of the Case, compelling the ***reasonable inference*** that the Banks adhered to "a conscious commitment to a common scheme," *Monsanto*, 465 U.S. at 764; *Apple*, 952 F. Supp. 2d at 689, or had "a unity of purpose or a common design and understanding, or a meeting of minds," *Am. Tobacco Co.*, 328 U.S. at 810; *Anderson News*, 680 F.3d at 183; *Apex Oil*, 822 F.2d at 252, to adopt and maintain CBA Clauses. This was what Plaintiffs were required to demonstrate, without the obligation to "dispel" or "exclude" every inference of potentially independent conduct. *See Publ'n Paper*, 690 F.3d at 61-63.

Accordingly, Plaintiffs have proven the Banks combined and/or conspired, in violation of Section 1 of the Sherman Act, to adopt and maintain CBA Clauses. It was error for the district court to rule this element was not proved at trial.

### E.   Evidence Suggestive of Independent Conduct Is Insufficient To Undercut the Preponderance of Evidence Proving Conspiracy

A number of arguments were presented by Defendants and/or adopted by the district court suggesting the Banks' conduct was benign. These include: (i) that permissible conduct occurred during the meetings; (ii) the decision to adopt the CBA Clause was made independently; (iii) the meetings were a client development

effort by Wilmer; and (iv) that the Banks generally deny engaging in collusive conduct. None of these arguments withstand scrutiny, because when viewed as a whole and subject to reasonable inferences, the record proves collusion by the Banks.

### 1. Whether the Banks May, or May Not, Have Engaged in Some Permissible Conduct Does Not Negate Reasonable Inferences of Conspiracy

The district court declined to find the Banks colluded on CBA Clauses, in part, out of apparent concern the Banks may have engaged in (at least some) permissible business conduct during the meetings. For example, the Court observed that aspects of the meetings were akin to trade association, lobbying or protected *Noerr-Pennington* behavior (*see* SPA-82).

Even assuming, *arguendo*, the Banks pursued some trade association- or lobbying-like conduct, those activities do not negate reasonable inferences of a combination or conspiracy by the Banks. The inherent legality of any underlying conduct does not preclude an inference of an illegal antitrust violation:

> It is not of importance whether the means used to accomplish the unlawful objective are in themselves lawful or unlawful. Acts done to give effect to the conspiracy may be in themselves wholly innocent acts. Yet, if they are part of the sum of the acts which are relied upon to effectuate the conspiracy which the statute forbids, they come within its prohibition.

75

*Am. Tobacco*, 328 U.S. at 809.[30]

Thus, the district court's "***hesitan[cy]*** to infer an illicit agreement from a record where many of the Issuing Banks' communications resembled those of trade associations or lobbying groups" was misplaced (and is actually legal error) (SPA-82).

Trade association activity does not immunize one from antitrust liability. *See, e.g.*, *Standard Iron Works v. ArcelorMittal*, 639 F. Supp. 2d 877, 897 (N.D. Ill. 2009) (citing Richard A. Posner, Antitrust Law, at 170 (2d ed. 2001)) ("that the exchange is 'laundered' through a trade association should be no defense, especially since an empirical study of price-fixing cases found that trade associations have figured as defendants in a surprising number of cases"). Antitrust law is replete with cases finding collusion arising from trade association activities. *See United States v. Associated Press*, 52 F. Supp. 362, 370 (S.D.N.Y. 1943), *aff'd*, 326 U.S. 1 (1945) (discussing Supreme Court cases where majority of trade association activity was lawful except price fixing and "without [price

---

[30] *See also Cont'l Ore*, 370 U.S. at 707 ("it is well settled that acts which are in themselves legal lose that character when they become constituent elements of an unlawful scheme.") (citations omitted); *United States v. N.Y. Great Atl. & Pac. Tea Co.*, 173 F.2d 79, 82 (7th Cir. 1949) (citing *Am. Tobacco*, 328 U.S. at 809; *Associated Press*, 326 U.S. at 14) ("Some of the things done by the defendants, when examined and considered separately may be perfectly legal, but when used to promote or further a conspiracy to do an unlawful thing, that which when considered alone is lawful, when used to further the conspiracy becomes unlawful.").

fixing], the combination would have been lawful").[31]  And, of course, the Banks did not form an actual trade association; they formed private groups dedicated to implementing and then protecting their use of CBA Clauses.

The district court similarly erred by declining to draw inferences of collusion on the basis that certain Arbitration Coalition activities resembled *Noerr-Pennington* conduct (*see* SPA-82).  If some of the Banks' conduct was entitled to limited *Noerr-Pennington* immunity (which they failed to prove), the underlying conduct still qualifies as evidence demonstrating the purpose and character of the Banks' CBA Clause conspiracy. *United Mine Workers v. Pennington*, 381 U.S.

---

[31] *See also Allied Tube & Conduit Corp. v. Indian Head, Inc*., 486 U.S. 492 (1988) (open vote during trade association meeting supported finding of unlawful combination); *F.T.C. v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411 (1990) (agreement among court appointed counsel to stop providing representation); *F.T.C. v. Ind. Fed'n of Dentists*, 476 U.S. 447 (1986) (dental association policy requiring its members to withhold x-rays from insurers); *Am. Soc. of Mech. Eng'rs, Inc. v. Hydrolevel Corp*., 456 U.S. 556 (1982) (members of a standard setting organization declared a competitor's product unsafe); *Nat'l Soc. of Prof'l Eng'rs v. United States*, 435 U.S. 679 (1978) (trade group's canon of ethics prohibiting competitive bids); *Radiant Burners, Inc. v. Peoples Gas Light & Coke Co*., 364 U.S. 656 (1961) (trade association members refusing to provide safety approval for competitor's product); *Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*, 857 F.2d 55 (2d Cir. 1988) (professional tennis association's formal rules regarding tournament participation and sponsorship); *Klickads, Inc. v. Real Estate Bd. of N.Y., Inc*., 2007 WL 2254721 (S.D.N.Y. Aug. 6, 2007) (competitors mandated use of single IT service for real estate listings); *In re Auto. Refinishing Paint Antitrust Litig.*, 229 F.R.D. 482, 492 (E.D. Pa. 2005) ("communication and cooperation among Defendants through the aegis of a trade association may ... establish the existence of a conspiracy").

657, 670 n.3 (1965); *see also MCI v. AT&T,* 708 F.2d 1081, 1160 (7th Cir. 1983);

*Alexander v. Nat'l Farmers Org*., 687 F.2d 1173, 1196 (8th Cir. 1982). The

district court should not have neutralized such evidence because activity

immunized by *Noerr-Pennington* can support a Sherman Act violation.[32]

Whether the Banks may also have participated in otherwise permissible

behavior is no impediment to finding agreement to conspire, and, in fact, such

evidence itself may help prove conspiracy.

### 2.    The Record Demonstrates the Banks Did Not Independently Adopt and Maintain CBA Clauses

The record, viewed as a whole, shows that senior Bank in-house counsel

were integrally involved in both the inter-firm communications and the Banks'

decisions to adopt and maintain CBA Clauses, which unquestionably provides a

strong, reasonable inference the Banks' CBA Clause decisions were not made

independently. The district court, however, did not draw an inference of collusion

from the decisions to adopt and/or maintain CBA Clauses, despite finding the

"meetings [were] heavily slanted in favor of arbitration," instead concluding the

"final" decision to adopt was reached independently by each Defendant (SPA-83).

---

[32] *See, e.g.*, *Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co*., 305 F.3d 1124, 1138 (10th Cir. 2002); *In re Welding Fume Products Liab. Litig*, 2010 WL 7699456, at *93 (N.D. Ohio June 4, 2010); *Hamilton v. Accu-Tek*, 935 F. Supp. 1307, 1327 (E.D.N.Y. 1996); *In re Brand Name Prescription Drugs Antitrust Litig*., 1995 WL 509666, at *2 (N.D. Ill. Aug. 18, 1995); *Cont'l Airlines, Inc. v. Am. Airlines, Inc*., 824 F. Supp. 689, 702-03 (S.D. Tex. 1993); *Cipollone v. Liggett Group, Inc*., 668 F. Supp. 408, 411 (D.N.J. 1987).

This conclusion is perplexing because the district court had specifically rejected the notion that the timing of Defendants' decisions to adopt a CBA Clause militated against a finding of conspiracy: "Even if Amex, Discover, and Citi's decision to adopt arbitration were made independent of any consideration of their competitors' actions, their enduring participation at the meetings over the years would still implicate them in any agreement to maintain their clauses and facilitate adoption by other Issuing Banks" (SPA-59).

Regardless, the record shows that Bank senior in-house counsel, who also participated in the numerous meetings and other communications, were essential to the decision to adopt and maintain CBA Clause. It is true that executive "sign-off" at Amex, Citi and Discover was needed to implement a CBA Clause. But each executive with "sign-off" authority testified they were completely dependent on their senior in-house counsel regarding the advisability of a CBA Clause: Kelly, Amex's President of U.S. Cards, relied on senior in-house counsel Heine to advise on whether or not to adopt a CBA Clause (A457-460; A1557-1558; A2064-2065);[33] Freiberg, CEO of Citi's Cards, authorized a CBA Clause based on the recommendation of General Counsel Kleinbaum at a single meeting (A469-470; A2343-2344; A2352); and Yob, head of Discover's card operations, similarly

---

[33] Amex's President (Kenneth I. Chenault) was kept informed about Amex's CBA Clause (A2063; A5148). However, his approval was not required to implement the CBA Clause (A2063).

authorized the CBA Clause at a single meeting on the recommendation of his senior in-house counsel (A474-476; A2010; A2391).[34]  Thus, it was the senior in-house lawyers who initiated and spearheaded the approval of the CBA Clause projects.  And it was the senior in-house counsel who met and communicated with their competitors on CBA Clauses.

### 3.    The Arbitration Coalition and In-House Counsel Group Were Not Wilmer Initiated Client Development Functions

The district court observed that the May 25, 1999 meeting featured elements akin to a client development effort by Wilmer, which led the court to state the Arbitration Coalition arose from a corresponding "insatiable desire of law firms to develop new clients" (*see* SPA-65).  The quoted comment is a broad generalization that may be true, but as to the specific origins of the Coalition the court's observation is clearly erroneous and not supported by a view of the record of the meetings as a whole.

The record indisputably shows the meetings and communications of the Arbitration Coalition were not a business development program by Wilmer's Christopher Lipsett.  The Coalition was not a venture initiated by Wilmer.  The group's organizers were Bank personnel: Heine and MacDonald (A389).  There are *no* documents reflecting any invitations to the first known Coalition meeting,

---

[34] Similarly, Discover's General Counsel (Kelly McNamara-Corley) was aware of Discover's arbitration efforts (A453; A474; A1198; A1600-1601), but her approval was not required to implement the CBA Clause.

held on July 28, 1999, from any Wilmer attorneys.  Nor are there any documents from Wilmer reflecting any effort by the firm to organize that meeting.  When MacDonald reported how he had advanced the process on June 23, 1999—one month before the July 28, 1999 meeting—he emailed Heine and copied Ballard attorney Alan Kaplinsky, and two others (A389; A3098).  He did not copy or even mention any Wilmer attorney (A389; A3098).

Wilmer's absence from these key organizational Coalition documents is telling.  Had Lipsett actually organized the Arbitration Coalition then he and other Wilmer attorneys would have authored or at least have been identified in the documents. Wilmer attorneys would have sent invitations.[35]  They certainly would not have allowed a competitor lawyer, Kaplinsky, to occupy any kind of organizational support function and issue separate invitations (see A388-392).  Wilmer attorneys would have been identified as the primary contact persons for the first Coalition meeting.  Wilmer attorneys would have received regular updates on the organization of, and potential participants in, the Coalition.  They did not.

As to the In-House Counsel Group, Lipsett had no knowledge of the group's existence or that it held six conference calls (A2152-2153).  This secret group was not revealed to *any* outside counsel.

---

[35] In stark contrast, the May 25, 1999 invitations were sent by Wilmer (see A384; A386-387), and no other outside counsel participated in that meeting (A387; A2563).

81

That Wilmer attorneys, as well as Kaplinsky, acted as facilitators makes logical sense and comports with the record. They provided office space for the meetings from time-to-time (*see, e.g.*, A376; A383; A389; A398-400; A403-404; A410). After the initial Coalition meeting, they circulated emails scheduling upcoming meetings or calls. Wilmer and Ballard attorneys' interests were aligned with the Banks' interest to adopt and maintain CBA Clauses because these outside counsel would profit from related legal work, which they did provide (*see* A441-442; A459; A470-471; A474). Having them at some of the meetings also provided "cover" to the Banks' in-house counsel.

That the Wilmer and Ballard law firms were so closely intertwined with the Banks suggests their lawyers were not acting as independent, arms-length counsel but were instead acting as agents of the Banks. *See, e.g.*, *In re Artha Mgmt., Inc.*, 91 F.3d 326, 328, 329 (2d Cir. 1996) ("relationship between a lawyer and client is one of agent and principal" and "an attorney's, actual authority 'may be inferred from words or conduct which the principal has reason to know indicates to the agent that he is to do the act'") (citations omitted).[36] And the record shows these lawyers represented most of the Banks (*see, e.g.*, A441-442), which clearly makes them agents of the Banks. *Artha*, 91 F.3d at 328.

---

[36] *But see also Shahinian v. Tankian*, 242 F.R.D. 255, 261 (S.D.N.Y. 2007) ("It is important to note that the fact that a client has utilized the services of an attorney to perpetrate a fraud does not establish that the attorney was a knowing participant in the client's fraud.").

The fact remains that neither law firm initiated the idea for or otherwise launched the Arbitration Coalition or the In-House Counsel Group.  What these lawyers did do was provide assistance to the Banks in their ongoing CBA Clause scheme.

### 4.    The Banks' Denial That They Conspired to Adopt and Maintain CBA Clauses Carries Little or No Weight

Much of the Banks' defense is constructed on the mere assertion of denying they conspired.  Such *pro forma* denials carry little weight against the volume of evidence, discussed above, proving cartel conduct by the Banks.  *See, e.g.*, *Apex Oil*, 822 F.2d at 256 (holding fact finder must weigh defendants' denials of conspiracy against other evidence); *Minpeco*, 673 F. Supp. at 692 (conspiracy can be reasonably inferred despite defendants' "sworn denials"); *Products Liab. Ins. Agency, Inc. v. Crum & Forster Ins. Companies*, 682 F.2d 660, 662 (7th Cir. 1982) (Posner, J.) (holding "conclusional denials of conspiracy" entitled to little weight); *Alexander v. Phoenix Bond & Indem. Co.*, 149 F. Supp. 2d 989, 1000 (N.D. Ill. 2001) (noting defendants' denials of conspiracy can be countered by other evidence).

Their denials also suffer from a lack of credibility by critical participants.  For example, MacDonald, retained by First USA as a "consultant" to spearhead the Arbitration Coalition project (A389), did all that he could to cause the Banks to adopt and maintain CBA Clauses.  He was a self-proclaimed "proponent" of

arbitration (A1683) to insulate Banks from class actions. MacDonald viewed class actions as "old fashioned protection rackets" (A2882), "legalized extortion" (A2834; A1718), a "gaming business" (A2890), or a "[s]hakedown racket" (A2890; A1718). He characterized such actions as "a nuisance, a game played by trial lawyers to line their own pockets and harass business" (A1683), and that class action lawyers were "barbarians" (A2903; A1731) whose greed was "self-evident" (A1691).

MacDonald's claim the Banks never agreed to collectively implement CBA Clauses (A1735) falls flat next to his strong rhetoric, his extensive and pervasive organization of and participation in the Arbitration Coalition (A389-391; A393-394; A410; A433; A435; A454), and the fact that all the Banks adopted their CBA Clauses during the course of the meetings and then ceased participating in the Coalition that MacDonald helped launch.

A more striking example is Amex senior in-house counsel Tim Heine. Although a leader of the Arbitration Coalition, Heine was not candid about the nature and scope of the Coalition meetings during his February 19, 2004 deposition, which was held four months after the last known Coalition event. At that time, only the May 25, 1999 meeting had been disclosed in discovery.[37]

---

[37] The existence of the Coalition and other meetings was the result of discovery in the related matter, *In re Currency Conversion Fee Antitrust Litig.*, MDL No. 1409, M21-95 (S.D.N.Y.) (WHP). That case concerned the collusive imposition of

Heine could not recall the number of meetings that occurred (A1536), claiming there were "less than five" (A1536), far less than the 28 meetings and calls eventually uncovered. He indicated meetings were held in lawyers' offices in Philadelphia and New York (A1536), but he did not reveal that *he had sent an invitation* for a meeting that was *hosted by him* at Amex's New York offices (A401; A3284; A1536). Heine was immensely involved in the Arbitration Coalition activities:

- he prepared an internal Amex "Arbitration Overview" presentation, dated December 6, 1999, that stated "*[w]e have also helped pull together an ad hoc industry group* … this group may serve as a forum or conduit for industry-wide or other cooperative activities" (A455; A4448; A2269);

- he discussed agenda topics for the May 25, 1999 meeting (A384; A1545; A2239, A2241-2242);

- Heine engaged in an August 1999 email exchange concerning pro-arbitration research stating "we all agreed conceptually that research like this might be very helpful for obvious reasons" (A453-454; A3105);

- meeting invitations identify Heine as a co-sponsor or co-chair (A376, A390, A401-402);

- Heine prepared a memorandum concerning the September 29, 1999 Coalition meeting that stated he was a member of a subgroup to craft "response points" (A396);

---

foreign transaction fees, involving the same Banks here, except Discover and Capital One. Plaintiffs there learned about the May 25, 1999 meeting, where foreign transaction fees were also discussed. In pursuing discovery of similar meetings, the plaintiffs deposed Heine, in February 2004, who reluctantly revealed that there were a few other "industry meetings" (*see* A536; *see generally* A1536-1537).

- he was invited, by Discover in-house counsel Steven Daily, to participate in conference calls regarding industry "self-regulation efforts" in November and December 1999 (A455-456);

- following the March 2, 2000 meeting, which he hosted at Amex's headquarters, he was a contact person for a small Coalition sub-group that sought to formulate "a concrete proposal on how a more organized public relations effort might benefit us all" (A402; A3116);

- Heine authorized contributions by Amex for amicus briefs (A395-396; A2874); and

- he was identified as one of the "core group of arbitration [Coalition] members" (A446; A3130).

Heine also consulted with his colleague, Amex in-house litigation counsel Julia MacDermott, on subjects discussed at Coalition and In-House Counsel Group meetings, which she also attended (*see* A458).

Heine's extensive involvement in the Arbitration Coalition belies his claimed inability to recall the meetings, including the one he hosted at Amex's headquarters, making his testimony, including denials of collusion, simply not credible.

Next to mere denials of culpability, the record provides abundant evidence the Banks combined and/or conspired to adopt and maintain CBA Clauses via their numerous and extensive inter-firm communications, many of which occurred in connection with groups the Banks organized to facilitate this process, which groups disbanded once the Banks' common objective had been achieved.

86

## II.    The District Court Improperly Conflated Antitrust Injury And Antitrust Standing

The district court previously held that Plaintiffs had established antitrust standing because Plaintiffs alleged antitrust injury caused by Defendants' CBA Clauses conspiracy and because Plaintiffs were efficient enforcers of the antitrust laws.  *See, e.g.*, *Ross v. American Exp. Co.*, 773 F. Supp. 2d 351, 372-73 (S.D.N.Y. 2011); *Ross v. Bank of America*, 2009 WL 151168, at *3-*4 (S.D.N.Y. Jan. 21, 2009).  However, following the bench trial, the district court held "Plaintiffs failed to prove statutory antitrust standing" because "Plaintiffs failed to prove an antitrust injury" (SPA-48-49).

The court's conclusion put the cart before the horse.[38]  Antitrust standing may be established without proof of antitrust injury.  *See AlliedSignal, Inc. v. B.F. Goodrich Co.*, 183 F.3d 568, 575 (7th Cir. 1999) ("The doctrine of antitrust standing ... determin[es] whether a plaintiff is the proper party to bring a private action under the antitrust laws.") (internal quotes omitted).  At trial, Plaintiffs— who already established antitrust standing—were obligated to prove antitrust injury.  *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)

---

[38] The district court's confusion is understandable because "[a]ntitrust standing and its terminological cousin, antitrust injury, are often confused."  *Triple M Roofing Corp. v. Tremco, Inc.*, 753 F.2d 242, 247 (2d Cir. 1985).  Confusion between antitrust standing and antitrust injury "occurs because the two concepts 'share a common ingredient.'"  *Id*.  The common ingredient is both limit "recovery to those who have been injured by restraint on competitive forces in the economy."  *Id*. (citation omitted).

(on post-trial appeal, stating "[p]laintiffs must prove antitrust injury"). The district court should not again have reached antitrust standing, which it had found satisfied earlier in the litigation.

Even though antitrust standing and antitrust injury share a common ingredient, they should not be "invoked interchangeably" because "each concept involves a distinct element of [the private antitrust action]." *Greater Rockford Energy & Tech. Co. v. Shell Oil Co.*, 998 F.2d 391, 395 (7th Cir. 1993).[39] As succinctly explained by one court:

> The primary difference between 'antitrust standing' and 'antitrust injury' is the point in the proceedings where the plaintiff's right to recover under the antitrust laws is challenged. To say that a plaintiff lacks 'standing' is to say that there is no set of facts which could be adduced at trial to show the requisite competitive injury ... [whereas] [t]o say that a plaintiff has not proved 'antitrust injury,' on the other hand, is to say that plaintiff has not satisfied the burden of showing that he or she has been injured 'by reason of' the antitrust laws. In most cases, this decision cannot be made until after trial. Hence one may have 'standing' sufficient to survive a motion to dismiss, yet be unable to prove 'antitrust injury' at trial.

