# 14-1610-cv(L),
## 14-1616-cv(CON)

# United States Court of Appeals for the Second Circuit

ROBERT ROSS, ON BEHALF OF HIMSELF AND ALL OTHERS SIMILARLY SITUATED, ANDREA KUNE, WOODROW CLARK, S. BYRON BALBACH, JR., MATTHEW GRABELL, PAUL IMPELLEZZERI, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, RICHARD MANDELL, RANDAL WACHSMUTH,

*Plaintiffs-Appellants,*

HERVE SENEQUIER,

*Plaintiff,*

*v.*

CITIGROUP, INC., CITIBANK (SOUTH DAKOTA), N.A., CITICORP DINERS CLUB, CITIBANK USA, N.A., UNIVERSAL BANK, N.A., UNIVERSAL FINANCIAL CORPORATION, DISCOVER FINANCIAL SERVICES, INCORPORATED, DISCOVER BANK, AMERICAN EXPRESS CENTURION BANK, AMERICAN EXPRESS COMPANY, AMERICAN EXPRESS TRAVEL RELATED SERVICES COMPANY, INC., DB SERVICING CORPORATION,

*Defendants-Appellees,*

*(Additional Caption on the Reverse)*

_____

*On Appeal from the United States District Court for the Southern District of New York (Pauley, J.)*

## BRIEF FOR CITI APPELLEES

DAVID F. GRAHAM
T. ROBERT SCARBOROUGH
PATRICK E. CROKE
SIDLEY AUSTIN LLP
1 South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000
dgraham@sidley.com

EAMON P. JOYCE
DAVID W. DENTON, JR.
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
(212) 839-5300

*Attorneys for Defendants-Appellees Citigroup Inc., Citibank, N.A. (as successor-in-interest to Citibank (South Dakota), N.A., for itself and as successor-in-interest to Citibank U.S.A., N.A., Universal Bank, N.A., and Universal Financial Corp.), and Citicorp Diners Club Inc.*



*and*

BANK OF AMERICA N.A. (USA), CAPITAL ONE, J.P. MORGAN CHASE & CO., CHASE BANK USA, N.A., HSBC FINANCE CORPORATION, PROVIDIAN FINANCIAL CORPORATION, PROVIDIAN NATIONAL BANK, INCORPORATED, HSBC BANK, NEVADA, N.A., CHASE BANK USA, N.A., CAPITAL ONE BANK (USA), N.A., FKA CAPITAL ONE BANK, CAPITAL ONE, N.A., FKA CAPITAL ONE, F.S.B., BANK OF AMERICA, N.A., NATIONAL ARBITRATION FORUM, NATIONAL ARBITRATION FORUM, CAPITAL ONE F S B, NOVUS CREDIT SERVICES, INC., MBNA AMERICA BANK, N.A., MBNA AMERICA (DELAWARE), N.A., DFS SERVICES, LLC,

*Defendants.*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellees Citigroup Inc., Citibank, N.A. (as successor-in-interest to Citibank (South Dakota), N.A., for itself and as successor-in-interest to Citibank U.S.A., N.A., Universal Bank, N.A., and Universal Financial Corp.), and Citicorp Diners Club Inc. hereby certify, through their undersigned counsel, as follows:

1. Citigroup Inc. is a publicly traded company. Citigroup does not have any parent corporations, and no publicly held corporation owns 10% or more of Citigroup's stock.

2. Citibank, N.A. is a wholly owned subsidiary of Citicorp, which in turn is a wholly owned subsidiary of Citigroup Inc., a publicly held corporation. No other publicly held corporation owns 10% or more of Citibank, N.A.'s stock.

3. Citibank (South Dakota), N.A. was a subsidiary of Citigroup Inc. Citibank (South Dakota), N.A. has ceased to exist as a legal entity, and its successor-in-interest is Citibank, N.A.

4. Citibank U.S.A., N.A., Universal Bank, N.A., and Universal Financial Corp. were previously indirect, wholly owned subsidiaries of Citigroup Inc. Citibank U.S.A., N.A., Universal Bank, N.A., and Universal Financial Corp. have ceased to exist as legal entities, and their successor-in-interest was Citibank (South Dakota), N.A.

i

5.      Citicorp Diners Club Inc. was previously an indirect subsidiary of

Citigroup Inc.  Citigroup Inc. sold its interest in Citicorp Diners Club Inc. in 2010.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES .................................................................................v

COUNTERSTATEMENT OF THE ISSUE..........................................................1

COUNTERSTATEMENT OF THE CASE............................................................1

    A.    Background .........................................................................................3

    B.    Citi Cards' Adoption Of An Arbitration Clause ..................................4

    C.    The Meetings Upon Which Plaintiffs' Conspiracy Theory Rests ......11

          1.    The May 25, 1999 Wilmer Meeting .........................................11

          2.    The "Arbitration Coalition" .....................................................13

          3.    The Consumer Companies' Class Action Working Group ......19

          4.    The In-House Working Group ..................................................20

    D.    In Finding That Defendants Did Not Conspire To Adopt And Maintain Arbitration Clauses, The District Court Repeatedly Rejected The Inferences That Plaintiffs Sought To Have It Draw. ..................................................................................................22

SUMMARY OF ARGUMENT .............................................................................28

STANDARD OF REVIEW ..................................................................................32

ARGUMENT .......................................................................................................35

I.    PLAINTIFFS HAVE NOT SHOWN ANY ERRORS OF LAW IN THE COURT'S FINDING THAT NO AGREEMENT EXISTED.............36

    A.    The District Court Properly Recognized That Unlawful Agreements Can Be Express Or Tacit. ...............................................37

    B.    The District Court Properly Required Plaintiffs To Prove Their Claim of Conspiracy By A Preponderance of the Evidence. ..............40

C.      The District Court Correctly Reviewed the Totality of the
        Evidence. ............................................................................45

II.   THE DISTRICT COURT'S FACTUAL FINDINGS THAT THERE
      WAS NO CONSPIRACY TO ADOPT OR MAINTAIN
      ARBITRATION CLAUSES IS WELL-SUPPORTED AND
      CORRECT. ....................................................................................49

CONCLUSION ........................................................................................59

CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF
      APPELLATE PROCEDURE 32(a)

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

PAGE(S)

CASES

*Alexander* v. *Nat'l Farmers Org.*,
687 F.2d 1173 (8th Cir. 1982) ............................................................33

*Anderson* v. *City of Bessemer*,
470 U.S. 564 (1985) ........................................................34, 38, 49

*Apex Oil Co.* v. *DiMauro*,
822 F.2d 246 (2d Cir. 1987) ...........................................22, 37, 44, 55

*AT&T Mobility LLC* v. *Concepcion*,
131 S. Ct. 1740 (2011) .............................................................12, 26

*Bakalar* v. *Vavra*,
619 F.3d 136 (2d Cir. 2010) ...............................................................44

*Canady* v. *Providence Hosp.*,
132 F.3d 1480, 1997 WL 812468 (D.C. Cir. 1997) ............................33

*Diesel Props S.R.L.* v. *Greystone Bus. Credit II LLC*,
631 F.3d 42 (2d Cir. 2011) ................................................31, 34, 35, 38

*Freedom Holdings, Inc.* v. *Cuomo*,
624 F.3d 38 (2d Cir. 2010) ..........................................31, 35, 38, 44, 57

*Green Tree Fin. Corp.* v. *Bazzle*,
539 U.S. 444 (2003) ..............................................................................12

*Green Tree Fin. Corp.* v. *Randolph*,
531 U.S. 79 (2000) ................................................................................12

*Hormel Foods Corp.* v. *Jim Henson Prods., Inc.*,
73 F.3d 497 (2d Cir. 1996) ..................................................................49

*In re Baby Food Antitrust Litig.*,
166 F.3d 112 (3d Cir. 1999) ................................................................57

*In re High Fructose Corn Syrup Antitrust Litig.*,
    295 F.3d 651 (7th Cir. 2002) ...............................................................45

*In re Publication Paper Antitrust Litigation*,
    690 F.3d 51 (2d Cir. 2012) ...................................................41, 43, 44

*Matsushita* v. *Zenith Radio Corp.*,
    475 U.S. 574 (1986)....................................................................40, 53

*Products Liability Insurance Agency, Inc.* v. *Crum & Forster Insurance Cos.*,
    682 F.2d 660 (7th Cir. 1982) ...............................................................50

*Ramsey* v. *United Mine Workers of Am.*,
    481 F.2d 742 (6th Cir. 1973) ...............................................................33

*Starr* v. *Sony BMG Music Entertainment*,
    592 F.3d 314 (2d Cir. 2010) ................................................................32

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)............................................................................40

*Treasure Valley Potato Bargaining Ass'n* v. *Ore-Ida Foods, Inc.*,
    497 F.2d 203 (9th Cir. 1974) ...............................................................33

*United States* v. *General Motors Corp.*,
    384 U.S. 127 (1966)......................................................................32, 33

*United States* v. *Hertular*,
    562 F.3d 433 (2d Cir. 2009) ...............................................................41

*United States* v. *Parke, Davis & Co.*,
    362 U.S. 29 (1960)..............................................................................32

*United States* v. *Yellow Cab Co.*,
    338 U.S. 338 (1949)......................................................................36, 38

*White* v. *White Rose Food*,
    237 F.3d 174 (2d Cir. 2001) ...............................................................31

## STATUTES

Sherman Act. 15 U.S.C. § 1 .....................................................................2

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23(b)(2)................................................................................1

Fed. R. Civ. P. 52 ...............................................................................1, 32

## COUNTERSTATEMENT OF THE ISSUE

Whether, based on the evidence adduced during a five-week bench trial, the district court clearly erred in finding that Plaintiffs-Appellants had not carried their burden of showing that that Citi reached an "agreement to collusively adopt and maintain class-action-barring arbitration clauses."

## COUNTERSTATEMENT OF THE CASE

This appeal seeks to overturn a fact-finder's verdict that the court (Pauley, J.) issued after a five-week trial and memorialized in a 91-page decision pursuant to Federal Rule of Civil Procedure 52. The trial was a combined one, seeking only equitable relief, on the antitrust conspiracy claims of several classes of cardholders against three sets of charge card issuers.[1] The district court heard live or videotaped testimony from more than 40 witnesses, including experts, and admitted over 400 exhibits into evidence. After hearing and weighing the evidence, including evaluating competing inferences and credibility, the district court found that Plaintiffs had failed to prove their claims by a preponderance of the evidence.

Specifically, the district court rejected Plaintiffs' claim that the Citi Appellees ("Citi"), various American Express entities ("American Express"), and various Discover entities ("Discover") (together, "Defendants")—in concert with

---

[1] No monetary relief was sought, and the classes were certified pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure.

1

other issuers (collectively, with Defendants, the "Issuing Banks")—reached a mutual agreement with one another to adopt and/or maintain class-action-barring arbitration clauses (hereafter, "arbitration clauses") in violation of the Sherman Act. 15 U.S.C. § 1. Plaintiffs asked the court to make this finding based primarily on the occurrence of a variety of meetings held between mid-1999 and 2003 that were attended by representatives of a variety of industries—not just card issuers. These meetings, supervised and largely hosted by two leading American law firms, provided the attendees with updates on litigation, legislation and regulatory issues related to arbitration and, at least in the earliest meetings, explored potential advocacy efforts to support the public acceptance of arbitration clauses.

