# 14-1610-cv(L)

14-1616-cv(con)

IN THE

## United States Court of Appeals

FOR THE SECOND CIRCUIT

---

ROBERT ROSS, ON BEHALF OF HIMSELF AND ALL OTHERS SIMILARLY SITUATED,
ANDREA KUNE, WOODROW CLARK, S. BYRON BALBACH, JR., MATTHEW GRABELL,
PAUL IMPELLEZZERI, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY
SITUATED, RICHARD MANDELL, RANDAL WACHSMUTH,

*Plaintiffs-Appellants*,

[caption continued on inside front cover]

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
CASE NOS. 05-CV-7116(WHP) & 04-CV-5723(WHP)

## BRIEF FOR DEFENDANTS-APPELLEES AMERICAN EXPRESS COMPANY, AMERICAN EXPRESS TRAVEL RELATED SERVICES COMPANY, INC. AND AMERICAN EXPRESS CENTURION BANK

EVAN R. CHESLER
ROWAN D. WILSON
GARY A. BORNSTEIN
CRAVATH, SWAINE & MOORE LLP
825 Eighth Avenue
New York, NY 10019
(212) 474-1000
*Attorneys for Defendants-Appellees*
*American Express Company, American*
*Express Travel Related Services*
*Company, Inc. and American Express*
*Centurion Bank*

November 21, 2014

[caption continued from front cover]

HERVE SENEQUIER,

*Plaintiff,*

v.

CITIGROUP, INC., CITIBANK (SOUTH DAKOTA), N.A., CITICORP DINERS CLUB, CITIBANK USA, N.A., UNIVERSAL BANK, N.A., UNIVERSAL FINANCIAL CORPORATION, DISCOVER FINANCIAL SERVICES, INCORPORATED, DISCOVER BANK, AMERICAN EXPRESS CENTURION BANK, AMERICAN EXPRESS COMPANY, AMERICAN EXPRESS TRAVEL RELATED SERVICES COMPANY, INC., DB SERVICING CORPORATION,

*Defendants-Appellees*,

BANK OF AMERICA N.A. (USA), CAPITAL ONE, J.P. MORGAN CHASE & CO., CHASE BANK USA, N.A., HSBC FINANCE CORPORATION, PROVIDIAN FINANCIAL CORPORATION, PROVIDIAN NATIONAL BANK, INCORPORATED, HSBC BANK, NEVADA, N.A., CHASE BANK USA, N.A., CAPITAL ONE BANK (USA), N.A., FKA CAPITAL ONE BANK, CAPITAL ONE, N.A., FKA CAPITAL ONE, F.S.B., BANK OF AMERICA, N.A., NATIONAL ARBITRATION FORUM, NATIONAL ARBITRATION FORUM, CAPITAL ONE F.S.B., NOVUS CREDIT SERVICES, INC., MBNA AMERICA BANK, N.A., MBNA AMERICA (DELAWARE), N.A., DFS SERVICES, LLC,

*Defendants.*

# RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned counsel for Defendants-Appellees American Express Company, American Express Travel Related Services Company, Inc. and American Express Centurion Bank certifies the following:  American Express Company is the parent company of American Express Travel Related Services Company, Inc. and American Express Centurion Bank, and American Express Company is a publicly held company.  Berkshire Hathaway, Inc., a publicly held corporation, owns more than 10% of the outstanding shares of American Express Company.

November 21, 2014

s/ Evan R. Chesler
_____
Evan R. Chesler

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ....................................................................1

SUMMARY OF THE ISSUES FOR REVIEW ...................................................2

STATEMENT OF THE CASE...........................................................................3

    A.   Plaintiffs Are Not Current or Prospective Amex Cardmembers and Are Unaffected by Amex's Arbitration Provision............................4

    B.   The District Court Found That There Was No Conspiracy Among the Issuers. .........................................................................5

        1.   Plaintiffs Concede That Amex Adopted an Arbitration Provision Independently and Before Any Alleged Conspiracy. ..............................................................6

        2.   The Challenged Meetings Were Organized by the Wilmer Law Firm as a Business Development Exercise After Many Issuers Already Had Arbitration Clauses In Effect. ........................8

        3.   The Meetings Were an Opportunity to Learn About Important Legal Issues and Engage in Legal Advocacy. ..............13

SUMMARY OF THE ARGUMENT ..................................................................18

ARGUMENT ....................................................................................................21

I.    PLAINTIFFS LACK ARTICLE III STANDING TO SUE AMEX.............21

    A.   Plaintiffs Must Show That They Face an Imminent Injury That Can Be Redressed by the Relief They Seek. .........................................21

    B.   The Evidence At Trial Proved That Plaintiffs Lack Standing...............22

    C.   The District Court Misapplied This Court's Decision in *Ross v. Bank of America*. ..........................................................25

II.   IF THIS COURT REACHES THE MERITS, THE DISTRICT COURT'S JUDGMENT IN FAVOR OF AMEX SHOULD BE AFFIRMED. ....................................................................................30

    A.   The District Court Applied the Correct Legal Standard to Plaintiffs' Claim..............................................................................30

1.    The District Court Entered Judgment After a Bench Trial, Not Summary Judgment, So It Was Not Required to Draw Factual Inferences in Plaintiffs' Favor ........................................... 30

2.    The District Court Correctly Required Plaintiffs To Establish a Combination or Conspiracy by a Preponderance of the Evidence ................................................................... 32

3.    The District Court Did Not Err By Searching for Evidence That "Tends To Exclude" the Possibility That the Banks Acted Independently. ................................................... 34

4.    The District Court Correctly Recognized That Its Duty Was To Weigh the Evidence in Totality, and It Did So. ...................... 36

B.   This Court Should Review the District Court's Finding That No Conspiracy Occurred for Clear Error. .................................. 37

C.   The District Court's Finding That Amex Did Not Engage in a Conspiracy Is Supported by the Evidence and Not Clearly Erroneous. ............................................................... 40

1.    Amex Independently Adopted Its Arbitration Clause Before Any Conspiracy Allegedly Began, and It Had a Unilateral Economic Incentive To Do So. ................................................... 41

2.    The Other Banks Also Had A Unilateral Economic Motive To Adopt Arbitration Provisions and Did So Independently Over Several Years. .............................................. 42

3.    The Multi-Industry Meetings Concerned Nothing More Than Legal Education and Advocacy. .......................... 45

III.  ALTERNATIVELY, THE JUDGMENT MAY BE AFFIRMED BECAUSE PLAINTIFFS FAILED TO PROVE ANTITRUST INJURY. ................................................................ 51

A.   Plaintiffs Were Required To Prove Antitrust Injury at Trial ............... 51

B.   Plaintiffs Failed To Prove Antitrust Injury .......................... 52

IV.  THE JUDGMENT MAY BE AFFIRMED ON THE ALTERNATIVE GROUND THAT PLAINTIFFS FAILED TO SATISFY THE TRADITIONAL REQUIREMENTS FOR EQUITABLE RELIEF AGAINST AMEX. ...................................................... 57

ii

CONCLUSION ............................................................................. 60

COMPLIANCE STATEMENT ...................................................... 61

CERTIFICATE OF SERVICE ....................................................... 62

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. Wright*, 468 U.S. 737 (1984) ....................................................27

*Anderson News LLC v. Am. Media, Inc.*, 680 F.3d 162 (2d Cir. 2012)..................33

*Anderson v. Bessemer City, N.C.*, 470 U.S. 564 (1985) .............................38, 40, 49

*Assoc. Gen. Contractors, Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983)..................................................................................51

*AT&T Mobility LLC v. Concepcion*, 131 S.Ct. 1740 (2011) ...................................59

*Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328 (1990) ......................52

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)......................................................44

*Bruh v. Bessemer Venture Partners III L.P.*, 464 F.3d 202 (2d Cir. 2006)............19

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977)...............52, 54

*Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508 (1972) ...................47

*California v. Am. Stores Co.*, 495 U.S. 271 (1990) ...................................................22

*Canady v. Providence Hosp.*, 132 F.3d 1480 (D.C. Cir. 1997)...............................40

*Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104 (1986)...........................51, 52

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) ............................................22, 27

*Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138 (2013) ................................1, 22, 25

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332 (2006)............................................23

*Diesel Props S.r.l. v. Grey Stone Bus. Credit II LLC*, 631 F.3d 42 (2d Cir. 2011) ..........................................................................................................31

*Dunn v. Phoenix Newspapers, Inc.*, 735 F.2d 1184 (9th Cir. 1984)........................40

*E.R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961) ................................................................................47

*eBay v. MercExchange, LLC*, 547 U.S. 388 (2006) ....................................57, 58, 59

*Freedom Holdings Inc. v. Cuomo*, 624 F.3d 38 (2d Cir. 2010) .......................passim

*Frey & Son v. Cudahy Packing Co.*, 256 U.S. 208 (1921) .....................................38

*Funeral Consumers Alliance, Inc. v. Serv. Corp. Int'l*, 695 F.3d 330 (5th Cir. 2012) ...............................................................24

*Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485 (2d Cir. 2004) ......32

*H. A. Artists & Associates, Inc. v. Actors' Equity Ass'n*, 451 U.S. 704 (1981) ...............................................................38, 40

*In re Elevator Antitrust Litig.*, 502 F.3d 47 (2d Cir. 2007) ....................................44

*In re LIBOR-Based Fin. Instruments Antitr. Litig.*, 935 F. Supp. 2d 666 (S.D.N.Y. 2013) ....................................................................54

*In re New Jersey Title Ins. Litig.*, 683 F.3d 451 (3d Cir. 2012) .............................24

*In re New Motor Vehicles Canadian Export Antitr. Litig.*, 522 F.3d 6 (1st Cir. 2008) ......................................................................passim

*In re Publication Paper Antitr. Litig.*, 690 F.3d 51 (2d Cir. 2012) .................passim

*Krieger v. Gold Bond Building Prods.*, 863 F.2d 1091 (2d Cir. 1988) ...................49

*Lewis v. Casey*, 518 U.S. 343 (1996) .....................................................................21

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ......................................passim

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) .............34

*Monsanto Co. v. Spray-Rite Services Corp.*, 465 U.S. 752 (1984) ...................31, 38

*O'Shea v. Littleton*, 414 U.S. 488 (1974) ...............................................................29

*Paycom Billing Servs., Inc. v. MasterCard Int'l, Inc.*, 467 F.3d 283 (2d Cir. 2006) ....................................................................52, 53, 56

*Ross v. American Express*, 547 F.3d 137 (2d Cir. 2008) ........................................22

*Ross v. Bank of America*, 524 F.3d 217 (2d Cir. 2008) ..............................25, 26, 28

*Salinger v. Colting*, 607 F.3d 68 (2d Cir. 2010) .......................................57

*Shain v. Ellison*, 356 F.3d 211 (2d Cir. 2004) .......................................21

*Starr v. Sony BMG Entertainment*, 592 F.3d 314 (2d Cir. 2010) ......................38, 39

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998) ....................................1

*United Mine Workers v. Pennington*, 381 U.S. 657 (1965)....................................48

*United States v. General Motors Corp.*, 384 U.S. 127 (1966) ..........................38, 39

*United States v. Oregon State Med. Soc.*, 343 U.S. 326 (1952) ............................38

*Warth v. Seldin*, 422 U.S. 490 (1975)......................................................27

**Statutes & Rules**

9 U.S.C. § 2.......................................................................................59

15 U.S.C. § 26.........................................................................1, 22, 57

28 U.S.C. § 1291.................................................................................1

28 U.S.C. § 1331.................................................................................1

28 U.S.C. § 1337.................................................................................1

F.R.C.P. 52(a)(6)..........................................................................37, 40

# JURISDICTIONAL STATEMENT

The district court exercised jurisdiction pursuant to 15 U.S.C. § 26 and 28 U.S.C. §§ 1331 and 1337. However, as explained below, the district court lacked Article III jurisdiction over Plaintiffs-Appellants' ("Plaintiffs") claim for injunctive relief against American Express Company, American Express Travel Related Services Company, Inc., and American Express Centurion Bank (collectively, "Amex"). Plaintiffs failed to show they face a "certainly impending" injury that is "redressable" by the injunction they seek against Amex, and they therefore lack standing. *See, e.g., Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013). This Court has jurisdiction on appeal to review the district court's conclusion to the contrary. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 95 (1998).