*Haff v. Jewelmont Corp.*, 594 F. Supp. 1468, 1472 n.2 (N.D. Cal. 1984); *Rockford Energy*, 998 F.2d at 395 ("Antitrust injury involves a causation requirement in order to define the class of potential plaintiffs eligible to bring suit" whereas "[antitrust] [s]tanding ... examines the connection between the asserted

---

[39] Although *Rockford Energy* addressed antitrust standing and antitrust injury in the context of a private antitrust action for damages, "[t]he same logic applies to claims for injunctive relief under Section 16 of the Clayton Act." *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 437 (2d Cir. 2005).

wrongdoing and the claimed injury to limit the class of potential plaintiffs to those who are in the best position to vindicate the antitrust infraction").[40]  While in *Haff*, the district court properly recognized the difference between alleging antitrust standing at the beginning of the case and ***proving antitrust injury*** at trial, in this case the district court conflated the two inquiries.

The distinction between antitrust injury and antitrust standing is important here.  As noted, the district court previously found Plaintiffs established antitrust standing.  *See, e.g.*, *Ross v. Bank of America*, 2009 WL 151168, at *4 ("Because Plaintiffs sufficiently allege that they have suffered antitrust injury and are 'efficient enforcers,' they have antitrust standing.").  Accordingly, the only factor the district court needed to address at trial was proof of an antitrust conspiracy, which is the "causation requirement" demonstrating antitrust injury (not antitrust *standing*).  *Rockford Energy*, 998 F.2d at 395.

The district court incorrectly ruled on antitrust standing when it should have addressed antitrust injury.  Here, Plaintiffs have proved an antitrust conspiracy, as discussed in Argument Part I *supra*, and, therefore, the antitrust injury requirement is also met.

---

[40] *See also Disenos Artisticos E Industriales S.A. v. Work*, 676 F. Supp. 1254, 1278 (E.D.N.Y. 1987) (noting difference between antitrust standing and antitrust injury requirements and discussing Supreme Court cases).

## CONCLUSION

As this Court stated in *Bank of America*, vacating and remanding this case to the district court:

> [B]ecause the banks conspired not to offer cards permitting class actions … the cardholders would have been forced to accept a less valuable card as a result of the banks' alleged collusion.

524 F.3d at 224.

Plaintiffs have now proven by a preponderance of the evidence that the Banks colluded—combined and/or conspired—to adopt and maintain CBA Clauses in violation of Section 1 of the Sherman Act. The district court's rulings that Plaintiffs failed to prove conspiracy, and antitrust standing and injury, should be reversed and the matter remanded for further proceedings on the appropriate scope of injunctive relief.

DATED:  August 22, 2014   Respectfully submitted,

            BERGER & MONTAGUE, P.C.

            MERRILL G. DAVIDOFF
            DAVID A. LANGER

               /s/ Merrill G. Davidoff

            _____
              MERRILL G. DAVIDOFF

            *Also contributing to the brief:*

            Martin I. Twersky
            Michael J. Kane
            Zachary D. Caplan
            **BERGER & MONTAGUE, P.C.**
            1622 Locust Street
            Philadelphia, PA  19103
            Telephone:  215/875-3000
            215/875-4604 (fax)

            *Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

### Certificate of Compliance With Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1.      On July 31, 2014, this Court granted Plaintiffs-Appellants' motion for leave to file an oversize brief up to 22,000 words.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 21,330 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), as calculated by the word-processing system used to prepare and finalize the brief.

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman font at 14-point size.


Date:  August 22, 2014                          /s/ David A. Langer

                                                _____
                                                David A. Langer
                                                BERGER & MONTAGUE, P.C.
                                                1622 Locust Street
                                                Philadelphia, PA  19103
                                                Telephone:  215/875-3000
                                                215/875-4604 (fax)

                                                *Counsel for Plaintiffs-Appellants*

92

## CERTIFICATE OF SERVICE

I, David A. Langer, counsel for Plaintiffs-Appellants, certify that, on August 22, 2014, copies of the attached Opening Brief of Plaintiffs-Appellants and the associated three-volume Joint Appendix were filed with the Clerk of the Court and served electronically through the appellate CM/ECF system pursuant to Federal Rules of Appellate Procedure 25(a)(2)(D) and 25(c)(2) and Local Rules 25.1(c)(1) and 25.1(h)(2).

I further certify that all parties required to be served have been served.

Date:  August 22, 2014                    /s/ David A. Langer
                                     _____
                                     David A. Langer
                                     BERGER & MONTAGUE, P.C.
                                     1622 Locust Street
                                     Philadelphia, PA  19103
                                     Telephone:  215/875-3000
                                     215/875-4604 (fax)

                                     *Counsel for Plaintiffs-Appellants*

# SPECIAL APPENDIX

# SPECIAL APPENDIX

# TABLE OF CONTENTS

**Description**                                                    **Special Appendix Page No.**

Opinion and Order
(4/10/14) (BOFA Dkt. No. 565 AMEX Dkt. No. 366)[1] ................................. SPA-1

Judgment
(4/23/14) (BOFA Dkt. No. 566) ................................................................. SPA-93

Judgment
(4/23/14) (AMEX Dkt. No. 367) ............................................................... SPA-95

Sherman Act, 15 U.S.C. §1 ...................................................................... SPA-97

Clayton Act, 15 U.S.C. §26 ...................................................................... SPA-98

---

[1] Where the same document is listed on both dockets, it will be indexed here once with the docket entry number cited for both dockets, using this format: "AMEX Dkt. No. ___; BOFA Dkt. No. ___." If docketed on different dates, the earlier date will be used.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 4/10/14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - -X
THIS DOCUMENT RELATES TO:           :

ROBERT ROSS, *et al.*,                      :        04 Civ. 5723 (WHP)

          Plaintiffs,          :

       - against -                :

AMERICAN EXPRESS COMPANY, *et al.*, :

          Defendants.         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - -X
ROBERT ROSS, *et al.*,                      :
                           05 Civ. 7116 (WHP)

          Plaintiffs,          :

       - against -                :        OPINION & ORDER

BANK OF AMERICA, N.A. (USA), *et al.*,  :

          Defendants.         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - -X

WILLIAM H. PAULEY III, District Judge:

          The Plaintiffs' class actions allege that credit card issuers collusively

adopted class-action-barring arbitration clauses in violation of the Sherman Act to

prevent cardholders from redressing their injuries collectively through the courts.  They

seek injunctive relief prohibiting such clauses in cardholder agreements.  Following the

denial of summary judgment, these class actions were consolidated for trial.  That trial is

the latest milestone in this long-running multidistrict litigation in which all of the

Defendants settled foreign currency conversion fee claims for hundreds of millions of

dollars in damages and attorneys' fees.  Thereafter, many of the Defendant banks also

-1-

agreed to eliminate class-action-barring arbitration clauses from their cardholder agreements.  But Defendants American Express, Citibank, and Discover refused to yield that issue.

Counsel for the parties navigated an ocean of documents and electronic discovery, conducted hundreds of depositions, and litigated numerous motions and appeals. This complex dispute was distilled first in motions to dismiss, then in motions for summary judgment, and finally, because the issues were so nuanced, at trial.  Through the diligence and consummate professionalism of counsel, the facts and legal arguments were marshalled to a point of equipoise, but the law does not permit a Solomon-like resolution.  While all counsel are commended for their efforts, this Court concludes that the Plaintiffs have not sustained their burden.

BACKGROUND

The first class action, <u>Ross v. American Express</u>, is brought on behalf of "[a]ll VISA and MasterCard general purpose cardholders of cards issued by [Bank of America, MBNA, Citibank, or Chase]."  <u>See Ross v. American Express</u>, No. 04 Civ. 5723 (WHP), 2005 WL 2364969, at *13 (S.D.N.Y. Sept. 27, 2005).

The second class action, <u>Ross v. Bank of America</u>, is brought on behalf of all persons holding a credit or charge card under a United States cardholder agreement containing an arbitration provision during the class period with the Banks that were defendants in the multidistrict litigation <u>In re Currency Conversion Litigation</u>, No. 01-

-2-

MD-1409 (WHP)[1] (the "Currency Conversion multidistrict litigation") (including cards

originally issued under the MBNA, Bank One, First USA, and Providian brands).  See

Ross v. Bank of America, No. 05 Civ. 7116 (WHP), Order dated Oct. 6, 2009 (Dock. No.

158) at 11; see also In re Currency Conversion Fee Antitrust Litig., MDL No. 1409, 2009

WL 3444920, at *3 (S.D.N.Y. Oct. 6, 2009).

These class actions were consolidated for a bench trial.  This Court makes

the following findings of fact and conclusions of law pursuant to Federal Rule of Civil

Procedure 52.

FINDINGS OF FACT

I.    The Parties

Robert Ross and Randal Wachsmuth are the Class Representatives in Ross

v. American Express.  Robert Ross, Richard Mandell, Matthew Grabell, S. Byron

Balbach, Jr., Woodrow Wilson Clark, Jr., Andrea Kune, and Paul Impellezzeri are the

Class Representatives in Ross v. Bank of America.  These eight representatives are

holders of Discover, Diners Club, MasterCard, and/or Visa branded general purpose

credit cards.  Richard Mandell also represents a certified subclass of "all persons holding

during the class period a credit card under a United States cardholder agreement with

---

[1]    These defendants are JP Morgan Chase & Co., Chase Bank USA, N.A., Bank of
America, N.A. (USA), Bank of America, N.A., MBNA America Bank, N.A., MBNA
America (Delaware), Capital One Bank, Capital One, F.S.B., Citigroup Inc., Citibank,
N.A. (as successor-in-interest to Citibank (South Dakota), N.A., for itself and as
successor in interest to Citibank U.S.A., N.A. and Universal Bank, N.A.), Universal
Financial Corp., Citicorp Diners Club Inc., HSBC Finance Corporation, HSBC Bank
Nevada, N.A., Discover Services LLC, Discover Financial Services, and Discover Bank.
See Ross v. Bank of America, No. 05 Civ. 7116 (WHP), Order dated Oct. 6, 2009 (Dock.
No. 158) at 1-2.

-3-

Discover Bank, which cardholders have not previously successfully exercised their right to opt-out of the Arbitration of Disputes provision."[2] Ross v. Bank of America, No. 05 Civ. 7116 (WHP), Order dated Oct. 6, 2009 (Dock. No. 158) at 11.

      The Defendant American Express entities are American Express Company and its subsidiaries American Express Travel Related Services, Inc., American Express Centurion Bank, and American Express Bank, FSB (collectively, "American Express" or "Amex"). The Defendant Citigroup entities are Citigroup and its subsidiaries Citibank (South Dakota), N.A. and Citicorp Diners Club, Inc. (collectively "Citi"). The Defendant Discover entities are DFS Services LLC, Discover Financial Services, and Discover Bank (collectively, "Discover"). Bank of America (which merged with Defendant MBNA in 2006), Capital One, Chase (which merged with Defendant First USA/Bank One in 2004 and acquired Providian in 2008), and Household/HSBC (together with the Defendants, "the Issuing Banks"[3]) entered into court-approved settlement agreements with Plaintiffs in July 2010. Ross v. Bank of America, No. 05 Civ. 7116, Final Judgment and Order of Dismissal, dated July 22, 2010 (Dock. No. 251). The National Arbitration Forum ("NAF") was also a settling defendant. Ross v. Bank of America, No. 05 Civ. 7116, Final Judgment and Order of Dismissal, dated Apr. 30, 2012 (Dock. No. 383).

---

[2]  Members of the subclass are not included in the certified class. Ross v. Bank of America, No. 05 Civ. 7116 (WHP), Order dated Oct. 6, 2009 (Dock. No. 158) at 11.

[3]  Wells Fargo & Company and its wholly owned subsidiary Wells Fargo Bank, N.A. were named co-conspirators in Ross v. Bank of America, but were not defendants in these actions.

II.    Consumer Arbitration Agreements and Class Action Arbitration Agreements

       In the late nineties, a wide array of firms and industries explored the prospect of using arbitration for consumer dispute resolution.  (Trial Transcript ("TT") at 4122:23-4123:1 (Elzinga).)  At that time, such clauses proliferated in the automobile, financial services, brokerage services, cell phone, HMO, and online retailing industries.  (TT at 4124:1-16 (Elzinga).)  Consumer arbitration and class action waivers were also hot topics of discussion in the legal community.  (See, e.g., TT at 2869:7-15 (Lipsett); TT at 3277:24-3278:5 (Heine); TT at 3607:7-10 (Nelson); PX-8661.)

III.   American Express Adopts a Consumer Arbitration Clause

       Against this backdrop, in the spring of 1998, Timothy Heine (Managing Counsel in Amex's General Counsel's office) proposed that Amex include a mandatory class-action-barring arbitration provision in its card member agreements.  (TT at 3270:9-14, 3276:9-12, 3277:13-16 (Heine).)  By mid-1998, Heine assembled a team of Amex in-house counsel to study the arbitration issue.  (TT at 3279:25-3281:9, 3286:4-8 (Heine); AX-9054.)  In November 1998, Heine and Julia MacDermott (Group Counsel for Amex) pitched the adoption of an arbitration clause to Alfred Kelly (Amex's U.S. Consumer Card Services Group President).  (TT at 2621:20-2622:2 (Kelly).)  Kelly concurred with their proposal and considered the arbitration provision an "easy call" that would benefit Amex by "lowering litigation costs in the short term and [avoiding] very expensive class action suits in the medium to longer term."  (TT at 2604:6-17 (Kelly).)  In late 1998, Kelly approved adoption of the arbitration clause.  (TT at 3286:9-21, 3288:18-19, 3306:8-12 (Heine); TT at 2604:6-8, 2611:8-2612:5 (Kelly).)  Amex notified cardholders

-5-

of its arbitration provision in April 1999 and the provision became effective upon the card member's next use of the card, or no later than June 1999. (PX-5028.) Amex continues to maintain a class-action-barring arbitration clause. (See, e.g., PX-8439.)

## IV.     The May 25, 1999 WilmerHale Meeting of Senior In-House Credit Card Counsel

Some time before May 1999, Chris Lipsett and Ron Greene (two WilmerHale[4] partners) spoke with Heine about Amex co-sponsoring an "informal meeting of senior in-house credit card counsel representing the various segments of the U.S. credit card business" on "issues of common concern," including arbitration. (TT at 508:1-9 (Heine); PX-0042.). Lipsett and Greene, feeling "pressure from the firm to enlarge [their] practice" had conceived of the meeting as a marketing strategy at which they "could in substance show [their] stuff" to potential new clients. (TT at 2824:25-2827:24 (Lipsett).) WilmerHale hoped to enhance the meeting's credibility by having some of its sophisticated and diverse credit card firm clients serve as co-sponsors. (TT at 2827:13-24 (Lipsett).) A May 3, 1999 invitation sent to various credit card in-house counsel identified Amex, Citi, First USA, and Sears Roebuck & Co. as meeting co-sponsors, but neither Heine nor Joan Warrington (General Counsel to Citi Cards' North American cards business until June 1999, at which point she became Legislative and Regulatory Counsel to the Consumer Bank for Citigroup) recalled Amex or Citi playing any substantive role in meeting preparations. (PX-0042; TT at 3320:2-3321:19 (Heine); TT at 969:10-25 (Warrington).) The invitation noted, "[w]e recognize, of course, that the

---

[4]  At that time, the firm was known as Wilmer Cutler & Pickering LLP. In 2004, it became Wilmer Cutler Pickering Hale and Dorr LLP. In 2005, it became WilmerHale. This Court refers to the firm as "WilmerHale."

-6-

companies sending counsel to such a meeting are competitors, and that for legal reasons

certain issues will need to remain off-limits" but that in talking to the sponsors, "a

consensus quickly emerged that there was a need for a broader exchange of views and

experiences." (PX-0042.)

A May 14, 1999 invitation included a proposed agenda listing "the use of

arbitration clauses in card agreements" as a topic. (PX-0672.) Lipsett testified that he

included arbitration as an agenda item because it was "going to be important to retail

financial services firms" and that he wanted "to show these folks that this was something

on which we were at the leading edge." (TT at 2833:4-22 (Lipsett).) The invitation also

indicated that Chase, Discover, Household, MBNA, and Providian were likely attendees.

(PX-0672.)

Lipsett and Green convened the May 25, 1999 meeting at WilmerHale's

Washington, D.C. office. (PX-0032.) Heine (Amex), Warrington (Citi), and Hugh

Hayden (Vice President and Associate General Counsel of Discover) attended, along with

five of the Issuing Banks.[5] (PX-0032.) While Robert Birnbaum (Vice President and

Associate General Counsel for Chase) believed that arbitration was discussed, the only

surviving handwritten notes, from Joanne Sundheim (Senior Vice President and General

Counsel for First USA) and Janet Burak (Vice President and General Counsel for

Household), make no reference to arbitration. (PX-0044; PX-0045; TT at 139:10-15

(Birnbaum).)

---

[5]   The other Issuing Banks in attendance were Capital One, Chase, First USA,
Household, and Providian. (PX-0032).

V.      The Creation of the Arbitration Coalition

As of the May 25, 1999 meeting, only First USA (in January and March 1998) and Amex (in April 1999) had implemented arbitration provisions.  (PX-0063; PX-5028; PX-8052.)  After the May 25 meeting, together with the WilmerHale and Ballard Spahr law firms, Amex and First USA organized a second meeting of in-house counsel.  (PX-5068; PX-5219.)  This group gave themselves the moniker, "the Arbitration Coalition."  (PX-5219; PX-5068.)  In 1998, First USA retained Duncan MacDonald as a consultant on arbitration issues.  (TT at 1098:3-8 (MacDonald).)  MacDonald, a former general counsel for Citi, was an outspoken advocate against class action lawsuits.  (TT at 1087:25-1090:8 (MacDonald).)  Though MacDonald had not attended the May 25, 1999 meeting, he "certainly knew about it" and was "good friends" with Lipsett.  (TT at 2855:5-6, 12 (Lipsett).)  Lipsett recalled that MacDonald "was interested in developing some sort of forum to talk about arbitration issues which is something that was kind of an assignment he had from [First USA]."  (TT at 2855:9-12 (Lipsett).)  Heine (Amex) also helped organize the inaugural meeting of the Arbitration Coalition.  (PX-5219.)

MacDonald and Heine enlisted Alan Kaplinsky, (a Ballard partner) "to help us round up other businesses that might want to join a coalition to defend and foster arbitration."  (PX-5219.)  Kaplinsky, a well-known lawyer in consumer financial services, had already staked out a position as a "thought leader" on arbitration issues.  (TT at 2858:1-6 (Lipsett).)  Lipsett hoped that involving Kaplinsky would lend further credibility to the endeavor and "minimize the extent to which [Kaplinsky] . . . would get more of the attention."  (TT at 2858:13-24 (Lipsett).)  MacDonald also planned to reach

-8-

out to other Issuing Banks including Discover, Household, Bank of America, and

MBNA, which were rumored to be considering arbitration.  (PX-5219.)  Together,

MacDonald, Lipsett, and Kaplinsky recruited in-house counsel from various industries to

participate in the inaugural meeting of the Arbitration Coalition.  (See, e.g., PX-1208

(MacDonald obtaining contacts from the National Arbitration Forum).)  The purpose of

the meeting was to explore "efforts to protect arbitration" with a "diverse group" of

companies from various industries "that have adopted or are considering adopting

arbitration to resolve disputes with their consumer customers."  (PX-5033; TT at

2860:17-25 (Lipsett).)

Amex and First USA (through MacDonald) were listed as co-chairs of the

meeting on various invitations.  (PX-5220; PX-5221; PX-6125.)  On July 13, 1999,

Kaplinsky invited Discover's in-house counsel.  (PX-6125.)  He warned that "the

plaintiffs' bar is engaged in a 'take no prisoners' assault on consumer arbitration

programs" and that consumer lenders must "be equally well networked if we are to

ultimately prevail in establishing arbitration as the acceptable forum for resolving

consumer disputes."  (PX-6125.)  Kaplinsky's invitation also expressed a need to do a

better job in communicating with other lenders that have adopted arbitration programs."

(PX-6125.)

On July 28, 1999, the Arbitration Coalition convened its first meeting at

WilmerHale's New York office.  (PX-6125.)  Representatives from seven Issuing Banks

attended, including Heine (Amex), Warrington (Citi), and Steve Daily (Discover in-house

counsel).[6]  (PX-0355; PX-5069.)  Lawyers from WilmerHale, Ballard, and other firms,

along with representatives from Sears, Toyota, GE Capital, Dollar Financial, JAMS, and

Burson-Marsteller, a public relations firm, also attended.  (PX-5069.)

      The July 28, 1999 "Arbitration Agenda" contained the heading "why we

are here," followed by the subheadings "consumer service providers with common

issue."  (PX-6125.)  Another heading titled "working together to turn the tide" contained

the subheadings "sharing best practices" and "drafting fair, enforceable arbitration

provisions."  (PX-6125.)  Other headings included "PR and Regulatory Efforts" and

"Public Relations Problem."  (PX-6125.)  With the exception of Daily (Discover), no one

kept handwritten notes of the meeting.  (PX-6127.)  Daily's notes indicate that

"legislation . . . working with trade associations, [and] obtaining research regarding

arbitration" were discussed.  (TT at 766:3-4 (Daily); PX-6127.)  He also noted "concern"

about "bad press" and "bad law" regarding arbitration.  (PX-6127.)  There were eighteen

more meetings or conference calls of the self-styled "Arbitration Coalition."