In factual findings that Plaintiffs' Brief does not acknowledge, the district court unequivocally found that Plaintiffs had not "carr[ied] their burden to demonstrate an agreement among the Issuing Banks to implement and maintain arbitration clauses." SPA-81. The court instead concluded that "the record indicates that the final decision to adopt class-action-barring arbitration clauses was something the Issuing Banks hashed out individually and internally." SPA-83. In doing so, the court rejected Plaintiffs' invitation "to read evidence of [a] benign agreement" among various, unspecified issuers to discuss potential advocacy measures designed to preserve the availability of arbitration, "as evidence of a

separate, illegal agreement to collusively adopt and maintain class-action-barring arbitration clauses." SPA-82; *see also* SPA-81.

Moreover, it is not simply the district court's findings that Plaintiffs' Brief consistently ignores. Despite their claims that the district court erred in its weighing of the evidence, Plaintiffs do not even pretend to present a balanced overview of the evidence in their Statement of the Case. To the contrary, Plaintiffs omit virtually all mention of the volumes of evidence introduced below which contradict their theories and support the district court's decision. This Counterstatement of the Case supplies some of what Plaintiffs have omitted.

### A. Background

Near the end of long-running multidistrict litigation proceedings, *see* SPA-1, certain cardholder plaintiffs filed complaints containing the antitrust claims at issue in this appeal. Plaintiffs alleged that during the period of mid-1999 to 2003 various card-issuing banks purportedly conspired to adopt and maintain in their cardholder agreements arbitration provisions which prohibited class action arbitrations (which Plaintiffs call the "Class-Barring Arbitration" or "CBA" provisions). *See* SPA-2–SPA-4. The crux of Plaintiffs' theory is that the Issuing Banks hatched this alleged conspiracy during meetings that were only nominally held to discuss, *inter alia*, arbitration-related legal developments and advocacy. *See id.*

3

During the relevant time period, as the district court recognized, "[c]onsumer arbitration and class action waivers were . . . hot topics of discussion in the legal community."  SPA-5.  Many companies in a variety of industries— including the automobile industry, brokerage services, financial services, online retailers, and health clubs, *see* A2443—had adopted arbitration provisions in their customer agreements, including arbitration provisions barring class actions. American Express decided to do so in 1998 after internal discussion of the merits of such a move, *see* SPA-5, *i.e.* before the alleged conspiracy began, and notified its cardholders of this change in April 1999.  Another card issuer, First USA, had already done the same more than a year earlier, in 1998.  *See* SPA-8.

**B. Citi Cards' Adoption Of An Arbitration Clause**

The evidence at trial showed that the decision by Citi Cards to adopt an arbitration clause, which was reached in the fall of 2000, had nothing to do with any of the meetings upon which Plaintiffs focus—which Citi personnel attended infrequently and primarily by telephone.  *See* A4353.  Instead, the decision was the result of an entirely independent and contemporaneously well-documented internal process, *see* SPA-83, including study and formal review within the general counsels' offices of Citi Cards and its corporate parent, Citigroup Inc., and approval by Citi Cards' CEO, *see* SPA-29–SPA-30.

4

The Citi Cards business unit first began considering whether to adopt arbitration clauses in its consumer agreements before any of the allegedly conspiratorial meetings in question took place. In November 1998, Julie Nelson, the attorney responsible for Citi Cards' litigation, recommended to Joan Warrington, then general counsel of Citi's U.S. Cards group, that Citi Cards consider an arbitration provision. SPA-29. Warrington asked Nelson to investigate the issue, A1664–65; A1832, and Nelson did so, *see* SPA-29. However, Warrington was not personally a proponent of arbitration clauses, *see* A2378; A1665, and, accordingly, by the time she left her position as Citi Cards' general counsel—in about June 1999—no decision to adopt arbitration clauses had been made. Warrington left Citi altogether in February of 2000, and the uncontroverted testimony at trial was that she did not participate in the decision made many months later by Citi Cards to adopt an arbitration clause. A2022; A2337. She was unaware of the decision until it was publicly announced to cardholders in 2001. A2377.

In mid-1999, Wendy Kleinbaum replaced Warrington as general counsel for Citi Cards. SPA-29. In the fall of 1999, Kleinbaum sought suggestions from her legal staff regarding potential cost-saving measures. A2287. In response, Nelson again raised the possibility that Citi Cards might adopt an arbitration clause. A2026-27; A2337; A1835–36.

5

Kleinbaum in turn elected to form a team to study the issue. Specifically, in February 2000, Kleinbaum formed an internal legal team, headed by Nelson and Karla Bergeson, to study arbitration's pros and cons. *See, e.g.*, SPA-29; *see also* A2338–39; A2028; A1490-91 (explaining that Bergeson led Citi Cards' consumer regulatory team, which handled cardmember agreement changes). The emails memorializing the creation of the internal team stated that the team was being appointed "to dimension the risks and rewards of adding an arbitration clause to our cardmember agreement." A3281–82. Little work was done by the internal team in the next several months, however. A3520. On May 26, 2000, Nelson emailed the team asking it to "regroup" on the "arbitration project" to discuss, *inter alia*, "developing a memo describing the pros and cons of arbitration." A4883; A2290. Research projects were subsequently developed, some of which were assigned to summer interns. A2349; A3289.

Unbeknownst to the lawyers at Citi Cards, the general counsel's office of Citigroup (the corporate parent) was also turning its attention to the subject of arbitration. SPA-29. In a June 22, 2000 memorandum, Michael Heyrich, a Citigroup attorney who had been tasked with monitoring "horizon issues," *see* A2354–56, enthusiastically recommended to Charles Prince, Citigroup's Chief Legal Officer and General Counsel at the time, that arbitration provisions be

6

adopted in *all* of Citigroup's consumer business lines.  SPA-29–SPA-30; *see also* A3295–98 (memo).

Heyrich's memorandum generally addressed the potential benefits of arbitration clauses and the "movement toward arbitration in . . . consumer-oriented businesses."  He suggested that arbitration could be a means to ameliorate or mitigate a wide range of potential risks to Citigroup, thus saving the bank money, including by "avoid[ing] future class actions in hostile jurisdictions."  A2356; A2360; A3291.  Moreover, Heyrich did not limit the recommendations of his memo to the credit card business at issue in this case; on the contrary, he urged the adoption of arbitration clauses in all of "Citigroup's consumer lines businesses including cards, private banking, lending and financing, and insurance" as well as "beyond the consumer arena . . . in the corporate and international context."  A3291; A2355.  At the time of Heyrich's memo, neither he nor Kleinbaum was aware that the other was studying arbitration.  SPA-30.

Following his receipt of Heyrich's memo, Prince endorsed its conclusions.  As the district court recognized, "[o]n July 6,2000, Prince forwarded the Heyrich memo to a number of in-house attorneys, including Mike Ross (Deputy General Counsel to Citigroup's Global Consumer Group), who in turn alerted Kleinbaum and Nelson to Citigroup's determination that 'arbitration should be used in our business unless there are strong countervailing considerations against our

implementing it now.'" *Id.* (quoting PX-6085); A2340 (Kleinbaum testimony regarding her understanding of Prince's determination).

Given Prince's directive, the consideration of an arbitration clause by the Citi Cards legal team tasked with that assignment—which before the summer of 2000 had no deadline—was newly accelerated, with the ongoing direct involvement by Mike Ross, who reported to Prince. A2340–41. At Ross's request, A3289, Nelson developed a work timeline for the project, the first phase of which was to consist of an analysis "of the pros and cons of arbitration and the state of the law" and would conclude with the internal team deciding whether to recommend adoption. A3301; A2295. Eventually, in September 2000, Nelson and Kleinbaum prepared a memo with their recommendation and traveled to New York, at Ross's request, to meet with Ross to present and discuss that recommendation. A3537–58; A2301–02; A2342–43.

Included in a packet of materials provided to Ross for the meeting was a September 12, 2000 memo prepared by Nelson with Kleinbaum's review, laying out in detail the case for Citi Cards' adoption of an arbitration clause, including anticipated cost savings on outside counsel and discovery necessary for litigation, while acknowledging that an arbitration clause would not be a "panacea." A3530–32; A3537–38. At the trial, Nelson and Kleinbaum testified extensively regarding the memo, its preparation, and the points it addressed. A2299–301 (Nelson);

8

A2340–2342 (Kleinbaum).  Plaintiffs' Brief is silent about this trial testimony and the September 12, 2000 memo.

On September 14, 2000, Ross met with Kleinbaum and Nelson to discuss the memo and their recommendation.  At that meeting, he concurred and asked that the recommendation be presented to Steven Freiberg, the CEO of Citi Cards, for his business approval as quickly as possible.  A2343; A2302.  Kleinbaum then met with Freiberg in or around October 2000.  A2343.  She conveyed the lawyers' recommendation, and Freiberg  concurred.  A2343.  In that regard, contrary to Plaintiffs' characterization, *see* Pls.' Br. 39, 79, the evidence showed that Freiberg did not rubber-stamp Kleinbaum's recommendation.  Freiberg was known to his employees to be a strong manager, A2344, and had previously been aware of the project to investigate arbitration clauses, A2019; A2338; A2344; A2352.  He based his decision to implement an arbitration clause on his understanding that adoption of such a clause would accrue obvious benefits to Citi Cards, including lower costs, quicker resolution of claims, and insulation from class-action suits.  A2024–25.  As he testified, he viewed the decision as obvious from a business perspective. A2024–25 ("[I]n the sum of its parts, it seemed to me that it would be a good decision for the customer, or the card member, and a good decision for Citi.  And I didn't give it much more thought than that because on those merits alone, it made sense.").

Freiberg's decision in about October 2000 for Citi Cards to adopt arbitration clauses was final and never revisited. A2344. While it took a period of time for that decision to be fully operationalized, the district court credited the evidence that Citi intended to provide notice to cardholders that it had adopted an arbitration clause by February 2001, but operational issues delayed notification to cardholders until mid- and late-2001. SPA-30. The clauses were mailed to cardholders in waves in May, June, October, and November of 2001. *Id.*

Plaintiffs suggest that the purportedly conspiratorial meetings among lawyers interested in the state of arbitration developments occurred in close proximity to the various issuers' decisions to adopt an arbitration clause. *See*, *e.g.*, Pls.' Br. 78–79. That counterfactual is simply wrong in the case of Citi, particularly as it relates to those actually involved in the Citi Cards decision. In spurring adoption of an arbitration clause by Citi, none of the attorneys involved from the Citigroup General Counsel's office, *i.e.*, Prince, Heyrich and Ross, had any knowledge of any meetings, much less attended any. Nor did Freiberg. A2022. Kleinbaum also never attended any of the meetings. A2338. Instead, as of Fall 2000, the evidence indicated at most that Nelson *may* have participated by *telephone* in a single meeting in April 2000—the contents of which were entirely

10

innocuous.[2]  *See* A3224 (agenda of meeting); A2672 (email summarizing meeting); A2304.  It is little wonder that the district court did not find any connection between the meetings and Citi Card's ultimate decision to adopt an arbitration clause.[3]

### C. The Meetings Upon Which Plaintiffs' Conspiracy Theory Rests

#### 1.  The May 25, 1999 Wilmer Meeting

In 1999, two partners in the law firm now known as Wilmer Hale (hereafter, "Wilmer"), Chris Lipsett and Ron Greene, sponsored a May 25 meeting of senior in-house counsel from various issuers for purposes of presentations by Wilmer attorneys on a wide variety of legal "'issues of common concern'" facing payment card companies.  SPA-6.  The issues included "Relations Between Issuers and Co-Branding, Affinity, or Private Label Partners"; "Outsourcing of Credit and Collections Functions"; and "Consumer Bankruptcy Issues".  A2563.  As the

---

[2] Warrington attended three meetings in 1999, the last on September 29, 1999. *See infra* at 18.  But she had been replaced as Citi Cards' general counsel in about June 1999, and had no role or input in Citi Cards' decision to adopt arbitration more than a year later. *See*, *e.g.*, A2376–77; A2304; A2337; A2348.  The only other meeting attended by someone from Citi Cards prior to Freiberg's October 2000 decision was on March 2, 2000, *i.e.*, about seven months before the decision.  That meeting (also innocuous in its contents) was attended by Bergeson (the only meeting she attended).  Bergeson was replaced on the Citi Cards arbitration team at the end of August 2000 and was not involved in the subsequent recommendation that Citi Cards adopt arbitration.  A1509–10.