Were this Court to find that Plaintiffs do have Article III standing, it would have jurisdiction to review the judgment pursuant to 28 U.S.C. § 1291.

## SUMMARY OF THE ISSUES FOR REVIEW

1.        Should the judgment be affirmed on the jurisdictional ground that Plaintiffs lack Article III standing, because they are not current or prospective Amex cardmembers and therefore do not face a certainly impending injury redressable by the relief they seek, *i.e.*, an order enjoining the use of arbitration provisions in agreements to which they are not and will never be parties?

2.        Did the district court apply the correct legal standard when it determined that a conspiracy prohibited by Section 1 of the Sherman Act may be tacit or express, may or may not constitute a formal agreement, and may be proven by direct or circumstantial evidence, and that such evidence is to be evaluated in its totality?

3.        Were the district court's findings, made after a five-week bench trial at which over 40 witnesses testified and 440 exhibits were admitted, that there was no agreement among credit card issuers to adopt and maintain arbitration provisions and that Plaintiffs failed to prove antitrust injury supported by the evidence and not clearly erroneous?

4.        Should the judgment be affirmed on the alternative ground that Plaintiffs failed to show an irreparable injury or to meet the other traditional requirements to obtain equitable relief?

## STATEMENT OF THE CASE

This is a consolidated appeal from judgments rendered for the Defendants after a five-week bench trial, in which Plaintiffs argued that the law firm then known as Wilmer Cutler & Pickering LLP ("Wilmer") helped originate and facilitate a conspiracy among lawyers for several credit card issuers ("Issuers") to adopt and maintain arbitration clauses in agreements with their cardmembers.[1] (Plaintiffs' Br. ("Br.") 82-83.)  Plaintiffs contended that a series of legal education and advocacy meetings—held over a four-and-a-half year period, initiated by Wilmer as a business development exercise and attended by in-house and outside counsel for the Issuers, as well as firms outside the credit card industry, who are not alleged to be co-conspirators—were the vehicle for this highly improbable cartel.  (Br. 57.)

Plaintiffs conceded that Amex had adopted its clause before the beginning of the alleged conspiracy.  (Br. 15.)  And Plaintiffs' own expert admitted that consumers did not care about arbitration clauses when choosing among cards, meaning issuers could adopt arbitration clauses unilaterally without losing

---

[1] Two class actions were brought in the U.S. District Court for the Southern District of New York by certified classes of *non*-Amex cardmembers seeking to enjoin Amex and other Issuers from including and enforcing the arbitration provisions in agreements with their cardmembers:  *Ross, et ano. v. American Express Company, et al.* and *Ross, et al. v. Bank of America, et al.*  (SPA2-3.)  Although the two actions had not been formally consolidated, they were jointly tried in January and February 2013.  (SPA1.)

customers.  (SPA38.)  Plaintiffs argue that the Issuers nevertheless conspired (under Wilmer's supervision) out of concern that arbitration clauses might become a basis for competition at some unknown point in the future.  (Br. 47-48.)

A.    **Plaintiffs Are Not Current or Prospective Amex Cardmembers and Are Unaffected by Amex's Arbitration Provision.**

Although the district court correctly disposed of the claims against Amex on the merits, it should have done so for lack of jurisdiction because Plaintiffs do not have Article III standing to sue Amex.  The relevant facts are simple and undisputed:  Plaintiffs are not Amex cardmembers, but only customers of Visa, MasterCard and Diners Club issuers.  (SPA44.)  There is no evidence that any Plaintiff intends to obtain an Amex card at any time in the future.  To the contrary, the only testifying Plaintiff averred that, for reasons unrelated to arbitration, he had not had an Amex card in decades and "would never do business with Amex again".  (SPA44.)  Plaintiffs' own expert also admitted at trial that Amex's arbitration provisions could have no direct effects upon persons, like them, who neither have nor wish to get Amex cards.  (A2203, at 3171:11-25.)  Yet Plaintiffs seek an injunction prohibiting Amex from using or enforcing arbitration provisions in agreements with *its* cardmembers, who are not before the Court.  (A553.)

Article III of the Constitution requires that Plaintiffs prove they face a certainly impending injury that will be redressed by the injunction.  By grounding

4

Plaintiffs' standing upon an abstract harm "to the market" and by deeming irrelevant the trial evidence showing that an injunction against Amex's arbitration provision would not redress any harm to Plaintiffs, the district court did not correctly resolve the standing issue. (SPA44; SPA47-48.) Its decision is contrary to decades of Supreme Court precedent requiring Plaintiffs to prove that prospective relief is necessary to redress a concrete injury that *personally* threatens them. *E.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 n.1 (1992). Because Plaintiffs lack Article III standing, this Court should affirm the judgment below.

**B. The District Court Found That There Was No Conspiracy Among the Issuers.**

On the merits, the district court correctly found that there was no conspiracy among the issuers. Plaintiffs primarily assert that this Court should discard the district court's findings of fact and conduct a *de novo* review of the trial record. (Br. 52.) In Plaintiffs' view, the trial judge *could have* drawn a "reasonable inference" that conspiracy was more likely than not, and because such an inference was reasonable, they contend the court was *required* to draw that inference in their favor. (Br. 3.) However, Plaintiffs do not argue that the district court's finding of no conspiracy was clearly erroneous or unsupported by the evidence.

After identifying and articulating the legal standards governing Plaintiffs' claim, the district court evaluated the evidence as a whole and found: "the Plaintiffs ha[d] not sustained their burden" of proving a conspiracy (SPA2); the meetings concerned "entirely legitimate topics" (SPA79); and the "decision to adopt class-action-barring arbitration clauses was something the Issuing Banks hashed out individually and internally" (SPA83). The court also found Plaintiffs had not proven antitrust injury. (SPA49.)

The district court based its findings upon the extensive trial record, including meeting agendas, invitations, summaries circulated among the attendees, handwritten notes taken at the meetings, emails and internal memoranda. (SPA79; SPA6-7.) It also made express credibility determinations of the witnesses who attended meetings or participated in each Issuer's separate process of adopting an arbitration clause. (SPA80-81.) The court applied the correct legal standards to Plaintiffs' antitrust claim, and its finding that there was no conspiracy was far from clearly erroneous. If this Court does reach the merits, it should affirm.

1. **Plaintiffs Concede That Amex Adopted an Arbitration Provision Independently and Before Any Alleged Conspiracy.**

As the district court found and as Plaintiffs concede, Amex decided to adopt its arbitration clause independently, well before any of the allegedly conspiratorial meetings began. (SPA5-6; Br. 13.)

In the late 1990s and early 2000s, the use of arbitration as a dispute resolution mechanism gained the attention and interest of companies across a broad array of industries, including the consumer financial services industry.  (SPA5.) Arbitration provisions became increasingly common features of consumer contracts and a growing subject of litigation.  The use and enforceability of consumer arbitration therefore became a "hot topic" at bar association meetings, legal education seminars, and in legal publications (SPA5), and the in-house legal teams at consumer-oriented companies monitored arbitration-related legal developments closely.

In the spring of 1998, Timothy Heine, Managing Counsel at Amex, began developing a proposal to include an arbitration provision in Amex's cardmember agreements.  (SPA5.)  Heine first learned about arbitration provisions at American Bar Association or PLI conferences and through professional reading. (A2229-30, at 3275:2-3277:16.)

In mid-1998, Heine assembled a team of Amex in-house counsel to study the issue further and make a formal recommendation to senior management. (SPA5.)  Heine and his team concluded that arbitration could provide a more efficient, cost-effective way to resolve cardmember disputes, and that it would mitigate the risk and cost associated with class-action litigation.  (SPA5; A2230, at 3278:11-24.)  By July 31, 1998, Heine had drafted an initial proposed arbitration

7

provision for use in the Amex cardmember agreement. (A2230-31, at 3279:25-3281:9; A4853.)

In November 1998, Heine made a presentation to Alfred Kelly, then President of Amex's Consumer Card Services Group, in which Heine recommended that Amex adopt an arbitration provision. (SPA5.) Kelly made the final decision to adopt the provision in late 1998 or early 1999, and testified at trial that he considered it an "easy call". (SPA5; A2061, at 2604:6-12.) Arbitration clauses were not a term on which issuers competed (SPA38), and he did not consider competitors' practices to be significant to his decision (A2062, at 2608:5-21). Amex did not expect—or experience—a loss of customers as a result of its adoption of arbitration. (A2061, at 2605:9-13; A2062, at 2608:10-21; A2061-62, at 2606:22-2608:5; A2237, at 3306:25-3307:3.)

In April 1999, Amex notified its cardmembers that the arbitration provision would become effective upon their next use of the card, and in any event no later than June 1999. (SPA5-6; A2910-11.) Amex's decision was therefore made and implemented independently and before the allegedly conspiratorial meetings began at the end of May 1999.

> ### 2. The Challenged Meetings Were Organized by the Wilmer Law Firm as a Business Development Exercise After Many Issuers Already Had Arbitration Clauses In Effect.

In total, Plaintiffs charge eleven Issuers with conspiring to adopt and

8

maintain class-waiving arbitration provisions: Amex, Bank of America, Capital One, Chase, Citibank, Discover, FirstUSA/Bank One, Household, MBNA, Providian and Wells Fargo. (A281, at ¶ 3; A146, at ¶¶ 1-2.) Two of these (Wells Fargo and Bank of America) adopted arbitration clauses without an explicit class waiver in the early and mid-1990s, long before the meetings began. (A2452, at 4159:7-11; A1807, at 1591:2-17; A4211, at ¶ 4.) Two others (FirstUSA and Amex) had already independently adopted arbitration provisions with class action waivers by April 1999. (SPA8; A4139; A2910-11.) Plaintiffs' assertion that "all the Banks adopted" arbitration "[d]uring the course of the meetings" (Br. 73; *see also id*. at 32) is incorrect.

In May of 1999, a month after Amex implemented its arbitration provision, Ron Greene and Chris Lipsett—then two partners at Wilmer—organized a business development meeting concerning legal issues pertinent to credit card issuers. Lipsett and Greene were under "a lot of pressure from the firm to enlarge the[ir] practice" (A2116, at 2824:25-2825:7; SPA6), and they conceived the May 25 meeting as a way to get "face time with a smaller group" to show that they were on the "leading-edge" of certain issues (A2119, at 2836:9-13). According to Lipsett, the "whole point was to try and have a meeting at which we could in substance show our stuff, and we were inviting people who were not clients" in an effort to develop new business. (A2117, at 2827:15-17.)