      On July 30, 1999, Wendy Hufford (GE Capital in-house counsel) sent an

email to Warrington (Citi), noting that she had enjoyed speaking with her at the "recent

meeting in New York" and that she would be interested in sharing "best practices

regarding litigation management" with Citi's litigation director.  (PX-7517.)  Warrington

forwarded the email to Julie Nelson (then responsible for Citi Card's credit card

litigation), suggesting the two "compare notes."  (PX-7517.)

---

[6]  The other Issuing Banks in attendance were Bank of America, Chase, First USA, and
Household.  (PX-5069.)

## VI.    Discover Adopts an Arbitration Clause

James Swift (Discover's head of litigation) considered arbitration clauses as early as the mid-1990s. (TT at 3936:23-24; 3945:19-25 (Swift).)  Daily researched the use of arbitration clauses and made a concrete proposal to his superiors, Swift and Hayden. (TT at 748:21-24; 750:2-6 (Daily).)  Buoyed by his review of proliferating literature, as well as discussions with Daily on the subject, Swift recommended that Discover add a class-action-barring arbitration clause to its card member agreement in 1998. (TT at 3948:11-15 (Swift).)  Swift believed that an arbitration provision would save Discover the significant expenses associated with litigating often "meritless" class actions. (TT at 3947:17-3948:3 (Swift).)

In early 1999, Swift pitched the arbitration provision to Joseph Yob (Discover's Executive Vice President for Cardholder Operations). (TT at 3954:18-3956:21 (Swift).)  Yob approved Discover's adoption of an arbitration clause and Discover began its four to six month internal process for approving changes to card member agreements before officially providing notice to its cardholders in July 1999. (TT at 3905:9-13; 3906:5-7 (Yob).)  Also in July 1999, Discover noticed cardholders that it would be implementing a class-action-barring arbitration clause. (TT at 4040:7-23 (Matysik); PX 6124; PX-6138; PX-6139; DX-11004; DX-11005; DX 11013.)  The clause took effect in September 1999. (PX 6124; PX-6138; PX-6139; DX-11004; DX-11005; DX 11013.)

-11-

VII.    The September 29, 1999 Arbitration Coalition Meeting

Only a few days after the July 1999 coalition meeting, MacDonald emailed his supervisor at First USA and Eric Mogilnicki (a WilmerHale partner) to organize a second Arbitration Coalition meeting.  (PX-1215.)  Additional topics MacDonald suggested included "sharing best practices," "how to set up arbitration program," "arbitration price statistics," and "plain language vs. fine print & overkill."  (PX-1215.)  In early September 1999, MacDonald invited Arbitration Coalition members to a meeting at WilmerHale's office in Washington, D.C. at the end of the month.  (PX-6134.)  The email reminded Arbitration Coalition participants that "[w]e agreed to take a number of steps going forward, including sharing our thoughts and materials (including FAQ responses, customer identification materials, and legal briefs) on the issues regarding arbitration that come up most frequently and pose the greatest difficultly."  (PX-6134.)  MacDonald's email also asked Issuing Banks "if you have not already done so, please send me the arbitration clause used by your company, any change-in-terms notices that were involved in the adoption of the clause, and any answers to FAQs or other explanations of the clause."  (PX-6134.)

The September 29, 1999 meeting agenda identified impediments to using consumer arbitration clauses in consumer contracts, such as "challenges to adoption of arbitration clauses" and "challenges to the absence of class actions."  (PX-0358.)  Representatives of seven Issuing Banks attended, including Heine (Amex), Warrington

-12-

(Citi), and Daily (Discover).[7] (PX-5076.) Lipsett and Mogilnicki of WilmerHale and Kaplinsky of Ballard attended along with individuals from Sears, GE Capital, Dollar Financial, American Bankers Association, Consumer Bankers Association, and The Wexler Group, a public relations firm. (PX-5076.)

Heine (Amex), Gail Siegel (Chase in-house counsel), and Daily (Discover) memorialized the September 29 meeting in internal memos. (PX-0110; PX-5034; PX-8125.)

Heine's memo, dated October 4, 1999 warned of "the possibility of a rogue or unsophisticated player (not necessarily in our industry) who attempts to be heavy handed or unfair in the adoption or exercise of a clause such that it causes all businesses using consumer arbitration to be judged in an unfavorable light." (PX-5034.) Heine noted that the coalition planned to "[e]stablish[] a better information exchange" through a secure internet site and that he agreed to be part of a small sub-group to "discuss and develop initial 'response points' to counter the various arguments being made to challenge arbitration clauses" that could ultimately be used as an industry "white paper" if needed. (PX-5034.) Heine testified the sub-group would focus on developing "a series of questions and answers that would help inform the public discourse and ultimately assist in the enforceability of arbitration clauses." (TT at 3355:19-24 (Heine).) Heine also alluded to the possibility that Arbitration Coalition members would fund amicus briefs to be submitted through trade associations "without attribution." (PX-

---

[7] The other Issuing Banks in attendance were Bank of America, Chase, First USA, and Household.

-13-

SPA-13

5034.) Heine recorded the fact that there were "no plans whatsoever for the group to take any public posture or even consider itself as a formal or official group in any way." (PX-5034.)

Siegel's memo contained non-public information relating to three Issuing Banks' future plans for arbitration.[8] (PX-0110.) Specifically, Siegel reported that Citi had "adopted a wait and see attitude" because it "want[ed] to see the results of all the litigation involving First USA," that Wells Fargo had adopted a "take it or leave it" attitude, and that Household was "watching what is happening." (PX-0110.) Siegel also spoke with David Carpenter (First USA in-house counsel) "regarding how First USA might be using arbitration as a collective litigation strategy." (TT at 863:3-5 (Siegel).) Siegel's memo described the formation of two "subcommittees": one to "identify issues to study to obtain research (the hat may later be passed around)" and one to "identify talking points to incorporate into a flip book . . . to support the use of arbitration." (PX-0110.) According to Siegel, the Arbitration Coalition discussed "the fact that using arbitration for credit cards could be perceived as anti-consumer which could spawn more bills in Congress in the future." (PX-0110.) In summarizing her observations and thoughts, Siegel opined that in contrast to the July 1999 meeting, "[t]here is no longer universal fervor for using arbitration clauses in view of the litigation it has spawned."[9] (PX-0110.)

---

[8] Siegel also recorded Sears' and GE Capital's positions about arbitration. (PX-0110.)

[9] Additionally, Siegel expressed her view that First USA had created a "catch-22 situation" by using NAF as its arbitration administrator because NAF was perceived as a "creditor's tool." (PX-0110.)

-14-

Daily's memo, dated October 6, 1999 reported on the Coalition's desire to prepare talking points in defense of arbitration. (PX-8125.) Daily informed his Discover colleagues Swift and Hayden that he was "asked by the group to take a lead in preparing a short briefing paper, in the form of FAQs, on the subject of arbitration" that could be used for government relations and media relations purposes. (PX-8125; TT at 811:9-14 (Daily).)

On October 8, 1999, Mullen (MBNA) and other MBNA attorneys spoke with Curtis Brown (NAF General Counsel) regarding arbitration. (PX-7696; TT at 1994:3-14 (Brown).) In addition, Mullen spoke with Larry Drexler (Vice President and Associate General Counsel for First USA) about First USA's experiences with its arbitration clause. (PX-6005.) On January 17, 2000, Brown told Mullen that he had asked David Carpenter (First USA) about his willingness to share information about First USA's experience with arbitration "regarding the collection/recovery side of their arbitration process." (PX-7697.) Carpenter had agreed to "share what he could," but "at a certain point, such information becomes proprietary and competitive." (PX-7697.)

The Arbitration Coalition's November 17, 1999 meeting at Ballard's Philadelphia office featured a discussion of Daily's "FAQ's Project." (PX-5078; PX-8140.) Representatives from eight Issuing Banks, including Heine (Amex), Warrington (Citi), and Daily (Discover) were invited.[10] (PX-8140.) Additional participants included MacDonald, Lipsett and Mogilnicki from WilmerHale, Kaplinsky from Ballard, and

---

[10] The other Issuing Banks invited were Bank of America, Chase, First USA, Household, and MBNA.

-15-

representatives from Ugly Duckling, Sears, GE Capital, Toyota, Dollar Financial, Delta Funding, TCF Financial, and Balch & Bingham. (PX-8140.) After working on draft FAQs and Talking Points for three weeks, Daily circulated them the day before the meeting. (PX-6140; TT at 811:24-25 (Daily).)

Following the meeting, Daily circulated revisions to the FAQs and Talking Points to Arbitration Coalition members. (PX-6143.) The revisions reflected "comments received from the group at our last meeting, as well as comments [Daily] received internally [at Discover]." (PX-6143.) Daily encouraged Arbitration Coalition members to "tailor these documents as you see fit" and elaborated on how Discover customized its own version. (PX-6143.)

Daily also offered to work on a "self regulation" project for the Coalition in November 1999. (PX-6010.) To fulfill that promise, he circulated draft fairness guidelines and convened at least two conference calls regarding self-regulation in December 1999 with Heine (Amex), Regina Mullen (MBNA in-house counsel), MacDonald (First USA), Mogilnicki (WilmerHale), and Kaplinsky (Ballard). (PX-6010; PX-6142; PX-6144.) In arranging one of the conference calls Daily opined that "all of the banks using arbitration feel it is important to convince customers, courts, the media, legislators, regulators, and the general public that arbitration is being used by banks in a way that is fundamentally fair, and that will not deprive customers of their rights." (PX-6144.)

In December 1999, MacDonald solicited $5,000 contributions for the preparation of amicus briefs in the Eleventh Circuit by the WilmerHale and Ballard firms

-16-

in <u>Baron v. Best Buy Co.</u>, 260 F.3d 625 (11th Cir. 2001). (PX-1222.) <u>Baron</u> involved the enforcement of mandatory arbitration clauses in a retailer's private-label credit card agreement, where the district judge concluded that NAF was not a neutral arbitrator. WilmerHale's amicus brief was filed on behalf of Fed Net, a group of former judges acting as arbitrators. (PX-1222.) Ballard's brief was on behalf of three trade associations, the American Bankers Association, the Consumer Bankers Association, and the American Financial Services Association. (PX-1222.) In soliciting financial support from the Issuing Banks, MacDonald noted that "<u>Baron</u> must be reversed. If not, class action lawyers across the US will create absolute hell for the business community." (PX-1222.)

At the same time MacDonald was soliciting contributions, settling Defendant MBNA notified cardholders it was adopting an arbitration clause effective February 1, 2000. (PX-6000; PX-8347.) Mullen (MBNA) attended the November 1999 meeting of the Arbitration Coalition, but there is no record of any MBNA representative attending prior meetings. (PX-6009; TT at 2302:1-15 (Mullen).)

VIII.   <u>Subsequent Meetings of the Arbitration Coalition in 2000</u>

The Arbitration Coalition met throughout 2000. WilmerHale hosted the first meeting on January 12, 2000 at its Washington, D.C. office. (PX-5081.) An email reminder encouraged invitees to "bring a copy of your arbitration agreement." (PX-5081.) Topics on the agenda included "best practices protocol" and "public relations/consumer education." (PX-5084.) Daily (Discover) and Julie Lepri (Bank One in-house counsel) took notes at the meeting. (PX-6146; PX-6147; PX-7591.) Their notes

-17-

indicate that arbitration-related litigation was a major topic of discussion but do not discuss any specific arbitration clauses. (PX-6146; PX-6147; PX-7591.) Daily did not recall whether he brought a copy of Discover's clause and didn't "believe [he] saw anyone handing over arbitration agreements" at the meeting. (TT at 832:10-11 (Daily).) Five Issuing Banks attended the January 12 meeting, including Heine (Amex), Harry Silverwood (Citi in-house counsel), and Daily (Discover).[11] (PX-5082; PX-5083; PX-7591.) Additional participants included MacDonald, Kaplinsky from Ballard, and representatives from GE Capital, Dollar Financial, American Bankers Association, American General Finance, National Retail Federation, American Financial Services Association, TransAmerica, Consumer Bankers Association, Lynn Stodghill, Burr & Forman, Balch & Bingham, and Bradley Arant Rose & White. (PX-5082; PX-5083; PX-7591.)

After the January 12, 2000 meeting, MacDonald solicited contributions for another amicus brief to be filed in support of a petition for a writ of certiorari in <u>Green Tree Financial Corp.-Alabama v. Randolph</u>, 531 U.S. 79 (2000), a case regarding the arbitrability of class claims. (PX-1226.) MacDonald importuned the Issuing Banks to contribute because the consensus of attendees at the January 12 meeting was that "getting the Supreme Court to hear the case and decide it in our favor is of utmost importance." (PX-1226.) While MacDonald sought $2,500 contributions from ten institutions, he

---

[11] The other Issuing Banks in attendance were First USA/Bank One and Household. (PX-5082; PX-5083; PX-7591.)

-18-

noted that "[t]he signatories on the masthead would be trade associations, not individual companies." (PX-1226.)

In February 2000, Bank of America and Household noticed their cardholders that they were adopting a class-action-barring arbitration clause. (PX-8024; PX-8150; PX-8344; PX-8369). Both banks implemented their clauses in April 2000. (PX-8150; PX-8344; PX-8369.) Household and Bank of America representatives attended the July and September 1999 Arbitration Coalition meetings. (PX-5069; PX-5076.) Household also had a representative at the January 2000 meeting. (PX-5082.)

On March 2, 2000, Amex hosted an Arbitration Coalition meeting at its New York headquarters. (PX-8149.) Again, the "Arbitration Group Meeting" agenda listed "public relations" and "formalization of [the] group" as topics. (PX-5088.) A public relations expert from Burson-Marsteller made a presentation on "some of the ways in which a public relations effort could alter perceptions about consumer arbitration." (PX-5228.) Heine (Amex) and MacDonald were designated as contact persons for a small group to formulate "a concrete proposal on how a more organized public relations effort might benefit us all." (PX-5228.) Seven Issuing Banks attended the meeting, including Amex (Heine) and Citi (Karla Bergeson (Citi Cards in-house counsel)). [12] (PX-5087; PX-7594; TT at 335 (Bergeson).) Additional attendees included MacDonald, Lipsett and Mogilnicki from WilmerHale, Kaplinsky from Ballard, lawyers from Pepper Hamilton, Bradley Arant Rose & White, and Lynn Stodghill, and representatives from

---

[12] The other Issuing Banks in attendance were Bank of America, Chase, First USA/Bank One, Household, and MBNA. (PX-5087.)

-19-

GE Capital, Dollar Financial, Delta Funding Company, and Burson-Marsteller.  (PX-5087.)

On April 18, 2000, the Arbitration Coalition met again at Ballard's Philadelphia office.  (PX-0089.)  "Public relations" was on the agenda.  (PX-0089.)  Eight Issuing Banks attended, including Amex (Heine), Citi (Nelson), and Discover (Daily).[13]  (PX-0117; PX-8030.)  Additional attendees included MacDonald, Lipsett and Mogilnicki from WilmerHale, Kaplinsky from Ballard, and representatives from Sears, GE Capital, Dollar Financial, Transamerica, American Bankers Association, GMAC, Burr & Forman, Bradley Arant Rose & White, and Lynn Stodghill.  (PX-0117.)

On April 30, 2000, after the Supreme Court granted certiorari, MacDonald again solicited donations for amicus briefs in Green Tree Financial Corp.-Alabama v. Randolph, 531 U.S. 79.  (PX-5229.)  MacDonald informed the Arbitration Coalition that the cost of another wave of amicus briefs from the WilmerHale and Ballard firms would be significant, noting that such an investment "was modest next to the possibilities." (PX-5229.)  MacDonald warned: "it is important in the extreme for us to try to influence the outcome of this very important case" and that if "Greentree loses, arbitration could suffer a grave, perhaps fatal setback."  (PX-5229.)  A victory, on the other hand, "could send many class action lawyers to where they belong—to the employment lines."  (PX-5229.)

---

[13]  The other Issuing Banks in attendance were Bank of America, Chase, Household, First USA/Bank One, and MBNA.  (PX-0117.)

-20-

Also in April 2000, Mogilnicki invited nine Issuing Banks, including
Amex (Heine), Citi (Silverwood), and Discover (Daily) to an Arbitration Coalition
meeting scheduled for June 14 at WilmerHale's Washington, D.C. office. [14] (PX-0090;
PX-0093.) Other past attendees of Arbitration Coalition meetings were also invited.
(PX-0093.) The agenda included litigation and regulatory updates. (PX-0094.)

On October 3, WilmerHale hosted the last Arbitration Coalition meeting
of 2000. (PX-8054.) Amex (Heine), MacDonald, Lipsett and Mogilnicki from
WilmerHale, Kaplinsky from Ballard, and representatives from Pepper Hamilton, Sears,
American Bankers Association, Burr & Forman, Bradley Arant, and Hangley Aronchick
attended that meeting at WilmerHale's Washington, D.C. office. (PX-8054; PX-8234.)
Issuing Banks First USA/Bank One, MBNA, and Household sent representatives. (PX-
8234.)

## IX.    MacDonald Conceptualizes and Forms the Class Action Working Group

In September 2000, MacDonald conceived an idea for a group separate
from the Arbitration Coalition to counter "class action mania." (PX-1235.) Specifically,
MacDonald proposed to Kaplinsky, Lipsett, Mogilnicki, and First USA that they convene
a "one day, roundtable brainstorming session that will focus exclusively on the growing
epidemic of class actions and new, out-of-the-box ways that industry might adopt in
responding to them." (PX-1235.) MacDonald contemplated inviting "companies and

---

[14] The other Issuing Banks invited were Bank of America, Capital One, Chase, First
USA/Bank One, Household, and MBNA. (PX-0093.)

their lawyers that are not in our [arbitration] coalition" from industries such as "big auto, manufacturing, pharmaceutical, brokerage, healthcare [and] retail." (PX-1235.)

MacDonald presented his idea to the Arbitration Coalition at its October 3, 2000 meeting. (AX-9065.) In an email later that month, MacDonald explained that "[t]his special meeting does not reflect a decision to abandon our arbitration efforts, but instead to use them as a base . . . to help industry deal with the larger issue of the proliferation of class action law suits." (AX-9065.)

In addition to their direct communications at Arbitration Coalition meetings, the Issuing Banks also exchanged information indirectly. Before the September 29, 1999 meeting, Siegel (Chase) sought information during a telephone conversation with Curtis Brown (NAF) regarding how other Issuing Banks had dealt with issues related to arbitration. (PX-5300.) On September 18, 1999, Siegel told her colleagues Birnbaum and James Condren (Chase in-house counsel) about her conversation with Brown. (PX-5300.) Specifically, Siegel reported that Brown informed her that First USA, Discover, American Express, Sears, Household, GE Capital, and MBNA had implemented arbitration provisions through change-in-terms notices sent to cardholders. (PX-5300.) The fact that MBNA was implementing an arbitration clause was not publicly known at that time. (PX-8347.)

Additionally, on January 9, 2001, John Culhane (a Ballard lawyer) emailed Nelson (Citi) on behalf of "a client considering using arbitration clauses in credit card agreements." (PX-7533.) The client had asked Culhane to "confirm that Universal and Citibank (South Dakota) [were] not currently using arbitration." (PX-7533.)

-22-

Culhane explained that if "this information is available, the client would like to know if

the use of arbitration clauses is still under consideration and what the major concerns

are." (PX-7533.)

On January 16, 2001, the Arbitration Coalition met again in Philadelphia,

this time at Pepper Hamilton's offices. (PX-8251.) The agenda identified

"Education/Public Information" and "need for white papers" as discussion points. (PX-

8214.) Nine Issuing Banks were invited, including Amex (Heine), Citi (Silverwood and

Wendy Kleinbaum (General Counsel for the North American credit card business)), and

Discover (Daily).[15] (PX-8251.) No attendance list exists, though Lepri (Bank One) took

notes indicating that the Arbitration Coalition discussed arbitration-related case law,

legislative developments, and potential market research. (PX-7607; TT at 1797:7-13

(Lepri).)

Days later, MacDonald, Kaplinsky, Mogilnicki, Lipsett, and others

announced the inaugural meeting of the "Consumer Companies' Class Action Working

Group" and attached a "manifesto" championing the "fight" against "abusive class

actions." (PX-5102.) Employing flamboyant language, the "manifesto" declared: "In

the class actions wars, it's not class members versus the companies, it's the plaintiffs'

lawyers versus the companies. Suing companies is their business." (PX-5102.)

The Consumer Companies' Class Action Working Group met for the first

time on February 14, 2001 at the National Retail Federation in Washington, D.C. (PX-

---

[15] The other Issuing Banks invited were Bank of America, Capital One, Chase, First
USA/Bank One, Household, and MBNA. (PX-8251.)

-23-

5102.) Seven Issuing Banks attended, including Amex (Heine and MacDermott) and Citi (Nelson and Petra "Tedde" Tasheff (Citigroup in-house counsel)).[16] (PX-7555.) A number of large corporations and trade associations sent representatives, including Fleet, GE Capital, Federal Express, Ford, Monsanto, Dollar Financial Group, Primerica, Chrysler Financial, Dow Chemical, Daimler Chrysler, TCF Financial, Master Card, American Bankers Association, National Retail Federation, and the United States Chamber of Commerce. (PX-7555.) Nearly twenty law firms sent attorneys, including WilmerHale, Ballard, Pepper Hamilton, Hangley Aronchick, Morrison & Foerster, O'Melveny & Myers, Bradley Arant, McGuire Woods, Heller Ehrman, Sidley Austin, Piper Marbury, Skadden Arps, Forman Perry, Nixon Peabody, Alston & Bird, Burr & Forman, Crowell & Moring, and Stroock & Stroock & Lavan. (PX-7555.)