[3] The only meeting in "proximity" to Freiberg's decision was an October 3, 2000 meeting of the "Arbitration Coalition."  But the attendance list showed that no one from Citi attended that meeting.  A4337.  Plaintiffs did not contend otherwise. A404-05.

district court found, crediting Lipsett's testimony, Lipsett and Greene organized

the meeting for marketing and client-development purposes.  SPA-6.[4]  While

Wilmer invited some of its credit card clients to serve as co-sponsors "to enhance

the meeting's credibility," including American Express and Citi, they played no

role in the substantive meeting preparations.  *Id.*

Near the bottom of the agenda of legal developments was an item regarding

developments as to arbitration clauses.  A2564.  That item was placed on the

agenda by Lipsett because Lipsett wanted to show that it was an issue "'on which

[he and Greene] were on the leading edge;'" the evidence at trial was unclear as to

whether that item was ever even reached.  SPA-7 (recognizing that surviving notes

from the meeting do not mention arbitration).  However, at the time, the

enforceability of arbitration agreements was already being extensively litigated

nationwide, including a series of cases that reached the Supreme Court.  *See*, *e.g.*,

*Green Tree Fin. Corp.* v. *Randolph*, 531 U.S. 79 (2000); *Green Tree Fin. Corp.* v.

*Bazzle*, 539 U.S. 444 (2003) (plurality).  Eventually, the Supreme Court held that

states could not invalidate arbitration agreements with class action waivers, as

doing so would violate the Federal Arbitration Act.  *AT&T Mobility LLC* v.

*Concepcion*, 131 S. Ct. 1740, 1748 (2011).

---

[4] By the time of trial, Greene had passed away, and Lipsett, who testified
extensively, had retired from Wilmer and joined the Consumer Financial
Protection Bureau as Senior Counsel in the Office of the Director.  *See* A2115–
A2116.

## 2.  The "Arbitration Coalition"

Wilmer subsequently decided to organize and host an ongoing series of meetings focusing solely on arbitration related issues, which was consistent with the suggestion of an individual named Duncan MacDonald, who was then serving as a consultant to First USA, and with whom Lipsett was "good friends."  SPA-8; *see* A2124.[5]  Lipsett decided to do so because he and Greene were looking for a new opportunity "to be in front of clients to try and use that for our business development purposes," and arbitration issues were "a new area."  A2124; A2126; SPA-8.  Thereafter, Lipsett and his colleagues at Wilmer, working together with the Ballard Spahr law firm (including partner Alan Kaplinsky), and MacDonald, organized and hosted a series of periodic meetings and teleconferences focused on arbitration-related issues.  *See* SPA-8; A2124; A2126.  The district court credited Lipsett's testimony that he hoped that involving Kaplinsky, "a 'thought leader' on arbitration issues," "would lend further credibility to the endeavor" without detracting attention from Lipsett.  SPA-8.  An in-house lawyer from American Express participated in organizing the first meeting.  *Id.*

---

[5] Plaintiffs challenge the district court's finding that Wilmer "sparked" the meetings of the Arbitration Coalition, claiming that this could not have been the case because Wilmer did not issue written invitations to the first meeting.  Pls.' Br. 80-81.  But Lipsett testified to the contrary regarding Wilmer's core role and also testified that he and others at Wilmer made efforts to invite their clients.  *See, e.g.*, A2117.

Wilmer hosted the first of these meetings at its office on July 28, 1999, and some materials for the meeting bore "the moniker, 'the Arbitration Coalition.'" *Id.* The program was not restricted to credit card issuers; attendees were from a variety of industries dealing with consumers. *See* A2939 (meeting sign-in sheet). Indeed, more than half of the people at the July 1999 meeting were from other industries, outside counsel, or other entities not alleged to be co-conspirators. *Id.* The July 1999 meeting was not exceptional in this regard. *All* of the meetings of the Arbitration Coalition had substantial attendance by participants from other industries who are not alleged to part of a conspiracy. *See* A2945; A2950; A2953; A3966; A3264; A2904; A3227.

Consistent with Wilmer's and Ballard Spahr's role in organizing and hosting these meetings, the meetings generally focused on presentations by outside counsel concerning legal developments, including cases, legislation, and regulatory actions that might limit the enforceability of arbitration clauses. A2126. Lipsett estimated without contradiction that outside counsel did more than 90 percent of the talking at the meetings, largely in the nature of presentations. A2134–35. There was also more limited discussion among some individuals who expressed an interest in potentially pursuing joint advocacy efforts to defend and promote arbitration before lawmakers, the courts, and the public. A2126; A2129–30; 2246–47. For instance, in inviting participants to the July 1999 meeting, Kaplinsky "warned that

14

'the plaintiffs' bar is engaged in a take no prisoners' assault on consumer arbitration programs' and that consumer lenders must 'be equally well networked.'" SPA-9.

Against this backdrop, the district court found that "[t]he purpose of the [July 28] meeting was to explore 'efforts to protect arbitration.'" SPA-9. Indeed, under the heading "Current Affairs," the agenda for the July 28 meeting listed the various quarters from which challenges to the legitimacy of arbitration clauses were arising: "[i]ncreased media scrutiny," "[t]arget[ing by] class action lawyers," "[r]egulatory inquiries," "[l]egislative rumblings," and case law. A2837; A1796–97. In turn, the speakers focused on ways to avoid enforceability problems. For example, outside lawyers from Wilmer and Ballard Spahr presented on "drafting fair, enforceable arbitration provisions"—material that was similar in nature to that being presented in legal publications (including by some of the same speakers) or at various paid seminars. A2134–35. There was also discussion of working together to formulate potential advocacy responses to the attacks on arbitration clauses, including developing supporting materials (*e.g.*, "law review articles," "soliciting public figure defenders") and "PR & Regulatory Efforts" (including "consumer & media education," "public relations effort," "lobbying politicians," "calling on interested regulators"). SPA-10; A2837. At trial, Lipsett was shown this agenda (and similar ones for other meetings), and addressed each agenda item

15

in turn. He explained that the topics of discussion were universally innocuous, focusing either on legal analyses by outside lawyers of legal issues surrounding arbitration clauses or potential advocacy efforts to counter the attempts to eliminate class action barring arbitration clauses as a legitimate option. A2130; A2134–35. Consistent with this testimony, the district court specifically credited notes taken at the July 28, 1999 meeting indicating that "'legislation, working with trade associations, and obtaining research regarding arbitration'" were discussed. SPA-10 (alterations and omission omitted).[6]

The next meeting of the so-called Arbitration Coalition, on September 29, 1999, dealt with similar topics. The meeting agenda noted impediments to using arbitration clauses, such as legal challenges to the adoption of such clauses and challenges to provisions prohibiting class arbitrations. *Id.* Not only did Lipsett go through the agenda at trial to explain the inoffensive nature of the topics discussed, A2130; 2134–35, but Plaintiffs' expert admitted under cross-examination that every single one of the agenda items was a legitimate topic of discussion that did

---

[6] The district court noted that after this meeting, Wendy Hufford, in-house counsel for GE Capital, emailed Warrington to suggest an interest in sharing "'best practices regarding litigation management'" with the Citi Cards litigation director. SPA-10 (quoting PX-7517). Warrington forwarded this message to Nelson, who held that position. SPA-10 (quoting PX-7517). Nothing in the record suggests that any substantive discussions followed, A1664; A1833; A2316, much less that any agreement occurred regarding adoption of arbitration clauses. In any event, as the district court found, "[b]ecause GE Capital is not an alleged co-conspirator, this Court draws no inference from that communication." SPA-70.

not raise anticompetitive concerns.  A1794–95 (Dr. Robert Tollison).[7]  And as was

common at these events, the September 29, 1999 meeting was attended by

representatives of companies not claimed to be conspirators as well as industry

associations such as the American Bankers Association and the Consumer Bankers

Association, a public relations firm and outside lawyers.  SPA-12–SPA-13.

Memoranda memorializing the meeting indicate that issues discussed included

drafting responses to arguments challenging arbitration clauses, and other notes

from the same meeting memorialize equally innocent discussions about

"'inform[ing] the public discourse and ultimately assist[ing] in the enforceability

of arbitration clauses'" and "fund[ing] amicus briefs to be submitted through trade

associations."  SPA-13; SPA-15 (discussing FAQs to be developed for government

and media relations).

    At that same meeting, there were some one-on-one conversations outside the

group instituted by Gail Siegel of Chase, who was trying to gather information

---

[7] Out of all of the agendas for all the meetings, Dr. Tollison identified only a couple of items from a single agenda, (July 28, 1999), that he said raised competitive concerns in his mind.  A1776; A1797.  One agenda item he initially noted in that regard stated "Working together to turn the tide," A1776, but he ultimately acknowledged that there was nothing problematic about this item if the attendees were "working together . . . to participate in court cases regarding the enforceability of arbitration clauses" or "working together to counter problematic legislation."  A1797, *see* A2837.  Lipsett and other attendees testified that this was in fact the nature of the group's efforts, A2126–27, and the district court made findings consistent with that testimony, SPA-62.  Tollison's purported concerns about other topics in the July 28, 1999 agenda were similarly based on incorrect factual assumptions that Lipsett's testimony dispelled.  A2127–30.

17

about arbitration.  A2376.  Among other things, Siegel's notes reported that
Warrington (who by that time had left Citi Cards) stated that Citi had "'adopted a
wait and see attitude' because it 'want[ed] to see the results of all the litigation'"
then pending as to arbitration clauses in other cardholder agreements.  SPA-14
(alteration in original).[8]  Siegel testified at trial about her side discussions.  While
observing that Siegel's communications "may have been inappropriate in
hindsight," the district court specifically found her testimony credible and found
that her conversations were merely part and parcel of "a general desire for
information rather than an intent to initiate a conspiracy."  SPA-69.  Indeed, Chase
did not adopt an arbitration clause until almost two and a half years later.  SPA-34.