Wilmer hoped to enhance the meeting's credibility by listing several of its clients, including Sears, Amex, Citi and FirstUSA, as sponsors. (SPA6.) Aside from a handful of the Issuers, meeting attendees included other companies such as General Electric, Nordstrom and Sears, who Plaintiffs do not allege participated in any conspiracy. (A567.) The district court found that the meeting was "a business development initiative on behalf of WilmerHale". (SPA65.)

Wilmer considered the meeting "pretty successful" in the sense that Wilmer was "trying to strut a little bit" and they thought they "had done that effectively". (A2124, at 2854:22-24.) Afterwards, Lipsett and Greene "want[ed] to have another opportunity like [the May 25 meeting], to be in front of clients to try and use that for our business development purposes". (A2124, at 2855:1-4.) They selected arbitration as a topic for a series of business development meetings because they thought it was a rapidly developing area, in which Wilmer had a competitive advantage. (A2124, at 2856:20-2857:10.) Their idea also grew out of discussions with Duncan MacDonald, a friend of Lipsett and a consultant to FirstUSA. (A2124, at 2855:5-2856:3; A1680, at 1086:19-21.) Lipsett asked a lawyer from the Ballard Spahr firm, Alan Kaplinsky—whom he had "known . . . since the early '90s"—to be involved, because Kaplinsky "had already staked out a public position as knowing a lot about" arbitration through his authorship of several relevant articles. (A2124-25, at 2857:19- 2858:19.)

10

Together, the Wilmer partners, along with MacDonald and Kaplinsky, recruited in-house counsel from various industries to participate in a series of meetings beginning in July 1999. (SPA9.) As with the May 25, 1999 meeting, participation in these "Arbitration Coalition" meetings was not limited to the Issuers. Frequent attendees included car companies, such as Toyota, Ford and Chrysler; public relations firms, such as Burson Marsteller and the Wexler Group; trade organizations, such as the U.S. Chamber of Commerce; and other law firms, such as Pepper Hamilton LLP and Bradley Arant Boult Cummings LLP. (SPA10; A568-80.) And although the district court found that Heine participated in organizing the first of the meetings (SPA8), Wilmer—not Amex—was recognized by the attendees as the primary force behind the meetings (*see* A2239, at 3314:5-7; A2241, at 3321:15-23; A1454, at 189:16-22; A1620, at 851:14-17; A1842, at 1734:19-21; A1850, at 1766:23-24).

In September 2000, MacDonald emailed Lipsett, Kaplinsky and Wilmer partner Eric Mogilnicki with an idea for "a separate meeting that would be devoted to new ways to deal with class actions". (A2882.) MacDonald wrote that "[i]deally, the participants will include people we haven't seen before—the senior in-house litigation management lawyers and some of their leading outside class action defenders (e.g., your counterparts in other great law firms)". (A2882.) Lipsett agreed and helped MacDonald organize two "Class Action Working Group

11

Meetings" because of the "business development possibilities".  (A2137, at 2908:22-2909:6.)

       The Class Action Working Group meetings were attended by representatives from a broad variety of industries and organizations including, for example, law firms such as Morrison & Foerster, O'Melveny & Myers, and Skadden Arps; academics such as George Priest of Yale; trade organizations such as the American Bankers' Association, National Retail Federation and the U.S. Chamber of Commerce; automotive companies such as Chrysler and Ford; and other assorted companies, including Federal Express, General Electric and Monsanto.  (A573; A575.)  The district court found that these meetings were "[c]onceived by MacDonald" with only "limited support from Coalition members" and that they "accomplished little".  (SPA68.)

       After the second and final meeting of the Class Action Working Group, several in-house lawyers initiated a handful of conference calls focused narrowly on more "practical" issues of concern to in-house attorneys.  (SPA27-28.) The group was concerned that the Class Action Working Group meetings were "more academic and theoretical"; that "for in-house counsel in financial services companies, issues relating to non-financial issues are not as relevant" and that "outside counsel, for all their worth, do not see the same internal issues that in-house counsel face".  (A4428.)  They established a series of conference call

12

discussions concerning issues such as "cost control", "outside counsel management", "the rise in intellectual property claims" and "tracking legislation that impacts our industry". (A4428.) Participation in these calls was sporadic from the outset (A1939, at 2118:20-24; A3192; A3278-79), and they "effectively fizzled" within a few months (SPA 69; A1953, at 2172:3-2173:16).

The timeline of these meetings does not mesh with the Issuers' adoption of arbitration clauses. By the time the first "Arbitration Coalition" meetings began, five Issuers (Amex, Bank of America, Wells Fargo, FirstUSA and Discover) had already adopted some form of arbitration provision. (*See* SPA5, 8, 11; A4211, at ¶ 4; A2687-88.) The last Issuer to adopt an arbitration clause, Chase, notified its cardmembers of the change in March 2002, nearly four and a half years after FirstUSA first adopted a clause with an explicit class waiver. (A567-78.) The arbitration meetings then continued for another year and a half, as issues concerning the enforceability of consumer arbitration continued to make their way through the courts and legislatures. (A578-80.)

### 3. The Meetings Were an Opportunity to Learn About Important Legal Issues and Engage in Legal Advocacy.

The written and testimonial record documenting the attendees and discussions at the meetings demonstrates that the meetings concerned legitimate topics related to advocacy and legal developments. Contemporaneous documentation includes meeting invitations, attendance lists, agendas, handouts,

calendar entries, post-meeting summaries and handwritten notes. As the district court noted:

> There is a general pattern of attendance lists and agendas for the Arbitration Coalition meetings as well as WilmerHale's summaries of the discussions. The handwritten notes are consistent with one another and WilmerHale's summaries. (Compare [A2691], with [A3347]; compare [A3967], with [A3637], and [A3420].) These notes reflect that permissible topics such as litigation developments and advocacy efforts were primary topics of discussion.

(SPA79.) The court found that meeting attendees such as "Tasheff (Citi), Barry (Capital One), and Heine (Amex) testified credibly and openly regarding those portions of meetings they recalled. Many more witnesses testified fulsomely about their involvement with the groups and their recollections of the meetings." (SPA80-81.) "Overall," the court found, "the record presented at trial is quite robust considering [that] the meetings . . . took place ten to fifteen years ago". (SPA81.)

Witnesses consistently testified at trial that they attended the meetings to keep abreast of fast-moving legal developments concerning arbitration. (A2240, at 3318:4-21; A2304, at 3570:11-13; A1665, at 1027:17-22; A2032, at 2487:15-2488:13; A1597, at 759:20-24; A1874, at 1861:1-7; A1853, at 1775:24-1776:13.) Contemporaneous agendas demonstrate that the meetings typically began with a reminder delivered by outside counsel that "this is a meeting of people who represent competitors and there should be no discussion at or around the meeting about confidential business information, there should be no discussion of pricing

14

type issues or the like, and that there should be no discussion of any kind about agreeing on business terms". (A2120, at 2839:20-2840:2; A2563.) This was typically followed by presentations on (i) recent litigation developments, including discussions of *amicus* opportunities, and (ii) recent legislative developments. (*See, e.g.*, A2808; A2947; A2844.) The legal and legislative updates were typically presented by outside counsel, specifically Lipsett, Kaplinsky or Mogilnicki. (*See* A2126, at 2862:8-2863:14; A1734, at 1301:20-1302:12.) After most meetings, Mogilnicki circulated a summary of what had been discussed to a wide array of individuals, including people who did not attend. (*See, e.g.*, A3340; A3967-68; A3116-17; A2672-73; A3110; A2553; A4411-12; A3265-66.)

The meetings also reflected an interest in lobbying and public relations efforts to help shape developing legislation and jurisprudence relating to arbitration. The credit card industry had previously organized a successful coalition to address bankruptcy issues, and participants saw this arbitration "coalition" as a similar follow-on effort. (A1700, at 1166:18-21; A1750, at 1366:18-21; A1663, at 1018:17-1019:4.) Duncan MacDonald took a lead role in the arbitration efforts, as he had with the bankrupty efforts, including by mobilizing issuers to submit *amicus* briefs in relevant cases. (SPA16; SPA18; SPA20.) The agendas and related emails included extensive discussion of *amicus* opportunities, and various meeting participants contributed to at least three

15

separate efforts.  Meeting participants also attended oral argument at the Supreme

Court in *Green Tree v. Randolph* and *Green Tree v. Bazzle*.  (A1886, at 1907:12-

15; A2136, at 2904:17-25.)

       Further advocacy efforts are evidenced in the various meeting

agendas.  For example, the September 29, 1999 meeting included discussion of

pending bills related to arbitration.  (*See* A2131, at 2883:21-2884:1; A4961;

A4972.)  The November 1999 meeting included a discussion of *amicus*

opportunities, legislative updates and group advocacy projects.  (A2947; A2132, at

2889:22-2891:16.)  The March 2000 meeting included litigation and legislative

updates, and a presentation by a public relations firm.  (SPA19-20; A2954; *see also*

A3115; A2133, at 2893:13-2895:8.)  Agendas for other meetings reflected similar

lobbying and PR topics.  (A2952; A3224; A2678; A3965; A3964; A3963; A2844;

A2723; A5144.)

       Wilmer and MacDonald invited a broad range of participants from

across industries to these meetings, with no effort to keep them secret, going so far

as to send written invitations to people that the organizers did not know.  (*See*, *e.g.*,

A1737, at 1313:18-20.)  As noted above, attendees included not merely the Issuers,

but also trade associations, law firms, public relations firms, and participants from

other industries, such as Toyota, Monsanto and Federal Express, who were not

alleged to be co-conspirators.  The district court ultimately found that the presence

16

of these "other industries and outside counsel resembles a trade association", and cut against the inference of a cartel. (SPA67.) As Citi's expert, Dr. Kenneth Elzinga, testified, "if the issuers were trying to form a cartel, you wouldn't do so with all of these different individuals and organizations present". (A2449, at 4147:24-4148:1.)

In sum, the record demonstrates that Amex implemented its arbitration provision before any meetings occurred, and that it thereafter attended business development meetings organized by a prominent law firm. Plaintiffs contend that Wilmer, together with Ballard Spahr, "provide[d] assistance to" an unlawful horizontal conspiracy. (Br. 83.) But the record shows, and the court below expressly found, that the meetings were organized for the outside lawyers' business development purposes. (SPA65.) The in-house attorneys who attended the meetings did so to stay current with legal developments and to consider efforts to influence the state of the law concerning arbitration. To the extent that attendees expressed any interest in "working together", it was in the context of lobbying, *amicus* efforts and public relations aimed at promoting the public image and protecting the enforceability of arbitration agreements.

On the basis of this record, the district court expressly found that "the final decision to adopt class-action-barring arbitration clauses was something the Issuing Banks hashed out individually and internally". (SPA83.)