MacDonald exhorted the group that "class actions are getting out of hand" and have become "a gaming business" and a "shakedown racket," but that the group could "beat" the problem "by working together." (PX-1244.) His prepared remarks suggested that the trial bar was more organized than large consumer companies because "[a]s competitors we are conditioned to go it alone" due to a "Century + of [the] Sherman [Act]." (PX-1244.) MacDonald also cited "embarrassment about charges; fear of competitor exploitation or that elevation will risk media exposure [and] more damages" as reasons for industry's failure to parry the class action bar's thrust. (PX-1244.) MacDonald urged the group to "[d]evelop an efficient action plan." (PX-1244.) Agenda

---

[16] The other Issuing Banks in attendance were Chase, Capital One, First USA/Bank One, Household, and Providian. (PX-7555.)

-24-

items included "Hallmarks of Abusive Class Actions" and "What Industry Might Do To Manage Class Actions Better." (PX-7556.)

In March 2001, settling Defendant Providian noticed cardholders that it would implement a class-action-barring arbitration clause the following month. (PX-8044; PX-8349.) A Providian representative had attended the initial May 25, 1999 meeting and the inaugural Consumer Companies' Class Action Working Group meeting. (PX-0032; PX-7555.)

On April 5, 2001, the Arbitration Coalition met at WilmerHale's New York office. (PX-1252.) MacDonald made "a special pitch for a large turnout" at the April meeting and characterized the Arbitration Coalition as "the only organization uniquely devoted to protecting industry use of arbitration of consumer disputes." (PX-1252.) MacDonald implored invitees to "help us keep the defense going," reminding them that "our adversaries are determined to bring industry to its knees" and "find weak links in our Defenses." (PX-1252.) The agenda noted "legislative developments" and "recent cases" as topics of discussion. (PX-8213.) No attendance list exists, but nine Issuing Banks were invited, including Amex (Heine), Citi (Kleinbaum and Silverwood), and Discover (Daily).[17] (PX-1252.)

On May 30, 2001, the Class Action Working Group met for the second and final time at Chase's headquarters in New York. (PX-0351.) Nine Issuing Banks

---

[17] The other Issuing Banks invited were Bank of America, Capital One, Chase, First USA/Bank One, Household, and MBNA.

attended, including Amex (MacDermott) and Citi (Tasheff).[18]  (PX-0351; PX-7555.)
MacDonald was there, along with Lipsett and Mogilnicki (WilmerHale), Kaplinsky
(Ballard), and a host of attorneys from major law firms, including Pepper Hamilton,
Morrison & Foerster, Sutherland, Weil, Hogan, Stroock, and Skadden.  Other attendees
included GE Capital, Ford, Toyota, Consumer Bankers Association, and Professor
George Priest from Yale Law School.  (PX-0351; PX-7555; PX-8607.)  Priest made a
presentation to the group about "class action abuse."  (PX-8607.)

        In the invitation to the May meeting, Harvey (Pepper Hamilton) noted that
the "consensus" from the prior meeting was that the group should not try to reinvent the
wheel but "work as much as we can through existing organizations and an informal
collaboration of inside and outside counsel."  (PX-7557.)  The invitation was signed by
an "organizing committee" comprised of Michael Barry (Capital One in-house counsel),
MacDonald, and a number of law firms including Lipsett and Mogilnicki (WilmerHale),
Kaplinsky (Ballard), and Harvey (Pepper Hamilton).  (PX-7557.)  According to a
summary that was circulated after the meeting, the Class Action Working Group focused
on how to advance "class action reform" and even considered "the possibility of
formalizing the Group's existence by incorporating a 501(c)(3) corporation."  (PX-8607.)
Barry (Capital One), James Condren (Chase), and Leonard Gail (Bank One in-house
counsel) "shared the experiences of their companies with the group."  (PX-8607.)  The
meeting ended with updates on class action litigation from outside law firms and an

---

[18]  The other Issuing Banks in attendance were Bank of America, Capital One, Chase,
First USA/Bank One, Household, MBNA, and Providian.

agreement "to focus on a set of discrete issues over the summer and meet again in the Fall." (PX-8607.)  However, the Class Action Working Group never convened another meeting.

An Arbitration Coalition meeting may also have occurred on May 30, 2001 in New York.  (PX-6022.)[19]  While it would have been odd to hold an Arbitration Coalition meeting on the same day as the Class Action Working Group meeting, a handwritten attendance list establishes that on some date around May 30 a meeting occurred among seven of the Issuing Banks including Discover (David Oppenheim),[20] as well as Kaplinsky (Ballard), Harvey (Pepper Hamilton), MacDonald, and others.  (PX-6022.)

X.     The In-House Working Group

In preparation for the May 2001 Class Action Working Group meeting, Barry (Capital One) reached out to his in-house peers Tasheff (Citi), Condren (Chase), and Gail (Bank One) to lead a panel discussion.  (PX-7561.)  Barry noted the special concerns of in-house counsel and the importance of sharing "practical ideas that in-house counsel could use."  (PX-7561.)  After the May 30th meeting, Barry and Condren discussed with MacDermott (Amex) the need to organize another, smaller group of in-

---

[19]  At trial, this Court reserved decision on the admissibility of PX-6022.  PX-6022 is now received in evidence and this Court evaluates its probative value in view of questions about its authentication.

[20]  The other Issuing Banks in attendance were Capital One, Chase, First USA/Bank One, Household, MBNA, and Providian.  (PX-6022.)

house counsel. (PX-7565.) They compiled names of in-house counsel to invite into "our little group," which they styled the "In-House Working Group." (PX-7565.)

Thinking it best to limit such a group to financial services companies, Barry selected in-house counsel to participate in an inaugural conference call to take place on July 9, 2001. (PX-7565.) The "little group" consisted of Amex (MacDermott), Citi (Tasheff), Capital One (Barry), Bank One (Gail), MBNA (Mullen), Providian (Jamie Williams (in-house counsel)), Household (Susan Jewell and Mark Leopold(in-house counsel)), and Chase (Condren). (PX-8616.) Discover and Wells Fargo were not invited.

While the larger Class Action Working Group "has value," Barry noted a "few major shortcomings" including some obvious ones: "for in-house counsel in financial services companies, issues relating to non-financial issues are not as relevant;" "outside counsel, for all their worth, do not see the same internal issues that in-house counsel face;" and "the [class action working] group's focus can be more academic and theoretical, and less practical." (PX-8616.) In contrast, the In-House Working Group could serve as "a sounding board to share issues that impact [the financial services] industry." (PX-8616.) Topics proposed for the July 9, 2001 inaugural conference call included "[c]reating an informal 'information please' email network" and "[i]dentifying other means to protect our employers from the plaintiffs' network." (PX-5313.) Guilelessly, the designated passcode for the conference call was "ARBITRATION." (PX-5314.) And the call began with "the obligatory antitrust admonition." (PX-5313.) Peculiarly, the call participants deny that arbitration was discussed. No attendance lists, notes, or memos of this call exist.

-28-

On July 31, 2001, Barry (Capital One) reached out to Gail (Bank One) to ascertain whether Bank One permitted cardholders to opt-out of its arbitration provision, and "[i]f yes, was there a penalty (i.e. they had to close their accounts)? And, what percentage of people opted out?" (PX-7609.) Gail forwarded Barry's email to Lepri (Bank One), noting that "Mike is one of these guys with whom I have a monthly call to chat about benchmarking and other issues." (PX-7609.)

XI.    Citi Adopts an Arbitration Clause

In November 1998, Nelson recommended to Warrington (then General Counsel of Citi's U.S. Cards group) that Citi consider an arbitration provision. (TT at 3854:11-3855:11). That same day, Nelson requested information on arbitration from Kaplinsky. (PX-7516.) Warrington informed Bergeson of Nelson's recommendation. When Kleinbaum replaced Warrington in June 1999, Citi had not decided to adopt an arbitration clause. (TT at 2460:7-20 (Kleinbaum).) In February 2000, Kleinbaum, who received arbitration materials from Lipsett, formed an internal team led by Nelson and Bergeson to consider arbitration pros and cons. (TT at 1704, 1707-08, 3505-08 (Nelson); PX-6078; TT at 2466-67, 3509, 3703-06 (Kleinbaum).) Bergeson attended the March 2, 2000 Arbitration Coalition meeting.

While Nelson and Bergeson's team was studying arbitration during the summer of 2000, lawyers at Citigroup, Citi Card's corporate parent, independently began considering arbitration. (PX-6082.) On June 22, 2000, Michael Heyrich, a secunded Skadden associate in Citigroup's General Counsel's office, enthusiastically recommended arbitration for all Citigroup's consumer business lines to Charles Prince

-29-

(Citigroup's Chief Legal Officer and General Counsel). (TT at 3822:20-3823:8 (Prince); TT at 3771:4-6 (Heyrich); PX-6082.) At the time Heyrich wrote his memo, neither Heyrich nor Kleinbaum were aware that each of them was considering arbitration. (TT at 3778:23-25 (Heyrich); TT at 3713:17-3714:2 (Kleinbaum).) On July 6, 2000, Prince forwarded the Heyrich memo to a number of in-house attorneys, including Mike Ross (Deputy General Counsel to Citigroup's Global Consumer Group), who in turn alerted Kleinbaum and Nelson to Citigroup's determination that "arbitration should be used in our business unless there are strong countervailing considerations against our implementing it now." (PX-6081; PX-6082; PX-6085; TT at 3713:3-6 (Kleinbaum); TT at 2523:3-5 (Mike Ross).)

After learning of the Heyrich memo, Kleinbaum recommended to Steve Freiberg(CEO of Citi Cards) that Citi Cards adopt a class-action-barring arbitration clause in September or October of 2000. (TT at 2430:18-25, 2436:12-2437:2 (Freiberg); TT at 3729:6-14 (Kleinbaum).) Freiberg accepted Kleinbaum's recommendation and Citi Cards implemented adoption of such a clause. (TT at 2437:2 (Freiberg); PX-7540). While Citi intended to notice cardholders by February 2001, operational issues delayed notification until May, June, October and November of 2001. (PX-6086; PX-8179; PX-8180; PX-8181; PX 8350; TT at 3565:25-3567:3 (Nelson).) The clauses became effective in July, November, and December of 2001. (PX-8179; PX-8180; PX-8350.)

XII. Additional Meetings of the In-House Working Group

The In-House Working Group convened conference calls on August 7 and September 4, 2001. (PX-7567; PX-7635.) The August call agenda noted the

-30-

"importance of benchmarking, sharing information on current cases and plaintiffs'
claims" and called for each participant to be prepared to introduce two or three cases or
issues that "may have implications for the rest of us" or "on which the member seeks
input from the group." (PX-7567.) Any remaining time would be opened for questions
"so that we may be able to get some answers to the burning issues our business people
keep raising." (PX-7567.) The August call opened with an antitrust admonition. (PX-
7567.) During the September call, participants planned to build on previously discussed
topics, including "follow up on counsel issues" and "more on information sharing and
benchmarking." (PX-7635.) While Bank of America had missed the inaugural In-House
Working Group call in July, Jan Aniel (Bank of America in-house counsel) joined the
August and September calls. (TT at 2323:1-9 (Aniel); PX-7567; PX-7635.) Discover
was not invited to participate.

On October 2, 2001, Mogilnicki (WilmerHale) invited Arbitration
Coalition members to a meeting on October 24, 2001. (PX-8144.) Concurrently, Barry
(Capital One) emailed the In-House Working Group seeking to schedule a conference
call "this week or early next," and noting that Capital One "had a few developments on
our end that might be worth discussing." (PX-6074.) One such development was that
Capital One had begun noticing cardholders that it had added an arbitration clause. (PX-
8072.) Despite Barry's request, there is no evidence that any In-House Counsel Working
Group call was held until November 6, 2001.

Mogilnicki invited nine Issuing Banks to the October 24, 2001 meeting of
the Arbitration Coalition, including Amex (Heine), Citi (Kleinbaum, Silverwood,

Tasheff, and K. Jordan), and Discover (Daily).[21]  (PX-8144.)  But no attendance list or

agenda exists.

On November 6, 2001, the In-House Working Group conference call

occurred and included Amex (MacDermott), Citi (Tasheff), Bank of America (Aniel),

Bank One (Gail), Chase (Condren), Household (Jewell and Leopold), and MBNA

(Mullen).  (PX-7570.)  The group discussed "new cases and developments," some of

which Barry gleaned from Lipsett's client-update email on class actions.  (PX-7570.)

After participating in the conference call, Mullen (MBNA) emailed her colleagues that

Chase has an arbitration clause under "active consideration."  (PX-6007.)  The

information about Chase's arbitration clause was not publicly available.

On November 28, 2001, the Arbitration Coalition met at WilmerHale's

Washington, D.C. office.  (PX-6061.)  Six Issuing Banks participated, including Amex

(Heine) and Citi (Nelson and Tasheff).[22]  (PX-6062.)  Additional attendees included

Chrysler, American Bankers Association, Ugly Duckling Corporation, May Department

Stores, Ford, American Financial Services Association, Dollar Financial, GE Capital,

Consumer Bankers Association, and the U. S. Chamber of Commerce.  (PX-6062.)  A

phalanx of lawyers, including Lipsett and Mogilnicki (WilmerHale), Kaplinsky (Ballard),

and others from Pepper Hamilton, Burr & Forman, and Troutman Sanders also attended.

(PX-6062.)

---

[21]  The other Issuing Banks invited were Bank of America, Capital One, Chase, First
USA/Bank One, Household, and MBNA.

[22]  The other Issuing Banks in attendance were Bank One/First USA, Capital One,
Household, and MBNA.  (PX-6062.)

The following week, the In-House Working Group convened another conference call. (PX-7571.) The same Issuing Banks were invited, including Amex (MacDermott) and Citi (Tasheff). (PX-7571.) No attendance lists, agendas or notes exist.

XIII.   Arbitration Coalition Meetings in 2002

The Arbitration Coalition met in January and June 2002 at WilmerHale's New York offices. (PX-0019; PX-5122.) On January 31, 2002[23], four Issuing Banks attended, including Citi (Nelson).[24] (PX-0120.) Other attendees included GE Capital, May Department Stores, MONY Life Insurance, and American Financial Services Association. (PX-0120.) Lipsett and Mogilnicki (WilmerHale) and Kaplinsky (Ballard) also attended, as well as lawyers from Pepper Hamilton and other law firms. (PX-0120.) Arbitration Coalition members were asked to bring status reports on legislative developments relating to arbitration. (PX-0119.) AT&T's counsel made a presentation concerning Ting v. AT&T, 182 F. Supp. 2d 902 (N.D. Cal. 2002), aff'd in part, 319 F.3d 1126 (9th Cir. 2003), in which a federal district court struck down AT&T's arbitration provision. (PX-0119.)

---

[23]  There is also a handwritten attendance list for an Arbitration Coalition meeting on January 13, 2002. (PX-1262.) Because that was a Sunday, the date was likely recorded in error. This Court concludes, however, that an additional meeting did take place on an unknown date. Amex (Heine) attended, along with Chase (Siegel), Lipsett and Mogilnicki (WilmerHale), Kaplinsky (Ballard), and Duncan MacDonald. (PX-1262.) Representatives from Hangley Aronchick, Bradley Arant, American Financial Services Association, American Business Financial Services, and MONY Life Insurance were also present. (PX-1262.)

[24]  The other Issuing Banks in attendance were Bank One/First USA, Chase, and Household. (PX-0120).

-33-

In March 2002, settling Defendant Chase noticed cardholders it was implementing a class-action-barring arbitration clause. (PX-8067; PX-8265.) The clause became effective in May 2002. (PX-8067; PX-8265.)

On March 19, 2002, the In-House Working Group held its last conference call. Invitees included Amex (MacDermott) and Citi (Tasheff). The agenda included "[m]ethods for disclosing arbitration in solicitations." (PX-7573.) Barry suggested recent developments in arbitration-related case law as a topic, which could encompass "[a]ny recent useful decisions/orders involving any of your clients that are not published or widely reported." (PX-7573.) Several days later, Mullen (MBNA) emailed the In-House Working Group inquiring about interactions with cardholders attempting to amend their agreements unilaterally to add alternate arbitration fora. (PX-0049.) Aniel (Bank of America) and Williams (Providian) responded to Mullen's query. Williams commented that "[t]o date, our arbitration provision has been used sparingly." (PX-0049.)

On June 13, 2002 the Arbitration Coalition convened again. (PX-5122.) In the meeting notice, Mogilnicki highlighted "two issues on which it would be helpful if [the coalition] gathered information from our respective businesses," namely notices that consumers have elected to use the "Consumer Arbitration Forum" and reports on "the anti-arbitration press, legislation and judicial council developments" in California. (PX-5122.) Six Issuing Banks sent representatives, including Citi (Nelson and Tasheff).[25] (PX-6027; PX-8030.) Other institutions also participated, including GE Capital, Ford,

---

[25] The other Issuing Banks in attendance were Capital One, Chase, First USA/Bank One, Providian, and MBNA.

-34-

Chrysler, Dollar Financial, American Bankers Association, and Ugly Duckling.  (PX-6027.)  MacDonald, Lipsett and Mogilnicki (WilmerHale), and Kaplinsky (Ballard) also attended.  (PX-6027.)  Before the June meeting, Mogilnicki (WilmerHale) opined to a "core group of arbitration group members" including Amex (Heine and MacDermott), that "relatively few members of the arbitration group were committed to attending our last meeting and I think there's been a trend in that direction over the past year."  (PX-5230.)

XIV.    Arbitration Coalition Meetings in 2003

        The Arbitration Coalition did not meet again until April 22, 2003 at WilmerHale's Washington, D.C. office.  (PX-5127; PX-8030.)  Eight Issuing Banks attended, including Amex (Heine and Stuart Alderoty, Chief Litigation Counsel); Citi (Nelson and Tasheff), and Discover (Swift and Oppenheim).[26]  (PX-5127.)  In addition to Lipsett and Mogilnicki (WilmerHale) and Kaplinsky (Ballard), GE Capital, American Financial Services Association, Spotswood LLC, American Bankers Association, National Retail Federation, TCF Financial, and Consumer Bankers Association representatives also attended.  (PX-5127; PX-8030.)  Amex representatives and several others participated in a "field trip" to the Supreme Court to hear oral argument in Green Tree Financial Corp. v. Bazzle, 539 U.S. 444 (2003).  (TT at 2904:17-22 (Lipsett); PX-5127; PX-5128).  This was the last in-person meeting of the Arbitration Coalition.  Two additional teleconferences were held in 2003, one on June 25 and another on October 16.

---

[26]  The other Issuing Banks in attendance were Capital One, Chase, First USA/Bank One, Providian, and MBNA.

-35-

(PX-6067; PX-8147.)  All of the Issuing Banks except Bank of America were invited to participate in both conference calls, including Amex (Heine and MacDermott), Citi (Kleinbaum, Nelson, Silverwood, Tasheff, and Jordan), and Discover (Daily).  (PX-6067; PX-8147.)  No attendance sheets for these conference calls exist.

XV.   Discover's Opt-Out Provision

In January 2003, Discover noticed cardholders regarding a new "opt out" provision that allowed them to reject its arbitration clause by sending a rejection notice by March 25, 2003.  (PX-8085.)  If Discover did not receive a rejection notice by that date, the provision became final as to that cardholder.

XVI.   WilmerHale's and Kaplinsky's Representation of the Issuing Banks

Before 2003, WilmerHale represented Amex, Citi, Bank of America, Bank One/First USA, Capital One, Household, MBNA, and Providian.  (TT at 2944:15-2946:17 (Lipsett).)  And at some point before 2005, Lipsett represented Chase. (TT at 2946:6-7, 2948:15-18 (Lipsett).)  He also represented MBNA in the Currency Conversion multidistrict litigation regarding foreign currency exchange fees.  (TT at 2925:6-8 (Lipsett).)  Kaplinsky assisted Amex, Capital One, Citi, and Discover with their arbitration clauses.  (TT at 1936:17-1937:14 (Swift); TT at 2177:7-99 (Barry); TT at 3443:3-13 (Heine); TT at 3565:12-21 (Nelson).)

XVII.   The Credit Card Industry Is Oligopolistic

The Issuing Banks' collective market share of the general purpose credit card market is very high.  In 1999, Amex, Citi, Discover, First USA, MBNA, Chase, Bank of America, Household, Capital One, and Providian had a collective market share

-36-

of 82.91% as measured by transaction volume and 79.82% as measured by outstanding balances. (PX-8539A; TT at 1411:8-1412:11, 1413:2-1414:13 (Tollison).) By 2005, this percentage had risen to 86.53% measured by transaction volume and 87.64% measured by outstanding balances, accounting for the acquisition of First USA by Chase and MBNA by Bank of America. (PX-8539C; TT at 1415:19-1417:2 (Tollison).) In 2009, these percentages dropped slightly, but the Issuing Banks still held a collective market share of 81.9% as measured by transaction volume and 81.21% as measured by outstanding balances, accounting for Providian's acquisition by Chase. (PX-8539D; TT at 1417:4-23 (Tollison).)

There are high barriers to entry into the general purpose credit card market because it is difficult for a new bank to gain sufficient market share to compete with the Issuing Banks. (TT at 1421:6-1422:9 (Tollison).) Because such a small number of firms hold nearly 80% of the market share, the credit card market is highly concentrated and oligopolistic. (TT at 1420:7-13 (Tollison).) Oligopolistic markets are characterized by mutually independent behavior among firms, meaning that what is optimal for a firm depends on the conduct of the firm's competitors. (TT at 1419:14-24 (Tollison).)

XVIII. Arbitration and Consumers

The parties presented expert testimony on issues relating to consumer attitudes about arbitration and the impact those attitudes could have on the claims at issue in this lawsuit. This Court credits the testimony of these expert witnesses as described below.