The meetings hosted by Wilmer (and occasionally Ballard Spahr) continued
periodically over the next several years.  All of these meetings were conducted
under the auspices and with the attendance of outside attorneys from either Wilmer
or Ballard Spahr—as well as the attendance of numerous parties not alleged to be
part of any conspiracy—and focused on the same types of legal issues regarding
the enforceability of arbitration clauses.  *See, e.g.,* SPA-21 (litigation and
regulatory updates); SPA-25; SPA-26; SPA-33; SPA-34 (legislative and legal
developments); SPA-35 (field trip to the Supreme Court to hear arbitration-related
oral argument); SPA-20 (solicitation of funds for arbitration-related amicus briefs).

---

[8] A "wait and see" approach is, of course, a far cry from an agreement to adopt
arbitration, as even Plaintiffs' expert conceded.  A1818.

18

### 3. The Consumer Companies' Class Action Working Group

In September 2000, MacDonald conceived of an additional roundtable session focused on "counter[ing] 'class action mania'" and "'the growing epidemic of class actions,'" which he initially proposed to Kaplinsky, Lipsett, another Wilmer partner (Eric Mogilnicki), and First USA. SPA-21. The contemplated invitees included companies and their outside lawyers from "industries such as 'big auto, manufacturing, pharmaceutical, brokerage, heathcare [and] retail.'" SPA-22.

In January 2001, MacDonald announced a meeting of the "Consumer Companies' Class Action Working Group" and attached what the district court described as a "flamboyant" "'manifesto.'" SPA-23. The meeting was held in February 2001 at the National Retail Federation, and, in addition to personnel from some of the Issuing Banks, was attended by a large number of other corporations and trade associations, as well as nearly twenty law firms. SPA-24. Presentations by in-house counsel from DaimlerChrysler and Dow Chemical were among the featured presentations. The concededly "mostly ineffective" group, Pls.' Br. 24, met only once more, on May 30, 2001, SPA-26.[9]

There is no evidence at all that any agreement to adopt or maintain arbitration clauses was discussed at either of these meetings. Quite to the contrary,

---

[9] At the February 2001 meeting, Nelson also made a presentation, which she previously had given at CLE seminars, on internal risk management. The presentation had nothing to do with the subject of arbitration. A2306; A1843.

what the district court found was that the documentation that existed of these meetings showed that the issues discussed were "entirely legitimate topics" consisting of advice on common legal issues, not collusion as to business practices. SPA-79.

### 4. The In-House Working Group

Later in 2001, attorneys from Capital One, Chase and American Express organized a smaller group of in-house counsel from financial services companies to meet periodically by phone. The purpose of this group, which the organizers styled the "In-House Working Group," was to serve as a "sounding board to share issues that impact [the financial services] industry." SPA-27–SPA-28. In contrast to the Class Action Working Group, the In-House Working Group was designed to be more "practical," focusing on "internal issues that in-house counsel face." SPA-28. That mundane focus was reflected in the topics proposed for the group's inaugural conference call in July 2001, which included creating an email network and identifying "'other means to protect our employers from the plaintiffs' network.'" SPA-28.

The only Citi participant in these conference calls, and sporadically at that, was Petra "Tedde" Tasheff. Tasheff was not part of Citi Cards; she was an in-house lawyer at Citigroup. A1957–59. And she had no involvement either in Citi Card's adoption of arbitration clauses or the decision by Charles Prince to have all

20

business units consider adopting arbitration absent "strong countervailing considerations." SPA-30. Indeed, the Citi Cards' adoption decision had been made more than eight months before the July 2001 In-House Working Group meeting, and change-in-terms notices had begun being mailed to cardholders in May and June 2001. SPA-30.[10]

The group held a handful of additional conference calls before it "fizzled." SPA-69. Having reviewed the "documentation in scheduling emails of at least some issues they hoped to discuss," and heard testimony as well from the participants in these calls, the district court concluded that "the evidence shows that entirely legitimate topics were discussed." SPA-79, *see also* SPA-30–SPA-31 ("The August call agenda noted the 'importance of benchmarking, sharing information on current cases and plaintiffs' claims' and called for each participant to be prepared to introduce two or three cases or issues that 'may have implications for the rest of us' or 'on which the member seeks input from the group.'"); SPA-34 ("developments in arbitration-related case law").

---

[10] Most of the other counsel participating in the group also came from companies that had publicly announced adoption of arbitration clauses long before. While Chase and Capital One later also chose to adopt arbitration clauses, the evidence at trial showed that those were independent decisions too, having nothing to do with any meetings of the In-House Working Group. *See*, *e.g.*, A1956.

### D. In Finding That Defendants Did Not Conspire To Adopt And Maintain Arbitration Clauses, The District Court Repeatedly Rejected The Inferences That Plaintiffs Sought To Have It Draw.

The Issuing Banks adopted arbitration clauses at disparate times.[11]

Nonetheless, the district court found that the conduct of the issuing banks could be characterized as parallel conduct. SPA-53. The district court correctly recognized, however, that parallel action that is not the product of an illegal agreement does not violate the Sherman Act. Accordingly, the Court turned to the analysis of "additional circumstances, often referred to as 'plus' factors, which, when viewed in conjunction with the parallel acts, can serve to allow a fact-finder to infer a conspiracy." SPA-52–SPA-53 (quoting *Apex Oil Co.* v. *DiMauro*, 822 F.2d 246, 253 (2d Cir. 1987)). Because "Plaintiffs concede that they have no direct evidence of a conspiracy among the Issuing Banks," the entirety of the district court's factual findings reflect its exercise of judgment as to what "'inferences . . . may

---

[11] Four issuers had adopted arbitration clauses prior to the first meeting of the Arbitration Coalition, First USA publicly announced adoption in 1997; American Express decided to adopt in 1998, publicly notifying cardholders in April 1999; and Discover noticed cardholders in July 1999, the conclusion of a four to six month logistical process. SPA-11. In addition, Wells Fargo, an alleged co-conspirator which attended no meetings prior to May 2001, had also adopted. A2452; A2687. The next issuer to notify cardholders of adoption of an arbitration provision was MBNA, in December 1999. MBNA had not attended any meetings, however. A1792. In February 2000, Bank of America and HSBC each provided notices to cardholders. It was then another eight months before Citi Cards made its October 2001 decision to adopt. In March 2001, Providian noticed its cardholders; but it too had attended no meetings of the Arbitration Coalition. A1793. Subsequently, Capital One announced adoption in October 2001, SPA-70, and it was not until March 2002 that Chase announced its adoption, SPA-34.

fairly be drawn from the behavior of the alleged conspirators.'"  SPA-51 (citing

*Michelman* v. *Clark-Schwebel Fiber Glass Corp.*, 534 F.2d 1036, 1043 (2d Cir.

1976)).

First, while acknowledging that certain motives to conspire were

conceivable, such as collusion to ensure that no issuing bank facilitated a rise to

salience of arbitration clauses,[12] the court concluded that it was "convinced the

evidence is just as consistent with legitimate activity in furtherance of the Issuing

Banks' independent self-interests."  SPA-63.  It added that "[e]ven absent a

conspiracy to adopt and maintain arbitration clauses, the Issuing Banks would still

be motivated to cooperate on efforts to sway public opinion and defend the legality

of their clauses in the courts and legislatures," and recognized that such efforts are

protected from the Sherman Act by the *Noerr-Pennington* doctrine.  *Id.* (quoting *E.*

*R.R. Presidents Conference* v. *Noerr Motor Freight, Inc.,* 365 U.S. 127, 136

(1961)).

Second, although the court observed what it characterized as "an unusually

high amount of inter-firm communications regarding arbitration," SPA-63, it

nevertheless concluded that this evidence proved no more than an opportunity to

conspire, SPA-64.  After hearing the testimony of the meeting participants, and

---

[12] The district court also found, however, that during the time period of the alleged collusion, "arbitration clauses were not salient to consumers," and that "firms are expected to compete as to salient terms, but not as to non-salient terms."  SPA-38.

reviewing the corroborative documentary record regarding what occurred, the court found the contents of the meetings to have been "benign."[13]  The court found that "education on legal developments on arbitration and 'legislative updates' were significant aspects," and "the bulk of the discussion centered on publicly available information—including the arbitration clauses themselves."  SPA-66.  Moreover, meetings of the Arbitration Coalition were "not limited to the issuing Banks or even the credit card industry," which the district court found "cuts against any inference that an express agreement to implement and maintain arbitration clauses was articulated at the Arbitration Coalition meetings."  SPA-67.  Ultimately, the district court found that although the evidence might "*permit* an inference of illegality, . . . inferences of legitimate activity are just as persuasive."  *Id.*  Finally, with respect to the scattered contacts or attempted contacts between various persons outside of the group meetings, the district court found that these did not indicate "an intent to initiate a conspiracy," SPA-69, as opposed to mere

---

[13] In particular, the district court rejected the claim that the Issuing Banks colluded in drafting their arbitration clauses.  SPA-66.  The only "joint drafting" the district court found pertained to "FAQs," *see id.*, which were documents containing no confidential information and "intended primarily for use by the group in connection with legislative efforts and media relations" as part of a publicity campaign on the benefits of arbitration clauses.  A3393.  And uncontradicted testimony showed that when the notion of potentially drafting a model "fair" arbitration clause was raised among a smaller group (which did not include Citi), that idea was explicitly *rejected* precisely because of concerns about antitrust issues that such a collaboration might raise.  A2133.

"information-seeking" of a type " "consistent with conscious parallelism rather than collusion." SPA-71.[14]

Third, the district court concluded that the activities of the Defendants and other Issuing Banks were not contrary to self-interest. The district court found it "clear that the Issuing Banks had independent interests in adopting arbitration clauses to preclude costly class actions," irrespective of what other banks chose to do. SPA-60. Likewise, the court found that attendance at the various meetings was not contrary to self-interest. Quite the opposite, the court found that "[g]iven that arbitration was a relatively new development, each Defendant has an interest in staying abreast of the evolving legal and regulatory landscape," SPA-72—a conclusion underscored by the presence at the meetings of numerous other companies and persons not claimed to have been part of any conspiracy. A2448–49. Moreover, far from it being against the self-interest of those parties that had already adopted arbitration clauses to attend the meetings, they each had a common self-interest in encouraging measures designed to protect the continued enforceability of arbitration clauses against litigation, legislation, and other

---

[14] There were three instances of purported communications outside of group settings involving Citi. The first involved GE Capital, *see supra* at 16 n.7, a non-conspirator, SPA-70. The second was the Warrington-Siegel conversation in September 1999, which the Court specifically found not to be collusive. *See supra* at 16 n.7. The third was an attempt by a Ballard Spahr attorney, in January 2001, to gain information for a client from Julie Nelson regarding Citi Cards' consideration of arbitration. The uncontradicted evidence is that this attempted contact went unanswered. A2333–34.

challenges. *See* SPA-72. As the district court found, this included helping to educate other companies which might be considering adopting arbitration clauses on "how to 'get it right'" and avoid, creating bad precedent regarding unenforceability that could ultimately affect the enforceability of their own clauses as well. *Id.*

Fourth, the district court found that the arbitration clauses ultimately adopted by the Issuing Banks did not reflect "artificial" standardization. Although it considered the evidence on this point to be "ambiguous," the district court found it "unsurprising that over time each of the Issuing Banks' arbitration clauses would morph to incorporate a class action waiver." SPA-73–SPA-74. This conclusion is consistent with the Supreme Court's recent recognition that "[a]rbitration is poorly suited to the higher stakes of class litigation." *Concepcion*, 131 S. Ct. at 1752. Because class arbitration "greatly increases risks to defendants," "sacrifices the principal advantage of arbitration," and "makes the process slower, more costly, and more likely to generate procedural morass than final judgment." *Id.*

Finally, the district court rejected Plaintiffs' suggestion that it infer a conspiracy from the existence or absence of various forms of evidence, finding that the absence of documentation of meetings "among busy lawyers covering a range of topics discussed many years ago" was not evidence "that a conspiracy was afoot." SPA-78. Equally important, the court observed that the notes that do exist

26

reflect "permissible topics such as litigation developments and advocacy efforts."
*Id.* The court likewise rejected any negative inference stemming from witnesses'
failures to recall certain facts, finding that "the memory gaps of a few witnesses do
not transmogrify an honest lack of recollection into a conspiracy. Overall, the
record presented at trial is quite robust considering the meetings that took place ten
to fifteen years ago." SPA-81.