17

## SUMMARY OF THE ARGUMENT

Amex prevailed after trial on the merits, but there is also an antecedent ground supporting the judgment below: the district court lacked jurisdiction over the claims against Amex. Article III of the Constitution required Plaintiffs to show they faced a certainly impending injury caused by Amex's conduct that was redressable by the injunction they sought. However, the Plaintiff class consists of individuals who are not current or prospective Amex cardmembers, and thus are not affected by the arbitration provision in Amex's cardmember agreements. They therefore did not show they personally faced a concrete, imminent injury. Nor did they show that the injunction they sought—which would prohibit Amex from using or maintaining arbitration provisions in agreements with *its* cardmembers (who are not before the Court)—would redress any such injury. Accordingly, the judgment in favor of Amex should be affirmed on this jurisdictional issue even before the merits are considered.

On the merits, Plaintiffs' primary attack on the judgment below is to challenge the legal standard applied by the district court. They argue that the evidentiary record supports a "reasonable inference" that conspiracy was more likely than not, and they contend that because this inference was supportable the district court was required to accept it. (Br. 3.) Their argument is without merit. The district court applied the correct legal standard to Plaintiffs' claim and, sitting

18

as factfinder after a five-week bench trial, was entitled to make a reasoned choice among competing inferences.

After considering the extensive trial record, the district court found that the relevant meetings were organized by Wilmer for business development purposes and that the attendees (i) discussed legislative and judicial developments regarding consumer arbitration and (ii) considered advocacy and public relations initiatives they could undertake to counter public attacks on arbitration and defend its enforceability. The court recognized that agreements could be tacit and could be proven with circumstantial evidence, but—applying the proper standard—the court concluded that the facts presented at trial did not prove an illicit conspiracy. Plaintiffs have not argued that this was clearly erroneous or an unreasonable view of the evidence.

This Court may also affirm on two other alternative grounds. *See Bruh v. Bessemer Venture Partners III L.P.*, 464 F.3d 202, 205 (2d Cir. 2006) ("[W]e may affirm on any basis for which there is sufficient support in the record, including grounds not relied on by the district court."). *First,* Plaintiffs failed to prove antitrust injury. Their own expert conceded that consumers would suffer the same alleged harm from the independent adoption of arbitration clauses as from the purported conspiracy. He speculated about two additional "dimensions of harm" that could arise from an agreement to adopt arbitration clauses, but

Plaintiffs did not support that speculation with evidence that either theoretical harm had actually come to pass.

*Second*, even if Plaintiffs could establish a violation of the antitrust laws, they do not meet the traditional requirements to obtain equitable relief. They did not prove they faced an irreparable injury, that the balance of hardships favored them, or that an injunction would be consistent with the strong federal policy favoring arbitration embodied by the Federal Arbitration Act.

For all these reasons, the district court's judgment in favor of Amex should be affirmed.

# ARGUMENT

## I. PLAINTIFFS LACK ARTICLE III STANDING TO SUE AMEX.

As described below, the district court correctly found that there was no conspiracy among the Issuers and entered judgment for Amex on the merits. However, the district court need not have reached the merits as to Amex because Plaintiffs lacked Article III standing to seek an injunction against Amex. The district court therefore lacked jurisdiction, and its judgment should be affirmed for this reason alone.

### A. Plaintiffs Must Show That They Face an Imminent Injury That Can Be Redressed by the Relief They Seek.

"The existence of standing is a question of law" that this Court reviews *de novo*. *Shain v. Ellison*, 356 F.3d 211, 214 (2d Cir. 2004). The "irreducible constitutional minimum of standing contains three elements": (i) injury-in-fact, (ii) causation and (iii) redressability. *Lujan*, 504 U.S. at 560-61. Because the elements of standing, including injury, are "not mere pleading requirements but rather an indispensable part of the [Plaintiffs'] case, each element must be supported in the same way as any other matter on which the [Plaintiffs] bear[] the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation," including, "by the evidence adduced at trial." *Id*. at 561. In a class action, the named plaintiffs must personally demonstrate standing. *Lewis v. Casey*, 518 U.S. 343, 357 (1996).

21

To obtain an injunction, Plaintiffs' named representatives must show they face a "certainly impending" future injury. *Clapper*, 133 S. Ct. at 1147. Conjectural, hypothetical or speculative injuries will not suffice, *id.*, nor are past injuries sufficient to establish standing for *prospective* injunctive relief, *see City of Los Angeles v. Lyons*, 461 U.S. 95, 106-7 (1983). The requested injunction must also redress the impending injury. *Lujan*, 504 U.S. at 561.

**B.    The Evidence At Trial Proved That Plaintiffs Lack Standing.**

As this Court previously held, "the plaintiffs in this action are not holders of Amex credit cards and therefore do not seek relief as purchasers of Amex products". *Ross v. American Express*, 547 F.3d 137, 139 (2d Cir. 2008). Plaintiffs, who are holders of Visa, MasterCard and Diners Club cards, "have not entered into any contract whatever with Amex, let alone any contract containing an arbitration clause". *Id.* at 143. At trial, Plaintiffs did not dispute that Amex's arbitration clause does not directly affect them. This means that Plaintiffs failed to show a certainly impending injury that can be redressed by the injunction they seek. It also means that Plaintiffs' claims fail under Section 16 of the Clayton Act, 15 U.S.C. § 26, which requires antitrust plaintiffs seeking injunctive relief to prove they face "threatened loss or damage" to their "own interests in order to obtain relief". *California v. Am. Stores Co.*, 495 U.S. 271, 296 (1990). This requirement "dovetails" with Article III standing. *In re New Motor Vehicles Canadian Export*

22

*Antitr. Litig.*, 522 F.3d 6, 14 (1st Cir. 2008).[2]

Plaintiffs cannot ground their injury on the hypothetical possiblity that they may obtain an Amex card in the future. It is well established that "'some day' intentions . . . do not support a finding of the 'actual or imminent' injury" that is required to prove Article III standing. *Lujan*, 504 U.S. at 564. In *Lujan*, conservationists challenged government regulations threatening the survival of endangered species. However, although the conservationists had traveled to view endangered species in the past, and wished to do so in the future, the conservationists had no proof of "concrete plans" to do so again, and therefore lacked an actual or imminent injury. *Id*.

Here, the facts are starker than in *Lujan*. The Plaintiffs did not express even "some day intentions" to obtain an Amex card, and the only named plaintiff who testified swore that he had not had an Amex card for decades, had not

---

[2] Plaintiffs argued to the district court that in antitrust cases, the "requirements for standing for injunctive relief . . . are less stringent than those for damages claims". (A1233.) That is incorrect. Standing to seek damages and standing to seek an injunction are distinct inquiries, and a plaintiff who has standing to obtain damages does not necessarily have standing to seek injunctive relief. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) ("We have insisted . . . that 'a plaintiff must demonstrate standing separately for each form of relief sought.'"). For example, a plaintiff who suffers monetary injury stemming from a price-fixing conspiracy may have standing to sue any or all of the conspirators because her injury may be fairly traceable to all of them, and (money being fungible) may be redressed by damages paid by any of them. However, her past injury does not confer standing to obtain injunctive relief that will not redress any *prospective* injury. *See, e.g.*, *New Motor Vehicles*, 522 F.3d at 14.

desired to obtain one since and "would never do business with Amex again". (A1419, at 50:8-52:5; A1421, at 58:5-19.) *Lujan* thus squarely forecloses Plaintiffs' standing to sue Amex. *See Funeral Consumers Alliance, Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 343 (5th Cir. 2012) (without proof that plaintiffs would buy a casket from defendants, the "fact that death is inevitable is not sufficient to establish a real and immediate threat of future harm" ); *In re New Jersey Title Ins. Litig.*, 683 F.3d 451, 461 (3d Cir. 2012) (dismissing antitrust claims against title insurers brought by homeowners who had not alleged "plans to buy title insurance in the future" even though evidence showed homeowners generally change residences every seven years); *New Motor Vehicles*, 522 F.3d at 15 (dismissing case brought against car sellers by plaintiffs who did not "make any allegation regarding a named plaintiff's intention to buy or lease another new vehicle within such a time frame as could be deemed imminent").

Plaintiffs' expert admitted that persons, like Plaintiffs, who do not have an Amex card and do not intend to obtain one would not suffer any "direct harm from actions by [Amex]". (A2203, at 3171:11-25.)  Plaintiffs nonetheless attempted to construct a speculative chain of hypothetical events under which an injunction removing Amex's clauses "might" result in possible "indirect effects" leading to "potential benefits" to cardmembers of other banks. (A2220-21, at 3239:12-3240:8.)  Their expert hypothesized that removal of Amex's arbitration

clause *could* lead Amex to be sufficiently concerned about the possibility of class action litigation that it would decide to adopt pro-cardmember terms (apart from arbitration) in its agreements. (A2220, at 3239:14-20.) Then, "since [Amex] is a major player in the credit card market", Amex's decisions regarding non-arbitration terms could "affect the behavior of other issuers" who "might—this is an independent effect—might choose to move to [Amex's position]". (A2220-21, at 3239:12-3240:8.) Plaintiffs made no attempt to prove the linkages in this complex chain of events. Such a speculative, attenuated chain of events is insufficient to establish a certainly impending injury. *See Clapper*, 133 S. Ct. at 1150 ("respondents' speculative chain of possibilities does not establish that injury . . . is certainly impending").

### C. The District Court Misapplied This Court's Decision in *Ross v. Bank of America*.

The district court's conclusion that this Court's prior decision in *Ross v. Bank of America*, 524 F.3d 217 (2d Cir. 2008) ("*BofA*"), established Plaintiffs' standing was a mistake of law. (SPA43-48.) Amex was not a party to *BofA*, which was a case brought by Visa, MasterCard and Discover cardmembers against Visa, MasterCard and Discover issuers. Unlike in *BofA*, Plaintiffs here are neither current nor prospective customers of the issuer they have sued. (*Compare BofA*, 524 F.3d at 220 *with* SPA2.) Thus, Amex's arbitration clause poses them no threat of harm, and an injunction removing that clause would provide them no

25

benefit.

In *BofA*, this Court addressed an issue not raised in the present case, *i.e.*, whether the plaintiffs had standing even though the issuers in that case had not invoked their arbitration clauses against them. 524 F.3d at 221-22. This Court concluded that the district court had "mischaracterize[d]" the *BofA* plaintiffs' alleged injuries. It found that apart from any harm that might result from invocation of the clauses, the plaintiffs had adequately alleged (but not yet proven) two "injuries to the market": a "reduction in choice" of credit cards and "diminished quality of credit card services". *Id*. at 223, 224. The *BofA* panel held only that the plaintiffs then before the Court (Visa, MasterCard and Discover cardmembers) had alleged facts sufficient to support standing to sue the banks that issued those cards, because the plaintiffs alleged that they personally had suffered the market-based injuries. The Court did not give *any* plaintiff who claimed to have a credit card standing to sue *any* issuer, even if the evidence showed that the defendant's arbitration clause did not affect the plaintiff. Furthermore, having expressly declined to reach the causation and redressability requirements of Article III standing, *id.* at 225 n.2, this Court also could not have held that an injunction against Amex would redress any of Plaintiffs' alleged injuries.