During the period of the alleged conspiracy (May 1999-October 2003),
arbitration clauses were not salient to consumers.  (TT at 2727:21-25 (Bar-Gill); TT at
4132:15-4133:6 (Elzinga).)  Salience describes the prominence to consumers of various
aspects of a multidimensional product.  (TT at 2657:15-2658:3 (Bar-Gill).)  Those
product aspects which are visible or meaningful to consumers are "salient."  (TT at
2722:1-6 (Bar-Gill).)  For example, the price of a can of soda is likely salient to
consumers, but the source of aluminum used to make the can may not be.  Generally,
firms are expected to compete as to salient terms, but not as to non-salient terms.  (TT at
2722:24-2723:4 (Bar-Gill).)  The salience of any given term may change over time.  (TT
at 2723:24-2724:1 (Bar-Gill).)

There are many examples of terms in the credit card and banking industry
rising to salience.  For instance, Annual Percentage Rates ("APRs") were not salient until
the late 1980s or 1990s, late and over-the-limit fees were not salient until Citi and
Discover introduced cards without these fees, and foreign currency exchange fees were
not salient until issuers such as Capital One, Chase, and Amex advertised cards without
them in the wake of the Currency Conversion multidistrict litigation.  (TT at 2724:6-
2726:4 (Bar-Gill).)  Examples of emerging salience abound in other consumer contracts
and include ATM usage fees and early termination penalties in cellular telephone
contracts.  (TT at 2726:5-2727:6 (Bar-Gill).)

There are generally two ways in which a non-salient term can become
salient.  (TT at 2730:20-22 (Bar-Gill).)  One is education by sellers, including advertising
campaigns that draw attention to particular product features.  (TT at 2730:23-2731:1

-38-

SPA-38

(Bar-Gill).)  Competitors often force obscure terms to salience in order to distinguish and market their products.  (TT at 2744:10-12 (Bar-Gill).)  For example, Capital One's "No Hassle Rewards" campaign drew attention to the fact that some of its competitors imposed conditions such as blackout dates that made redeeming rewards like frequent flyer miles difficult.  (TT at 2744:13-21 (Bar-Gill).)

Learning by consumers is the other means by which a term can rise to salience.  (TT at 2731:2-3 (Bar-Gill).)  Consumer learning occurs in a number of contexts.  First, a consumer may have a personal experience that makes a previously obscure term salient.  (TT at 2733:18-19 (Bar-Gill).)  For example, a consumer may try to return merchandise and find the merchant offers only store credit, not cash.  As a result, return policies become salient to the consumer, who starts to consider them before making purchases.  Consumers can also learn from the experiences of others, including through the media.  (TT at 2733:19-25 (Bar-Gill).)  Consumer groups and consumer advocates may facilitate a term's rise to salience, such as by alerting consumers to check their credit card statements for "hidden" charges.  (TT at 2734:19-21 (Bar-Gill).)

It is often difficult to predict whether a term will become salient.  (TT at 2735:8-10 (Bar-Gill).)  Seller education remains under the control of sellers, and it is hard to know what will capture the attention of consumers, advocates, or regulators.  (TT at 2735:8-18 (Bar-Gill).)  Collusion can delay the rise to salience of product features that would normally become salient under competitive conditions.  (TT at 2745:3-12 (Bar-Gill).)  If Issuing Banks conspire to adopt a term that favors them, such as a hefty late-payment fee, that unlawful agreement would disincentivize those Issuing Banks from

-39-

attempting to gain a competitive advantage by distinguishing themselves from their co-conspirators on the basis of that term. (TT at 2745:3-12 (Bar-Gill).)

Arbitration clauses continue to be largely non-salient to consumers. But Plaintiffs point to some signs of incipient salience with respect to class-action-barring arbitration, such as publicity following the Minnesota Attorney General's action against the NAF and negative publicity accompanying Wells Fargo's introduction of class-action-barring arbitration clauses for bank account holders. (TT at 2729:13-2730:3 (Bar-Gill).)

## CONCLUSIONS OF LAW

I.    Jurisdiction

This Court has jurisdiction pursuant to 15 U.S.C. § 26 and 28 U.S.C. §§ 1331, 1337.

II.    Plaintiffs' Standing to Bring Suit Against American Express

As a threshold matter, Amex contends that Plaintiffs lack Article III standing to sue Amex because they face no actual or imminent injury-in-fact. Amex also argues that Plaintiffs have failed to show an antitrust injury that can be redressed by the injunction they seek. Discover joins Amex's challenge to antitrust standing.

To maintain this suit, Plaintiffs must have both Article III standing and antitrust standing. It is well settled that "[t]he federal judicial power extends only to actual cases and controversies." E.I. Dupont de Nemours & Co. v. Invista B.V., 473 F.3d 44, 46 (2d Cir. 2006). The "irreducible constitutional minimum" of Article III standing requires three elements: (1) injury-in-fact; (2) causation; and (3) redressibility. Lujan v.

-40-

Defenders of Wildlife, 504 U.S. 555, 560 (1992). "The party invoking federal jurisdiction bears the burden of establishing these elements" and each element must be "supported . . . with the manner and degree of evidence required at the successive stages of the litigation." Lujan, 504 at 561. At this final stage in the litigation, Plaintiffs' Article III standing must therefore be "supported adequately by the evidence adduced at trial." Lujan, 504 U.S. at 561 (citing Gladstone Realtors v. Vill. of Bellwood, 441 U.S. 91, 115 n.31 (1979)). Further, in a class action, the named plaintiffs must themselves have standing to sue; it is not sufficient to show that "an injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." Lewis v. Casey, 518 U.S. 343, 357 (1996) (citations and internal quotation marks omitted); see also Mahon v. Ticor Title Ins. Co., 683 F.3d 59, 64 (2d Cir. 2012).

Courts only evaluate antitrust standing after Article III standing has been established. Ross v. Bank of America, N.A. (USA), 524 F.3d 217, 222 n.1 (2d Cir. 2008). Antitrust standing requires antitrust injury, which is "an injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977). A court must also evaluate other factors relevant to standing, often referred to as the "efficient enforcer" factors, to ensure that the party stating the antitrust injury is a proper plaintiff. These factors are "(1) 'the directness or indirectness of the asserted injury;' (2) 'the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement;' (3) the speculativeness of the alleged injury; and (4) the difficulty of identifying damages and

apportioning them among direct and indirect victims so as to avoid duplicative recoveries." Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc., 467 F.3d 283, 290-91 (2d Cir. 2006) (quoting Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council, 857 F.2d 55, 66 (2d Cir. 1988)).

    A.    Article III Standing

        Article III standing is a prerequisite to any consideration of the merits of a case or controversy. See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998). "First and foremost, there must be alleged (and ultimately proved) an injury-in-fact—a harm suffered by the plaintiff that is concrete and actual or imminent, not conjectural or hypothetical." Steel Co., 523 U.S. at 103 (citations and internal quotation marks omitted). Plaintiffs identify four injuries in fact: (1) an increase in the "full price" that Plaintiffs must pay for credit card services; (2) a diminution in the quality of credit cards; (3) reduced consumer choice in credit card terms; and (4) a reduction in the quantity of credit cards without class-action-barring arbitration clauses. (Pls. Prop. Conclusions of Law, dated Mar. 19, 2013 (ECF No. 550) at 155.)

        In 2006, the Defendants in Ross v. Bank of America, No. 05 Civ. 5116 (WHP) moved to dismiss Plaintiffs' claims for lack of Article III and antitrust standing. See In re Currency Conversion Fee Antitrust Litig., 2006 WL 2685082, at *1 (Sept. 20, 2006). Amex was not a defendant to that action. On appeal, the Second Circuit reversed this Court's dismissal for lack of standing and held that Plaintiffs alleged an Article III injury-in-fact. See Ross v. Bank of America, 524 F.3d at 223. Specifically, the Second Circuit concluded that Plaintiffs had alleged "antitrust injuries in fact" stemming from

"injuries to the market from the banks' alleged collusion to impose a mandatory term in cardholder agreements." Ross v. Bank of America, 524 F.3d at 223.  In addition to a reduction in consumer choice, the Second Circuit identified "at least two ways" in which the alleged conspiracy resulted in Plaintiffs "receiving objectively less valuable cards": the loss of the services of class action lawyers to monitor and challenge Issuing Bank behavior and the loss of the opportunity to go to court. Ross v. Bank of America, 524 F.3d at 224 ("A card that limits the holder to arbitration is less valuable (all other factors being equal) than a card that offers the holder a choice between court action or arbitration.").

Amex argues that the Supreme Court's recent decision in Clapper v. Amnesty International USA clarifies that Article III injuries-in-fact must be "certainly impending" rather than "fears of hypothetical future harm." See 133 S. Ct. 1138, 1151 (2013).  From there, Amex maintains that the specter of abusive practices by the Issuing Banks is too ephemeral to confer standing.  But the Second Circuit squarely held that the injuries Plaintiffs alleged were "sufficiently 'actual or imminent,' as well as 'distinct and palpable,' to constitute Article III injury in fact." Ross v. Bank of America, 524 F.3d at 223.  Further, it indicated that loss of opportunities to file a lawsuit or participate in a class actions were concrete diminutions in card values even if no lawsuits were commenced.  "The harms claimed by the cardholders . . . are injuries to the market . . . not injuries to any individual cardholder from the possible invocation of an arbitration clause." Ross v. Bank of America, 524 F.3d at 223.  Thus, the reduction in choice and quality are distinct injuries to consumers, separate from the issue of whether any

-43-

individual may be wronged in the future by the Issuing Banks. This reasoning undergirded the Second Circuit's determination that standing exists even if the Issuing Banks never invoked a mandatory arbitration clause against a particular cardholder. See Ross v. Bank of America, 524 F.3d at 223-24.

      The Second Circuit's focus on "injuries to the market" also defeats Amex's assertion that no injury-in-fact exists because no named plaintiff is an Amex cardholder. Ross v. Bank of America, 524 F.3d at 223. Amex advanced an identical argument when it challenged Plaintiffs' antitrust standing on summary judgment in Ross v. American Express, No. 04 Civ. 5723. This Court determined that while Amex is "differently situated in that Plaintiffs are not Amex cardholders," Plaintiffs "nevertheless suffered reduced choice in the marketplace as a result of Amex's alleged collusion with the Banks" and that "a jury could find that Amex's conduct caused injury to competition in the credit card market." In re Currency Conversion Fee Antitrust Litig., 773 F. Supp. 2d 351, 373 (S.D.N.Y. 2011). The fact that Lead Plaintiff Ross does not hold an Amex card and "would never do business with Amex again" is irrelevant in view of his broader claim that the credit card market as a whole is tainted by collusion. (TT at 39:22-40:3; 52:2-5 (Ross).)

      Based on the prior rulings of the Second Circuit and this Court, Plaintiffs allege cognizable Article III injuries-in-fact. That shifts the inquiry to whether they have proven those injuries at trial. See, e.g., Gladstone Realtors, 441 U.S. at 115 n.31 ("Although standing generally is a matter dealt with at the earliest stages of litigation, usually on the pleadings, it sometimes remains to be seen whether the factual allegations

-44-

of the complaint necessary for standing will be supported adequately by the evidence adduced at trial."). Plaintiffs offered evidence regarding abusive practices of certain Issuing Banks after their adoption of mandatory arbitration clauses. (PX-8646; PX-8647; PX-8678). They also showed that an individual cardholder would have little economic incentive to challenge such actions absent a class action. (TT at 2684:3-2685:3 (Bar-Gill).) That evidence was compelling.

But the threshold identified by the Second Circuit to demonstrate an injury-in-fact is far lower. The mere existence of the clauses diminishes the cards' value by foreclosing the opportunity for cardholders to go to court and address grievances through class action litigation. See Ross v. Bank of America, 524 F.3d at 224. It is undeniable that consumer choice was reduced when the seven Issuing Banks—who collectively held between 79-87% of the transaction volume and outstanding balances in the credit card market from 1999-2009—each adopted a class-action-barring clause. (PX-8539A; PX-8539C; PX-8539D.) Amex contends that Capital One, Chase, Bank of America, and HSBC—who account for about 36% of purchase volume and 41% of outstanding balances—no longer have arbitration clauses. (PX-8434.) But those Issuing Banks only deleted their class-action-barring arbitration clauses from cardholder agreements as part of settlements of these very actions. (See Consumer Financial Protection Bureau Arbitration Study Preliminary Results, dated 12/12/13 ("CFPB Study") at 19-20 (noting that the Ross v. Bank of America, No. 05 Civ. 7116 settlement removed

-45-

mandatory arbitration for 43% of credit card loans outstanding as of 2012).[27])  It would

be "absurd" to deny Plaintiffs' standing "merely because some of the alleged co-

conspirators have settled and agreed to remove their arbitration clauses."  In re Currency

---

[27]  This Court takes judicial notice of the CFPB Study pursuant to Rule 201.  Rule 201 allows this Court to take such notice "at any stage of the proceeding" if the judicially noticed facts are "not subject to reasonable dispute," that is, they "can be accurately and readily determined from sources whose accuracy cannot readily be questioned," Fed. R. Evid. 201(b) and (d).  Defendants object on three grounds to this Court's consideration of the CFPB Study:  the timeliness of Plaintiffs' request, the reliability of the CFPB Study, and on hearsay grounds.  Defendants' objections are overruled:

    First, judicial notice may be taken "at any stage of the proceeding," including as late as on appeal.  See, e.g., United States v. Davis, 726 F.3d 357, 368 (2d Cir. 2013) (concluding that judicial notice during appeal is appropriate); Trigueroes v. Adams, 658 F.3d 983, 987 (9th Cir. 2011) (same).

    Second, Courts may take judicial notice of data contained in Government reports.  See, e.g., Denius v. Dunlap, 330 F.3d 919, 926 (7th Cir. 2003) (concluding that a district court may take judicial notice of information on an official government website); Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir. 1991) (holding that district courts may take judicial notice of the contents of certain public records).  It is true that the CFPB Study results are "subject to revision . . . if further analysis so warrants."  (CFPB Study at 4.)  But it is telling that Defendants do not point out any errors in the report.  And extrapolation from Elzinga's market share charts, see PX-8539A; PX-8539B; PX-8539C; PX-8539D, reaches much the same result as the CFPB Study.

    Third, the CFPB Study is admissible as a hearsay rule exception because the report is a public record.  See Fed. R. Evid. 803(8).  This exception applies when the document is "a record or statement of a public office [that] sets out: (i) the office's activities; (ii) a matter observed while under a legal duty to report . . ." and "neither the source of information nor other circumstances indicate a lack of trustworthiness."  Fed. R. Evid. 803(8).  Section 1028(a) of the Dodd-Frank Act imposes on the CFPB the legal obligation to study the use of pre-dispute arbitration clauses in consumer financial products and services and report its findings to Congress.  12 U.S.C. § 5518(a).  Indisputably, the CFPB Study is the product of that legal mandate.

-46-

Conversion Fee Antitrust Litig., 773 F. Supp. 2d at 373. While there are more credit cards available today without arbitration clauses, 13 of the 20 largest Issuing Banks impose class-action-barring arbitration clauses. (CFPB Study at 21.) Had the settling defendants in these two lawsuits continued to impose class-action-barring arbitration clauses in cardholder agreements, nearly 94% of outstanding credit card loans would be subject to them.[28] (CFPB Report at 23.) As such, Plaintiffs have carried their burden to prove Article III injury-in-fact.

Causation is the next element of Article III standing. A plaintiff must prove "the existence of an immediate link between [the defendants' conduct] and the injury." See Pac. Capital Bank, N.A. v. Connecticut, 542 F.3d 341, 350 (2d Cir. 2008). Here, there is no question that Amex and the other Issuing Banks' adoption of the class-action-barring arbitration clauses is linked immediately to the injuries-in-fact.

Finally, to show redressibility, Plaintiffs must prove a "non-speculative likelihood that the injury can be remedied by the requested relief." W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP, 549 F.3d 100, 106-07 (2d Cir. 2008) (citing Lujan, 504 U.S. at 561). Here again, Amex argues that Plaintiffs failed to prove redressibility because they do not hold Amex cards and would be unaffected by an injunction invalidating Amex's clause. But because the injuries-in-fact constitute "present market effects" stemming from adoption of the class-action-barring arbitration clauses, the elimination of Amex's clause would redress the identified injuries to the market even if it

---

[28] This Court credits Plaintiffs' compelling evidence that Discover's opt-out option— utilized by less than 0.1% of cardholders—did not meaningfully counteract any loss in consumer choice. (See generally TT at 2746:23-2763:5, 3205:14-3207:25 (Bar-Gill).)

-47-

did not directly affect any individual cardholder.  See In re Currency Conversion Fee
Antitrust Litig., MDL No. 1409, 2009 WL 151168, at *3 (S.D.N.Y. Jan. 21, 2009).

      B.    Antitrust Standing

          Amex and Discover argue that Plaintiffs failed to prove statutory antitrust
standing at trial.  To prove antitrust standing, Plaintiffs must demonstrate an antitrust
injury.  "The antitrust injury requirement ensures that a plaintiff can recover only if the
loss stems from a competition-reducing aspect of the defendant's behavior."  Atl.
Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 344 (1990).

          On remand from the Second Circuit, this Court determined that Plaintiffs
in Ross v. Bank of America alleged antitrust standing.  While the Second Circuit only
addressed Article III standing in remanding this case, the Court of Appeals "previewed its
thinking" on antitrust standing, noting that "one form of antitrust injury is 'coercive
activity that prevents its victims from making free choices between market alternatives.'"
In re Currency Conversion Fee Antitrust Litig., 2009 WL 151168, at *4 (citing Ross v.
Bank of America, 524 F.3d at 223).  Thus, this Court concluded on remand that
Plaintiffs' Article III injury-in-fact was also an antitrust injury resulting directly from the
alleged collusion.  In re Currency Conversion Fee Antitrust Litig., 2009 WL 151168, at
*4.

          Subsequently, on summary judgment in Ross v. American Express, No. 04
Civ. 5723, American Express challenged Plaintiffs' antitrust standing because no Plaintiff
was an American Express cardholder.  Again, this Court noted that "Article III injury-in-
fact as determined by the Court of Appeals appears coextensive with antitrust injury in

-48-

fact." <u>In re Currency Conversion Fee Antitrust Litig.</u>, 773 F. Supp. 2d at 372.  While the injuries-in-fact are the same, for antitrust standing these injuries must have been the product of competition-reducing collusion.  If the clauses were adopted independently, there is no injury "of the type the antitrust laws were intended to prevent."  <u>Brunswick</u>, 429 U.S. at 489.

  The only way for Plaintiffs to prove antitrust injury is to demonstrate by a preponderance of the evidence that Defendants colluded in adopting and maintaining class-action-barring arbitration clauses.  For the reasons set forth below, this Court concludes that Plaintiffs' have not carried their burden to show that the adoption and maintenance of class-action-barring arbitration clauses was the product of collusion.  Therefore, Plaintiffs have failed to prove an antitrust injury.

III. <u>Violation of Section 1 of the Sherman Act</u>

  Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce."  15 U.S.C. § 1.  Despite the expansive language of Section 1, the Supreme Court has recognized that Congress intended to outlaw only "unreasonable restraints" of trade or commerce.  <u>State Oil Co. v. Khan</u>, 522 U.S. 3, 10 (1997).  Plaintiffs claim that Amex, Citi, and Discover violated Section 1 of the Sherman Act by agreeing with their competitors to implement and maintain mandatory class-action-barring arbitration clauses as a term or condition for holding their general purpose credit cards.  To succeed on their Section 1 claim, Plaintiffs must prove by a preponderance of the evidence "(1) a combination or some form of concerted action between at least two legally distinct

-49-

economic entities that (2) unreasonably restrains trade." <u>Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.</u>, 386 F.3d 485, 506 (2d Cir. 2004).

     A.    <u>Concerted Action</u>

     An antitrust conspiracy in violation of Section 1 of the Sherman Act requires proof of joint or concerted action as opposed to unilateral action. <u>Anderson News, L.L.C. v. Am. Media, Inc.</u>, 680 F.3d 162, 183 (2d Cir. 2012). "'[T]he crucial question' is whether the challenged anticompetitive conduct 'stem[s] from independent decision or from an agreement, tacit or express.'" <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 553 (2007) (quoting <u>Theatre Enters., Inc. v. Paramount Film Distrib. Corp.</u>, 346 U.S. 537, 540 (1954)). The circumstances of the alleged conspiracy "must reveal 'a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement.'" <u>Monsanto Co. v. Spray-Rite Serv. Corp.</u>, 465 U.S. 752, 764 (1984) (quoting <u>Am. Tobacco Co. v. United States</u>, 328 U.S. 781, 810 (1946)). No formal agreement is required to constitute an antitrust conspiracy. "The essential combination or conspiracy in violation of the Sherman Act may be found in a course of dealings or other circumstances as well as in any exchange of words." <u>Am. Tobacco Co.</u>, 328 U.S. at 809-10. It is enough that "concert of action is contemplated and . . . the defendants conformed to the arrangement." <u>United States v. Paramount Pictures</u>, 334 U.S. 131, 142 (1948).

     An unlawful agreement may be proved through direct or circumstantial evidence "that reasonably tends to prove that the [defendants] and others had a conscious commitment to a common scheme designed to achieve an unlawful objective."

-50-

Monsanto, 465 U.S. at 764. While Plaintiffs concede that they have no direct evidence of a conspiracy among the Issuing Banks, "conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with . . . precision." United States v. Snow, 462 F.3d 55, 68 (2d Cir. 2006); see also Anderson News, 680 F.3d at 183 ("conspiracies are rarely evidenced by explicit agreements"). Rather, conspiracies "nearly always must be proven through 'inferences that may fairly be drawn from the behavior of the alleged conspirators.'" Anderson News, 680 F.3d at 183 (quoting Michelman v. Clark-Schwebel Fiber Glass Corp., 534 F.2d 1036, 1043 (2d Cir. 1976)).