Ultimately, the district court made the unequivocal factual finding that
Plaintiffs had not "carr[ied] their burden to demonstrate an agreement among the
Issuing Banks to implement and maintain arbitration clauses." *Id.* In that regard,
the district court then summarized its core factual findings based on its review of
the evidence as a whole. First, "many of the activities of the Arbitration Coalition
are akin to legitimate activities protected under the *Noerr-Pennington* doctrine."
SPA-82. Second, the district court made extensive factual findings regarding the
self-interest of each party in adopting these arbitration clauses:

> Undoubtedly, avoiding class actions through arbitration was in
> each issuing Banks' independent self-interest, regardless of
> whether its competitors also adopted such a provision. Though
> an illegal agreement to collusively adopt arbitration would have
> given the Issuing Banks comfort on their journey to make
> arbitration an industry standard, they were just as likely to
> travel that road alone. Unlike some other cost-saving measures,
> the benefit of arbitration—avoiding class action litigation—was
> not diminished if competitors were in on the secret. In fact,
> absent any agreement to adopt arbitration, educating one's
> competitors on how to do so properly would have helped to
> maximize the benefits any one firm could realize.

27

SPA-83.  Third, and most significantly, the district court found that "the record indicates that the final decision to adopt class-action-barring arbitration clauses was something the Issuing Banks hashed out individually and internally."  *Id.*

The district court entered judgment for the Defendants, SPA-93–SPA-96, and this appeal followed.

## SUMMARY OF ARGUMENT

In its appellate posture, this long-running case now presents an exceedingly narrow question.  This Court need only resolve whether Plaintiffs have shown that the court below clearly erred in finding, based on a voluminous trial record, that "Plaintiffs have failed to carry their burden to demonstrate an agreement among the Issuing Banks to implement and maintain arbitration clauses" and in finding instead that "the final decision to adopt class-action-barring arbitration clauses was something the Issuing Banks hashed out individually and internally."  SPA-81, SPA-83; *see also* SPA-82 (rejecting Plaintiffs' invitation to "read evidence" from trial to reach the opposite conclusion).

In order for these findings to be reversed as being clearly erroneous, Plaintiffs have to demonstrate that the record was without evidentiary support for them and that no factual inferences existed which could permissibly support the district court's judgment.  *See*, *e.g.*, *infra* at 31, 33–35, 38  Plaintiffs neither make nor attempt to make such a showing, however, and their rendition of the trial court

evidence does not even purport to address the evidence adverse to their claims. They decline to attempt such a showing with good reason. The district court had first-hand opportunity to assess the credibility of dozens of witnesses over five weeks of trial testimony and then gave careful consideration to the testimony and evidence after trial. There is an abundance of evidence demonstrating that Citi Cards' decision to adopt and maintain the challenged arbitration clauses grew out of extensive and prolonged independent internal study, rather than any agreement, express or tacit, with card issuers. Not only did the District Court hear and credit the testimony of Citi Cards' CEO, its then-General Counsel, Citigroup's Chief Legal Officer and General Counsel, and other Citi witnesses, but Citi's decision-making was contemporaneously memorialized in internal memoranda and work product. *See* SPA-29–SPA-30.

Instead of addressing the narrow issue before this Court or even acknowledging the district court's unambiguous factual findings, Plaintiffs insist that this Court should apply *de novo* review, attempt to point to legal errors that do not exist, and ultimately urge this Court re-weigh the inferences that may be drawn from the evidence and effectively re-try the case. Plaintiffs' arguments are meritless.

First, clear error, not *de novo* review, governs. *See infra* at 32–35, 36–37, 38, 44–45; *contra* Pls.' Br. 52. This is not a case in which the district court found

an agreement among Citi and other Issuing Banks to adopt or maintain arbitration clauses, thereby giving rise to questions about legality which might be subject to *de novo* review. Rather, as shown, this is a case in which the court below unequivocally found that Plaintiffs had failed to carry their burden of demonstrating by a preponderance of the evidence that there was any such mutual agreement to adopt or maintain.

Second, Plaintiffs' attempts to gin-up legal error in the district court's judgment do not withstand the mildest scrutiny. *Infra* § I. Plaintiffs argue that the court required Plaintiffs to present "evidence of explicit agreement," Pls.' Br. 56, required Plaintiffs "to dispel" any "possibility the Banks may have independently," *id.* at 60, and did not properly weigh the totality of the evidence, *id.* at 61–64. But the district court did none of these things. Instead, the court below expressly recognized that "[n]o formal agreement is required to constitute a conspiracy," SPA-50; it never required plaintiffs to "dispel" all other "possibilities," but properly recognized that just as the existence of evidence which "tends" to exclude independent conduct is relevant to a court's inquiry at the summary judgment stage, it is part-and-parcel of analyzing whether Plaintiffs have proven a conspiracy at trial by a preponderance of the evidence, *see* SPA-51; *infra* at 40–43; and reviewed "*all* the . . . evidence," SPA-81 (emphasis added), in reaching the very factual findings that Plaintiffs refuse to acknowledge here, *see* SPA-81–83.

30

The great irony of Plaintiffs' arguments and a fatal shortcoming of their appeal is that it is Plaintiffs who grossly miscomprehend the legal burdens they had to carry at trial. They argue that if the record contains any "reasonable inference" of a conspiracy or contains evidence that "reasonably tends to prove" a conspiracy, *see*, *e.g.*, Pls.' Br. 3, 5 ¶ b, 51, 54, 56–58, 60, 62, 65, they should have prevailed at trial and therefore are entitled to judgment on appeal. That is simply wrong. These are the standards that apply to determine whether the evidence is sufficient to withstand summary judgment or a directed verdict—neither of which is at issue here. After a post-trial verdict, "[t]he fact that there may have been evidence to support an inference," *Diesel Props S.R.L.* v. *Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011), or that "the evidence could support inferences favorable to their claim," *Freedom Holdings, Inc.* v. *Cuomo*, 624 F.3d 38, 54 (2d Cir. 2010), are irrelevant. What matters are the inferences ultimately "drawn by the trial court," and so long as those inferences are not wholly without evidentiary support, the district court's findings are not clearly erroneous. *Diesel Props*, 631 F.3d at 52.

The trial court's judgment is amply supported in the record and should be affirmed.

## STANDARD OF REVIEW

Plaintiffs pay lip service to the familiar rule that "[i]n reviewing a district court's decision in a bench trial, [this court] review[s] the district court's findings of fact for clear error and its conclusions of law *de novo.*" *White* v. *White Rose Food*, 237 F.3d 174, 178 (2d Cir. 2001). Plaintiffs err, however, in their imprecise generalization that "the issue of antitrust conspiracy (or agreement) . . . is a matter of law reviewed *de novo.*" Pls.' Br. 52.

Plaintiffs seek to extrapolate this position by partially quoting a statement from a footnote in *United States* v. *General Motors Corp.*, that "the ultimate conclusion by the trial judge, that the defendants' conduct did not constitute a combination or conspiracy in violation of the Sherman Act, is not to be shielded by the 'clearly erroneous' test embodied in Rule 52(a) of the Federal Rules of Civil Procedure." 384 U.S. 127, 141 n.16 (1966).[15] Plaintiffs omit, however, critical context that follows, in which the Court observed that "the question here is not one of 'fact,' but consists rather of the legal standard required to be applied *to the undisputed facts of the case.*" *Id.* (emphasis added). Other cases have likewise observed that where the facts of the case are not in dispute, the application of the Sherman Act to those facts is a question of law. *See United States* v. *Parke, Davis*

---

[15] Plaintiffs also cite *Starr* v. *Sony BMG Music Entertainment*, 592 F.3d 314, 319 n.2 (2d Cir. 2010) for this proposition. *See* Pls.' Br. 56. The citation is puzzling because the cited footnote observes only that conclusory pleadings that defendants conspired together may not be accepted as true in evaluating a motion to dismiss.

*& Co.*, 362 U.S. 29, 44 (1960) ("Because of the nature of the district court's error we are reviewing a question of law, namely, whether the district court applied the proper standard to essentially undisputed facts.").

This case is not one involving undisputed facts, however. Instead, the facts at trial were hotly disputed. Thus, the fundamental antecedent question in this case—whether any collusive agreement to adopt arbitration clauses existed at all— is an issue of fact that must be reviewed for clear error. *See* Fed. R. Civ. P. 52(a). Numerous courts have, in the decades following *General Motors*, faithfully applied this "clearly erroneous" standard of review to factual findings in a bench trial regarding the existence of a conspiracy. *See*, *e.g.*, *Canady* v. *Providence Hosp.*, 132 F.3d 1480 (table), 1997 WL 812468, at *1 (D.C. Cir. 1997) ("[W]e may overturn the court's finding that there was no conspiracy only if it is clearly erroneous."); *Alexander* v. *Nat'l Farmers Org.*, 687 F.2d 1173, 1206 (8th Cir. 1982) ("[W]e cannot say it was clearly erroneous for the district court to reject findings that [defendants'] practices were part of an unlawful conspiracy."); *Treasure Valley Potato Bargaining Ass'n* v. *Ore-Ida Foods, Inc.*, 497 F.2d 203, 207-08 (9th Cir. 1974) ("Since our review of the record does not disclose clear error, we necessarily affirm this finding [that there was no conspiracy]."); *Ramsey* v. *United Mine Workers of Am.*, 481 F.2d 742, 743, 747 (6th Cir. 1973) (reviewing

33

district court's finding that there was "neither an actual nor an implied conspiracy," and holding that the finding was not "clearly erroneous").

The district court's findings in this case clearly demarcate the line between questions of law and questions of fact. Judge Pauley expressly acknowledged that "Plaintiffs['] fail[ure] to carry their burden of showing a collusive agreement moots the issue of whether such an agreement would be an unreasonable restraint on trade." SPA-84. Because of the court's factual finding that no agreement to establish arbitration provisions existed, it was unnecessary to reach the question "whether [any such agreement] was unlawful under the Sherman Act." *Id.*

Thus, this court reviews the factual determination that no conspiracy existed only for clear error. Under that deferential standard, this court need only determine that "the district court's account of the evidence is plausible," and "the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson* v. *City of Bessemer*, 470 U.S. 564, 573-74 (1985). "The fact that there may have been evidence to support an inference contrary to that drawn by the trial court does not mean that the findings made are clearly erroneous." *Diesel Props*, 631 F.3d at 52 (discussing, *inter alia*, *Anderson*).