However, the district court understood *BofA* to allow *any* cardmember to sue Amex for injunctive relief because this Court's focus was on "injuries to the

26

market", and "the elimination of Amex's clause would redress the identified injuries to the market *even if it did not directly affect any individual cardholder*". (SPA47-48 (emphasis added).) By taking the "injury to the market" language out of context, the district court misread *BofA* in a manner that conflicts with decades of Supreme Court precedent establishing that plaintiffs must prove they face a concrete injury and may not rely on abstract injuries that do not personally affect them. *See Lujan*, 504 U.S. at 560 (an injury must be "concrete and particularized . . . not conjectural or hypothetical"); *Allen v. Wright*, 468 U.S. 737, 752 (1984) ("[T]he standing inquiry requires careful judicial examination . . . to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted."); *City of Los Angeles*, 461 U.S. at 101 ("Plaintiffs must demonstrate a 'personal stake in the outcome' . . . Abstract injury is not enough."); *Warth v. Seldin*, 422 U.S. 490, 499 (1975) ("[T]he plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.").

In particular, the district court misinterpreted *BofA* in a manner foreclosed by *Lujan v. Defenders of Wildlife*. The district court held that the lack of any direct, personal injury to the named class representative was "irrelevant in view of his broader claim that the credit card market as a whole is tainted by collusion". (SPA44.) However, in *Lujan*, the Supreme Court noted:

27

> At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss, we "presum[e] that general allegations embrace those specific facts that are necessary to support the claim"[,] . . . [but] at the final stage, those facts (if controverted) must be "supported adequately by the evidence adduced at trial".

504 U.S. at 561. *BofA* was at the pleading stage where, under *Lujan*, a general allegation of injury may suffice. The Court in *Lujan* acknowledged that "the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purposes of standing". *Id*. at 562-63. "But the 'injury in fact' test requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured." *Id*. at 563 (internal quotations omitted). The evidence here demonstrated that Plaintiffs are not among those injured in the manner alleged in *BofA*. The district court thus erred in concluding that general injuries to the market—without proof of injury to the named class representatives—would suffice. The district court further erred in relying upon *BofA* to govern the causation and redressability analyses even though this Court had expressly reserved those questions. 524 F.3d at 225 n.2.

The district court also erroneously discounted the fact that, years after the end of the alleged conspiracy, issuers representing nearly half of the credit card market now offer credit cards governed by agreements without arbitration clauses. (SPA45.) Citing only its own prior decision in this case, the district court

concluded that it would be "absurd to deny Plaintiffs standing merely because some of the alleged co-conspirators have settled and agreed to remove their arbitration clauses". (SPA46 (internal quotations omitted).) However, it is well established that Plaintiffs must have standing to pursue injunctive relief at all phases of a case, and mere "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects". *New Motor Vehicles*, 522 F.3d at 14 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974)). Thus, before concluding that Plaintiffs had standing, the district court should have determined whether, in light of the changed circumstances in the market, Plaintiffs had "establish[ed] the continuing presence of the requisite threatened injury". *Id*.

As Amex conclusively demonstrated at trial and as the district court found, a variety of credit cards without arbitration clauses are now readily available to consumers. (SPA45.)[3] As in *New Motor Vehicles*, subsequent events have "eliminate[d] any realistic current threat" that Plaintiffs face any risk of *future* harm in the form of reduced choice of credit cards (now that they have ample choice) or in diminished quality of Visa, MasterCard or Diners Club cards they do

---

[3] As the evidence at trial showed, many consumers have more than one type of credit card, so many of the Plaintiffs likely now already have credit cards not subject to arbitration clauses. (A2113, at 2811:12-21.) For them, avoiding *any* credit card subject to an arbitration clause is as easy as choosing a different card from their wallet. (A2113, at 2813:2-22.)

hold or may obtain (which in any event remain unaffected by Amex's clause). 522

F.3d at 15. This is an independent reason Plaintiffs lack standing.

## II.    IF THIS COURT REACHES THE MERITS, THE DISTRICT COURT'S JUDGMENT IN FAVOR OF AMEX SHOULD BE AFFIRMED.

### A.    The District Court Applied the Correct Legal Standard to Plaintiffs' Claim.

Plaintiffs charge the district court with a variety of purported legal

errors. They maintain that the court improperly failed to draw inferences in their

favor (*see* Br. 3, 57); that it improperly required evidence of an "explicit

agreement" (*id*. at 56-58); that it improperly required evidence that "tends to

exclude" the possibility of independent action (*id*. at 58-61); and that it improperly

failed to evaluate the evidence as a whole (*id*. at 61-64). In each case, Plaintiffs

either misstate the appropriate legal standard or misrepresent the reasoning of the

district court.[4]

### 1.    The District Court Entered Judgment After a Bench Trial, Not Summary Judgment, So It Was Not Required to Draw Factual Inferences in Plaintiffs' Favor.

The challenged judgment was entered following a five-week trial at

which the district court sat as the finder of fact. At that proceeding, the district

court was entitled (and, in fact, obligated) to weigh competing inferences and make

_____

[4] The district court's conclusions of law should be reviewed *de novo*, and its findings of fact for clear error. (*See* Part II.B.)

credibility determinations:

> [W]hen the district court is sitting as trier of fact, it has no obligation to draw a given inference merely because it is supportable; nor has it any obligation, in its capacity as trier of fact, to view the evidence in the light most favorable to [a particular party]. The obligations of the court as the trier of fact are to determine which of the witnesses it finds credible, *which of the permissible competing inferences it will draw*, and whether the party having the burden of proof has persuaded it as factfinder that the requisite facts are proven.

*Diesel Props S.r.l. v. Grey Stone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011) (emphasis added) (citation omitted). It is well established that, following a bench trial, "[t]he fact that there may have been evidence to support an inference contrary to that drawn by the trial court does not mean that the findings made are clearly erroneous." *Id.* (citations omitted).

   Despite these basic legal principles, Plaintiffs assert that "[a]ll Plaintiffs must do is provide direct or circumstantial evidence that reasonably tends to prove . . . the Banks combined and/or conspired to impose CBA Clauses, which standard Plaintiffs met." (Br. 57 (citation omitted).) They aver that the record "unquestionably demonstrates *a reasonable inference* that it was more likely than not the Banks conspired to adopt and maintain CBA Clauses. *This suffices to prove the Banks agreed to a CBA Clause combination or conspiracy*, illegal under the Sherman Act . . . ." (*Id.* at 3 (emphases added).)[5] Plaintiffs' unfounded

---

[5] Plaintiffs' primary authorities for this assertion, *Monsanto Co. v. Spray-*

31

assertions confuse a judgment after trial with summary judgment, fundamentally misapprehending the district court's role as factfinder and this Court's standard of review.

Even if it were the case that Plaintiffs had established a "plausible inference" of conspiracy, reversal would be unjustified.  Instead, "they must show that the evidence permitted no other inferences".  *Freedom Holdings Inc. v. Cuomo*, 624 F.3d 38, 54-55 (2d Cir. 2010).  They have not, and do not even so argue.

> **2.    The District Court Correctly Required Plaintiffs To Establish a Combination or Conspiracy by a Preponderance of the Evidence.**

At trial, the district court held plaintiffs to their burden of "prov[ing] by a preponderance of the evidence '(1) a combination or some form of concerted action between at least two legally distinct economic entities that (2) unreasonably restrains trade'".  (SPA49-50 (quoting *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 506 (2d Cir. 2004)).)  Notwithstanding Plaintiffs' contentions (Br. 56-58), the court did not require evidence of an "explicit" agreement.  Rather, the court recognized that "conspiracies are rarely evidenced by explicit

---

*Rite Services Corporation*, 465 U.S. 752 (1984) and *In re Publication Paper Antitrust Litigation*, 690 F.3d 51 (2d Cir. 2012), concern the minimum quantum of evidence necessary for conspiracy allegations to be put to a finder of fact.  They do not alter the factfinder's well-established authority to choose between the competing reasonable inferences before it.

agreements" and that they "nearly always must be proven through inferences that may fairly be drawn from the behavior of the alleged conspirators". (SPA51 (quoting *Anderson News LLC v. Am. Media, Inc.*, 680 F.3d 162, 183 (2d Cir. 2012)).) It observed that "[n]o formal agreement is required to constitute an antitrust conspiracy", citing case law that conspiracy "may be found in a course of dealings or other circumstances as well as in any exchange of words". (SPA50 (citation omitted).) It recognized "[t]he crucial question is whether the challenged anticompetitive conduct 'stem[s] from independent decision or from an agreement, tacit or express.'" (SPA50 (citation omitted).)

In addition to considering caselaw regarding tacit agreements, the district court fully considered the possibility that Plaintiffs might establish an implicit or tacit agreement. For example, in assessing the significant number of "outsiders" who attended the meetings of the alleged cartel, the court reasoned: "The inclusion of other industries and outside counsel resembles a trade association, and cuts against any inference that an express agreement to implement and maintain arbitration clauses was articulated at the Arbitration Coalition meetings. This, however, does not preclude a tacit meeting of the minds, or a 'gentlemen's agreement' among the Issuing Banks." (SPA67.) Having recognized that a conspiracy potentially could be proven in this way, the court then went on to find that no such tacit agreement was proven here. This well-supported factual

33

finding does not equate to "requir[ing] evidence of explicit illegal agreement", as Plaintiffs maintain (Br. 57-58).

      **3.**      **The District Court Did Not Err By Searching for Evidence That "Tends To Exclude" the Possibility That the Banks Acted Independently.**

Although Plaintiffs acknowledge that *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986), requires evidence that "tends to exclude" the possibility of independent conduct, they contend that the district court is guilty of "over-reading" it and erroneously requiring Plaintiffs to "exclude" or "dispel" any possibility of independent action. (Br. 58.) Relying on this Court's decision in *Publication Paper*, Plaintiffs suggest that the district court was *required* to find a conspiracy as long as that was a "reasonable inference" from the evidence. (Br. 58 (quoting *Publ'n Paper*, 690 F.3d at 63).) Plaintiffs' assertions are meritless.

*First*, the Court in *Publication Paper* reviewed a decision granting summary judgment, 690 F.3d at 55, rather than, as in this case, a judgment based upon factual findings following a bench trial. Accordingly, as noted above (*see* Part II.A.1), even if Plaintiffs had successfully established "a reasonable inference" at trial, that alone would not entitle them to a finding of conspiracy. If the district court determined that both inferences of conspiracy and inferences of no conspiracy were permissible, it was "within [its] province" as a factfinder to decide

34

"what weight should be assigned to [those] inferences". *Publ'n Paper*, 690 F.3d at

61 (citation omitted).

   *Second*, at no point in its inquiry did the Court require Plaintiffs to

"dispel" or "exclude" the possibility of independent action. Rather, the Court

carefully weighed competing inferences that could be drawn from the evidence, as

it was required to do in its capacity as factfinder. The two examples that Plaintiffs

identify as instances where the Court allegedly required evidence that "excluded"

the possibility of independent action do not support their characterization of the

court's decision. First, Plaintiffs state:

> The court found the Banks' 'need to parry consumer backlash
> and temper any 'rogue' players establish[ed] a motive to
> conspire in the adoption of arbitration clauses' (SPA-62), but
> also observed that the Banks would be motivated to cooperate
> to sway public opinion on arbitration and to defend the legality
> of their clauses (SPA-63).

(Br. 60.) Second, Plaintiffs note:

> The court also found the Banks 'engaged in an unusually high
> amount of inter-firm communications regarding arbitration'
> (SPA-63) and the 'number of meetings over a sustained period
> devoted to the topic of arbitration far exceeds a level normally
> associated with client development pitches or CLEs' (SPA-65),
> but also observed the Coalition meetings were akin to a
> fledgling special interest group (SPA-67).