Nevertheless, antitrust law "limits the range of permissible inferences from ambiguous evidence in a [Section] 1 case" because the line between concerted action and permissible unilateral action will often be hard to discern. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 588 (1986); see also In re Baby Food Antitrust Litig., 166 F.3d 112, 124 (3d Cir. 1999) ("in drawing favorable inferences from underlying facts, a court must remember that often a fine line separates unlawful concerted action from legitimate business practices"). Thus, "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." Matsushita, 475 U.S. at 588. Rather, Plaintiffs must present evidence "that tends to exclude the possibility that the alleged conspirators acted independently." Matsushita, 475 U.S. at 588. "[O]nce a conspiracy is shown, only slight evidence is needed to link another defendant with it." Apex Oil Co. v. DiMauro, 822 F.2d 246, 257 (2d Cir. 1987). Nevertheless, Plaintiffs must provide evidence "pertaining

to each defendant" to demonstrate that that defendant participated in the conspiracy. AD/SAT v. Associated Press, 181 F.3d 216, 234 (2d Cir. 1999).

      1.     Parallel Conduct and "Plus Factors"

Where, as here, there is no direct evidence of an agreement, parallel conduct can be probative evidence of unlawful collusion. Apex Oil, 822 F.2d at 253. But parallel conduct among competitors is not in itself sufficient to prove an antitrust conspiracy. Indeed, parallel conduct is "just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market" as it is with the existence of an agreement. Twombly, 550 U.S. at 554. Even conscious parallelism, a process through which firms in a highly concentrated market may be able to "achieve cartel-like results simply by observing and following each other's market behavior," see 6 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1410b (3d ed. 2010), is "not in itself unlawful." Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 227 (1993); see also Apex Oil, 822 F.2d at 253 ("[P]arallel conduct alone will not suffice as evidence of [an antitrust] conspiracy, even if the defendants knew the other defendant companies were doing likewise." (internal citations omitted)).

However, an agreement among competitors "may be inferred on the basis of conscious parallelism, when such interdependent conduct is accompanied by circumstantial evidence and plus factors." Todd v. Exxon Corp., 275 F.3d 191, 198 (2d Cir. 2001); see also Apex Oil, 822 F.2d at 253 ("[A] plaintiff must show the existence of additional circumstances, often referred to as 'plus' factors, which, when viewed in

conjunction with the parallel acts, can serve to allow a fact-finder to infer a conspiracy."). So-called "plus factors" may include "a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of inter-firm communications." Twombly v. Bell Atl. Corp., 425 F.3d 99, 114 (2d Cir. 2005) (internal citations omitted), rev'd on other grounds by Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007).

Such plus factors are "neither exhaustive nor exclusive, but rather illustrative of the type of circumstances which, when combined with parallel behavior, might [lead a court to] infer the existence of an agreement." Mayor & City Council of Balt., Md. v. Citigroup, Inc., 709 F.3d 129, 136 n.6 (2d Cir. 2013). Rather, courts examine the existence of a conspiracy "as a whole" taking into consideration the totality of the evidence, as opposed to "dismembering it and viewing its separate parts." Cont'l Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 699 (1962); see also In re Publ'n Paper Antitrust Litig., 690 F.3d 51, 65 (2d Cir. 2012).

a)     Was there Parallel Conduct?

At the outset, this Court notes that the temporal connection between the meetings and the adoption of the clauses suggests parallel conduct. Together, the Issuing Banks participated in 28 meetings over a four-year period exploring avenues to displace class actions with arbitration of cardholder disputes. During that same approximate period, each Issuing Bank adopted a class-action-barring arbitration clause. While First USA implemented its class-action-barring arbitration clause more than a year before the first meeting, all of the other Issuing Banks noticed and implemented clauses within a

-53-

month of an Arbitration Coalition or In-House Working Group meeting attended by their counsel. In May 2002, Chase was the last Issuing Bank to adopt such a clause. One month later, the multi-year pattern of meeting nearly bimonthly dropped off. Indeed, the Arbitration Coalition did not meet again for almost a year, and after two follow-up conference calls, appeared to have disbanded.

Further, this Court credits expert testimony indicating that the credit card industry is an oligopoly in which conscious parallelism is the norm. For example, many of the Issuing Banks encourage their employees to hand over for analysis any competitor card member agreements or solicitations they receive by mail. (See, e.g., TT 3282:9-3283:10 (Heine).) As described earlier, the Issuing Banks also reached out to third parties, such as outside counsel or the National Arbitration Forum, for information on which of their competitors were adopting arbitration clauses and when. (See, e.g., PX-5300; PX-6005; PX-7533; PX-7696; PX-7697.)

The Defendants contend that a four-and-a-half-year-long "slow motion conspiracy" would defy both economic and common sense, as any benefit from collusive adoption of the clauses is lost unless they are adopted close in time. But not all conspiracies require swift, simultaneous parallelism. See, e.g., In re Northwest Airlines Corp. Antitrust Litig., 208 F.R.D. 174, 198 (E.D. Mich. 2002) (rejecting the "questionable premise" that a conspiracy "cannot be established absent a complete 'sea change' in each [conspirator's] practices that results in a lock-step approach to [adopting a policy]"). Unlike price fixing, which may quickly impose a negative toll on the first firm to raise its price unless others soon follow, an agreement to impose and maintain

-54-

arbitration clauses would not require immediate, concerted action to be successful because arbitration was not salient to consumers at that time. The implementation of the clauses was multifaceted for each Issuing Bank and subject to unique delays and difficulties. Further, the evidence suggests that the ultimate goal of the Arbitration Coalition was to "change the tide" by establishing arbitration as the accepted industry standard for dispute resolution. This could not have been expected to happen overnight. In fact, a more studied and staggered approach would have made sense given uncertainty and evolving law on the issue.

Additionally, the Defendants argue that their decisions to adopt arbitration clauses were made independently of their participation in the Arbitration Coalition and other meetings. Amex points out that it made the decision to adopt an arbitration clause in late 1998 and that its arbitration provision became effective in April 1999, a month before the inaugural May 25, 1999 meeting. Thus, it could not have been a party to any agreement to jointly adopt the clauses. But courts have often permitted inferences of collusion in response to the familiar fact pattern of a 'price leader' announcing to a roomful of its rivals its 'independent' decision to raise prices as an implicit invitation to follow suit. See, e.g., United States v. Foley, 598 F.2d 1323, 1331-32 (4th Cir. 1979) (inferring conspiracy where realtor announced price increase to rivals who then subsequently raised prices). Indeed, interdependent parallel conduct may be simultaneous or sequential. See In re Plasma-Deriv. Protein Therapies Antitrust Litig., 764 F. Supp. 2d 991, 1000 (N.D. Ill 2011). Sequential parallelism occurs when one or

-55-

more firms engage in an action that becomes known to its rivals, who can then choose whether to imitate the move.[29] In re Plasma-Deriv., 764 F. Supp. 2d at 1000 n.8.

Here, Amex and First USA—the only two Issuing Banks that adopted arbitration clauses prior to the May 25, 1999 meeting—were the same two banks that were actively involved in planning the initial meeting of the Arbitration Coalition on July 28, 1999. According to Lipsett, "developing some sort of forum to talk about arbitration issues" was an "assignment" MacDonald received as a consultant for First USA. (TT at 2855:9-11 (Lipsett).) And while the May 25, 1999 meeting appears to have been a WilmerHale client development initiative, Heine lent more than Amex's passive co-sponsorship to the subsequent Arbitration Coalition meetings. Heine and MacDonald worked with WilmerHale to gather participants for the Coalition's inaugural meeting. (PX-5219.) Thereafter, Heine continued to participate in Coalition meetings for years. In addition to hosting the March 2, 2000 meeting at Amex's New York headquarters, Heine presented an Arbitration Overview internally at Amex on December 6, 1999, in which he noted that Amex had "helped pull together an ad hoc industry group . . . [which] may serve as a forum or conduit for industry-wide or other cooperative activities." (PX-8640.) Heine was also the contact person for an Arbitration Coalition "sub-group" tasked with developing "a concrete proposal on how a more organized public relations effort

---

[29] Courts may draw an inference of interdependent parallelism more easily from simultaneous parallelism than sequential parallelism because concerted action in the absence of knowledge of or time to react to a competitor's action is improbable. See In re Digital Music Antitrust Litig., 592 F. Supp. 2d 435, 445 (2008) vacated on other grounds by Starr v. Sony BMG Music Entm't, 592 F.3d 314 (2d Cir. 2010). But that is not this case.

-56-

might benefit us all." (PX-5228.) This Court concludes that Heine's involvement in the Coalition was more than just a disinterested favor to Amex's outside counsel. In view of Heine's extensive participation in the Arbitration Coalition, Amex's approval of its arbitration clause prior to the May 25, 1999 meeting does not preclude a finding of parallel conduct between Amex and the other Issuing Banks.

Similarly, Discover noticed card members of its class-action-barring arbitration provision in July 1999, the same month as the first Arbitration Coalition meeting. Though Discover appears to have decided to adopt its arbitration clause in early 1999, the clause's implementation is close enough in time to the inauguration of the Arbitration Coalition for Discover to be considered a leader in sequential parallelism along with Amex and First USA. Like Heine, Discover's Daily was a prominent member of the Arbitration Coalition. He took the lead on the Coalition's FAQs and Self-Regulation projects, sharing Discover's internal work product and advice regarding arbitration. Given Daily's level of participation, the fact that Discover independently decided to adopt arbitration does not alter this Court's determination that its conduct was consciously parallel to that of the other Issuing Banks. See e.g., In re Northwest Airlines, 208 F.R.D. at 198 ("[E]ven if an Airline already had adopted [a policy] prior to the onset of the conspiracy alleged . . . this would not preclude the conclusion that this Airline nevertheless joined the conspiracy. . . .").

Citi, which did not implement arbitration clauses in its cards until July, November and December 2001, also argues that its decision to adopt arbitration was independent of its participation in the Arbitration Coalition meetings. Specifically, Citi

argues that Heyrich's June 2000 memo was the catalyst for Citi's adoption of an arbitration clause and that Heyrich was neither involved in nor aware of the Arbitration Coalition meetings. But Heyrich's memo was forwarded to Citi Cards' counsel months before the decision to implement an arbitration clause and after Citi Cards' counsel had already attended at least five Arbitration Coalition meetings. Ultimately, it was Citi Cards' in-house counsel who pitched the adoption of an arbitration clause to Freiberg, the final decision maker, in October 2000. While Citi was less involved than Amex and Discover in the Arbitration Coalition meetings, sufficient evidence exists to show that Citi took its competitors' actions into account. Warrington, Nelson's former boss, attended the May 25, 1999 meeting and the first two arbitration coalition meetings. There, she shared Citi's "wait and see" plans with her competitor Siegel (Chase). (PX-0110.) Through her attendance at these meetings she was able to put Nelson in touch with GE Capital's Hufford to "compare notes" about arbitration. (PX-7517.) Nelson then attended the April 2000 Arbitration Coalition meeting as Citi was actively considering arbitration—despite having already received substantial legal advice on arbitration from the WilmerHale and Ballard firms. (PX-7515; PX-7516; PX-8661; TT at 1703:15-20; 3634:3-16 (Nelson).) And a memo from Nelson to Kleinbaum regarding arbitration, dated September 11, 2000, contains a chart listing whether each of the Issuing Banks had adopted a clause. (PX-7529.) Other Citi Cards personnel, including Silverwood, Tasheff, and Bergeson, attended a combination of Class Action Working Group and Arbitration Coalition meetings as well.

-58-

Finally, this Court notes that the alleged Sherman Act conspiracy encompasses both an agreement to impose arbitration clauses and an agreement to maintain them. Even if Amex, Discover, and Citi's decision to adopt arbitration were made independent of any consideration of their competitors' actions, their enduring participation at the meetings over the years would still implicate them in any agreement to maintain their clauses and facilitate adoption by other Issuing Banks.

Viewing the evidence as a whole, this Court concludes that there was conscious parallel action in the adoption and maintenance of arbitration clauses among the Issuing Banks. Sequential parallelism, however, requires no advance agreement among competitors to be effective. Therefore, agreement is difficult to infer from sequential actions alone. See In re Fla. Cement & Concrete Antitrust Litig., 746 F. Supp. 2d 1291, 1309-10 (S.D. Fla. 2010). Without an agreement, there can be no antitrust liability. The question thus becomes whether the Issuing Banks' parallel action revealed an agreement or simply conscious parallelism. Accordingly, this Court turns to the analysis of "plus factors" to determine whether an agreement may be inferred. See In re Travel Agent Comm'n Antitrust Litig., 583 F.3d 896, 903 (6th Cir. 2009) ("The inadequacy of showing parallel conduct or interdependence, without more, mirrors the ambiguity of the behavior: consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market.").

b)      Plus Factors

(i)      Motive to Collude

Courts may not infer a conspiracy where the defendants have no "rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations." AD/SAT, 181 F.3d at 233.  It is clear that the Issuing Banks had independent interests in adopting arbitration clauses to preclude costly class actions.  This plus factor speaks to whether they also had a "rational economic motive" to adopt those clauses jointly, as opposed to going it alone. See Matsushita, 475 U.S. at 596-97.  The record amply demonstrates that the Issuing Banks were motivated to "work together to turn the tide" so that arbitration would be established as the "acceptable forum for resolving consumer debates." (PX-6125.)  But this evidence does not necessarily translate into a "rational economic motive" to collusively adopt the clauses.

The Issuing Banks harbored concerns "that using arbitration for credit cards could be perceived as anti-consumer." (PX-0110.)  An internal Citibank memo notes "that any arbitration program . . . will receive considerable public scrutiny and potential negative press," while an Amex memo recommends "assist[ing] in developing the PR / Consumer affairs strategy (e.g., can we turn this into a positive?)." (PX-6086; AX-9054.)  Discover was also "getting a lot of press, a lot of legislative inquiries [and] media inquiries as to whether we were going to adopt an arbitration clause" in 1998-99. (TT at 3951:13-16 (Swift).)  The Defendants maintain that they were not concerned about losing card members when they adopted arbitration clauses because arbitration was not salient to consumers at the time.  But Daily (Discover) reported to his superiors that most

-60-

of the consumer calls in response to Discover's clause were "hostile" and appeared to be "in response to articles or television programs about arbitration." (PX-8125). Even if most consumers were indifferent, this does not foreclose a motive to keep arbitration non-salient while issuers quietly adopted it across the board.

It is clear that the Issuing Banks also believed an "organized public relations effort might benefit us all." (PX-5228.) To that end, the Arbitration Coalition formed a sub-group to "discuss and develop initial response points to counter the various arguments being made to challenge arbitration clauses" and planned to use these FAQs "for government relations and media relations purposes." (PX-5034; PX-8125; TT at 811:7-14 (Daily); TT at 691:5-18, 3355:15-3356:2 (Heine).) The Coalition also explored the possibility of commissioning pro-arbitration research, which all agreed "might be very helpful for obvious reasons." (PX-5222.) And at the March 2000 Arbitration Coalition, a public relations expert from Burson-Marsteller gave a presentation on "some of the ways in which a public relations effort could alter perceptions about consumer arbitration." (PX-5228.) Indeed, "public relations," the "PR problem," "public discourse," and "anti-arbitration press, legislation and judicial council developments" appear as agenda items on at least four of the meetings for which agendas exist. (See, e.g., PX-0089; PX-0755; PX-5078; PX-5088.)

Finally, the Issuing Banks were concerned about protecting the enforceability of their clauses against "a rogue or unsophisticated player (not necessarily in our industry) who attempts to be heavy handed or unfair in the adoption or exercise of a clause such that it causes all businesses using consumer arbitration to be judged in an

-61-

unfavorable light." (PX-5034.)  If a competitor generated bad legal precedent with a poorly crafted clause, the ability of other banks to capitalize on the fruits of arbitration would be compromised.  Siegel (Chase) expressed a similar concern that First USA had created a "catch-22 situation" by mandating arbitration [with NAF] for debt collection, which had the byproduct of arbitration being "misperceived as anti-consumer." (PX-0110).

        Plaintiffs argue that the Issuing Banks' need to parry consumer backlash and temper any "rogue" players establish a motive to conspire in the adoption of arbitration clauses.  This Court agrees.  While arbitration was not salient to most consumers at the time of the alleged conspiracy, collusion would ensure that no Issuing Bank facilitated a rise to salience before arbitration was firmly entrenched as the industry norm.  As Kleinbaum (Citi) confirmed, it was "important that our card members not perceive us as engaging in actions that are harmful to them." (TT at 3740:23-24 (Kleinbaum).)  Collusion would also help to ensure that each bank's clause was sufficient quality withstand legal challenges that could undermine the enforceability of every bank's clause.  On at least two occasions, members of the Coalition were instructed to bring copies of their arbitration clauses with them to the meetings.  (PX-5081; PX-6134.)  Reaping the benefits of arbitration required that the Issuing Banks defeat legal challenges from the class action bar and minimize any media or regulatory backlash.  The Arbitration Coalition would be much more likely to succeed at this endeavor if each bank that implemented a clause maintained it and defended it.

A motive to conspire, however, does not mean that a conspiracy existed. While the collusive adoption and maintenance of arbitration clauses would have entrenched arbitration as an industry standard, this Court is convinced that the evidence is just as consistent with legitimate activity in furtherance of the Issuing Banks' independent self interests. Even absent a conspiracy to adopt and maintain arbitration clauses, the Issuing Banks would still be motivated to cooperate on efforts to sway public opinion and defend the legality of their clauses in the courts and legislatures. See E. R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 136 (1961) (publicity campaigns directed at lawmaking and law enforcement authorities are not actionable under the Sherman Act); Mercatus Grp., LLC v. Lake Forest Hosp., 641 F.3d 834, 851 (7th Cir. 2011) (communications to the public akin to advertising "are outside the reach of the antitrust laws"). Perceiving that class action attorneys would lobby and litigate to undermine the enforceability of arbitration clauses, the Issuing Banks networked to thwart the plaintiffs' bar. When the motive to cooperate is just as consistent with legitimate goals as non-legitimate goals, there can be no fair inference of collusion.

(ii)     Inter-firm Communications

There is no question that the Issuing Banks engaged in an unusually high amount of inter-firm communications regarding arbitration. Heine testified that "this particular grouping of people to discuss these issues was not something that . . . has happened in other contexts." (TT at 555:19-22 (Heine).) Testimony at trial indicated that the Issuing Banks were "fierce" and "vicious" competitors. (TT 542:1-17, 3400:17-3401:14 (Heine); TT at 3896:1 (Yob).) MacDonald described Amex as the "Darth

-63-

Vader" of the credit cards industry who "you just didn't talk to" because the "animosity

was very, very strong." (TT at 1148:7-11 (MacDonald).) Yob (Discover) described

Discover's relationship with other card issuers as "hostile" and characterized Visa and

Mastercard issuers as trying to "kill the baby [Discover] at birth." (TT at 3922:7-11

(Yob).) Plaintiffs argue that, but for collusion, such staunch competitors would not have

committed themselves to the Arbitration Coalition or joined together to establish an

"informal 'information please' network" through the In-House Working Group.

       In determining whether an inference of collusion can be drawn from the

Issuing Banks' inter-firm communications, this Court is mindful that "a mere showing of

close relations or frequent meetings between the alleged conspirators . . . will not sustain

a plaintiff's burden absent evidence which would permit the inference that these close

ties led to an illegal agreement." H.L. Moore Drug Exch. v. Eli Lilly & Co., 662 F.2d

935, 941 (2d Cir. 1981); see also In re Baby Food, 166 F.3d at 126 ("[C]ommunications

between competitors do not permit an inference of an agreement to fix prices unless those

communications rise to the level of an agreement, tacit or otherwise.") (internal citations

omitted); In re Graphics Processing Units Antitrust Litig., 527 F. Supp. 2d 1011, 1023

(N.D. Cal. 2007) ("Attendance at industry trade shows and events is presumed legitimate

and is not a basis from which to infer a conspiracy, without more."). While meetings

among competitors undoubtedly provide opportunities to conspire, deeming those

opportunities as proof of a conspiracy would condemn independent professional

associations. Kreuzer v. Am. Academy of Periodontology, 735 F.2d 1479, 1488-89 (D.C.

Cir. 1984).

*The May 25, 1999 Meeting*

This Court credits Lipsett that the May 25, 1999 meeting of senior in-house credit card counsel was a business development initiative on behalf of WilmerHale. Lipsett testified that the meeting "was our idea" and that "[n]one of [the Issuing Banks] approached us . . . . We reached out to try to get them to do it." (TT at 2828:15-16 (Lipsett).) While a private meeting among competing banks provided an opportunity to conspire, there is no evidence to suggest that a meeting of the minds to implement and maintain arbitration clauses actually took place. In fact, there is only scant evidence that arbitration was even discussed at this meeting. (TT at 139:5-15 (Birnbaum).)

*The Arbitration Coalition Meetings*

While sparked by the insatiable desire of law firms to develop new clients, the Arbitration Coalition meetings also involved significant organization and participation on the part of the Issuing Banks. Defendants analogize the meetings of the Arbitration Coalition to trade association meetings, CLE events, and client development pitches, none of which tend to raise antitrust concerns. There are similarities, but also striking differences.

The number of meetings over a sustained period devoted to the topic of arbitration far exceeds a level normally associated with client development pitches or CLEs. See, e.g., In re Northwest Airlines, 208 F.R.D. at 201 ("[I]t is somewhat striking that representatives of the [competing firms] found so many opportunities to at least 'compare notes' . . . where . . . cooperation among [the firms] was by no means necessary

-65-

for any individual [firm] to take effective action[.]").  The generation of joint work product, such as the FAQs project, is inconsistent with client development efforts because law firms do not generally parcel work assignments out to clients.  And potential client invitees are not usually called on to educate one another or share internal analysis.  Indeed, the significant level of cooperation among attendees was atypical of a CLE or client development pitch.  Any lawyer would agree that CLEs and client development pitches do not typically involve homework assignments, the formation of sub-groups, or the development of a public relations campaign.