There is a second fundamental legal error that pervades Plaintiffs' Brief as well. Plaintiffs repeatedly treat permissive evidentiary inferences as if they were

mandatory ones, first characterizing these inferences as "reasonable" and then asserting that the district court erred by not drawing these "reasonable" inferences in Plaintiffs' favor. *See, e.g.,* Pls.' Br. 3 (arguing that because the record "demonstrates a reasonable inference that it was more likely than not the Banks conspired" this "suffices *to prove*" a conspiracy) (emphasis added). But Plaintiffs are wrong. They have confused the standards for surviving a motion for summary judgment or a directed verdict with the standards for reviewing factual findings made after a trial. That is why, as discussed further below, it is no accident that the cases Plaintiffs cite in support of their arguments are time and again cases involving these earlier procedural stages, when inferences *must* be drawn in the favor of the non-moving party if they *can* reasonably be drawn. By contrast, this Court, adhering to the instructions of the Supreme Court, has been clear that after losing at trial, "Plaintiffs cannot secure reversal simply by demonstrating that the evidence *could* support inferences favorable to their claim. Rather, they must show that the evidence permitted no other inferences." *Freedom Holdings*, 624 F.3d at 54–55 (emphasis added); *accord Diesel Props*, 631 F.3d at 52.

## ARGUMENT

Notwithstanding Plaintiffs' attempts to characterize this case as one about legal errors, their appeal—as exemplified by their re-submission of the entire trial record in the Appendix, over Defendants' objection, and their repeated requests

that this Court draw different "reasonable inference[s]" from those the district court did, Pls.' Br. 3; *see id.* at 49–50, 62–64, 65–68, 71, 73—is no more than an effort to re-try their case.  And by leaving out discussions of all the evidence contrary to their position—on which the district court's decision rested—it is not even a fair effort at retrial.  While it goes without saying that this Court's role is not to conduct a retrial, Plaintiffs make matters worse by egregiously mischaracterizing the legal burden they were required to carry at trial and by ignoring the district court's factual findings about why they failed to meet that burden.  Plaintiffs set forth no basis for disturbing the judgment, which rests upon the district court's finding "that the final decision to adopt class-action-barring arbitration clauses was something the Issuing Banks hashed out individually and internally," and was not the product of an agreement among them.  SPA-83.

## I.  PLAINTIFFS HAVE NOT SHOWN ANY ERRORS OF LAW IN THE COURT'S FINDING THAT NO AGREEMENT EXISTED.

The district court correctly applied the governing legal standards in requiring Plaintiffs to prove the existence of a conspiracy.  Throughout this case, the district court carefully and correctly applied the instructions of the Supreme Court and this Court in holding Plaintiffs to the burden of proving the existence of a conspiracy.  As the Supreme Court first recognized in the context of antitrust law, it is a core maxim of appellate review that "where the evidence would support a conclusion either way but where the trial court has decided it to weigh more heavily for the

defendants[, s]uch a choice between two permissible views of the weight of evidence is not 'clearly erroneous.'" *United States* v. *Yellow Cab Co.*, 338 U.S. 338, 342 (1949). Plaintiffs, however, attempt to demonstrate some sort of legal error underlying the district court's factual findings, such that this Court might be able to substitute its judgment for that of the finder of fact. But the errors Plaintiffs purport to identify are makeweights which fundamentally mischaracterize what the district court actually did and found.

## A. The District Court Properly Recognized That Unlawful Agreements Can Be Express Or Tacit.

Plaintiffs assert that "[t]he district court erred to the extent it required evidence of explicit illegal agreement." Pls.' Br. 57–58; *id.* at 49–50 (similar). But the district court never voiced any such purported requirement, which is why Plaintiffs are unable to cite or quote any words to that effect. Quite to the contrary, the district court made clear that it understood that "[n]o formal agreement is required to constitute an antitrust conspiracy." SPA-50. After that correct statement of the law, the district court analyzed for thirty-four pages the evidence the Plaintiffs had adduced. The district court carefully evaluated the best case for Plaintiffs, taking step-by-step the "'plus factors, which, when viewed in conjunction with the parallel acts [of the defendants], can serve to allow a fact-finder to infer a conspiracy,'" SPA-52–SPA-53 (quoting *Apex Oil*, 822 F.2d at

37

253), and reiterated in summary that "direct evidence of an agreement is neither expected nor required," SPA-81.

Plaintiffs then shift to the equally unsupported assertion that "[i]n practical effect," the district court must have required evidence of an explicit illegal agreement. Pls.' Br. 49. This claim too is completely wrong, for two reasons. First, the argument—which boils down to a statement that because plaintiffs did not prevail, they must have been held to too restrictive a standard—is based upon the fallacious view that if a reasonable inference could be drawn, then the district court was somehow required to draw that inference in their favor and could not find to the contrary. *Contra Yellow Cab*, 338 U.S. at 342; *Anderson*, 470 U.S. at 574; *Diesel Props*, 631 F.3d at 52; *Freedom Holdings*, 624 F.3d at 54-55. Plaintiffs attribute the district court's unwillingness to draw inferences in their favor to in essence requiring direct evidence, but it is not. On the contrary, it is the classic role of the fact-finder in making credibility determinations, judging the evidence, and deciding which inferences to find most persuasive.

Second, Plaintiffs attempt to suggest that the district court itself found an "agreement" to establish arbitration as an "industry norm," and therefore its failure to find an actionable conspiracy to adopt and maintain arbitration clauses must somehow be based on the absence of direct evidence of such an illegal agreement. Pls.' Br. 49. But this attempt to impute acknowledgment of an unlawful agreement

38

wrenches the court's words from their context and mischaracterizes the court's decision.

Through numbering and emphasis absent from the district court's opinion, Plaintiffs attempt to massage the district court's finding: "***It is clear that the Issuing Banks had an agreement*** [i] to explore advocacy efforts aimed at expanding the enforceability of arbitration clauses and [ii] ***to establish class-action barring-arbitration as an industry norm***." Pls.' Br. 53 (quoting SPA-82) (emphasis and alteration added by Plaintiffs). Through this artful framing, Plaintiffs attempt to equate the district court's finding with "[a]n agreement among horizontal competitors to each adopt the same term or condition of sale." *Id.* But this ignores the actual words of the district court. As emphasized above, the district court's interpretation of the facts was clear: "the record indicates that the final decision to adopt class-action-barring arbitration clauses was something the Issuing banks hashed out individually and internally." SPA-83.

Indeed, Plaintiffs' Brief omits crucial context that directly follows the sentence of the court's opinion extracted by Plaintiffs. There, the district court clearly found as a matter of fact that the only agreement Plaintiffs had shown was a "benign agreement," one limited to advocacy efforts such as "solicitations to fund amicus briefs and research, and willingness to explore joint action such as the FAQs project." SPA-82. But to describe that as an "illegal agreement to

collusively adopt and maintain class-action-barring arbitration clauses" was, in the district court's words, "a bridge too far." *Id.* The district court expressly rejected the leap that Plaintiffs now seek to infer, declining to find any "evidence of a separate, illegal agreement to collusively adopt and maintain class-action-barring arbitration clauses." *Id.* And the district court emphasized that to the extent Defendants cooperated, the activities that Plaintiffs had proven were advocacy of the type "protected under the *Noerr-Pennington* doctrine," SPA-82, but that beyond that "this Court does not discern any concerted action," SPA-84. These conclusions are flatly inconsistent with Plaintiffs' assertion that the district court somehow found collusion to adopt arbitration clauses.

### B. The District Court Properly Required Plaintiffs To Prove Their Claim of Conspiracy By A Preponderance of the Evidence.

Plaintiffs are also mistaken in asserting that the district court "applied an incorrect standard for weighing the evidence," by requiring them to "present 'evidence that tends to exclude the possibility that the alleged conspirators acted independently.'" Pls.' Br. 58 (quoting SPA-51 and *Matsushita* v. *Zenith Radio Corp.*, 475 U.S. 574, 588 (1986)). Plaintiffs' arguments simply ignore and miscomprehend the burden plaintiffs bear at this stage of the proceedings.

First, plaintiffs' argument defies not only the law but common sense. In the absence of direct evidence of collusion (as was the case here), an antitrust plaintiff cannot even get past summary judgment and proceed to trial unless it satisfies the

requirement of "present[ing] evidence 'that tends to exclude the possibility that the alleged conspirators acted independently,'" as *Matsushita* held, 475 U.S. at 588. Accordingly, unless the evidence presented at trial at least "tends" to exclude lawful independent action, plaintiffs cannot possibly satisfy their more stringent trial burden of proving their case by a preponderance of the evidence—*i.e.*, that it is "*more likely* than not" that their claims are true. *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 328-29 (2007); *see also United States* v. *Hertular*, 562 F.3d 433, 447 (2d Cir. 2009) (preponderance of evidence standard satisfied if a fact's existence is "more likely than not").  Put differently, if a plaintiff cannot present evidence that "tends to exclude" the defendants' version of events—here, that the arbitration clauses were adopted and maintained for independently self-interested reasons, rather than as the product of collusion—that plaintiff could not possibly persuade the finder of fact that its account is "more likely than not."

Second, while this portion of Plaintiffs' Brief begins by asserting (incorrectly) that "tends to exclude" is an impermissible standard, Plaintiffs quickly shift to a quite different claim.  They note that it is improper to "over-rea[d]" *Matsushita*'s "tend to exclude" language by requiring a plaintiff to completely "dispel" the possibility of independent action and show that conspiracy is "the sole inference."  Pls.' Br. 58.  In support, they cite this Court's decision in *In re Publication Paper Antitrust Litigation*, 690 F.3d 51 (2d Cir. 2012), reviewing

41

a grant of summary judgment. But not only did *Publication Paper* involve a different procedural posture, the case makes clear that, properly understood, the "tends to exclude" standard contains no such requirement of completely dispelling or excluding any competing inferences. *Id.* at 63. And nowhere in the district court's opinion here did it state that Plaintiffs were required to prove that the inferences they claimed were the *only* available inferences—which is why, once again, Plaintiffs are unable to cite language to that effect in support of their claim that "[i]t was error . . . for the district court to require Plaintiffs to dispel the possibility the Banks may have acted independently." Pls.' Br. 60. Instead, the district court merely concluded that Plaintiffs had failed to carry their burden of showing by a *preponderance of the evidence* that the inferences they claimed were *more likely* true than innocent explanations and inferences offered by Defendants.

Third, in an effort to show that the district court must have held them to a legally improper standard of proof regardless of what the court actually said, Plaintiffs argue that because their allegations were "plausible" and their claimed inferences were (supposedly) "reasonable," this "warranted that reasonable inferences of collusion should be drawn from the entirety of the record." *Id.* at 59–61; *see also, e.g., id.* at 57 (arguing Plaintiffs are entitled to reversal because "[a]ll Plaintiffs must do is provide 'direct or circumstantial evidence that reasonably tends to prove,' *Monsanto*, 465 U.S. at 764, the Banks combined and/or conspired

to impose CBA Clauses, which standard Plaintiffs met."). Once again, this fundamentally confuses the standards of proof at trial with the standards applicable to pretrial motions, however. The question at trial is not merely whether claimed inferences are "reasonable" but whether the fact-finder finds them *more* persuasive than opposing inferences. And the "examples" that Plaintiffs point to as supposedly showing the district court's error in this regard are not instructive. Rather, they are nothing more than instances where the court, while acknowledging certain of Plaintiffs' points in the course of its review of various "plus" factors, found that Plaintiffs had not succeeded in tipping the scales of persuasion in their favor—because the court found opposing inferences were at least as persuasive. For example, when the district court analyzed the Issuing Banks' motives—a plus factor on which Plaintiffs now rely, *see* Pls.' Br. 60—the district court explicitly found that the motives were "just as consistent with legitimate goals as non-legitimate goals," so "there can be no fair inference of collusion" from this factor. SPA-63.