(Br. 60.) In neither instance did the court "look[] to see whether one inference

'tends to exclude' another" or require one inference to "dispel the corresponding

observations of permissible or independent conduct", as Plaintiffs claim. (*Id.* at

35

61.)  Instead, the court noted permissible competing inferences from the

evidence—and after a five-week trial, the court made a reasoned choice between

those inferences, finding that Plaintiffs did not meet their burden of proof.

Put differently, the district court did not conclude that *Matsushita*'s

"tends to exclude" language prohibited it from drawing the inference that the

Issuers had reached a conspiratorial agreement.  In an antitrust case, as in any

other, "when the evidence admits of competing permissible inferences with regard

to whether a plaintiff is entitled to relief, 'the question of what weight should be

assigned to [those] inferences remains within the province of the fact-finder at a

trial.'"  *Publ'n Paper*, 690 F.3d at 61.  Here, the district court understood its

responsibility and discharged it by weighing the inferences and finding that the

decision to adopt arbitration clauses "was something the Issuing Banks hashed out

individually and internally".  (SPA83.)

### 4. The District Court Correctly Recognized That Its Duty Was To Weigh the Evidence in Totality, and It Did So.

Next, Plaintiffs assert that the district court erred by

"compartmentalizing the various factual components" of the record "and wiping

the slate clean after each", thereby failing to consider the totality of the evidence.

(Br. 61.)  The court did no such thing.  The court expressly recognized the need to

"examine the existence of conspiracy 'as a whole' taking into consideration the

totality of the evidence, as opposed to 'dismembering it and viewing its separate

parts'". (SPA53.) The court then analyzed whether there was parallel conduct and, as Plaintiffs proposed in their post-trial briefing (A526-31), considered whether there were any "plus factors" suggestive of collusion.[6] At the conclusion of that analysis, the court expressly considered the evidence as a whole. It stated: "*In weighing all the 'plus factors' evidence*, this Court finds that Plaintiffs have failed to carry their burden to demonstrate an agreement among the Issuing Banks to implement and maintain arbitration clauses." (SPA81 (emphasis added).) Underscoring the holistic nature of its assessment, the court found that it "cannot infer an illegal agreement based on the evidence marshalled at trial". (*Id.*)

**B.  This Court Should Review the District Court's Finding That No Conspiracy Occurred for Clear Error.**

"On appeal from a bench trial," this Court "accord[s] considerable deference to a district court's findings of fact, which [it] will reverse only for clear error". *Freedom Holdings*, 624 F.3d at 49; *see also* F.R.C.P. 52(a)(6). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently."

_____

[6] Plaintiffs criticize the court's assessment of individual "plus factors" on the theory that "the court separately determined the weight of certain evidence". (Br. 62.) But a court applying a "totality of the evidence" standard may (and, to make its opinion comprehensible, often must) make subsidiary findings about the import of particular facts. That is what the district court did here.

*Anderson v. Bessemer City, N.C.*, 470 U.S. 564, 573-74 (1985). Plaintiffs "cannot secure reversal simply by demonstrating that the evidence could support inferences favorable to their claim. Rather, they must show that the evidence permitted no other inferences." *Freedom Holdings*, 624 F.3d at 54-55.

The existence of a conspiratorial agreement is a question of fact entrusted to the factfinder[7] and reviewable only for clear error. *See, e.g., H.A. Artists & Assocs., Inc. v. Actors' Equity Ass'n*, 451 U.S. 704, 717 (1981); *United States v. Oregon State Med. Soc.*, 343 U.S. 326, 331-32, 337 (1952).

Nevertheless, after a five-week trial in which the district court heard testimony from over 40 witnesses and evaluated 440 exhibits, Plaintiffs ask this Court to review the evidentiary record *de novo* to reconsider whether Plaintiffs proved the existence of a conspiracy. Relying on footnotes in *Starr v. Sony BMG Entertainment*, 592 F.3d 314 (2d Cir. 2010), and *United States v. General Motors Corporation*, 384 U.S. 127 (1966), they contend that "[t]he ultimate existence of an informal or tacit agreement under antitrust law is a legal conclusion" that should

---

[7] It has long been held that the existence or non-existence of a conspiratorial agreement is a jury question in cases in which a jury trial is available. *See Monsanto Co.*, 465 U.S. at 765 (holding that whether "Monsanto and some of its distributors were parties to an 'agreement' or 'conspiracy'" was for the jury to decide); *Frey & Son v. Cudahy Packing Co.*, 256 U.S. 208, 210 (1921) (holding that "whether there existed an unlawful combination or agreement . . . was a question for the jury to decide, and that the Circuit Court of Appeals erred when it held otherwise"); *Publ'n Paper*, 690 F.3d at 63 (referring to "the existence of a conspiracy" as an "inference that the jury could draw").

be reviewed *de novo*. (Br. 56, 52.) This assertion misreads that case law.

This Court in *Starr* reviewed a judgment granting a motion to dismiss and therefore accepted the "non-conclusory factual allegations" of the complaint as true. 592 F.3d at 317. The footnote on which Plaintiffs rely appears in the Court's description of those allegations and reads, in full: "The allegation that defendants agreed to this price floor is obviously conclusory, and is not accepted as true." *Id.* at 319 n.2. The Court did not opine one way or the other as to whether the existence of an agreement under antitrust law is a question of law or fact. It merely flagged one of the plaintiff's allegations in that case as "conclusory", *i.e.*, insufficiently well-pled to be accepted as true on a motion to dismiss.

Nor does *General Motors* stand for the proposition that the existence of a conspiratorial agreement is a question of law to be reviewed *de novo*. In *General Motors*, the Court expressly stated that the factual "findings by the trial judge compel the conclusion that a conspiracy to restrain trade was proved". 384 U.S. at 141. Far from reexamining the district court's factual findings, the Supreme Court accepted them and reversed because the district court's "conclusion cannot be squared with its own specific findings of fact". *Id.* at 140.[8] Since

_____

[8] *General Motors* is also distinguishable because it was "essentially a 'paper case'" that "did not unfold by the testimony of 'live' witnesses". 384 U.S. at 141 n.16. This case unfolded by the testimony of more than 40 witnesses, each of whom testified in person or by videotaped deposition.

*General Motors*, appellate courts have routinely applied clear error review to trial court findings that no conspiracy occurred. *See, e.g.*, *H.A. Artists & Assocs.*, 451 U.S. at 717; *Canady v. Providence Hosp.*, 132 F.3d 1480 (D.C. Cir. 1997) (table case); *Dunn v. Phoenix Newspapers, Inc.*, 735 F.2d 1184, 1187 (9th Cir. 1984).

For these reasons, the district court's finding that no conspiracy occurred should be reviewed for clear error.

**C.     The District Court's Finding That Amex Did Not Engage in a Conspiracy Is Supported by the Evidence and Not Clearly Erroneous.**

On appeal from a bench trial, this Court is "oblig[ed] to view the evidence in the light most favorable to the challenged judgment". *Freedom Holdings*, 624 F.3d at 54. It must "accord great deference to the district court's resolution of evidentiary conflicts, its choices among competing inferences to be drawn from the evidence, and its decision as to what weight to assign particular evidence". *Id*. "Where there are two permissible views of the evidence, the factfinder's choice between them *cannot* be clearly erroneous." *Bessemer City*, 470 U.S. at 574 (emphasis added); *see also Publ'n Paper*, 690 F.3d at 61. "[T]he reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility." F.R.C.P. 52(a)(6). As discussed below, the district court's finding was supported by the testimonial and documentary evidence and is not clearly erroneous.

40

1.      **Amex Independently Adopted Its Arbitration Clause Before Any Conspiracy Allegedly Began, and It Had a Unilateral Economic Incentive To Do So.**

As the district court found and Plaintiffs concede, Amex decided to adopt and then actually implemented its arbitration provision before the alleged conspiracy even began.  (*See* SPA5; Br. 13.)  Amex (and other issuers) did so because "avoiding class actions through arbitration was in each Issuing Bank's independent self interest, regardless of whether its competitors also adopted such a provision".  (SPA83.)

Amex and other issuers independently perceived arbitration as a useful tool for "lowering litigation costs in the short term and [avoiding] very expensive class action suits in the medium to longer term".  (SPA5 (quoting testimony of Amex's Alfred Kelly at A2061, at 2604:6-17).)  Crucially, the Issuers could safely adopt this cost-saving measure without fear of customer attrition because arbitration was not "visible or meaningful to consumers", and issuers did not compete on the basis of dispute resolution provisions.  (SPA38.)  As Kelly noted, "our industry is not going to advertise about remedies and talk about who has an arbitration clause or not. And that's certainly not going to cause a customer to switch their card product."  (A2062, at 2608:5-21.)  Kelly expected "zero" reaction from cardmembers, and he viewed the decision to adopt arbitration as an "easy call".  (SPA5; A2061, at 2605:9-19.)  Thus, not only did Amex adopt its

arbitration clause before the alleged conspiracy began, it had a rational incentive to adopt regardless of whether its competitors did so.

## 2. The Other Banks Also Had A Unilateral Economic Motive To Adopt Arbitration Provisions and Did So Independently Over Several Years.

Amex was not the only company to understand the benefits of arbitration. At the time of Amex's adoption, arbitration was becoming "*au courant*" in many industries. (SPA73; *see also* SPA5.) The Court found that "such clauses proliferated in the automobile, financial services, brokerage services, cell phone, HMO, and online retailing industries", and they were "hot topics of discussion in the legal community". (SPA5.) The credit card industry was no exception. As Plaintiffs concede, arbitration provisions "offered a potential cost savings device from the Banks' perspective". (Br. 40.)

Consistent with these incentives, before any of the allegedly conspiratorial meetings ever began, five of the eleven alleged conspirators (Bank of America, Wells Fargo, FirstUSA, Amex, and Discover) had already acted unilaterally to put some form of arbitration provision in place, and three of these (FirstUSA, Amex, and Discover) adopted provisions explicitly barring class actions. Another alleged conspirator, Providian, announced its adoption of a class-barring arbitration provision months before any representative attended any meeting. (A567-580.) Adoption by the identified issuers was staggered and

42

gradual, reflecting the fact that each issuer came independently over several years to conclude that an arbitration clause was worth implementing. Indeed, four and a half years elapsed between the time FirstUSA announced its class-barring arbitration clause in November 1997 and Chase did in May 2002. (*See* Br. 28-30.)

This evolution was driven not simply by the fact that arbitration was a "hot topic" (SPA5) and the Issuers perceived an "independent self interest" (SPA83) in defending against class actions, but also by the fact that each Issuer's adoption of an arbitration clause was a public act, with notification widely distributed to millions of cardmembers. (*See* A2238, at 3309:10-3310:1.) It was easy for the Issuers to keep track of the contents of one another's cardmember agreements, and they routinely did so to evaluate possible changes to their own agreements. (A2062, at 2608:5-2610:1.)[9] The district court recognized this, concluding that the Issuers' sequential "parallel conduct" was entirely consistent with legitimate independent action. (SPA52.) It found that although "there was

_____

[9] This debunks Plaintiffs' sole argument that the arbitration-related meetings were against the Issuers' self-interest absent a conspiracy. Plaintiffs contend that "[a] Bank that developed a viable, enforceable [class-waiving arbitration] Clause . . . possessed a cost savings advantage over its competitors" and that there would be "no legitimate reason" to share that advantage. (Br. 41.) But arbitration clauses are not like innovative manufacturing processes or other trade secrets. Arbitration clauses appear in the cardmember agreements disseminated to millions of cardmembers and are, therefore, necessarily public, so a firm that had adopted a clause would have made the details of its arbitration provisions known to its competitors, whether or not the firm attended any meetings.

conscious parallel action in the adoption and maintenance of arbitration clauses among the Issuing Banks", "agreement is difficult to infer from sequential actions alone". (SPA59.) As the Supreme Court has recognized, parallel conduct and interdependence are "just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market". *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007); *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 51 (2d Cir. 2007).