On the other hand, notes and agendas from the meetings indicate that education on legal developments on arbitration and "legislative updates" were significant aspects of each meeting.  (See, e.g., PX-0358; PX-0768; PX-5078.)  While there is evidence that certain of the Issuing Banks shared some internal, non-public information, (see PX-0110), the bulk of the discussion centered on publicly available information— including the arbitration clauses themselves.  With the exception of the FAQs project, there is also little evidence that the Issuing Banks engaged in joint drafting projects.  While the banks were instructed to bring copies of their arbitration clauses to meetings, there is no evidence indicating what, if anything was done with them.  But among sophisticated counsel, this is hardly surprising.

Defendants' expert testified that the Arbitration Coalition meetings were not conducive to the formation of a cartel, because they were open to outsiders.  (TT at 4116:8-20 (Elzinga) (stating the guest list of conspiratorial meetings "is limited to people who are participating in the cartel activity itself").)  Though the Arbitration Coalition

-66-

meetings were not open to the public, attendance was not limited to the Issuing Banks or even the credit card industry. Aside from WilmerHale and Ballard, various other law firms attended. Representatives from public relations firms also attended several meetings, as did participants from other industries, like Sears and Toyota. At the second Arbitration Coalition meeting, attendees agreed that "participants in other industries will be solicited to join the effort" including "creditor groups, computer, . . . utilities, telephone companies [and health care networks]." (PX-0110.) "The presence of numerous uninvolved observers at such meetings tends to dispel any specter of illegality." In re Nat'l Ass'n of Music Merchs., Musical Instruments & Equip. Antitrust Litig., MDL No. 2121, 2012 WL 3637291, at *2 (S.D. Cal. Aug. 20, 2012). The inclusion of other industries and outside counsel resembles a trade association, and cuts against any inference that an express agreement to implement and maintain arbitration clauses was articulated at the Arbitration Coalition meetings. This, however, does not preclude a tacit meeting of the minds, or a "gentlemen's agreement" among the Issuing Banks.

Viewing the Arbitration Coalition meetings as a whole, this Court concludes that the evidence is ambiguous. The number of meetings and the level of cooperation and information-sharing among "fierce competitors" to "change the tide" on arbitration permit an inference of illegality. But inferences of legitimate activity are just as persuasive. The bulk of the Coalition's activities were akin to that of a fledgling special interest group cooperating to advance a mutually beneficial business initiative they felt was under siege by a well-networked enemy.

-67-

*The Class Action Working Group Meetings*

The two meetings of the Class Action Working Group were attended by a plethora of outsiders from other industries, trade associations, lawyers, and lobbyists. Conceived by MacDonald, the Class Action Working Group was an outgrowth of the Arbitration Coalition but appears to have had limited support from Coalition members, and met only twice. The meetings had the trappings of a trade association or special interest group. Other than providing MacDonald with another platform for his anti-class action crusade, the meetings accomplished little. While Plaintiffs characterize MacDonald's exhortations as the basis of a tacit agreement, the presence of invitees from other industries and law firms was not conducive to the formation of conspiracy among the Issuing Banks. The two meetings focused on global efforts to curtail class actions and spanned topics such as "discovery reform," "smarter, tougher certification challenges," and working for reform "in the judiciary" and "on the legislative side." (PX-7559.) At best, the Class Action Working Group can be viewed as an outgrowth of any conspiracy already established by the Arbitration Coalition. But viewed on its own this Court concludes that it does not support an inference of collusion.

*The In-House Working Group Conference Calls*

Of the three types of inter-firm meetings, the In-House Working Group, an "an informal 'information please' network," permits the strongest inference of an agreement. Its meetings were conducted without the participation or knowledge of any outsiders and with little evidence regarding their subject matter. That raises antitrust concerns. "[W]e expect competitors to meet together only minimally and to assemble

-68-

publicly for relatively open meetings conducted with a particular and justifiable purpose

in mind. To the extent that rivals move away from this model, their activity becomes less

consistent with normal competition and more consistent with a conspiracy to repress it."

Areeda ¶ 1417b; cf. Weit v. Cont'l Ill. Nat'l Bank & Trust Co. of Chi., 641 F.2d 457,

477-78 (7th Cir. 1981) (fact finder may consider evidence of informal meetings by

officers on numerous occasions to determine if the totality of the evidence warrants an

inference of agreement). Barry acknowledged that "to imply organization to this group

probably overstates it." (TT at 2165:11-13 (Barry).) Over time the group "fizzled" and

"faded away" (TT at 2173:1-12 (Barry).)

### *"Side Conversations" and Sharing of Non-Public Information*

In addition to the meetings described above, Plaintiffs contend that "side

conversations" among certain of the Issuing Banks permit an inference of collusion. At

the September 29, 1999 Arbitration Coalition meeting, Siegel (Chase) initiated individual

side conversations out of "the group setting" with Sears, GE Capital, Citi, Bank of

America, Household, and First USA. (TT at 861:14-865:1 (Siegel); PX-0110.) Siegel

testified credibly that she did not know much about arbitration and was "in an

investigative fact-finding mode at the moment." (TT at 865:11-866:12 (Siegel).) The

Coalition did not, however, "go around the table and say, well, what are you doing, what

are you doing, what are you doing?" (TT at 863: 22-24 (Siegel).) While Siegel's

communications may have been inappropriate in hindsight, her questioning of non-credit

card counsel as well as her competitors indicates a general desire for information rather

than an intent to initiate a conspiracy. Nevertheless, Siegel's conversations reveal an

-69-

unexpected willingness to cooperate with "fierce competitors." Plaintiffs also point to Warrington (Citi) putting her colleague Nelson in touch with Hufford (GE Capital) to "compare notes" on arbitration shortly after Warrington and Hufford met at the July 1999 Arbitration Coalition meeting. Because GE Capital is not an alleged co-conspirator, this Court draws no inference from that communication.

      The In-House Working Group meetings appear to have spurred bilateral information exchanges as well. In another communication from July 2001, Gail (Bank One) instructed Lepri (Bank One) to respond to an inquiry from Barry (Capital One) as to whether Bank One permitted cardholders to opt out of arbitration and if so, what percentage of cardholders had done so. (PX-7609.) Both Gail and Barry were members of the In-House Working Group, which convened a conference call earlier that month. In October 2001, Capital One noticed cardholders that it was implementing an arbitration clause.

      Plaintiffs point to other "side" communications, many of which involve First USA and MacDonald. Days after the September 1999 meeting, Larry Drexler (First USA in-house counsel) shared First USA's experience regarding the use of arbitration "both offensively (for collection actions) and defensively (for consumer complaints)" with Mullen (MBNA). (PX-6005.) About a month later, when he invited Lepri (Bank One) to the November 1999 Arbitration Coalition meeting, MacDonald told her that MBNA was "going to switch to arbitration soon" and that MBNA was going to join the Coalition. (PX-7587.)

MacDonald reached out to Stephen Whittaker (Providian) in January 2001 to inform him that he had told NAF that Providian was considering arbitration. (PX-7705.) MacDonald then put Providian in touch with NAF directly, stating "let me know if there is anything I can do to help move things along." (PX-7705.) As the first Issuing Bank to adopt arbitration, First USA's eagerness to share its experiences with its competitors is disconcerting—especially in view of the fact that it had assigned MacDonald to develop a "forum to talk about arbitration issues." (TT at 2855:9-10 (Lipsett).) MacDonald also furnished unsolicited updates to the Issuing Banks on competitors' plans. Further, he aggressively pursued the opportunity to push Providian and NAF together to "move things along." (PX-7705.)

Finally, Plaintiffs offer communications in which certain of the Issuing Banks attempted to obtain information about their competitors' plans regarding arbitration through third parties such as Kaplinsky (Ballard) or Curtis Brown (NAF). (See PX-5300; PX-6016; PX-7553; PX-7696; PX-7697.) But this sort of information-seeking is common in concentrated markets, and such behavior is consistent with conscious parallelism rather than collusion.

        (iii)   <u>Acts Contrary To Unilateral Self Interest</u>

In order to distinguish concerted action from mere parallelism, courts look to whether firms would have engaged in acts contrary to their own self interest but for the existence of an illegal agreement. However, "[t]he concept of 'action against self-interest' is ambiguous and one of its meanings could merely constitute a restatement of interdependence." In re Baby Food, 166 F.3d at 122. Thus, "no conspiracy should be

-71-

SPA-71

inferred from ambiguous evidence or . . . mere parallelism when defendants' conduct can be explained by independent business reasons." In re Baby Food, 166 F.3d at 122.

Plaintiffs argue that the Issuing Banks acted against their unilateral self-interest in educating their competitors on the utility and use of class-action-barring arbitration clauses. They contend it is tantamount to sharing a valuable cost-saving measure. For example, they point to the Arbitration Coalition's cooperative revisions of Daily's FAQs following the October 1999 Arbitration Coalition meeting. They also note that Issuing Banks were asked to bring copies of their arbitration clauses to meetings.

The Defendants contend that meeting for educational and advocacy purposes is not against their self-interest even if they never adopted an arbitration provision. Given that arbitration was a relatively new development, each Defendant had an interest in staying abreast of the evolving legal and regulatory landscape. Each Defendant also had a unilateral self-interest in shaping the public discourse in favor of arbitration. And because the goal of establishing arbitration as an industry norm depended in part on courts and legislators accepting arbitration in the legal landscape, Defendants had an interest in educating their competitors on how to "get it right." While this Court finds that those meetings evidenced a degree of communication and collaboration beyond what one would expect from a CLE or a trade association, this Court does not find that participation in the meetings was so contrary to self-interest that an illegal agreement can be inferred from this "plus factor."

-72-

(iv)    Artificial Standardization

Another plus factor Plaintiffs urge this Court to consider is the artificial standardization of the arbitration clauses.  See E.I. du Pont de Nemours, 729 F.2d at 140 n.10; In re Currency Conversion Fee Antitrust Litig., No. 05 Civ. 7116 (WHP), 2012 WL 401113, at *7 (S.D.N.Y. Feb. 8, 2012).  Plaintiffs contend that the Issuing Banks' arbitration clauses were artificially standardized as a result of their illegal agreement to include class action waivers and to otherwise bar collective redress.  Plaintiffs point to the fact that when the alleged conspiracy began, the marketplace contained major participants who had neither arbitration clauses nor class action waivers.  After the Arbitration Coalition ceased meetings, all the Issuing Banks had similar clauses.  To infer an illegal agreement from artificial standardization, the uniformity in products cannot be the result of legitimate processes.  See In re Elevator Antitrust Litig., 502 F.3d 47, 51 (2d Cir. 2007) ("Similar contract terms can reflect similar bargaining power and commercial goals (not to mention boilerplate); similar contract language can reflect the copying of documents that may not be secret; similar pricing can suggest competition at least as plausibly as it can suggest anticompetitive conspiracy[.]").

The evidence on this plus factor is ambiguous.  On the one hand, the Issuing Banks were asked to provide copies of their arbitration clauses for analysis and discussion at meetings and they intended to work together to share "best practices."  It is also undeniable that the Arbitration Coalition had a special interest in defeating class action lawsuits.  On the other hand, arbitration was becoming *au courant*—numerous legal publications were discussing arbitration as a means of preventing class action

-73-

litigation, and it continues to be a developing area of the law.  It is unsurprising that over time each of the Issuing Banks' arbitration clauses would morph to incorporate a class action waiver.  Because the evidence is "just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market" this plus factor does not warrant an inference of illegal agreement.  See Twombly at 550 U.S. at 554.

(v)    <u>Issuing Bank Communications Concerning Foreign Currency Exchange Fees</u>

Plaintiffs' antitrust claims in these actions grew out of discovery conducted in the multidistrict litigation—which was settled in October 2009 as to all defendants—alleging that the same Issuing Banks engaged in a conspiracy to fix foreign currency exchange ("F/X") fees.  See Order Approving Final Settlement, In re Currency Conversion Fee Antitrust Litig., MDL No. 1409 (WHP), Dock No. 755, dated Oct. 22, 2009.  Specifically, Plaintiffs alleged in that MDL litigation that the Issuing Banks conspired to fix uniform F/X fees and instructed one another on a legal strategy to avoid having to disclose that fee to cardholders through various meetings and bilateral communications.

Some of those communications involving F/X fees were close in time to the meetings at issue in these actions.  For example, in November 1998, Bergeson (Citi) shared her legal analysis on how to avoid disclosure of the F/X fee with Andrew Semmelman (Chase in-house counsel).  (PX-1030; TT at 3113:5-15, 3115:22-3116:1 (Semmelman).)  In February and March of 1999, Bergeson shared that information with Joanne Sundheim of First USA.  (TT at 243:23-257:3 (Sundheim).)  Sundheim's notes

-74-

from one of her calls with Bergeson indicate that the two shared details of their respective Issuing Banks' plans regarding F/X fees. (PX-0053.) On May 24, 1999, the day before the first meeting at issue in this case, Bergeson spoke with Ron Greene (WilmerHale) and Susan Barnes (Wells Fargo in-house counsel) regarding F/X fees. (PX-5256; TT at 365:9-23, 373:10-381:2 (Bergeson).) Barnes's notes from that meeting indicate that she learned Amex was not disclosing the F/X fee. (PX-5256.) And then, during the May 25, 1999 meeting at issue in this case, Amex's F/X fee non-disclosure practice was discussed again. (PX-0032; PX-5028; TT at 116:13-22 (Birnbaum); TT at 559:20-562:17, 588:23-589:3 (Heine).)

From June to October of 1999, Chase, First USA, Wells Fargo, and Bank of America engaged in various communications with each other regarding F/X fees. For example, in May or June of 1999, Sundheim (First USA) revealed to Birnbaum (Chase) that First USA's fee had not yet been implemented due to "operational difficulties." (TT at 117:19-119:10 (Birnbaum).) On June 23, 1999, a Chase executive asked Birnbaum and Semmelman for help in tracking down information on whether their competitors were charging 2% for foreign transaction fees, "hoping that maybe one of you may have better information . . . in talking to other attorneys." (PX-0680.) Birnbaum (Chase) spoke with John Lee (Wells Fargo in-house counsel) on September 17, 1999 regarding how F/X fees should be disclosed on billing statements. (PX-0686; TT at 113:11-17, 124:7-131:24 (Birnbaum).) And on October 5, 1999, Ronald Renaud (Bank of America in-house counsel) telephoned Sundheim (First USA), to discuss legal disclosure obligations regarding F/X fees. In a subsequent email, Sundheim informed other First

-75-

USA executives that she "got a call yesterday from a lawyer at BofA asking how we got comfortable with the new rate. I encouraged him to join us!" (PX-0052.)

Evidence of "[p]rior antitrust violations and the history of competition in a market" may be used to show the "intent, motive and method of a conspiracy under Section 1" so long as there is a "direct, logical relationship" between the collateral conspiracy and the instant conspiracy. U.S. Football League v. Nat'l Football League, 842 F.2d 1335, 1371 (2d Cir. 1988). Given the overlap in participants, meetings, and time frames, Plaintiffs argue that evidence of concerted action among the Issuing Banks with regard to F/X fees is probative of concerted action with respect to the class-action-barring arbitration clauses. In essence, Plaintiffs treat the F/X evidence as another "plus factor" permitting an inference of collusion in the absence of direct evidence. See, e.g., In re Static Random Access Memory (SRAM) Antitrust Litig., 580 F. Supp. 2d 896, 903 (N.D. Cal. 2008) (finding prior guilty pleas "support an inference of a conspiracy" regarding instant antitrust conspiracy). This evidence suggests Defendants' had the opportunity to conspire.

But even assuming a "direct, logical relationship" between the two alleged conspiracies, the F/X evidence does not permit an inference of collusion with respect to arbitration clauses. Unlike the authorities Plaintiffs cite, no prior judgment or guilty plea established the existence of an F/X conspiracy because the multidistrict litigation was settled. That settlement forecloses the possibility of inferring an illegal agreement to adopt arbitration clauses based on close connections to an established conspiracy to fix and conceal F/X fees. All this Court gleans from the F/X evidence is that the

-76-

communications between the Issuing Banks regarding both F/X fees and arbitration clauses were similar: The Issuing Banks paid close attention to their competitors' actions, inquired directly of one another about prospective plans, and met and educated each other on the issue at hand. But the question is not whether the Issuing Banks tended to communicate in this manner; it is whether an illegal agreement to implement and maintain class-action-barring arbitration clauses can be inferred from such communications. As such, the collateral F/X evidence adds little to a record already replete with relevant inter-firm communications regarding arbitration.[30]

        (vi)    <u>Paucity of Notes, Internal Work Product, and Recollection Regarding Meetings</u>

Plaintiffs do not specifically raise the paucity of notes, work product, and witness recollection regarding the meetings as a plus factor, but they have used it to suggest an inference of collusion throughout this litigation. "In many contexts, inferences from silence are perilous, and silence is often so ambiguous that it is of little probative force, inviting a fact finder to speculate as to its meaning." <u>Murata Mfg. Co. v. Bel Fuse, Inc.</u>, 422 F. Supp. 2d 934, 941 (N.D. Ill. 2006) (internal quotation marks and citations omitted) (finding silence "unnatural" in context and therefore giving rise to inference); <u>see</u> <u>United States v. Hale</u>, 422 U.S. 171, 176 (1975) ("In most circumstances silence is so ambiguous that it is of little probative force.") The context of this case—

---

[30] At trial, Plaintiffs seemed to argue that the F/X conspiracy provided a motive for the arbitration conspiracy, i.e. to foreclose the possibility that the Issuing Banks could be sued for failing to disclose F/X fees. Plaintiffs appear to have abandoned that argument in their post-trial briefing. But to the extent they have not, this Court finds no evidence of such a motive.

-77-

periodic meetings among busy lawyers covering a range of topics discussed many years ago—does not lead this Court to infer from a lack of notes and failing recollections that a conspiracy was afoot.

(vii)    Documentation of the Meetings

Contemporaneous notes survive from only 7 of the 28 meetings.  Other than three internal memos from the September 29, 1999 meeting, attendees generated little work product to inform their colleagues of what they learned at the meetings.  (See, e.g., PX-6140; PX-8640.)  And there is hardly any documentation regarding substance or even attendance for the In-House Working Group meetings.

Defendants respond that 151 trial exhibits relate to the meetings, including agendas, attendance lists, invitations, scheduling communications, and meeting summaries.  Defendants also point to an additional 84 contemporaneous documents, including communications previewing discussion topics for upcoming meetings and providing litigation updates between meetings.  (See, e.g., AX-9092; AX-9081; PX-5269.)  Defendants argue that Plaintiffs are wrong to expect that formal minutes would be generated at meetings like those at issue and note that discovery in these actions did not commence until four years after the last of the meetings took place.

Given the Issuing Banks' investment of attorney time and travel expense in attending a series of meetings over a period of years, it is odd they generated so little internal work product.  Many times when employers send representatives to industry meetings—especially those that are out-of-town and expensive to attend—some sort of work product memorializing the knowledge gained is expected in return.  However, this

-78-

Court finds that the documentation surrounding the meetings, or lack thereof, is not alarming. This Court would not expect formal minutes to be taken at a CLE or client development pitch.

There is a general pattern of attendance lists and agendas for the Arbitration Coalition meetings as well as WilmerHale's summaries of the discussions. The handwritten notes are consistent with one another and WilmerHale's summaries. (Compare PX-0111, with PX-6135; compare PX-8248, with PX-7591, and PX-6146.) These notes reflect that permissible topics such as litigation developments and advocacy efforts were primary topics of discussion. And it is unremarkable that more handwritten notes did not survive.

While the In-House Working Group meetings did not generate attendance lists or notes, this Court would not expect extensive documentation to arise from "informal 'information please'" conference calls aimed at providing advice and updates among in-house counsel facing the same issues. (See, e.g., PX-5313.) And there is documentation in scheduling emails of at least some issues they hoped to discuss.

In sum, the evidence shows that entirely legitimate topics were discussed. Plaintiffs cannot construct an illegal conspiracy on the lack of documentation about illegitimate topics.

(viii)  Recollections of the Meetings

Many meeting attendees remembered very little about the substance of the meetings. At his February 2004 deposition, Heine, a "core" member of the Arbitration Coalition recalled that there "may have been less than five meetings" though he attended

-79-

at least eleven meetings over the course of three years.  (TT at 517:7-12 (Heine).)
Tasheff (Citi) did not remember attending the May 30, 2001 Class Action Working
Group meeting even though she volunteered to lead the group's efforts on "PR and
Legislative Affairs" with MacDermott (Amex) and Barry (Capital One).  (PX-8607; TT
at 2246:7-14 (Tasheff).)  Tasheff was also a member of the In-House Working Group and
received numerous emails regarding its conference calls, but had only a "vague
recollection" of participating in a call.  (TT at 2267:22-2268:12 (Tasheff).)  Similarly,
Aniel (Bank of America), another member of the In-House Working Group, could not
remember anything about the calls except "a very general vague recollection that there
may have been one, maybe two phone calls that I listened to."  (TT at 2336:11-16,
2344:17-2345:5 (Aniel).)  Barry (Capital One) did not have a specific recollection of
attending either Class Action Working Group meeting and did not remember being part
of the organizing committee or leading a panel at the May 30, 2001 meeting.  (PX-7561;
TT at 2148:23-2149:4, 2152:9-12; 2154:22-2155:20 (Barry).)  Warrington (Citi) also had
no specific recollections of what was discussed at the May 25, July 28, or September 29,
1999 meetings, despite remembering that she "may have talked to Chris Lipsett or Ron
Greene about setting up such a meeting."  (TT at 969:23-970:4, 971:2-6, 975:15-976:2,
980:14-16 (Warrington).)