Nor do the cases cited by Plaintiffs remotely support their attempt to manufacture legal error out of the district court's failure to find their claimed inferences the more persuasive ones *at trial*. *Monsanto*, for example, concerns only what a plaintiff must show to "survive a motion for a directed verdict." 465 U.S. at 759. Under *Monsanto*, when a plaintiff has adduced evidence that

"reasonably tends to prove that the manufacturer and others had a conscious commitment to a common scheme," all he has done is "created a jury issue as to whether [the defendants acted] pursuant to a price-fixing conspiracy." *Id.* at 768. Of course, as the Court noted, in rendering judgment, "[t]he choice between two reasonable interpretations of the testimony properly was left for the" finder of fact. *Id.* at 768 n.12. *Publication Paper* is similarly inapposite. As noted above, *Publication Paper* concerned the application of *Matsushita* to *summary judgment* proceedings, holding that summary judgment was improper if the existence of a conspiracy if was a reasonable inference that a jury could draw from the evidence. 690 F.3d at 63. But trial is a different matter, as *Publication Paper* recognized, noting that "when the evidence admits of competing permissible inferences with regard to whether a plaintiff is entitled to relief, 'the question of what weight should be assigned to [those] inferences remains within the province of the fact-finder at a trial.'" 690 F.3d at 61 (quoting *Apex Oil*., 822 F.2d at 253).

In sum, Plaintiffs' claim of legal error in the district court's "weighing" of the evidence is little more than a disguised disagreement with its fact-finding determinations, a matter that is subject only to "clearly erroneous" review. To satisfy that standard, they must demonstrate that the "evidence permitted *no other* inferences" than those that they now assert. *Freedom Holdings*, 624 F.3d at 54–55 (emphasis added). The fact that Plaintiffs' hypothesized scenarios were

44

"reasonable" or "plausible" do not "constitute findings by a preponderance of the evidence that what 'could have' happened, actually did happen." *Bakalar* v. *Vavra*, 619 F.3d 136, 151 (2d Cir. 2010).

## C. The District Court Correctly Reviewed the Totality of the Evidence.

Plaintiffs claim that the district court also erred by "separately determin[ing] the weight of certain evidence" but then not stepping back to consider the evidence as a whole. Pls.' Br. 62 (discussing *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 655 (7th Cir. 2002) (Posner, J.)). That argument is equally unavailing.

First, Plaintiffs admit that the district court began its discussion with an accurate statement of the law, noting that "courts examine the existence of a conspiracy 'as a whole' taking into consideration the totality of the evidence, as opposed to 'dismembering it and viewing its separate parts.'" SPA-53 (quoting *Cont'l Ore Co.* v. *Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)). The district court was likewise mindful of its task to "weig[h] *all* the 'plus factors' evidence." SPA-81 (emphasis added).

Notwithstanding the district court's explicit recognition of the need to evaluate the evidence as a whole, Plaintiffs nakedly assert that the court "did not examine Plaintiff's conspiracy evidence in its entirety." Pls.' Br. 63. Not only is there no support at all in the court's opinion for that statement, it is flatly

45

contradicted by pages 81 to 83 of the opinion. There, the district court, having gone through all the factors, expressly addressed the evidence as a whole in framing its final determination. The fact that in the preceding sections of the opinion the district court discussed each plus factor seriatim, identifying the insufficiencies in each aspect of Plaintiffs' case, is not a legal error, let alone an error at all. It is perfectly appropriate to evaluate items of evidence individually, and assess their flaws, before reaching an overall determination. After all, "zero plus zero equals zero," *High Fructose*, 295 F.3d at 655, and the Plaintiffs cannot prove their case by stacking uncredited inference on top of uncredited inference, and then claiming that the district court's failure to combine them into some other purported necessary inference was somehow an error of law.

Second, once stripped of its false claim that the district court's method of examining the facts constitutes a legal error, Plaintiffs' argument again is just a challenge to the district court's weighing of those facts accompanied by mischaracterizations of the court's opinion. For example, Plaintiffs suggest the Court somehow erred in concluding that the "numerous Arbitration Coalition meetings" were "akin to a fledgling special interest group" rather than an antitrust conspiracy because, according to Plaintiffs, the "court found that the numerous Arbitration Coalition meetings . . . raised an inference of illegality." Pls.' Br. 63 (citing SPA-67). But that is not what the district court "found" at the cited page.

The district court found that the number of meetings and level of cooperation "*permit* an inference of illegality." SPA-67 (emphasis added). Immediately after that statement, however, the court specifically stated, "But inferences of legitimate activity are just as persuasive." *Id.* Not only do Plaintiffs ignore the actual finding, they ignore the facts in which the district court rooted its determination, such as "[t]he inclusion of other industries and outside counsel," that "the bulk of the discussion centered on publicly available information," and the absence of "evidence that the Issuing Banks engaged in joint drafting projects." SPA-67. Similarly, Plaintiffs claim error because the district court purportedly "omitted" certain facts about the In-House Counsel Group, such as the fact that one conference call password was "ARBITRATION." Pls.' Br. 63. Yet, even a cursory review of the district court's opinion reveals that far from omitting these facts, the district court acknowledged them, *see, e.g.*, SPA-28, but simply rejected the ultimate inference that the plaintiffs wanted to draw, SPA-69.

Third, in contrast to the district court's careful approach, Plaintiffs' argument is plagued by a reprise of the fundamental legal error discussed above. Plaintiffs heavily rely on *High Fructose*, accusing the district court here of falling into "the 'trap to be avoided'" purportedly identified by the Seventh Circuit when the court below concluded "'the evidence as a whole cannot' support an antitrust claim." Pls.' Br. 62 (quoting *High Fructose*, 295 F.3d at 655). But, again,

47

Plaintiffs' argument rests on a summary judgment principle—not one required in a verdict after trial. Indeed, Plaintiffs manipulate the portions of Judge Posner's critical sentence that draw out this distinction, which describes the "trap to be avoided in evaluating evidence of an antitrust conspiracy *for purposes of ruling on the defendants' motion for summary judgment* is to suppose that if no single item of evidence presented by the plaintiff points unequivocally to conspiracy, the evidence as a whole *cannot defeat summary judgment*." *High Fructose*, 295 F.3d at 655 (emphases added). In reversing the grant of summary judgment, the Seventh Circuit recognized that it was still possible that "defendants could convince a [fact-finder] that [their view of] the evidence is the correct one." *Id.* at 666.

Here, Defendants did just that. Contrary to Plaintiffs' assertion, the district court did not ignore the communications and meetings evidenced in the record. The district court acknowledged that "the extensive record of inter-firm communications among competitors would give any court pause," but it rejected Plaintiffs proposed interpretation of that record and concluded that it "cannot infer an illegal agreement *based on the evidence marshaled at trial*." SPA-81 (emphasis added). That finding of fact reflects all the evidence and does not place undue emphasis on any one component. It simply reflects the underlying weakness of Plaintiffs' case.

48

## II.   THE DISTRICT COURT'S FACTUAL FINDINGS THAT THERE WAS NO CONSPIRACY TO ADOPT OR MAINTAIN ARBITRATION CLAUSES IS WELL-SUPPORTED AND CORRECT.

The district court's factual findings that there was no conspiracy are well-grounded in the record developed over the course of this lengthy trial.  Participants from each Defendant involved in that Defendant's critical decision-making testified in court, including Kleinbaum, Nelson, and Freiberg from Citi Cards and Prince, Ross, and Heyrich from Citigroup.  Outside lawyers from Wilmer, such as Chris Lipsett, explained in detail what occurred at the various meetings, and their testimony was corroborated by the reams of exhibits admitted in evidence.  Moreover, other attendees at the various meetings testified about what did and did not occur at those meetings.  The court weighed all this evidence, made credibility determinations and resolved competing inferences in making the factual findings that defeated Plaintiffs' claims.

Plaintiffs only response is either to ignore this mass of evidence or to aver weakly that it should not have been credited by the district court.  Plaintiffs go so far as to claim that the testimonial denials by these dozens of witnesses that any illegal agreement was formed "suffer from a lack of credibility."  Pls.' Br. 83.  But this is precisely the area in which the trial court receives the most deference.  As with any finder of fact, when "reviewing the district court's decision after a bench trial on the merits, [this Court] give[s] special deference to the court's

determinations of witness credibility." *Hormel Foods Corp.* v. *Jim Henson Prods., Inc.*, 73 F.3d 497, 502 (2d Cir. 1996). Notwithstanding "the superiority of the trial judge's position to make determinations of credibility," *Anderson*, 470 U.S. at 574, Plaintiffs invite this Court to abandon that familiar standard and substitute its judgment for that of the district court.

In an effort to make this appellate factfinding seem remotely palatable, Plaintiffs resort to further distortions of caselaw. They claim that the Seventh Circuit in *Products Liability Insurance Agency, Inc.* v. *Crum & Forster Insurance Cos.*, 682 F.2d 660, 662 (7th Cir. 1982) (Posner, J.), held that "'conclusional denials of conspiracy' [are] entitled to little weight." Pls.' Br. 83. Plaintiffs' clipped quotation tests the bounds of fair advocacy. What the Seventh Circuit actually wrote was: "Conclusional denials of conspiracy *in affidavits obviously drafted by lawyers* are entitled to little weight *in deciding whether to grant an antitrust defendant's motion for summary judgment*." *Prods. Liab.,* 682 F.2d at 662 (emphases added). This context could hardly be more different. Witnesses at the heart of the decision-making process at Citi and the other Defendants did not submit conclusional paper denials. Rather, they testified in open court, before the finder of fact, subject to lengthy examination by Plaintiffs' attorneys, and offered detailed testimony about the meetings, the decisions to adopt arbitration clauses, and their motives for participating in both.

Ironically, given their own emphasis on the need for a holistic assessment of the evidence, much of Plaintiffs' challenges to the district court's ultimate findings consist of attempts to re-argue the significance of various factual bits and pieces. Not only does this simply ignore all the other evidence introduced at trial bearing on the issue of conspiracy—which by itself more than suffices to support a permissible inference by the trial court of no conspiracy—it ignores the contrary evidence even on the handful of matters raised by Plaintiffs.

First, the district court's principal conclusion was that Plaintiffs had failed to demonstrate by a preponderance of the evidence that the various meetings attended by the Issuing Banks were held for impermissible purposes. Instead, the district court found that the advocacy discussed and the "education on legal developments on arbitration and 'legislative updates' that were significant aspects" of the meetings, SPA-66, were akin to those typically engaged in by trade associations and protected by the *Noerr-Pennington* doctrine, SPA-82. Plaintiffs attempt to mitigate this finding by noting that there are some cases in which trade associations have exceeded their usual role and become a conduit for an illegal agreement. Pls.' Br. 76.