One "common perception[]" of the market—shared by Plaintiffs' own expert—is that consumers did not care about arbitration clauses when selecting among credit cards, and card issuers did not compete on that basis. Consumer card choice is driven by terms that are "salient", meaning that they are "visible or meaningful to consumers". (SPA38.) As Plaintiffs' expert testified and the district court found, arbitration was not salient at the time of the alleged conspiracy and continues to be non-salient today. (SPA38; SPA40.) And because consumers do not switch products on the basis of non-salient terms, firms do not compete with respect to them. (SPA38.) Thus, the Issuers could (and did) adopt an arbitration clause unilaterally without fear of losing customers.

As the district court acknowledged, there is no need to hypothesize a conspiracy to explain the issuers' adoption of non-salient, cost-saving contract terms over a four-and-a-half-year span. The simple reality is that each issuer

44

became aware of arbitration due to its growing prevalence across industries, and each Issuer had individual incentives to adopt arbitration clauses. (SPA83.) The district court properly found that each company could and did achieve the full economic benefit of arbitration unilaterally and on its own timeline without any need to form a cartel. (SPA83-84.)

### 3. The Multi-Industry Meetings Concerned Nothing More Than Legal Education and Advocacy.

"[T]he range of inferences that may be drawn from [circumstantial] evidence depends on the plausibility of the plaintiff's theory." *Publ'n Paper*, 690 F.3d at 63. If the alleged conspiracy is "implausible, it takes 'strong[er] direct or circumstantial evidence'" than is otherwise necessary when the conspiracy "is economically sensible for the alleged conspirators to undertake". *Id*. Here, there is nothing "economically sensible" about a conspiracy in which (i) a number of firms adopted arbitration clauses *before* the alleged conspiracy began, (ii) those firms' adoption stretched over nearly half a decade, and (iii) due to the absence of competition concerning the clauses, the co-conspirators could have independently achieved the full economic benefits of arbitration without engaging in a cartel.

"Plaintiffs concede that they have no direct evidence of a conspiracy" (SPA51); the circumstantial evidence they do offer consists entirely of a series of multi-industry educational and advocacy meetings organized by a respected national law firm as a client development initiative in the years after the alleged

conspirators first started adopting arbitration provisions.[10] The Wilmer firm recognized that arbitration was a hot topic and saw itself as having a competitive advantage in the area. (*See* A2124, at 2856:20-2857:10.) Wilmer also understood that it "would be typically in the interests of firms like this to have arbitration provisions be enforceable, so these firms were interested in . . . influenc[ing] the result in litigation, to make sure it's well-litigated from the point of view of the side who wants the arbitration enforced". (SPA83.) Accordingly, the firm organized a series of meetings and discussions aimed at educating potential clients across industries and facilitating advocacy and *amicus* initiatives related to the enforceability of arbitration provisions.

The district court found that the substance of the meetings concerned legitimate educational and advocacy activity. The court observed that "notes and agendas from the meetings indicate that education on legal developments on arbitration and 'legislative updates' were significant aspects of each meeting". (SPA66.) Meeting attendees were conscious of media scrutiny and legislative inquiries concerning arbitration and they perceived a need for a public relations

---

[10] Although Plaintiffs identify a handful of "external" communications taking place outside of the context of the meetings (Br. 31-32), these cannot support an inference of conspiracy by Amex, as none of the communications included any Amex representative. In any event, the district court examined the evidence of these "side conversations" and found that "this sort of information-seeking is common in concentrated markets, and such behavior is consistent with conscious parallelism rather than collusion". (SPA71.)

strategy. (*See* SPA60.) Accordingly, they pursued various advocacy and public-relations initiatives.

For example, "the Arbitration Coalition formed a sub-group to 'discuss and develop initial response points to counter the various arguments being made to challenge arbitration clauses' and planned to use these FAQs 'for government relations and media relations purposes.'" (SPA61.) It "explored the possibility of commissioning pro-arbitration research." (*Id*.) And "a public relations expert from Burson-Marsteller gave a presentation on 'some of the ways in which a public relations effort could alter perceptions about consumer arbitration.'" (*Id*.) Indeed, the court noted that "'public relations,' the 'PR problem,' 'public discourse,' and 'anti-arbitration press, legislation and judicial council developments'" were recurring agenda items at the meetings. (*Id*.) The Supreme Court has made clear that these sorts of joint efforts "to influence the passage of new legislation or the enforcement of existing law" through use of "publicity campaign[s]" do not violate the Sherman Act. *See E.R.R. Presidents Conference v. Noerr Motor Freight, Inc*., 365 U.S. 127, 133, 136 (1961); *see also California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510-11 (1972) ("[I]t would be destructive of rights of association and of petition to hold that groups with common interests may not, without violating the antitrust laws, use the channels and procedures of state and federal agencies and courts to advocate their

47

causes and points of view . . . .").[11]

Plaintiffs latch on to the phrase "industry norm" in the district court opinion to re-characterize the court's finding of an agreement to explore advocacy, wrongly contending that "[t]he district court found that the Banks contemplated—and agreed—they would work together to cause their industry *to adopt and use CBA Clauses* as an industry norm". (Br. 57 (emphasis added)). In reality, the court could not have been more clear that its reference to an "industry norm" was *not* to be mistaken for an agreement to "adopt and use" arbitration provisions. According to the court, the Issuers:

> had an agreement to explore collective advocacy efforts aimed at expanding the enforceability of arbitration clauses and to establish class-action-barring arbitration as an industry norm. Direct evidence of this agreement abounds in meeting agendas, solicitations to fund amicus briefs and research, and willingness to explore joint action such as the FAQs project or self-regulation efforts. But *Plaintiffs ask this Court to read evidence of that benign agreement as evidence of a separate, illegal agreement to collusively adopt and maintain class-action-barring arbitration clauses.* Because the policy undergirding antitrust condemns interference with lawful competitive behavior, *Plaintiffs' theory is a bridge too far.*

---

[11] Plaintiffs argue that under *United Mine Workers v. Pennington*, 381 U.S. 657, 670 n.3 (1965), "the underlying conduct" related to such petitioning can still be used "as evidence demonstrating the purpose and character" of the Issuers' actions. (Br. 77.) Of course, the district court never suggested otherwise. It did not find the evidence of the meetings inadmissible or refuse to consider it. Rather, the court reviewed the evidence with care and concluded that the purpose and character of the Issuers' meetings were legitimate. (SPA79.)

48

(SPA82 (emphases added).)  Having found a "benign" agreement to engage in joint advocacy activity, it rejected any inference of collusion "to adopt and maintain" arbitration provisions in the very next breath.  Such a choice between permissible views of the evidence "cannot be clearly erroneous", *Bessemer City*, 470 U.S. at 574; and to the extent that the court's findings were based on credibility determinations (*see* SPA80-81), they "can virtually never be clear error", *Krieger v. Gold Bond Building Prods.*, 863 F.2d 1091, 1098 (2d Cir. 1988).

The district court also found that the presence of many "outsiders" in attendance at each meeting cut against the theory that the meetings facilitated a secret cartel:

> Though the Arbitration Coalition meetings were not open to the public, attendance was not limited to the Issuing Banks or even the credit card industry.  Aside from WilmerHale and Ballard, various other law firms attended.  Representatives from public relations firms also attended several meetings, as did participants from other industries, like Sears and Toyota. . . .  The inclusion of other industries and outside counsel resembles a trade association, and cuts against any inference that an express agreement to implement and maintain arbitration clauses was articulated at the Arbitration Coalition meetings.

(SPA66-67.)

Plaintiffs challenge these factual findings, however, arguing that because a conspiracy still *could* have occurred, the judgment should be reversed.  According to Plaintiffs, the extensive evidence of advocacy and educational activities "do[es] not negate reasonable inferences of a combination or conspiracy"

49

(Br. 75) and "permissible behavior is no impediment to finding an agreement to conspire" (Br. 78).[12] That argument fundamentally misstates the burden of proof and treats the existence of a conspiracy as an assumption for the Issuers to "negate", rather than a fact Plaintiffs have to prove by a preponderance of the evidence. Following trial, "Plaintiffs cannot secure reversal simply by demonstrating that the evidence could support inferences favorable to their claim. Rather, they must show that the evidence permitted no other inferences." *Freedom Holdings*, 624 F.3d at 54-55. If the standard were as Plaintiffs posit, an unsuccessful plaintiff could nearly always secure reversal because there was some evidence from which a competing inference could have been drawn. But that is not the law.

---

[12] Plaintiffs cherry-pick phrases from the trial record in an effort to manufacture the whiff of collusion. Complete consideration of the trial record shows how Plaintiffs have distorted these quotes. For example, Plaintiffs quote the phrase "working together" multiple times, but never describe the rest of the meeting agenda on which it appeared. (*See* Br. 18, 24, 32, 48, 67, 71, 73.) "Working together to turn the tide" was a heading on an agenda circulated in advance of the July 1999 meeting. (A3338.) Topics falling under the heading included: "Litigation support/amicus briefs/early warning systems/etc."; "Consumer & media education"; "Lobbying politicians"; "Calling on interested regulators"; "Engaging trade associations to help"; "Issuing position papers/legal briefs/talking points"; and "Soliciting public figure defenders". Each of these involved permissible activity. When asked at trial what was meant by "[w]orking together to turn the tide", MacDonald, the agenda's author, testified: "there was a lot of activity in the judicial system and the regulatory system, in Congress and state legislatures. And it was not looking good, and that was the matter of turning the tide . . . ." (A1730, at 1286:2-6.)

Because the district court's finding of no conspiracy was supported by the evidence and not clearly erroneous, the judgment dismissing Plaintiffs' claims against Amex should be affirmed.

## III. ALTERNATIVELY, THE JUDGMENT MAY BE AFFIRMED BECAUSE PLAINTIFFS FAILED TO PROVE ANTITRUST INJURY.

### A. Plaintiffs Were Required To Prove Antitrust Injury at Trial.

"[A] plaintiff seeking injunctive relief under § 16 of the Clayton Act must show a threat of antitrust injury." *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 122 (1986); *see Freedom Holdings*, 624 F.3d at 52 n.14. Plaintiffs argue, without citation, that antitrust injury exists *whenever* there is an "antitrust conspiracy". (Br. 89 ("Plaintiffs have proved an antitrust conspiracy . . . therefore, the antitrust injury requirement is also met").) That argument is contrary to law. "Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." *Assoc. Gen. Contractors, Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 534 (1983). Thus, in *Cargill*, the Supreme Court explained that, because the plaintiff failed to prove antitrust injury at trial, judgment should be entered for defendants, obviating the need to determine whether the defendants had violated the antitrust laws. 479 U.S. at 122; *see also Freedom Holdings*, 624 F.3d at 54-56.[13]

---

[13] Plaintiffs argue that the district court erred by "conflating" antitrust standing and antitrust injury, and that the district court should not have reviewed

51

**B.** **Plaintiffs Failed To Prove Antitrust Injury**

"The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition *reducing* aspect or effect of the defendant's behavior." *Paycom Billing Servs., Inc. v. MasterCard Int'l, Inc.*, 467 F.3d 283, 290 (2d Cir. 2006) (quoting *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990)) (emphasis in original). That injury must "reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation". *Id.* (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). To obtain injunctive relief, Plaintiffs were required to show that they faced "threatened loss or damage of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful". *Cargill*, 479 U.S. at 113 (internal quotation omitted).