       The witnesses Plaintiffs single out were deposed five to nine years after
the meetings took place.  Their failures to specifically recall certain meetings are not
probative of a conspiracy; rather, they are understandable lapses in human memory.
Tasheff (Citi), Barry (Capital One), and Heine (Amex) testified credibly and openly

-80-

regarding those portions of meetings they recalled.  Many more witnesses testified fulsomely about their involvement with the groups and their recollections of the meetings.  The memory gaps of a few witnesses do not transmogrify an honest lack of recollection into a conspiracy.  Overall, the record presented at trial is quite robust considering the meetings that took place ten to fifteen years ago.

c)   <u>Conclusion Regarding Parallel Conduct and Plus Factors</u>

In weighing all the "plus factors" evidence, this Court finds that Plaintiffs have failed to carry their burden to demonstrate an agreement among the Issuing Banks to implement and maintain arbitration clauses.  While the extensive record of inter-firm communications among competitors would give any court pause, this Court cannot infer an illegal agreement based on the evidence marshalled at trial.  The opportunity to collude does not translate into collusion.  <u>See, e.g.</u>, <u>Venture Tech., Inc. v. Nat'l Fuel Gas Co.</u>, 685 F.2d 41, 47 (2d Cir. 1982) (noting an antitrust plaintiff must show "more than the existence of a climate in which such a conspiracy may have been formed").  Especially where, as here, there is an oligopolistic market in which conscious parallelism is the norm, Plaintiffs must show by a preponderance of the evidence that the Issuing Banks' conduct "tends to exclude the possibility that the alleged conspirators acted independently."  <u>Matsushita</u>, 475 U.S. at 588 (internal quotation marks omitted).  Though direct evidence of an agreement is neither expected nor required, the plus factors must do more than leave this Court with "an equally plausible inference of mere interdependent behavior, i.e., actions taken by market actors who are aware of and anticipate similar

-81-

actions taken by competitors, but which fall short of a tacit agreement." <u>Apex Oil</u>, 822 F.2d at 254.

It is clear that the Issuing Banks had an agreement to explore collective advocacy efforts aimed at expanding the enforceability of arbitration clauses and to establish class-action-barring arbitration as an industry norm. Direct evidence of this agreement abounds in meeting agendas, solicitations to fund amicus briefs and research, and willingness to explore joint action such as the FAQs project or self-regulation efforts. But Plaintiffs ask this Court to read evidence of that benign agreement as evidence of a separate, illegal agreement to collusively adopt and maintain class-action-barring arbitration clauses. Because the policy undergirding antitrust condemns interference with lawful competitive behavior, Plaintiffs' theory is a bridge too far.

This Court is especially hesitant to infer an illicit agreement from a record in which many of the Issuing Banks' communications resembled those of trade associations or lobbying groups. "[M]embership and participation in a trade association alone does not give rise to a plausible inference of illegal agreement." <u>LaFlamme v. Societe Air France</u>, 702 F. Supp. 2d 136, 148 (E.D.N.Y. 2010). Further, many of the activities of the Arbitration Coalition are akin to legitimate activities protected under the <u>Noerr-Pennington</u> doctrine. <u>See</u> <u>Noerr</u>, 365 U.S. at 136; <u>Mercatus Grp.</u>, 641 F.3d at 851. In fact, the record indicates that this was not the first time the Issuing Banks willingly set aside their differences to address common public relations problems: Freiberg (Citi) noted that credit card companies had in the past met with one another six or seven times

-82-

in the presence of outside counsel as an "image council" chaired by MBNA to "focus on how to enhance the image of the card industry." (TT at 2455:12-2456:2 (Freiberg).)

Undoubtedly, avoiding class actions through arbitration was in each Issuing Banks' independent self interest, regardless of whether its competitors also adopted such a provision. Though an illegal agreement to collusively adopt arbitration would have given the Issuing Banks comfort on their journey to make arbitration an industry standard, they were just as likely to travel that road alone. Unlike some other cost-saving measures, the benefit of arbitration—avoiding class action litigation—was not diminished if competitors were in on the secret. In fact, absent any agreement to adopt arbitration, educating one's competitors on how to do so properly would have helped to maximize the benefits any one firm could realize. In this vein, Lipsett noted that the Arbitration Coalition was "trying to influence the state of the law relating to arbitration" because it "would be typically in the interests of firms like this to have arbitration provisions be enforceable, so these firms were interested in . . . influenc[ing] the result in litigation, to make sure it's well-litigated from the point of view of the side who wants the arbitration enforced." (TT at 2862:22-2863:7 (Lipsett).)

While the tenor of the meetings was heavily slanted in favor of arbitration, the record indicates that the final decision to adopt class-action-barring arbitration clauses was something the Issuing Banks hashed out individually and internally. Even MacDonald's aggressive communications to various Issuing Banks strike this Court as aimed at persuasion rather than collusion. While there is evidence the Issuing Banks tried to determine their competitors' plans and experiences regarding arbitration, as

-83-

would be expected in an oligopoly, this Court does not discern any concerted action arising from those inquiries. "Antitrust law is not intended to be as available as an over-the-counter cold remedy, because were its heavy power brought into play too readily it would not safeguard competition, but destroy it." Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc., 996 F.2d 537, 539 (2d Cir. 1993).

B.     Unreasonable Restraint on Trade

While this Court's determination that Plaintiffs failed to carry their burden of showing a collusive agreement moots the issue of whether such an agreement would be an unreasonable restraint on trade, this Court nevertheless reaches that question for the sake of assisting appellate review.[31] Had Plaintiffs proved such an agreement, this Court would then analyze whether it was unlawful under the Sherman Act.

"For over 100 years, the courts have understood the Sherman Act only to prohibit 'unreasonable' restraints on trade." United States v. Visa U.S.A., Inc., 344 F.3d 229, 237-38 (2d Cir. 2003) (citing Arizona v. Maricopa Cnty. Med. Soc'y, 457 U.S. 332, 342-43 (1982)). Courts generally evaluate unreasonable restraints on trade under two categories of analysis. Some conduct is prohibited because it is deemed unreasonable per se. State Oil, 522 U.S. at 10. Other conduct is outlawed only after evaluation under the so-called "rule of reason." State Oil, 522 U.S. at 10. Courts recognize a per se violation "[o]nce experience with a particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it." Maricopa Cnty. Med. Soc'y, 457

---

[31] In doing so, this Court takes heed of Judge Leval's advice that "we should not disguise dictum, but should forthrightly label it as what it is." Pierre N. Leval, "Judging Under the Constitution: Dicta About Dicta." 81 NYU L. Rev. 1249, 1282 (2006).

-84-

U.S. at 344; see also State Oil, 522 U.S. at 10 (per se restraints "have such predictable and pernicious anticompetitive effect, and such limited potential for procompetitive benefit, that they are deemed unlawful per se.").

But most antitrust claims are evaluated under the "rule of reason," "according to which the finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect." State Oil, 522 U.S. at 10. In addition, courts have recognized an "intermediate inquiry" known as a "quick look" analysis, if the conduct is a "naked restriction." Bogan v. Hodgkins, 166 F.3d 509, 514 n.6 (2d Cir. 1999) (citing NCAA v. Bd. of Regents, 468 U.S. 85, 109 (1984)). The "quick look" analysis is appropriate where the restraint, though not subject to the per se standard, is one that "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." Cal. Dental Ass'n v. F.T.C., 526 U.S. 756, 770 (1999).

1.      Per Se Standard

Per se violations are "so plainly anticompetitive" that a Court can presume them to be unreasonable without further analysis. Broadcast Music Inc. v. CBS, Inc., 441 U.S. 1, 8 (1979). As such, per se violations are rare. The Supreme Court has expressed "reluctance to adopt per se rules with regard to restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately

-85-

obvious." Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877, 886-87

(2007). The Second Circuit has determined that a horizontal agreement to adopt

arbitration provisions in employee contracts is not a per se violation. See Drayer v.

Krasner, 572 F.2d 348, 353-55 (2d Cir. 1978), abrogation recognized by In re

Crysen/Montenay Energy Co., 226 F.3d 160, 164 (2d Cir. 2000) (citing Cotton v. Slone,

4 F.3d 176 (2d Cir. 1993)). In Drayer, Judge Friendly recognized that "in a large part of

our economy parties have become subject to a regime of arbitration when some might

have preferred a judicial solution, and the development has been viewed as salutary."

Drayer, 572 F.2d at 354. And, the Supreme Court has expanded the reach of consumer

arbitration clauses in the past thirty years. See, e.g., Am. Express Co. v. Italian Colors

Rest., 133 S. Ct. 2304, 2311 (2013) (enforcing a contractual waiver of class arbitration

even when costs of individually arbitrating claim would exceed any recovery);

CompuCredit Corp. v. Greenwood, 132 S. Ct. 665, 673 (2012) (arbitration agreements

are not precluded in suits under the Credit Repair Organizations Act); AT&T Mobility

LLC v. Concepcion, 131 S. Ct. 1740, 1745-53 (2011) (invalidating a California rule that

conditioned the enforceability of certain arbitration agreements on the availability of

class arbitration procedures); Rent-A-Center, West, Inc. v. Jackson, 130 S. Ct. 2772,

2776-81 (2010) (precluding court from reaching threshold question of unconscionability

of an arbitration agreement as a whole where the agreement delegated that issue to the

arbitrator); Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 25 (1991) (holding that

contractually-required arbitration satisfies a statute's requirement that an injured person

be able to sue in federal court); Dean Witter Reynolds Inc. v. Byrd, 470 U.S. 213, 217

(1985) (compelling arbitration of arbitrable claims even when complaint contains other, nonarbitrable claims and splitting the two will result in piecemeal litigation); see also Volt Info. Scis, Inc. v. Bd. of Trustees of the Leland Stanford Junior Univ., 489 U.S. 468, 476 (1989) ("[D]ue regard must be given to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself [must be] resolved in favor of arbitration."); Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp., 460 U.S. 1, 24 (1983) (the Federal Arbitration Act reflects "a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary.").  As such, this Court cannot conclude that the alleged conspiracy was a per se violation of the antitrust laws.

      2.    "Quick Look" and Rule of Reason Standard

      Plaintiffs contend that if the alleged conspiracy is not unlawful under the per se standard, it should be analyzed under the "quick look" standard.  A "quick look" analysis "allows the condemnation of a naked restraint on price or output without an elaborate industry analysis." Cal. Dental, 526 U.S. at 763 (internal quotation marks omitted).  It "carries the day when the great likelihood of anticompetitive effects can easily be ascertained." Cal. Dental, 526 U.S. at 770.  Once a defendant has shown a precompetitive justification, however, "the court must proceed to weigh the overall reasonableness of the restraint using a full-scale rule of reason analysis." Bogan, 166 F.3d at 514 n.6 (internal quotation marks and citations omitted).  To prevail under the rule of reason analysis, plaintiffs must show that the defendant conspirators "have 'market power' in a particular market for goods or services." Visa, 344 F.3d at 238.

-87-

Then, they must show that the challenged action "had an actual adverse effect on competition as a whole in the relevant market." Capital Imaging Assocs., 996 F.2d at 543. If this showing is satisfied, the burden shifts to defendants "to offer evidence of the pro-competitive 'redeeming virtues' of their combination." Capital Imaging Assocs., 996 F.2d at 543.

A "quick look" analysis is appropriate here. While consumer arbitration clauses are accepted with increasing frequency as a prerequisite of myriad consumer contracts, one would expect that development to be a byproduct of a market free from manipulation. In Ross v. Bank of America, the Second Circuit recognized harms stemming from "reduced choice and diminished quality of credit services" as a result of any "illegal collusion to constrict the options available to cardholders." 524 F.3d at 223. Thus, "no elaborate industry analysis is required to demonstrate the anticompetitive character" of any agreement to adopt and maintain arbitration clauses among Issuing Banks that together hold an 80% share of the market. NCAA, 468 U.S. at 109. In FTC v. Indiana Federation of Dentists, the Supreme Court held that a quick look analysis was appropriate in reviewing "an aggressive effort to hinder insurers' efforts to implement alternative benefits plans by enlisting member dentists to pledge not to submit x rays in conjunction with claim forms." 476 U.S. 447, 450 (1986). The Supreme Court explained:

> A refusal to compete with respect to the package of services offered to customers, no less than a refusal to compete with respect to the price term of an agreement, impairs the ability of the market to advance social welfare by ensuring the provision of desired goods and services to consumers at a price approximating the marginal cost of providing them. Absent some countervailing

procompetitive virtue—such as, for example, the creation of efficiencies in the operation of a market or the provision of goods and services . . . such an agreement limiting consumer choice by impeding the ordinary give and take of the market place . . . cannot be sustained under the Rule of Reason.

Ind. Fed'n of Dentists, 476 U.S. at 459 (internal quotation marks and citations omitted), cited in Ross v. Bank of America, 524 F.3d at 223. The Supreme Court was unmoved by the Seventh Circuit's finding that dentists did not actually compete over the service in question. See Ind. Fed'n of Dentists, 476 U.S. at 455-56; see also Drayer, 572 F.2d at 354 (hinting that while negotiated arbitration clauses in employment contracts were not subject to a per se analysis, the situation could be different where "the plaintiff in opening an account had no choice but to accept the arbitration stipulation").

Thus, the inquiry shifts to whether the Defendants can provide any pro-competitive justifications. Here, Defendants failed to offer any such justifications for this Court's consideration. This Court therefore concludes that, under the "quick look" analysis on the record presented in this case, the collusive adoption of mandatory class-action-barring arbitration clauses, if proven, would have constituted an unreasonable restraint on trade in violation of section 1 of the Sherman Act. But this dicta should not be read to suggest that there are no business justifications that might require analysis under the rule of reason test.

-89-

## CONCLUSION

These actions are the latest installment in multidistrict litigation that spanned more than a decade and raised a spate of novel issues. They offer a cautionary lesson to all lawyers who labor under inexorable pressure to generate new business. When outside counsel convene meetings of competitors in the hope of propelling themselves to the forefront of an emerging trend—in this case, class-action-barring consumer arbitration agreements—they do so at their professional peril.

When the first meeting convened, only two defendants had class-action-barring arbitration clauses in their card member agreements. By the time the last meeting concluded, all ten of the Issuing Banks, accounting for approximately 87% of all credit card transactions in the United States, had adopted class-action-barring arbitration clauses in their card member agreements. It was only by a slender reed that Plaintiffs failed to demonstrate that the lawyers who organized these meetings had spawned a Sherman Act conspiracy among their clients.

In retrospect, the Issuing Banks' short-term goal of lowering litigation costs eluded them. Undoubtedly, retaining some of the most esteemed antitrust lawyers in the nation to counter the extraordinary talents of Plaintiffs' counsel imposed a significant burden on the Issuing Banks. Only the passage of time will reveal whether the Issuing Banks' longer-term goal of avoiding the expense of class action lawsuits can be achieved.

For the foregoing reasons, this Court grants judgment to the Defendants dismissing Plaintiffs' antitrust claims in this action for injunctive relief invalidating the class-action-barring arbitration clauses.

Dated:  April 10, 2014
       New York, New York

                        SO ORDERED:

                        WILLIAM H. PAULEY III
                            U.S.D.J.

*All Counsel of Record:*

Merrill G. Davidoff, Esq.
David A. Langer, Esq.
Charles P. Goodwin, Esq.
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103

Christopher M. Burke, Esq.
SCOTT + SCOTT LLP
707 Broadway, Suite 1000
San Diego, CA 92101
*Counsel for Plaintiffs*

Evan Chesler, Esq.
Gary Bornstein, Esq.
Rowan Wilson, Esq.
CRAVATH, SWAINE & MOORE LLP
825 Eighth Avenue
New York, NY 10019
*Counsel for Defendants American Express*

-91-

Robert Y. Sperling, Esq.
Malcom Cox, Esq.
Ronald S. Betman, Esq.
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601
*Counsel for Defendants Discover*

David Graham, Esq.
Theodore R Scarborough, Jr., Esq.
Patrick E. Croke, Esq.
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
*Counsel for Defendants Citigroup*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
ROBERT ROSS, et al.,

                        Plaintiffs,                 04 **CIVIL** 5723 (WHP)

-against-

                                               **JUDGMENT**

AMERICAN EXPRESS COMPANY, et al.,

                        Defendants.
------------------------------------------------------------X
ROBERT ROSS, et al.,

                        Plaintiffs,                 05 **CIVIL** 7116 (WHP)

-against-

BANK OF AMERICA, N.A. (USA), *et al.,*

                        Defendants.
------------------------------------------------------------X

       The issues in the above entitled actions having been brought on for a joint trial before the

Honorable William H. Pauley, III, United States District Judge, without a jury, commencing on

January 7, 2013, and concluding on February 7, 2013, and closing arguments having been held

on May 2, 2013, and the Court thereafter, having rendered its Opinion and Order (Doc. # 366 in

case no. 04cv5723, and Doc. # 565 in case no. 05cv7116), dated April 10, 2014, granting

judgment in favor of the Defendants, and dismissing Plaintiff's antitrust claims in these actions

for injunctive relief invalidating the class-action-barring arbitration clauses, it is,

      **ORDERED, ADJUDGED AND DECREED:**  That for the reasons stated in

the Court's Opinion and Order dated April 10, 2014 (Doc. # 366 in case no. 04cv5723, and Doc.

# 565 in case no. 05cv7116), judgment is entered in favor of the Defendants, and the Plaintiffs'

antitrust claims in these actions for injunctive relief invalidating the class-action-barring arbitration clauses are dismissed.

**DATED:** New York, New York

April 23 , 2014

RUBY J. KRAJICK

_____

**Clerk of Court**

So Ordered:

BY: _____

**Deputy Clerk**

_____

**U.S.D.J.**

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

ROBERT ROSS, et al.,

                         Plaintiffs,

        -against-

AMERICAN EXPRESS COMPANY, et al.,

                         Defendants.

-------------------------------------------------------------X

ROBERT ROSS, et al.,

                         Plaintiffs,

        -against-

BANK OF AMERICA, N.A. (USA), *et al.,*

                         Defendants.

-------------------------------------------------------------X

04 **CIVIL** 5723 (WHP)

## **JUDGMENT**

05 **CIVIL** 7116 (WHP)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:4/23/14

      The issues in the above entitled actions having been brought on for a joint trial before the Honorable William H. Pauley, III, United States District Judge, without a jury, commencing on January 7, 2013, and concluding on February 7, 2013, and closing arguments having been held on May 2, 2013, and the Court thereafter, having rendered its Opinion and Order (Doc. # 366 in case no. 04cv5723, and Doc. # 565 in case no. 05cv7116), dated April 10, 2014, granting judgment in favor of the Defendants, and dismissing Plaintiff's antitrust claims in these actions for injunctive relief invalidating the class-action-barring arbitration clauses, it is,

      **ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the Court's Opinion and Order dated April 10, 2014 (Doc. # 366 in case no. 04cv5723, and Doc. # 565 in case no. 05cv7116), judgment is entered in favor of the Defendants, and the Plaintiffs'

antitrust claims in these actions for injunctive relief invalidating the class-action-barring

arbitration clauses are dismissed.

**DATED:** New York, New York

April 23 , 2014

**RUBY J. KRAJICK**

_____

**Clerk of Court**

So Ordered:

BY: _____

_____

**U.S.D.J.**

**Deputy Clerk**





**Effective: June 22, 2004**

United States Code Annotated Currentness
   Title 15. Commerce and Trade
      Chapter 1. Monopolies and Combinations in Restraint of Trade (Refs & Annos)
        ➡➡ § 1. Trusts, etc., in restraint of trade illegal; penalty

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.

CREDIT(S)

(July 2, 1890, c. 647, § 1, 26 Stat. 209; Aug. 17, 1937, c. 690, Title VIII, 50 Stat. 693; July 7, 1955, c. 281, 69 Stat. 282; Dec. 21, 1974, Pub.L. 93-528, § 3, 88 Stat. 1708; Dec. 12, 1975, Pub.L. 94-145, § 2, 89 Stat. 801; Nov. 16, 1990, Pub.L. 101-588, § 4(a), 104 Stat. 2880; June 22, 2004, Pub.L. 108-237, Title II, § 215(a), 118 Stat. 668.)

Current through P.L. 113-120 approved 6-10-14

Westlaw. (C) 2014 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.





**Effective:[See Text Amendments]**

United States Code Annotated Currentness
  Title 15. Commerce and Trade
    Chapter 1. Monopolies and Combinations in Restraint of Trade (Refs & Annos)
      ➡➡ § 26. Injunctive relief for private parties; exception; costs

Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, including sections 13, 14, 18, and 19 of this title, when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings, and upon the execution of proper bond against damages for an injunction improvidently granted and a showing that the danger of irreparable loss or damage is immediate, a preliminary injunction may issue: *Provided*, That nothing herein contained shall be construed to entitle any person, firm, corporation, or association, except the United States, to bring suit for injunctive relief against any common carrier subject to the jurisdiction of the Surface Transportation Board under subtitle IV of Title 49. In any action under this section in which the plaintiff substantially prevails, the court shall award the cost of suit, including a reasonable attorney's fee, to such plaintiff.

CREDIT(S)

(Oct. 15, 1914, c. 323, § 16, 38 Stat. 737; Sept. 30, 1976, Pub.L. 94-435, Title III, § 302(3), 90 Stat. 1396; Dec. 29, 1995, Pub.L. 104-88, Title III, § 318(3), 109 Stat. 949.)

Current through P.L. 113-120 approved 6-10-14

Westlaw. (C) 2014 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.