While that might be true on the facts of a different case, this case does not concern such a scenario—and there was ample proof that the discussions that occurred at these meetings were on entirely legitimate topics. *See*, *e.g.*, *supra* at

15–16 (discussing Lipsett's comprehensive explanations of the innocuous matters discussed at the meetings).  As the district court found, the meetings were generally gatherings of representatives of companies from a variety of industries whose "communications resembled those of trade associations or lobbying groups . . . [engaged in] legitimate activities protected under the *Noerr-Pennington* doctrine."  SPA-82.  And although Plaintiffs are correct that the fact that parties may engage in "otherwise permissible behavior is no impediment to finding agreement to conspire," Pls.' Br. 78, the court ultimately found that there was insufficient evidence that anything other than legitimate conduct had occurred, a finding that was fully supported by the detailed testimony from Lipsett concerning what actually occurred at these meetings.[16]  The district court found that to infer illegality from this innocuous conduct was simply "a bridge too far."  SPA-82.

Plaintiffs are asking this Court to cross that bridge and substitute its judgment for that of the district court.  In service of that argument, Plaintiffs mischaracterize the findings of the district court.  For example, Plaintiffs submit that "[t]he district court correctly held that 28 meetings over a four-year period is indicative of parallel conduct *and collusion*."  Pls.' Br. 70 n.28 (emphasis added).

---

[16] Plaintiffs assert that the "language used by the Arbitration Coalition is one of action." Pls.' Br. 67.  But this begs the question whether the contemplated action was legitimate advocacy and education or collusive adoption.  The district court found the former.  Given the plentiful testimony at trial by meeting participants on precisely this point, Plaintiffs do not even attempt to demonstrate that this finding lacked evidentiary support.  They simply disagree with it.

But the district court made no such finding. While it is true that the district court found that certain evidence "suggests parallel conduct," SPA-53, "and collusion" is Plaintiffs' own embellishment. Plaintiffs ignore the thirty pages of the district court's opinion that follow, and which resulted in the unambiguous finding that the Court did "not discern any concerted action." SPA 84. Instead, Plaintiffs ask this Court to conclude that even though the meetings involved permissible behavior, there *must* somehow also have been impermissible behavior because the bank issuers attending the meetings all eventually adopted or maintained arbitration clauses. That inference is one as "consistent with permissible competition as with illegal conspiracy," *Matsushita*, 475 U.S. at 588, and it is precisely the inference that the district court found that the plaintiffs had failed to prove by a preponderance of the evidence. At the end of the day, Plaintiffs' grievance is the same: they disagree with the district court's factual conclusion that this behavior was consistent with permissible competition and they want this Court to effectively retry this case by rejecting the district court's determination.

Second, while the evidence showed that Citi had nothing at all to do with the organization of the Arbitration Coalition meetings, *see* A2138—and also showed that the occasional Citi attendees at those meetings were merely passive listeners, *see* A4353—the district court found that it was in the self-interest of those issuers which did initially help organize the meetings (First USA and Amex) to do so.

53

Plaintiffs assert that it would make "no competitive sense" for any individual issuing bank that thought it worthwhile to adopt an arbitration clause to participate in "meetings with their competitors where this competitive advantage would be dissipated." Pls.' Br. 72. But this flies in the face of the district court's clear recognition that, "[u]nlike some other cost-saving measures, the benefit of arbitration—avoiding class action litigation—was not diminished if competitors were in on the secret." SPA-83. And, tellingly, Plaintiffs' naked assertion is again unsupported by any attempt to show that the district court's contrary judgment had no support in the evidence. Plaintiffs also neglect the broader legal context in which the meetings they view as so nefarious occurred. Lawyers from a wide variety of industries, not just the issuing banks, together with outside counsel, "[p]erceiv[ed] that class action attorneys would lobby and litigate to undermine the enforceability of arbitration clauses." SPA-63. It was in the self-interest of all parties interested in the vitality of arbitration agreements to "networ[k] to thwart the plaintiffs' bar," *id.*, and to "sta[y] abreast of the evolving legal and regulatory landscape," SPA-72.

Moreover, the continuing viability of independently adopted arbitration clauses depended in part on legal precedent and statutory or regulatory language that would affect all parties. If one consumer company took a foolhardy approach to litigation or lobbying, it would have negative consequences for the entire

54

industry.  The district court credited Lipsett's testimony on this point, noting that there was great concern about ensuring that cases about these cardholder agreements are "well-litigated from the point of view of the side who wants the arbitration enforced."  SPA-83.  The record amply supports the district court's conclusion that "[e]ven absent a conspiracy to adopt and maintain arbitration clauses, the Issuing Banks would still be motivated to cooperate on efforts to sway public opinion and defend the legality of their clauses in the courts and legislatures."  SPA-63.  And this sort of mutually beneficial conduct is precisely what this Court recognized in *Apex Oil* as "mere interdependent behavior, *i.e.*, actions taken by market actors who are aware of and anticipate similar actions taken by competitors, but which fall short of a tacit agreement."  822 F.2d at 254.

Third, as discussed throughout, Plaintiffs simply cannot overcome the district court's conclusion that "the record indicates that the final decision to adopt class-action-barring arbitration clauses was something the Issuing Banks hashed out individually and internally."  SPA-83; *see also* SPA-49 ("Plaintiff[s] have not carried their burden to show that the adoption and maintenance of class-action-barring arbitration clauses was the product of collusion."[17]).  Citi sent a hodgepodge of attorneys to a number of different meetings over the course of

---

[17] Although Plaintiffs insinuate that the district court "perplexing[ly]" failed to address the possibility of a conspiracy to maintain arbitration clauses, Pls.' Br. 79, the district court explicitly found in the sentence quoted in text above that Plaintiffs had failed to carry their burden as to either conspiracy.  *Accord* SPA-81.

several years (several having nothing to do with the cards business, such as Harry Silverwood, *see, e.g.* A1507). But the district court rightly rejected—with plentiful evidentiary support—the claim that Citi Cards' decision to adopt an arbitration clause was a product of some mutual adoption conspiracy hatched at these meetings as opposed to its own separate decision-making.

On the contrary, Nelson's memo of September 12, 2000 laid out the benefits that Citi Cards could independently accrue through the implementation of an arbitration clause, especially cost savings and avoiding meritless class actions. A3544. Citi Cards and Citigroup lawyers and executives, as detailed above, had drawn and continued to draw similar conclusions. The record—either in testimony or in the memos of Nelson and Heyrich themselves—contains no evidence that the meetings played any role in Citi's purely internal recommendations and decision-making. But the record *does* indicate that Nelson, who had first recommended to her superiors that Citi Cards consider adopting arbitration clauses as early as November 1998, had good reason for an even more enthusiastic recommendation in September 2000 that arbitration be adopted. Specifically, she received a directive from Citigroup's Chief Legal Officer and General Counsel himself (Charles Prince) that arbitration clauses be adopted across Citigroup's business lines absent countervailing business considerations. SPA-30. There is no evidence that anyone in the Citigroup General Counsel's office whose work led to the

directive was even aware of the Arbitration Coalition meetings, much less motivated by an agreement reached at them. And rather than there being countervailing business considerations, the Citi Cards CEO who approved the adoption found it to be an obviously good decision from a business standpoint. *See* A2024–25. The district court's factual finding on this chronology could not be clearer: "After learning of the Heyrich memo, Kleinbaum recommended to Steve Freiberg (CEO of Citi Cards) that Citi Cards adopt a class-action-barring arbitration clause in September or October of 2000. Freiberg accepted Kleinbaum's recommendation and Citi Cards implemented adoption of such a clause." SPA-30 (record citations omitted).

Plaintiffs dispute the district court's factual finding, arguing that there is a "strong, reasonable inference the Banks' CBA Clause decisions were not made independently." Pls.' Br. 78; *but cf. In re Baby Food Antitrust Litig.*, 166 F.3d 112, 122 (3d Cir. 1999) (a "necessary conditio[n] for the conspiracy inference" is that the plaintiff "show that the allegedly wrongful conduct of [the defendants] was conscious and *not the result of independent business decisions*" (emphasis added)). But Plaintiffs do not attempt to and cannot show, as they "must," "that the evidence permitted no other inferences" than the one they seek to draw. *Freedom Holdings*, 624 F.3d at 54-55.

Indeed, the only basis they offer for overturning the district court's finding as it applies to Citi is that "Freiberg, CEO of Citi's Cards [sic], authorized a CBA Clause based on the recommendation of [Citi Cards'] General Counsel Kleinbaum at a single meeting."  Pls.' Br. 79.  Even if this characterization were an accurate summary of all that led to Citi Cards' decision to adopt arbitration, it would not demonstrate that the inference the court drew was impermissible.  Moreover, Plaintiffs' gross oversimplification ignores the ample evidence—including testimony from Kleinbaum and Freiberg—that they were motivated not by any horizontal agreement with competitors, but rather by an internal analysis that arbitration was in the best interests of Citigroup.  A2019-22 (Freiberg); A2344; A2352 (Kleinbaum).  Their assessment was shared by those at the top of Citigroup itself, and was conveyed in instructions from individuals with no connection whatsoever to any agreement with competitors.  The decision made was in Citi's independent self-interest, not the collusive collective interest of the Issuing Banks, and the district court committed no clear error in refusing to infer otherwise.

## CONCLUSION

For these reasons, the district court's decision granting judgment for the Citi

Defendants should be affirmed.

November 21, 2014                                  Respectfully submitted,

                                                  /s/ David F. Graham

                                                  David F. Graham
                                                  T. Robert Scarborough
                                                  Patrick E. Croke
                                                  SIDLEY AUSTIN LLP
                                                  One South Dearborn
                                                  Chicago, IL 60603
                                                  (312) 853-7000
                                                  dgraham@sidley.com

                                                  Eamon P. Joyce
                                                  David W. Denton, Jr.
                                                  SIDLEY AUSTIN LLP
                                                  787 Seventh Avenue
                                                  New York, NY 10019
                                                  (212) 839-5300

                                                  *Attorneys for Defendants-Appellees*
                                                  *Citigroup Inc., Citibank, N.A. (as*
                                                  *successor-in-interest to Citibank*
                                                  *(South Dakota), N.A., for itself and as*
                                                  *successor-in-interest to Citibank*
                                                  *U.S.A., N.A., Universal Bank, N.A.,*
                                                  *and Universal Financial Corp.), and*
                                                  *Citicorp Diners Club Inc.*

**CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE PROCEDURE 32(a)**

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,983 words (as determined by the Microsoft Word 2007 word-processing program used to prepare this brief), excluding those parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using the Microsoft Word 2007 word-processing program in 14-point Times New Roman font.

/s/     David F. Graham

*Attorney for Defendants-Appellees Citigroup Inc., Citibank, N.A. (as successor-in-interest to Citibank (South Dakota), N.A., for itself and as successor-in-interest to Citibank U.S.A., N.A., Universal Bank, N.A., and Universal Financial Corp.), and Citicorp Diners Club Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of November 2014, I electronically

filed and served the foregoing brief using the CM/ECF System.

/s/      David F. Graham

*Attorney for Defendants-Appellees Citigroup Inc., Citibank, N.A. (as successor-in-interest to Citibank (South Dakota), N.A., for itself and as successor-in-interest to Citibank U.S.A., N.A., Universal Bank, N.A., and Universal Financial Corp.), and Citicorp Diners Club Inc.*