Plaintiffs failed to prove antitrust injury at trial because the injuries they sought to prove (i) resulted solely from the arbitration clauses themselves rather than from diminished competition among card issuers, and (ii) would have occurred whether the arbitration clauses were adopted independently or in combination. Thus, this Court may affirm on the alternative ground that the Plaintiffs failed to prove antitrust injury.

---

the former after trial. (Br. 87-89.) That is a red herring: Plaintiffs admit that they had the burden of proving antitrust injury at trial (Br. 89), and their failure to do so warrants affirmance.

*First*, Plaintiffs were not injured by diminished competition because the presence or absence of arbitration clauses was not a basis on which card issuers competed, as Plaintiffs' own expert admitted. Dr. Bar-Gill and other witnesses testified that, during the period of the alleged conspiracy, arbitration clauses were not "salient" to consumers; in other words, they were not meaningful to consumers making choices concerning credit cards. (SPA38.) Because consumers did not care whether the credit cards they use have arbitration clauses, Issuers did not compete with one another regarding such clauses. (*See* SPA38.) In addition to constituting powerful evidence that the Issuers lacked a motive to conspire to adopt the clauses, the lack of competition concerning arbitration shows that such a conspiracy would have had *no* impact on competition among Issuers *even if it had occurred*. For example, no cardmember could challenge as anticompetitive an agreement among the Issuers not to use the digit "3" at the end of their credit card numbers because that is not something consumers consider important or over which issuers compete. Similarly, an agreement to adopt arbitration clauses could not have had an effect on competition. Crediting Plaintiffs' own expert testimony, there is no proof that the Plaintiffs' alleged injuries resulted from a "competition *reducing* aspect or effect" of the Issuers' conduct. *See Paycom Billing Servs.*, 467 F.3d at 290.

*Second*, Plaintiffs' expert acknowledged that the "bulk" of Plaintiffs'

53

alleged harms would also flow from independent adoption of clauses as much as conspiracy. (A2223, at 3249:6-11.) Plaintiffs argued that arbitration clauses (i) reduced consumers' ability to obtain redress from the banks for illegal practices, and (ii) by removing a deterrent to illegal conduct, enabled them to engage in such illegal practices. But Dr. Bar-Gill expressly testified each of these harms would occur without collusion: "[t]he inability to get, to obtain redress for harm done by cardholders . . . *this element of harm will also occur if the issuers adopt the clause independently*. . . . Similarly, the reduction in deterrence, the ex ante dimension of the harm, *would also occur and will harm consumers if the clause were adopted independently*". (A2104, at 2777:7-16 (emphasis added).) In other words, these were effects of each Issuer's *separate* adoption of an arbitration clause, not a collective agreement to adopt. Such effects do not support an antitrust injury. *See Brunswick Corp.*, 429 U.S. at 487 (plaintiff "would have suffered the identical 'loss' but no compensable injury" had the defendants not engaged in the challenged activity); *In re LIBOR-Based Fin. Instruments Antitr. Litig.*, 935 F. Supp. 2d 666, 690 (S.D.N.Y. 2013) ("As with the harm alleged in *Brunswick* and [*Atlantic Richfield*], the harm alleged here could have resulted from normal competitive conduct. Specifically, the injury plaintiffs suffered from defendants' alleged conspiracy . . . is the same as the injury they would have suffered had each defendant decided independently. . . .").

54

Plaintiffs advanced two potential harms flowing specifically from the alleged collusion, but neither was supported (let alone compelled) by the record at trial. Plaintiffs first suggested that "*if* the collusion led to an adoption of the [arbitration clauses] earlier or at least earlier by some issuers" then there was an "extra dimension of harm". (A2104, at 2777:25-2778:4.) However, Plaintiffs introduced no evidence in support of the claim that arbitration clauses were adopted earlier than they would otherwise have been; in fact, the Issuers' clauses were adopted over the course of a leisurely four-and-a-half-year period. (*See* Br. 28-30.) Amex adopted its clause independently and before the beginning of the alleged conspiracy (SPA5-6), so Amex's adoption could not have caused an antitrust injury even if this hypothesis were correct (and even if non-Amex cardmembers could have been injured by Amex's adoption of an arbitration clause).

Plaintiffs also speculated that collusion *could have* prevented arbitration clauses from becoming salient—and therefore a ground for competition among the Issuers—at some undefined point in the future. (SPA39.) That theory is a speculative hypothesis, not a proven fact. The trial record, including Dr. Bar-Gill's admissions, showed that "[a]rbitration clauses continue to be largely non-salient to consumers" (SPA40), even years after the end of the meetings comprising the alleged conspiracy and years after banks issuing roughly half of the

55

credit cards in the United States removed their clauses (SPA45-46). Similarly, Plaintiffs can point to no evidence that issuers without arbitration clauses have taken steps to make clauses salient to consumers—like engaging in advertising to highlight the lack of the clause in their agreements or the presence of the clause in competitor agreements. (A2224, at 3253:24-3254:15.) There is, in fact, no precedent in the record for competition over arbitration—or other methods for resolving legal disputes—in *any* industry.[14] (A2205, at 3178:9-16; A2224, at 3253:24-3254:15; A2374, at 3849:10-3850:4; A2427, at 4059:1-4060:7; A2446, at 4136:18-4137:13, 4137:22-25.) The only thing that Plaintiffs' expert could say for sure about the future salience of arbitration clauses is that "it is difficult to predict what will become salient". (A2094, at 2735:8-10.)

Because Plaintiffs provided no evidence that any of the harms they claimed resulted from an "anticompetitive effect either of the [antitrust] violation or of anticompetitive acts made possible by the violation", they proved no antitrust injury. *Paycom Billing Servs.*, 467 F.3d at 290 (internal quotation omitted). The

---

[14] Plaintiffs contend that the Issuers competed over dispute resolution because they sought to distinguish themselves on the basis of customer service—such as having well-trained customer service representatives answer customers' calls. (Br. 42 n.20.) However, Plaintiffs offered no evidence to support the notion that consumers consider the absence of arbitration clauses to be part of their customer service experience. Not only does that defy common sense, but it also was contradicted by the uniform evidence that arbitration is *not* viewed as important by cardmembers. (*See* Parts II.C.1 and II.C.2.)

Court may affirm the judgment on this basis alone.

## IV. THE JUDGMENT MAY BE AFFIRMED ON THE ALTERNATIVE GROUND THAT PLAINTIFFS FAILED TO SATISFY THE TRADITIONAL REQUIREMENTS FOR EQUITABLE RELIEF AGAINST AMEX.

"According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief." *eBay v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). These factors are "(1) that [they have] suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff[s] and defendant[s], a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction". *Id*. These requirements apply with no less force in antitrust cases. *See* 15 U.S.C. § 26 ("Any person . . . shall be entitled to sue for and have injunctive relief . . . against threatened loss or damage by a violation of the antitrust laws . . . when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity"); *see also Salinger v. Colting*, 607 F.3d 68, 78 (2d Cir. 2010) ("*eBay* strongly indicates that the traditional principles of equity it employed are the presumptive standard for injunctions in any context").

The district court concluded its analysis by finding that the Issuers did not violate the antitrust laws, and the court was therefore not required to address

57

these factors.  Even if this Court were to disagree with the district court's finding that no conspiracy occurred, the judgment can and should be affirmed on the separate grounds that Plaintiffs failed to show (i) that Plaintiffs faced irreparable injury in the absence of an injunction against Amex, (ii) that the balance of hardships between the parties favored the injunction or (iii) that the injunction they sought served the public interest.

The first of these conclusions—that Plaintiffs did not face an irreparable injury—is compelled by the same facts that show that Plaintiffs did not prove a redressable, certainly impending injury.  As non-Amex cardholders, Plaintiffs did not face irreparable injury resulting from Amex's arbitration provision.  (Part I.B.)  This fact is doubly true now, years after the end of the alleged conspiracy, because Plaintiffs have ample choice of credit cards without arbitration clauses.  (Part I.C.)

However, Plaintiffs also have failed to satisfy two other factors necessary for injunctive relief.  *First*, the balance of hardships between Plaintiffs and Amex tips against an injunction.  *See eBay*, 547 U.S. at 391.  As discussed above, the threat of injury to Plaintiffs resulting from Amex's clause is speculative and unproven, and an injunction offers no benefits to Plaintiffs, who are neither current nor prospective Amex cardmembers.  At the same time, an injunction would deprive Amex and its cardmembers—who were not represented before the

district court—from using an efficient form of dispute resolution that Amex cardmembers invoke *against* Amex every year. (A2252, at 3364:7-12.)

  *Second*, an injunction would disserve the public interest. *eBay*, 547 U.S. at 391. Plaintiffs sought an injunction prohibiting the enforcement of Amex's arbitration clause against the background of federal policy strongly favoring arbitration. That policy is embodied in the Federal Arbitration Act, which declares that such clauses "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract". 9 U.S.C. § 2. Supreme Court cases have "place[d] it beyond dispute that the FAA was designed to promote arbitration", and the FAA "reflect[s] a liberal federal policy favoring arbitration". *AT&T Mobility LLC v. Concepcion*, 131 S.Ct. 1740, 1749 (2011). This liberal policy applies even in the context of the "class-barring arbitration" clauses now attacked by Plaintiffs. *See id.* at 1746, 1750. Founding an injunction on the speculative, indirect and non-imminent harms that Plaintiffs claim result from arbitration clauses would turn this federal policy on its head at the expense of Amex and its cardmembers.

## CONCLUSION

The district court's judgment in favor of Amex should be affirmed.

Dated: November 21, 2014

CRAVATH, SWAINE & MOORE LLP

by

_____
s/ Evan R. Chesler
Evan R. Chesler
Rowan D. Wilson
Gary A. Bornstein

825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for Defendants-Appellees*
*American Express Company,*
*American Express Travel Related*
*Services Company, Inc. and American*
*Express Centurion Bank*

## COMPLIANCE STATEMENT

I, Evan R. Chesler, hereby certify that:

1.    This brief complies with the type-volume limitation of Fed. R. App. Pro. 32(a)(7)(B) because this brief contains 13,936 words, excluding the parts of the brief exempted by Fed. R. App. Pro. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. Pro. 32(a)(5) and the type style requirements of Fed. R. App. Pro. 32(a)(6) because this brief has been prepared using Microsoft Word 2007 in 14-point Times New Roman font.

Dated:  November 21, 2014

            s/ Evan R. Chesler
_____
               Evan R. Chesler

**CERTIFICATE OF SERVICE**

I hereby certify that on November 21, 2014, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated:  November 21, 2014

_s/ Evan R. Chesler_
Evan R. Chesler
